No. 23-55524

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

VITALY SMAGIN,

*Petitioner-Appellee,*

v.

ASHOT YEGIAZARYAN,

*Respondent-Appellant.*

On Appeal from the United States District Court
for the Central District of California
No. 2:14-cv-09764-RGK-PLA
Hon. R. Gary Klausner

**APPELLEE'S RESPONSE TO APPELLANT'S EMERGENCY
MOTION TO STAY**

Nicholas O. Kennedy
Baker & McKenzie LLP
1900 N. Pearl Street, Suite 1500
Dallas, Texas  75201
Telephone: 214.978.3000
nicholas.kennedy@bakermckenzie.com

Alexander D. Burch
Baker & McKenzie LLP
800 Capitol Street, Suite 2100
Houston, Texas  77002
Telephone: 713.427.5000
alexander.burch@bakermckenzie.com

Barry J. Thompson
Baker & McKenzie LLP
10250 Constellation Blvd., Ste. 1850
Los Angeles, California  90067
Telephone: 310.201.4728
barry.thompson@bakermckenzie.com

**Attorneys for Appellee Vitaly Smagin**

TABLE OF CONTENTS

**Page**

Table of Contents ...................................................................ii

Table of Authorities ............................................................iv

Introduction ......................................................................... 1

Relevant Background ............................................................ 4

    I.    The 2016 Injunction (Dkt. 90 [Ex. B].) ..................................5

    II.   The April 1 Clarifying Order (Dkt. 245 [Ex. C].) ...................6

    III.  The July 9, 2020 Clarifying Order (Dkt. 296 [Ex. D].) ...........6

    IV.  The September 1, 2020 Contempt Order (Dkt. 315 [Ex. E].) . 8

    V.   Yegiazaryan Is Again Held In Contempt In The May 22, 2023 Order (Dkt. 411 [Ex. A].) ...............................................9

Argument ........................................................................... 11

    I.    Yegiazaryan's Appeal Will Not Convince This Court He May Disregard The District Court's Orders With Impunity........ 12

        A.   Yegiazaryan remains in contempt of the 2016 and 2020 injunctions. ................................................................ 12

        B.   Yegiazaryan has not established comity concerns or that the district court has directed him to do any act in violation of some other jurisdiction's law. ...................14

        C.   The impossibility defense and the foreign-sovereign compulsion doctrine do not support a stay. .................17

    II.   Yegiazaryan Is Not Irreparably Harmed; Smagin Continues To Be Harmed; And The Public Has An Interest In Compliance With Court Orders............................................ 19

Conclusion.................................................................................................20

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Athena Cosmetics Inc. v. AMN Distrib.*,
   No. 22-55159, 2023 WL 370982 (9th Cir. Jan. 24, 2023) ................... 11

*FTC v. Affordable Media, LLC*,
   179 F.3d 1228 (9th Cir. 1999).................................................................. 17

*FTC v. EDebitPay, LLC*,
   695 F.3d 938 (9th Cir. 2012)........................................................... 12, 13

*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014)........................................................... 15, 17

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................ 11

*Smagin v. Yegiazaryan*,
   37 F.4th 562 (9th Cir. 2022), *pet. granted*, 2023 U.S.
   LEXIS 405 (U.S. Jan. 13, 2023) ............................................................. 4

*U.S. v. Rylander*,
   460 U.S. 752 (1983) ................................................................................ 17

*Yegiazaryan v. Smagin*,
   Nos. 16-55502, 16-56749, 17-56467, 2018 WL 2275269
   (9th Cir. May 18, 2018)................................................................. *passim*

## Other Authorities

Fed. R. App. P. 27(d)................................................................................ 22

Fed. R. App. P. 32-1................................................................................. 22

Liechtenstein Ordinance Art. 29d (March 10, 2022) ...................... *passim*

iv

## INTRODUCTION

Appellant Ashot Yegiazaryan has defied the district court's orders for more than six years. He has been in contempt of those orders for more than two years. There is no basis for an emergency stay of the May 22, 2023 order or the order setting a hearing to consider how to end Yegiazaryan's years of defiance.

The district court entered a $92 million judgment against Yegiazaryan in 2016. Shortly thereafter, the district court enjoined Yegiazaryan from asserting control over a Monaco bank account where he had hid more than $200 million through a trust called the Alpha Trust and its subsidiary Savannah Advisors. (Dkt. 411 at 1 [Ex. A]; *see also* Dkt. 90 [Ex. B].) That post-judgment injunction was affirmed in 2018. *Yegiazaryan v. Smagin*, Nos. 16-55502, 16-56749, 17-56467, 2018 WL 2275269, at *4-*7 (9th Cir. May 18, 2018).

Yegiazaryan refused to comply. In April 2020, the district court clarified that certain foreign acts by Yegiazaryan's agents targeting the Monaco bank account violated the injunction. (Dkt. 245 at 6-8.) It ordered that any person acting on behalf of Yegiazaryan—including "the trustees of the Alpha Trust"—"must immediately cease all actions … that

1

would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust." (Dkt. 245 at 8.) Yegiazaryan did not appeal.

Yegiazaryan still refused to comply. The district court thus clarified its injunction again on July 9, 2020. (Dkt. 296 [Ex. C].) This time, the court held that acts of Yegiazaryan's false trustees violated the injunction. (Dkt. 296 at 7.) It again ordered Yegiazaryan and those acting on his behalf, including the false trustees, not to take any actions to delay Smagin's collection efforts. (*Id.*) It also ordered that Yegiazaryan not act regarding the Alpha Trust or the Monaco bank account without district court approval. (*Id.*) Yegiazaryan again did not appeal.

Yegiazaryan still refused to comply. As a result, the district court held Yegiazaryan in contempt in September 2020, imposing sanctions of $2,000 for each day of non-compliance. (Dkt. 315 at 6.) Yegiazaryan again did not appeal. Sanctions from the September 2020 Order now total more than $1.5 million. They remain unpaid.

Yegiazaryan still refuses to comply. Instead, he has escalated his attacks. The district court thus again held Yegiazaryan in contempt on May 22, 2023. (Dkt. 411.) This May 22 Order merely directs Yegiazaryan

to do what he was ordered to do many times over the last several years. In other words, that Order told Yegiazaryan exactly how he must purge his contempt of the prior court orders (none of which are on appeal here).

After the May 22 Order's deadline for compliance passed, the district court set a show-cause hearing for June 26 to permit Yegiazaryan to explain his refusal to comply. (Dkt. 421.) Because Yegiazaryan has no explanation, he seeks an emergency stay from this Court to avoid answering to the district court for his long pattern of defiance.

The stay should be denied. First, the May 22 Order does not require the violation of a Liechtenstein ordinance as argued by Yegiazaryan. (*See* Mot. at 9-13.) It simply directs Yegiazaryan to confirm what the Liechtenstein courts have already stated—that his false trustees have no power. It similarly does not require Yegiazaryan to make a distribution to Smagin—only to cease taking or directing actions that preclude the legitimate trustees of the Alpha Trust from accessing trust funds. Yegiazaryan cannot rely on a mistaken interpretation of Liechtenstein law to avoid complying with the orders of the district court where he resides.

Second, the May 22 Order does not "superintend the conduct of

foreign litigation." (Mot. at 1.) Rather, the May 22 Order *supports* foreign litigation by ordering Yegiazaryan to stop the actions of the false trustees who interfere with that litigation. Ceasing that interference will give effect to the clear rulings of the Liechtenstein courts that only Smagin's appointed trustees—not Yegiazaryan's false trustees—may act on behalf of the Alpha Trust. This Court ruled in 2018 that a turnover order it reversed was premature because the Liechtenstein courts had not yet ruled on control of the Alpha Trust. *Yegiazaryan I*, 2018 WL 2275269, at 7-*11. Those Liechtenstein courts have now ruled in Smagin's favor. The May 22 Order enables those Liechtenstein rulings.

Yegiazaryan is a resident of the United States. He must comply with U.S. law, including orders of the district court. Yet Yegiazaryan refuses to obey the district court's clear and direct orders. The requested stay should be denied an the June 26 show-cause hearing permitted to go forward to consider further appropriate remedies.

## RELEVANT BACKGROUND

In 2016, the district court entered a judgment in favor of Smagin and against Yegiazaryan for more than $92 million. (Dkt. 411 at 1

4

[Ex. A].)[1]  Later in 2016, the district court found that Yegiazaryan had transferred assets that could satisfy the judgment into a Liechtenstein trust known as the Alpha Trust.  (*Id.*)  The Alpha Trust's subsidiary, Savannah Advisors, held the money in a Monaco bank account. (Dkt. 245 at 1.)[2]

Four separate district court orders support the May 22 Order.

## I.     The 2016 Injunction (Dkt. 90 [Ex. B])

On November 14, 2016, the district court enjoined Yegiazaryan and his associates from transferring, assigning, or otherwise disposing of the Alpha Trust funds.  (Dkt. 90 at 7-8.)  It found that "Yegiazaryan's record of concealing the true beneficial owner of assets through these types of nominee structures makes it likely that, given the opportunity, he will continue to hide the [Kerimov funds] in a way to avoid payment directly to himself in California where the proceeds would be subject to execution on the judgment."  (*Id.*)

Yegiazaryan appealed the 2016 injunction.  This Court affirmed:

---

[1] The long history between the parties in this appeal is detailed in several prior appeals.  *See Yegiazaryan v. Smagin*, 2018 WL 2275269, at *4-*7 (9th Cir. May 2018); *see also Smagin v. Yegiazaryan*, 37 F.4th 562, 564-66 (9th Cir. 2022), *pet. granted*, 2023 U.S. LEXIS 405 (U.S. Jan. 13, 2023).
[2] These funds are often known as the "Kerimov Funds" because they were paid to Yegiazaryan to settle an unrelated dispute with Mr. Kerimov.

> Here the district court identified a clear, case-specific risk that Yegiazaryan might evade the court's jurisdiction or contravene its judgment by funneling the Kerimov funds through a reshuffled deck of shell companies and bank accounts across the Caribbean, Cyprus, Monaco, Liechtenstein, or whatever other amicable havens he finds.

*Yegiazaryan I*, 2018 WL 2275269, at *6-*7. This already-affirmed injunction is the basis of the contempt finding now on appeal.

## II. The April 1 Clarifying Order (Dkt. 245 [Ex. C])

Rather than comply with the 2016 injunction, Yegiazaryan launched a scheme using surrogates to do things abroad he knew he could not do himself. On April 1, 2020, the district court clarified that the 2016 injunction prevented Yegiazaryan and those acting on his behalf from taking actions "that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust." (Dkt. 245 at 8.) Notably, the district court determined that Yegiazaryan and Vitaly Gogokhia had engaged in an illegitimate effort to avoid the 2016 injunction by attempting to enter into a fraudulent consent judgment in Nevis to be enforced in Monaco against the Alpha Trust funds. (*Id.* at 7.) Mr. Yegiazaryan did not appeal the April 2020 clarifying order.

## III. The July 9, 2020 Clarifying Order (Dkt. 296 [Ex. D])

Yegiazaryan continued to violate the 2016 injunction through

actions of others abroad. On July 9, 2020, the district court entered yet another clarifying order. (Dkt. 296.) This Order was based on the fraudulent actions of Yegiazaryan's falsely appointed trustees—the same false trustees at issue in the May 22 Order. The district court specifically prohibited Yegiazaryan and his associates from modifying the Alpha Trust or taking any action with respect to Savannah Advisors or its bank account without court approval. (Dkt. 296 at 8.) The district court also showed deference to, and support of, the Lichtenstein court order regarding the Alpha Trust, quoting the Liechtenstein court as follows:

> The manoeuvres with the additional fictitious trustees probably do not really serve the purpose of argumentation … **but are intended to create confusion abroad, especially in the proceedings in Nevis.** They impressively show that [Yegiazaryan] shows neither inhibition nor scruples in order to cheat his creditor out of his money.
> …
> In truth, the announced appeal [by Yegiazaryan] has no chance of success. **Its sole purpose is to give [Yegiazaryan] additional time to withdraw assets via the (fraud) proceedings in the Caribbean**.

(*Id.* at 6 (quoting Liechtenstein court, emphasis added).)

As he does here, Yegiazaryan sought to excuse his non-compliance by arguing that the 2018 Circuit opinion in this case—that, in part, deferred to the then-pending proceedings in Liechtenstein—meant the

district court was powerless to regulate Yegiazaryan's conduct. (*Id.*) The district court correctly rejected that argument: "[t]he fact that the Ninth Circuit expressed a desire to defer to the Liechtenstein courts on certain issues of law does not mean that [Mr. Yegiazaryan] can violate this Court's injunction with regard to the Alpha Trust as long as he does it in Liechtenstein." (*Id.* at 7.) Yegiazaryan did not appeal this Order.

## IV. The September 1, 2020 Contempt Order (Dkt. 315 [Ex. E])

In September 2020, the district court found Yegiazaryan in contempt of the court's prior injunctions. (Dkt. 315.) The district court noted that the Liechtenstein courts had awarded Smagin the powers to appoint and remove trustees of the Alpha Trust on March 2, 2020. (*Id.* at 2.) The district court also found that just a few weeks later, in defiance of the Liechtenstein ruling, Yegiazaryan purported to appoint different trustees for the Alpha Trust, namely Dozortseva and Jouniaux. (*Id.*) The district court recognized that Dozortseva had taken numerous steps with respect to the Alpha Trust in her false role—primarily through filings in Monaco—without approval of the district court and in violation of the April 1 and July 9, 2020 clarifying orders. (*Id.* at 4-5.) The district court also rejected Yegiazaryan's comity and impossibility defenses:

8

> The Court need not make a legal finding regarding the legitimacy of Dozortseva's appointment in order to require that Defendant either compel his trustee to comply with the Court's July 9 Order, or else remove her if she refuses to do so. Defendant cannot claim compliance is impossible where the ability to remedy the issue is plainly within his power. Put another way, Defendant has failed to show that he has taken all reasonable steps in order to comply.

(*Id.* at 6.) Yegiazaryan was ordered to provide proof to the court within seven days that Dozortseva had withdrawn all her efforts directed at the Alpha Trust or that Yegiazaryan had removed her as a trustee. (*Id.* at 8.) The district court warned that failure to do so would result in daily sanctions of $2,000. (*Id.*) Yegiazaryan did not comply. The accrued and unpaid sanctions exceed $1.5 million. Yegiazaryan did not appeal.

## V.  Yegiazaryan Is Again Held In Contempt In The May 22, 2023 Order (Dkt. 411 [Ex. A].)

Smagin has won definitively in Liechtenstein, at every level. So Yegiazaryan and his associates have taken increasingly brazen steps to stop the Monaco proceedings through fraudulent attacks on the Alpha Trust and the bank account of Savannah Advisors. (Dkt. 411.) Yegiazaryan also has refused to rein in the behavior of his false trustees in Monaco—or dismiss them—as he was ordered. All of this violates the clear injunctions. Sanctions of $2,000 per day did not compel compliance.

Smagin sought increased sanctions to compel compliance. (*Id.*; *see also* Dkt. 400.) The district court granted Smagin's motion on May 22, 2023, and directed Yegiazaryan to take four specific remedial measures within seven days or pay daily fines of $4,000:

> (1)    remove Dozortseva, Jouniaux, and Thielen from their roles in the Alpha Trust and Savannah Advisors,
>
> (2)    withdraw from all efforts for relief with respect to the Alpha Trust and its related entities,
>
> (3)    withdraw his opposition to Smagin's attempt to set aside the Gogokhia Consent Judgment, and
>
> (4)    withdraw his request to the Russian court to divide the Alpha Trust and reverse any alterations of the trust that took place without the Court's approval.

(Dkt. 411 at 9.) The district court declined to incarcerate Yegiazaryan, in that Order but left that option open "if [Yegiazaryan] is not persuaded to comply with its orders based on financial sanctions alone." (*Id.*) Yegiazaryan has chosen not to comply with any of the May 22 Order's remedial directives.

On June 13, the district court set a June 26 show-cause hearing. (Dkt. 421.) The June 13 Order recognized that Yegiazaryan remains in contempt. It ordered Yegiazaryan to appear where he "will have the opportunity to explain his actions, and the Court will determine whether

10

additional sanctions—including incarceration—are likely to persuade Yegiazaryan to comply with its orders." (*Id.* at 1-2.) No additional sanctions have been imposed.

In seeking a stay from this Court, Yegiazaryan seeks to stop the June 26 hearing. He recognizes he remains in contempt of the district court's prior orders. (Mot. at 20.) But he does not identify any sanctions actually imposed, other than a $4,000 daily fine he has not paid. He nevertheless requests this Court to enjoin the district court from holding a hearing seeking an explanation from Yegiazaryan or from conducting any further contempt proceedings against him during this appeal. (*Id.*) The Court should deny Yegiazaryan's motion and refuse the stay.

## ARGUMENT

Factors for issuance of a stay pending appeal are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injury the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). Each supports denial.

I.  **Yegiazaryan's Appeal Will Not Convince This Court He May Disregard The District Court's Orders With Impunity.**

Contempt orders and the sanctions they impose are subject to an abuse of discretion standard; the factual findings within them are reviewed only for clear error. *Athena Cosmetics Inc. v. AMN Distrib.*, No. 22-55159, 2023 WL 370982, at *1 (9th Cir. Jan. 24, 2023). Yegiazaryan does not demonstrate that the district court abused its discretion in the May 22 Order or in the order to appear on June 26. Yegiazaryan also fails to demonstrate clear error regarding any factual finding.

### A.  Yegiazaryan remains in contempt of the 2016 and 2020 injunctions.

"District courts have broad equitable power to order appropriate relief in civil contempt proceedings." *FTC v. EDebitPay, LLC*, 695 F.3d 938, 945 (9th Cir. 2012). This is what the district court has done, on at least four different occasions. Yegiazaryan has violated these clear and definite orders, Yegiazaryan cannot explain why he should be allowed to remain in contempt of those orders. He should not be so allowed.

The directives in the May 22 Order were necessary because Yegiazaryan repeatedly violated prior court orders that are final and non-

appealable. For example, Yegiazaryan's appointments of Dozortseva, Jouniaux, and Thielen and their subsequent acts directed at the Alpha Trust violated the prohibitions against taking any action regarding the Alpha Trust without first obtaining the district court's approval. (*See* Dkt. 245 at 8; *see also* Dkt. 296 at 7.) Yegiazaryan's related efforts seeking to alter the Alpha Trust in various jurisdictions, including Russia and Monaco, without the district court's prior approval likewise violated the district court's orders. (*Id.*) Similarly, the directive regarding Yegiazaryan's acts in Nevis regarding the fraudulent Gogokhia UK consent judgment is the result of Yegiazaryan's direct contempt of the April 1, 2020 clarification order. (Dkt. 245 at 8 (providing that Yegiazaryan and Gogokhia "must cease all actions in Nevis").)

Accordingly, each of the district court's directives in the May 22 Order are remedial measures aimed at curing Yegiazaryan's clear contempt of the district court's prior four final and non-appealable court orders. (Dkt. 411 at 5.) This was within the district court's broad discretion. *See EDebitPay,* 695 F.3d at 945. Yegiazaryan cannot seek to undo those orders now in this appeal.

**B.    Yegiazaryan has not established comity concerns or that the district court has directed him to do any act in violation of some other jurisdiction's law.**

Yegiazaryan's main argument for a stay, adjudicatory comity, misses the mark.  (Mot. at 9.)  Yegiazaryan argues, in essence, that he should be excused from compliance because some actions may have some effect on a foreign court and because Liechtenstein has enacted Russia-related sanctions.  (Mot. at 10.)  Both arguments are mistaken.

First, the Liechtenstein Ordinance on which Mr. Yegiazaryan relies is inapposite.  To begin, it was enacted in March 2022—several years after Yegiazaryan's long history of non-compliance began.  Yegiazaryan cannot excuse his misconduct by reference to the Russian war in Ukraine and its cascading consequences unrelated to this case.  He should have complied long ago, long before the ordinance went into effect.

Moreover, the district court's directives do not violate that ordinance in any event.  The ordinance prohibits "the establishment of a trust" by Russian citizens, and also prohibits such citizens from acting as "a trustee, nominal shareholder, manager, secretary or similar capacity for a trust."  (L.O. Art. 29d [Ex. E] (March 10, 2022).)  But neither Smagin

14

nor Yegiazaryan is a trustee of the Alpha Trust.[3]  Moreover, the district court's orders do not require Yegiazaryan to distribute any money to Smagin.  Nor do they require Yegiazaryan to appoint anyone to the trust, or exercise any control over it whatsoever.  Yegiazaryan has simply been ordered to confirm that the false trustees he fraudulently appointed long ago have no power to control the trust by perfecting their removal from those fictitious roles.  In other words, he must simply get out of the way so the legitimate trustees may control the trust in accordance with the rulings of the Liechtenstein courts.  It is for the legitimate trustees of the Alpha Trust, not Yegiazaryan, to decide how any potential future actions may fit with the Liechtenstein sanctions regime.  Nothing in the May 22 Order requires Yegiazaryan to violate the Liechtenstein ordinance.

Finally, even if the district court's directives somehow implicated the Liechtenstein ordinance (they do not), this Court should still reject Yegiazaryan's adjudicatory comity arguments.  Adjudicatory comity "involves … the discretion of a national court to decline to exercise jurisdiction over a case before it when ***that case*** is pending in a foreign

---

[3] Yegiazaryan was stripped of his control over the Alpha Trust by the Liechtenstein courts in 2020, well before the ordinance he relies on was enacted.  (Dkt. 261-5 at 1-4.)

court with proper jurisdiction." *Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014) (emphasis added). Yegiazaryan does not point to another "case" in Liechtenstein or elsewhere that is already addressing Yegiazaryan's non-compliance with the district court's 2016 and 2020 injunction orders or the effect of Liechtenstein's sanctions regime on Yegiazaryan's non-compliance. Finally, the Liechtenstein proceeding that this Court deferred to in 2018, *see Yegiazaryan I*, 2018 WL 2275269, at *10-*11, has concluded and resulted in a judgment in 2020 confirming that Yegiazaryan had lost all of his rights in the relation to the Alpha Trust. (Ex. F at 1-4.) The injunctions at issue respect and enforce that decision—the very same decision this Court previously told the parties they must wait on and defer to in further acts.

Yegiazaryan and his associates undermined this long-awaited decision by continuing their attacks against the Alpha Trust in Monaco using the sham trustees. These acts of defiance forced Smagin to pursue yet another action in Liechtenstein to clarify the 2020 Liechtenstein decision in order to address the litigation spurred on by Yegiazaryan's sham trustees in Monaco. (Ex. G at 5, 12.) In April 2023, the Liechtenstein Court issued an order confirming again that Yegiazaryan's

continued actions against the Alpha Trust since 2020 have no legal effect in Liechtenstein or anywhere else, including in Monaco. (*Id.* at 5 (confirming that Yegiazaryan's appointments in 2020 of Dozortseva and Jouniaux as trustees of the Alpha Trust were "void and ineffective").) The May 22 Order's directives seek to compel Yegiazaryan, who lives in the U.S. beyond the reach of the Liechtenstein courts, simultaneously to cure his contempt and respect the Liechtenstein court rulings regarding the Alpha Trust. Adjudicatory comity is not at issue with the May 22 Order.[4]

### C. The impossibility defense and the foreign-sovereign compulsion doctrine do not support s stay.

Yegiazaryan's impossibility and foreign-sovereign compulsion doctrine defenses are similarly mistaken. (Mot. at 12.) A party asserting impossibility of compliance bears the burden to establish impossibility. *U.S. v. Rylander*, 460 U.S. 752, 757 (1983). Moreover, a party cannot rely on impossibility when the alleged condition was created by the contemnor. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1241-42 (9th

---

[4] Even if the Court considered the international comity factors cited by Yegiazaryan, the most important factor is the location of the conduct in question because the United States has a strong interest in regulating conduct within its borders and ensuring U.S. residents like Yegiazaryan comply with the orders of its courts. *Mujica*, 771 F.3d at 604-05. As the district court correctly observed, "Yegiazaryan may not simultaneously disregard the Liechtenstein court's orders and rely on that court's authority to excuse him from obeying this court." (Dkt. 411 at 6.)

Cir. 1999). Yegiazaryan has not met his burden regarding impossibility.

First, again, nothing in the May 22 Order conflicts with the Liechtenstein ordinance. Even if it did, Yegiazaryan's so-called impossibility is a result of his prior refusal to comply when sanctions were not in place. Yegiazaryan's false appointments have no legal effect in Liechtenstein. (*See, e.g.*, Ex. G at 5.) There is no impediment to Yegiazaryan now removing those false appointments as directed by the district court to end to Yegiazaryan's illegal attacks on the Alpha Trust.

Yegiazaryan's argument that he cannot comply with the district court's May 22 directives because doing so would effect a distribution for Smagin's benefit in violation of the Liechtenstein ordinance is similarly mistaken. (Mot. at 1, 4.) Nothing in the May 22 Order compels the distribution of any funds from the Alpha Trust. They simply order Yegiazaryan to undo his prior fraudulent conduct directed at the trust and the bank account. Moreover, whatever hypothetical downstream indirect effect Yegiazaryan's reversals of his prior contemptuous conduct may have, those indirect effects are no excuse for Yegiazaryan to continue to openly defy a U.S. district court. Until Yegiazaryan demonstrates compliance with these orders, increasing sanctions are needed.

## II. Yegiazaryan Is Not Irreparably Harmed; Smagin Continues To Be Harmed; And The Public Has An Interest In Compliance With Court Orders.

Yegiazaryan has not demonstrated irreparable harm. Yegiazaryan has long chosen not to comply with the 2016 and 2020 orders of the district court. He has not paid the prior sanctions, and is not paying the additional $4,000 daily sanctions that are accruing. In the unlikely event this Court were to reverse the May 22 Order after a full appeal, the Court could similarly reverse the additional sanctions award. Yegiazaryan would be no worse off than he is today. There is no harm in allowing sanctions to accrue during the appeal when they are not being paid.

Moreover, Yegiazaryan has not been ordered to be incarcerated; a hearing has been set to determine what options (among many) may be appropriate to compel compliance. (Dkt. 421.) There is no basis to disrupt that hearing or divest the district court of the ability to enforce its orders. Yegiazaryan has also not established that he is at risk of criminal prosecution in Liechtenstein if he were to perform the remedial directives in the May 22 Order. The acts would not violate Liechtenstein law, and Yegiazaryan lives in California, not Liechtenstein.

In contrast, Smagin will continue to be harmed by Yegiazaryan's

requested stay. Yegiazaryan's stay request seeks to continue the confusions related to the Alpha Trust that Yegiazaryan created in defiance of the district court's orders and in disregard of the Liechtenstein court orders. This pattern of misdirection and obfuscation has prevented Smagin from collecting on his judgment for more than seven years. A stay would cause further harm to Smagin by allowing Yegiazaryan to continue (and escalate) his schemes with impunity.[5]

Finally, the public has a compelling interest in ensuring that U.S. residents comply with U.S. law, including U.S. court orders. Yegiazaryan has openly disregarded and defied the district court's orders since 2016. The prior monetary sanctions have not worked. Continuing to escalate the sanctions is therefore necessary to serve the public interest.

## CONCLUSION

This Court should deny the motion for emergency stay.

---

[5] Yegiazaryan is mistaken when he argues there is no urgency due to the passage of time. Smagin has been prevented from bringing a contempt motion (or doing anything else in the case) for years due to the fraudulent bankruptcy Yegiazaryan procured in Russia and the companion Chapter 15 case that divested Smagin of the ability to make any filings in this case without leave of the bankruptcy court. (*See* Order Granting Relief in Aid of Foreign Proceeding at 4 [Doc 84], *In re Smagin*, No. 2:21-bk-15342-BB (C.D. Bankr.) (filed and entered Aug. 13, 2021.) Smagin only recently obtained such leave after fighting in both Russia and the U.S. to regain authority to do so—over the objection of the Chapter 15 Foreign Representative. (*See* Dkt. 400-1 at 1 n. 1.)

20

Date: June 20, 2023   Respectfully submitted

        Baker & McKenzie LLP


        */s/ Alexander D. Burch*
        Nicholas O. Kennedy
        Baker & McKenzie LLP
        1900 N. Pearl Street, Ste. 1500
        Dallas, Texas 75201
        Telephone: 214.978.3000
        nicholas.kennedy@bakermckenzie.com


        Alexander D. Burch
        Baker & McKenzie LLP
        800 Capitol Street, Suite 2100
        Houston, Texas 77002
        Telephone: 713.427.5000
        alexander.burch@bakermckenzie.com


        Barry J. Thompson
        Baker & McKenzie LLP
        10250 Constellation Blvd., Ste. 1850
        Los Angeles, California 90067
        Telephone: 310.201.4728
        barry.thompson@bakermckenzie.com

        *Attorneys for*
        *Appellee Vitaly Ivanovich Smagin*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 20, 2023, that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted

*/s/   Alexander D. Burch*
Nicholas O. Kennedy
Baker & McKenzie LLP
1900 N. Pearl Street, Ste. 1500
Dallas, Texas 75201
Telephone: 214.978.3000
nicholas.kennedy@bakermckenzie.com

Alexander D. Burch
Baker & McKenzie LLP
800 Capitol Street, Suite 2100
Houston, Texas  77002
Telephone: 713.427.5000
alexander.burch@bakermckenzie.com

Barry J. Thompson
Baker & McKenzie LLP
10250 Constellation Blvd., Ste. 1850
Los Angeles, California 90067
Telephone: 310.201.4728
barry.thompson@bakermckenzie.com

*Attorneys for*
*Appellee Vitaly Ivanovich Smagin*

# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | May 22, 2023 |
|---|---|---|---|---|
| Title | *Vitaly Smagin v. Ashot Yegiazaryan* | | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Joseph Remigio (not present) | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | | Attorneys Present for Defendant: |
| Not Present | | Not Present |

**Proceedings:** **(IN CHAMBERS) Order Re: Defendant's Motion for Contempt and Additional Contempt Sanctions [DE 400]**

### I. INTRODUCTION

On December 22, 2014, Vitaly Smagin ("Smagin") filed a petition to confirm a foreign arbitration award against Ashot Yegiazaryan ("Yegiazaryan"). (ECF No. 1.) On March 31, 2016, the Court entered judgment in Smagin's favor, finding that Yegiazaryan was liable to Smagin for $92,503,652. (ECF No. 59.) Later in 2016, the Court determined that Yegiazaryan held assets that would satisfy the judgment in a trust in Liechtenstein (the "Alpha Trust"). On November 14, 2016, the Court enjoined Yegiazaryan and his associates from disposing of the Alpha Trust funds (the "2016 Injunction"). (ECF No. 90.)

Yegiazaryan did not heed the 2016 Injunction. On September 16, 2020, the Court held Yegiazaryan in contempt. (ECF No. 315.) The Court imposed sanctions of $2,000 for each day Yegiazaryan refused to comply with its orders.

Presently before the Court is Smagin's Motion for Contempt and Additional Contempt Sanctions. (ECF No. 400.) Smagin alleges that Yegiazaryan and his associates continue to disobey the Court's orders. For the following reasons, the Court **GRANTS** the Motion.

### II. FACTUAL BACKGROUND

The facts of these years-long proceedings have been discussed extensively in the Court's previous orders. The following facts are relevant to the current Motion:

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | May 22, 2023 |
|---|---|---|---|---|
| Title | *Vitaly Smagin v. Ashot Yegiazaryan* | | | |

## A. Previous Orders

Since being enjoined from disposing of the Alpha Trust's assets, Yegiazaryan and his associates have taken extraordinary actions to avoid paying the judgment owed to Smagin. The Alpha Trust is associated with two additional entities: Savannah Advisors and a Monaco bank account (the "Monaco Account"). (Order Re: Pl.'s Mot. to Clarify Post J. Inj. at 2, ECF No. 245.) The Alpha Trust owns Savannah Advisors, a business entity based in the Caribbean, which holds funds in the Monaco Account. (*Id.*)

### 1. The April 2020 and July 2020 Orders

On April 1, 2020, the Court issued an Order (the "April 2020 Order") clarifying the terms of the 2016 Injunction. (ECF No. 245.) In the April 2020 Order, the Court described a lawsuit brought by Yegiazaryan's former business partner, Vitaly Gogokhia, in which Yegiazaryan consented to a judgment against himself of approximately $180 million. (*Id.* at 6–7.) The Court determined that the consent judgment was an illegitimate effort between Gogokhia and Yegiazaryan to avoid the 2016 Injunction. (*Id.* at 7.) The Court ordered Yegiazaryan and his associates to "immediately cease" pursuit of the fraudulent Gogokhia consent judgment and any other legal actions in "any other jurisdiction that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust." (*Id.* at 8.)

Yegiazaryan continued to violate the 2016 Injunction. On July 9, 2020, the Court further constrained Yegiazaryan's activity with the Alpha Trust by issuing an Order (the "July 2020 Order") prohibiting Yegiazaryan and his associates from modifying the Alpha Trust or taking any actions with respect to Savannah Advisors or the Monaco Account without Court approval. (Order Re: Mot. for Civil Contempt [DE 261] at 7, ECF No. 296.)

### 2. The 2020 Contempt Order

The Court's September 16, 2020 Contempt Order (the "2020 Contempt Order") was precipitated by the actions of Natalia Dozortseva—an Alpha Trust trustee appointed by Yegiazaryan. (Order Re: Mot. for Civil Contempt [DE 300] at 2, ECF No. 315.) On July 29, 2020, Dozortseva filed an ex parte application in a Caribbean court to have herself appointed as director of Savannah Advisors and to restrain Savannah Advisors' authority over its assets and administration without her consent. (*Id.* at 4.) The Court determined that Yegiazaryan had the authority to control Dozortseva and that her actions violated its previous orders. (*Id.* at 4–6.) The Court ordered Dozortseva to withdraw any filings seeking relief related to the Alpha Trust and Savannah Advisors, and ordered Yegiazaryan to remove Dozortseva as trustee if she did not comply. (*Id.* at 6.)

Yegiazaryan did not comply with the 2020 Contempt Order. On September 23, 2020, Yegiazaryan filed a Statement of Partial Compliance. (ECF No. 320.) In the Statement, Yegiazaryan

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | May 22, 2023 |
|---|---|---|---|---|
| Title | *Vitaly Smagin v. Ashot Yegiazaryan* | | | |

said he had sent a cease-and-desist letter to Dozortseva demanding she comply with the Court's Order. (Stmnt. of Partial Compliance with Sept. 16, 2020 Contempt Order at 2–3, ECF No. 320.) However, "despite [Yegiazaryan's] counsel's best efforts, Ms. Dozortseva did not indicate . . . that she would comply." (*Id.* at 3.) Yegiazaryan further stated he would remove Dozortseva as trustee, but an acute illness prevented him from taking immediate action. (*Id.*) The Court found Yegiazaryan remained in Contempt. (Order Re: Stmnt of Partial Compliance, ECF No. 321.)

On September 25, 2020, Smagin filed a request for increased sanctions. (ECF No. 323.) The Court declined to increase sanctions at that time, but noted that Yegiazaryan had yet to comply with its order to remove Dozortseva as a trustee, and therefore remained in contempt. (Order Re: Pl.'s Req. for Sanctions [DE 323], ECF No. 327.)

### 3. The February 2021 Motions

On February 1, 2021, Smagin filed an additional Motion for Contempt. (ECF No. 364.) The same day, Yegiazaryan filed a Motion to Stay the 2020 Contempt Order. (ECF No. 366.) Smagin alleged, among other things, that Murielle Jouniaux—another trustee appointed by Yegiazaryan—was impeding recovery from the Alpha Trust. Yegiazaryan claimed he was powerless to comply with the Court's order because he had transferred "his powers as a protector" of the Alpha Trust to an individual named Lex Thielen when he became ill on September 23, 2020. (Mot. to Stay Contempt at 3, ECF No. 366.)

The Court denied both Motions. Regarding the Motion for increased sanctions, the Court noted that Yegiazaryan was subject to ongoing daily fines and concluded that Smagin had failed to establish that Yegiazaryan's actions justified increased sanctions. (Order Re: Mot. for Contempt [DE 364] at 2, ECF No. 395.) In denying the Motion to Stay the 2020 Contempt Order, the Court rejected Yegiazaryan's argument of impossibility, noting, "to the extent it is impossible for Mr. Yegiazaryan to comply with the Court's Contempt Order, Mr. Yegiazaryan created this inability to comply." (*Id.* at 3.) Yegiazaryan did not file any additional motions or statements of compliance following the denial of his requested stay. He remains in contempt.

### B. New Allegations

Now, more than two years later, Smagin again requests that the Court hold Yegiazaryan in contempt and impose increased sanctions. In his most recent Motion, Smagin alleges that despite securing a judgment in Liechtenstein permitting him to recover assets from the Alpha Trust, he continues to be stymied by Yegiazaryan's legal hijinks. Dozortseva, Jouniaux, and Thielen retain their roles as trustees and protector of the Alpha Trust and continue their attempts to alter the Alpha Trust and Savannah Advisors. (Mot. for Contempt at 5–7, ECF No. 400-1.) Smagin also alleges that Dozortseva

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | May 22, 2023 |
|---|---|---|---|---|
| Title | ***Vitaly Smagin v. Ashot Yegiazaryan*** | | | |

and Jouniaux have attempted to hinder his recovery by opposing Savannah Advisors' valid attempts in a Monaco court to transfer its own funds. (*Id.*)

Additionally, Smagin alleges that Yegiazaryan and his wife, Natalia Tsagolova, have engaged in sham divorce proceedings to dispose of the Alpha Trust in violation of the 2016 Injunction. (*Id.* at 8.) Yegiazaryan has asked a Russian court to divide the Alpha Trust between himself and Tsagolova. (*Id.*) Relatedly, Tsagolova filed a motion in Monaco to sequester 50% of Savannah Advisors' assets and won an order freezing more than $94 million in her favor. (*Id.* at 8–9.)

Finally, Smagin alleges that Yegiazaryan has intervened in legitimate legal proceedings in Monaco and England. Yegiazaryan has opposed efforts in Monaco to enforce a Liechtenstein court's finding that Yegiazaryan's son, Stephan Yegiazaryan, is not a beneficiary of the Alpha Trust. (*Id.* at 9.) Yegiazaryan also continues to insist on the validity of the Gogokhia consent judgment. (*Id.* at 7–8.) Yegiazaryan has opposed Smagin's claim to set the judgment aside in the High Court of Justice of England and Wales.

In his Opposition to the Motion and an accompanying Declaration, Yegiazaryan asserts that removing Dozortseva, Jouniaux, and Thielen from their involvement in the Alpha Trust and its related entities is unnecessary, since the Liechtenstein Court has terminated their powers. (Opp'n to Mot. for Civil Contempt at 3, ECF No. 401.) Yegiazaryan denies that his divorce from Tsagolova is a sham, and alleges that Smagin is colluding with Tsagolova to secure funds from the Alpha Trust. (Yegiazaryan Decl. ¶¶ 11–12, ECF No. 401.) Yegiazaryan also insists that his involvement in legal proceedings in Monaco and England is necessary to avoid criminal and civil liability. (*Id.* ¶ 14.)[1]

## III.   JUDICIAL STANDARD

Federal Rule of Civil Procedure 70 provides that a court may hold a party in contempt if it fails to perform any specific acts required by a judgment. There are two types of contempt penalties that can be ordered: civil or criminal. "Whether the contempt is civil or criminal depends on the intended effect of the penalty imposed." *United States v. Laurins*, 857 F.2d 529, 534 (9th Cir. 1988) (citing *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631–33 (1988)). Civil contempt is intended to be remedial, while criminal content is punitive. *Id.*

---

[1] Additionally, Yegiazaryan alleges numerous facts irrelevant to this Court, including facts related to Smagin's ongoing bankruptcy and divorce proceedings.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | May 22, 2023 |
|----------|------------------------|--|------|--------------|
| Title | *Vitaly Smagin v. Ashot Yegiazaryan* | | | |

"A district court has the power to adjudge in civil contempt any person who willfully disobeys a specific and definite order of the court." *Gifford v. Heckler*, 741 F.2d 263, 265 (9th Cir. 1984). Civil contempt "consists of a party's disobedience to a specific and definite court order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Once the court determines that the party is in contempt, it has "broad equitable power to order appropriate relief." *FTC v. EDebitPay, LLC*, 695 F.3d 938, 945 (9th Cir. 2012) (quoting *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003)). Civil sanctions must be either "compensatory or designed to coerce compliance." *See In re Dyer*, 322 F.3d 1178, 1192 (9th Cir. 2003). When considering how much to levy in sanctions, the court should utilize "the minimum sanction necessary to obtain compliance." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992) (citing *Spallone v. United States*, 493 U.S. 265, 280 (1990)).

## IV.  DISCUSSION

Smagin asks the Court to hold Yegiazaryan in contempt and impose increased sanctions. The Court addresses each request in turn.

### A.  Contempt

To establish a prima facie case for civil contempt, the moving party must show, by clear and convincing evidence, that the non-moving party disobeyed a specific and definite court order, and that such disobedience was (1) beyond substantial compliance, and (2) not based on a good faith and reasonable interpretation of the Court's order. *Dual-Deck Video*, 10 F.3d at 695. Once the court finds a prima facie case of civil contempt, the burden shifts to the alleged contemnor to demonstrate an inability to comply. *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). To do so, the accused party must demonstrate that it took all reasonable steps to comply but was unable. *Id.* at 856. When determining whether the non-moving party has met its burden, the Court may consider evidence, including the party's history of noncompliance. *Id.* at 857.

The Court has issued four specific and definite orders relevant to the present Motion: (1) the 2016 Injunction prohibiting Yegiazaryan from disposing of the Alpha Trust, (2) the April 2020 Order ordering Yegiazaryan and his associates to cease all actions in all jurisdictions that would "prevent, hinder, or delay Mr. Smagin's ability to collect" the judgment, (3) the July 2020 Order prohibiting Yegiazaryan from altering the Alpha Trust, Savannah Advisors, or the Monaco Account without the Court's consent, and (4) the 2020 Contempt Order ordering Dozortseva to withdraw her efforts seeking relief related to the Alpha Trust and Savannah Advisors and requiring her removal as an Alpha Trust trustee if she refused to comply with the Order.

Smagin alleges numerous violations of these orders. The Court addresses each in turn:

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | May 22, 2023 |
|---|---|---|---|
| Title | *Vitaly Smagin v. Ashot Yegiazaryan* | | |

#### 1. Dozortseva's and Jouniaux's Involvement

Dozortseva and Jouniaux have attempted to alter Savannah Advisors and opposed Savannah Advisors' allegedly valid efforts to transfer its own funds in the Monaco Court of Appeal. (Kennedy Decl., Exs. 1, 3, 4, ECF Nos. 400-3, 400-5, 400-6). These actions violate multiple Court Orders. The April 2020 Order prohibits Yegiazaryan's agents from engaging in legal proceedings that frustrate Smagin's recovery. The July 2020 Order prohibits the modification of Savannah Advisors without the Court's approval. Finally, the 2020 Contempt Order required Yegiazaryan to remove Dozortseva from the Alpha Trust and its related entities.

Yegiazaryan does not argue that he is unable to comply with these orders. Instead, he contends that formally removing Dozortseva and Jouniaux is unnecessary because the Liechtenstein court has terminated their involvement with the Alpha Trust and Savannah Advisors. The Court disagrees. Yegiazaryan appears undeterred by the Liechtenstein court's findings, as Dozortseva and Jouniaux continue to seek relief related to the Alpha Trust and Savannah Advisors in Monaco. Yegiazaryan may not simultaneously disregard the Liechtenstein court's orders and rely on that court's authority to excuse him from obeying this Court.

Accordingly, the Court holds Yegiazaryan in contempt for Dozortseva and Jouniaux's ongoing involvement in the Alpha Trust and its related entities. Because Dozortseva and Jouniaux have demonstrated they are unwilling to comply with the Court's orders, the Court orders Yegiazaryan to remove them as trustees and withdraw from all actions seeking relief for the Alpha Trust and its related entities.

#### 2. Thielen's Involvement

Thielen has attempted to remove Alpha Trust's trustees. (Kennedy Decl., Ex. 2, ECF No. 400-4.) Because this attempted modification of the Alpha Trust was made without this Court's consent, Thielen's action is a direct violation of the July 2020 Order. For the reasons discussed above, the Liechtenstein court's termination of Thielen's involvement does not relieve Yegiazaryan of his responsibility to follow this Court's orders. Accordingly, the Court holds Yegiazaryan in contempt for Thielen's involvement in the Alpha Trust. The Court orders Yegiazaryan to remove Thielen from his role as "protector" of the Alpha Trust.

#### 3. The Gogokhia Consent Judgment

Despite the Court's April 2020 finding that the Gogokhia consent judgment is invalid, Yegiazaryan opposes Smagin's efforts to set it aside. (Kennedy Decl., Ex 6., ECF No. 400-8.) Yegiazaryan claims he is "required to assert a defense with respect to claims brought against [him] by Mr. Smagin in England to avoid potential criminal (in addition to civil) prosecution." (Yegiazaryan

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | May 22, 2023 |
|---|---|---|---|---|
| Title | *Vitaly Smagin v. Ashot Yegiazaryan* | | | |

Decl. ¶ 14.) Yegiazaryan does not elaborate on why impeding Smagin's efforts to set aside a fraudulent consent judgment insulates him from criminal and civil liability. But given Yegiazaryan's history of noncompliance, the Court is not persuaded that Yegiazaryan's pursuit of the Gogokhia consent judgment is anything other than blatant disregard of the April 2020 Order. Accordingly, the Court holds Yegiazaryan in contempt for opposing Smagin's efforts to set aside the Gogokhia consent judgment and orders Yegiazaryan to withdraw his challenge to Smagin's claim before the court in England.

#### 4. Yegiazaryan's Intervention in Monaco

Yegiazaryan has opposed efforts in Monaco to validate a Liechtenstein court's finding that his son, Stephan Yegiazaryan, is not a beneficiary of the Alpha Trust. (Kennedy Decl., Ex. 10, ECF No. 400-12.) Yegiazaryan claims that this intervention did not interfere with Smagin's ability to recover funds from the Alpha Trust, and was necessary to stop a transfer of funds that would have violated regulations related to the Russia-Ukraine War. (Yegiazaryan Decl. ¶ 14.) The Court treats Yegiazaryan's claims with significant skepticism, since Yegiazaryan's intervention in Monaco appears on its face to be yet another attempt to block enforcement of unfavorable legal decisions related to the Alpha Trust. Therefore, Yegiazaryan's interference in the Monaco proceedings violates the April 2020 Order's prohibition on legal actions that would "prevent, hinder, or delay" Smagin's collection efforts. Accordingly, the Court holds Yegiazaryan in contempt for his intervention in Monaco and orders him to withdraw from all Monaco court proceedings related to the Alpha Trust.

#### 5. Yegiazaryan-Tsagolova Divorce Proceedings

Yegiazaryan requested that a Russian court divide the Alpha Trust as part of his divorce proceedings. (Kennedy Decl., Ex. 12, ECF No. 400-14.) Regardless of the legitimacy of these proceedings, this attempted modification of the Alpha Trust was done without the Court's permission and therefore violates the July 2020 Order. Yegiazaryan offers no explanation for why he sought to alter the trust without first obtaining the Court's approval. Accordingly, the Court holds Yegiazaryan in contempt for his alteration of the Alpha Trust. The Court orders Yegiazaryan to withdraw his request from the Russian Court and take all steps necessary to reverse any modifications of the Alpha Trust that were made without the Court's consent.

#### 6. Tsagolova's Motion to Sequester Savannah Advisor's Assets in Monaco

Tsagolova has secured a Monaco Court of Appeal ruling granting her motion to sequester 50% of Savannah Advisor's assets. (Kennedy Decl., Exs. 8, 9, 11, ECF Nos. 400-10, 400-11, 400-13.) The Court is troubled by this development and the serious implications it has on Smagin's ability to recover from the Alpha Trust.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | May 22, 2023 |
|---|---|---|---|
| Title | ***Vitaly Smagin v. Ashot Yegiazaryan*** | | |

Given Yegiazaryan's history of utilizing legal proceedings to dispose of the Alpha Trust's assets, the Court considers it probable—if not likely—that Tsagolova's actions are a coordinated effort with Yegiazaryan to avoid the 2016 Injunction. However, although he alleges the divorce is a sham, Smagin provides no additional evidence to support his assertion. Therefore, Smagin fails to show by clear and convincing evidence that Tsagolova's actions in Monaco violate the Court's orders. Accordingly, the Court declines to hold Yegiazaryan in contempt for Tsagolova's actions.

### B. <u>Sanctions</u>

Having held Yegiazaryan in contempt for numerous violations of its orders, the Court now addresses the topic of sanctions. When imposing sanctions, "the court should consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)) (internal quotation marks omitted).

If financial sanctions are insufficient to encourage compliance, a court may incarcerate a contemnor until he complies with its order. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 US 821, 828 (1994) ("The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance"); *see also In re Kenny G Enters., LLC*, 692 Fed. Appx. 950 (9th Cir. 2017) (affirming the coercive incarceration of a civil contemnor who refused to comply with court orders after the imposition of daily contempt sanctions). Such incarceration is a civil—as opposed to criminal—remedy because the contemnor carries "the keys of their prison in their own pockets." *Shillitani v. United States*, 384 U.S. 364 (1966) (quoting *In re Nevitt*, 117 F. 448, 461 (8th Cir. 1902)) (internal quotations marks omitted). Sanctions are inappropriate if they persist for so long that they "cease[] to be coercive and instead . . . become punitive." *See Kenny G Enters.*, 692 Fed. Appx. at 953 (reasoning a civil contemnor's incarceration of more than two years would "[a]t some point" become punitive and require contemnor's release). Additionally, Sanctions are improper if the contemnor demonstrates an inability to comply with the order. *Hicks*, 485 U.S. at 638 n.9.

The Court previously fined Yegiazaryan $2,000 for each day he failed to comply with the 2020 Contempt Order. Smagin now asks the Court to increase these sanctions to $20,000 per day and take Yegiazaryan into federal custody. While the Court agrees that Yegiazaryan's numerous violations of its orders warrant increased sanctions, the severe penalties Smagin requests appear designed to punish Yegiazaryan for his recalcitrance, rather than to encourage his compliance. Accordingly, the Court increases the fines to $4,000 per day of noncompliance with this Order. The Court warns Yegiazaryan,

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | May 22, 2023 |
|---|---|---|---|---|
| Title | *Vitaly Smagin v. Ashot Yegiazaryan* | | | |

however, that it will impose additional sanctions—including incarceration—if Yegiazaryan is not persuaded to comply with its orders based on financial sanctions alone.

Any fines accrued shall be payable to the Court. *Gen. Signal Corp.*, 787 F.2d at 1380. Payments shall be paid by certified check or money order made payable to "Clerk, U.S. District Court." Each certified check or money order must include the case name (Smagin v. Yegiazaryan) and number (2:14-cv-09764-RGK-PLA). Payments must be delivered to:

United States District Court, Central District of California
Attn: Fiscal Department
255 East Temple Street, Room 1178
Los Angeles, CA 90012

## V.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion and holds Yegiazaryan in contempt. The Court further orders Yegiazaryan to do the following within **seven days** of this order's issuance: (1) remove Dozortseva, Jouniaux, and Thielen from their roles in the Alpha Trust and Savannah Advisors, (2) withdraw from all efforts for relief with respect to the Alpha Trust and its related entities, (3) withdraw his opposition to Smagin's attempt to set aside the Gogokhia Consent Judgment, and (4) withdraw his request to the Russian court to divide the Alpha Trust and reverse any alterations of the trust that took place without the Court's approval. If Yegiazaryan fails to perform any of the above actions, he must pay daily sanctions of $4,000 as instructed above, until such time as he complies with the Court's orders.

**IT IS SO ORDERED.**

|  | : |
|---|---|
| Initials of Preparer | JRE |

cc: Fiscal

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| VITALY IVANOVICH SMAGIN,<br><br>Petitioner,<br><br>v.<br><br>ASHOT YEGIAZARYAN, a.k.a.<br>ASHOT EGIAZARYAN,<br><br>Respondent. | **Case No.  2:14-cv-09764-R**<br><br>**ORDER GRANTING POST-JUDGMENT INJUNCTION**<br><br><br>**Before: The Hon. Manuel L. Real**<br>**Courtroom:  8, 2nd Floor** |

Before the Court is Petitioner Vitaly Ivanovich Smagin's Application for a Post-Judgment Injunction. After reviewing the pleadings, evidence, and other materials, holding a hearing on October 26, 2016 to hear arguments from counsel, and being fully informed, the Court orders as follows.

On December 22, 2014, Petitioner Smagin filed this action seeking to confirm a final international arbitration award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38. At arbitration, Respondent Ashot Yegiazaryan, a.k.a. Ashot Egiazaryan, and Kalken Holdings Limited, a company existing under the laws of Cyprus, were found jointly and severally liable to Mr. Smagin in the amount of $84,290,064.20.

This Court confirmed the arbitration award on March 17, 2016 and entered judgment in favor of Mr. Smagin on April 4, 2016 in the amount of $92,503,652. Mr. Yegiazaryan appealed and sought a stay of enforcement pending appeal without the requirement of posting security for that stay. That request was denied, Mr. Yegiazaryan declined to post a bond and the Judgment is now final and enforceable.

Mr. Smagin recently sought a temporary restraining order and preliminary injunction on the grounds Mr. Yegiazaryan was continuing an admitted practice of concealing his beneficial ownership of assets that would inhibit or impair Mr. Smagin's ability to enforce his judgment. The Court granted the temporary restraining order and issued an order to show cause why a preliminary injunction should not issue and then set the matter for hearing. The matter was fully briefed by the parties. On October 26, 2016, at 10:00 am, the parties appeared before the Court. The Court heard argument of counsel for both sides. For the reasons set forth herein, as well as those stated on the record during the hearing, the Court will grant the requested preliminary injunction.

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Winter v. Natural Res. Def. Council,*

1

1  *Inc.*, 555 U.S. 7, 32 (2008) (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542

2  (1987)).

3         Accordingly, in order to issue this order, Mr. Smagin must establish that (1) he

4  has succeeded on the merits of his confirmation claim; (2) he is likely to suffer

5  irreparable harm absent an injunction; (3) the balance of the equities tips in favor of an

6  injunction; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def.*

7  *Council, Inc.*, 555 U.S. 7, 24 (2008); *see also, e.g., Republic of Philippines v. Marcos*,

8  862 F.2d 1355, 1362 (9th Cir. 1988); *Alliance for the Wild Rockies v. Cottrell*, 632

9  F.3d 1127, 1131 (9th Cir. 2011).

10        First of all, the Court concludes that it has authority to issue preliminary

11  injunctive relief in a post judgment setting, as long as the above criteria are satisfied.

12  While the Ninth Circuit Court of Appeals has not addressed the precise issue, courts in

13  the Third, Fifth, Sixth, and Eleventh Circuits have issued or affirmed similar asset

14  freezes "where waste, dissipation, or transfer of assets by [judgment debtor] has a

15  direct impact on appellee's potential ultimate recovery." *Meyers v. Moody*, 723 F.2d

16  388,389 (5th Cir. 1984); *see also*, *West Hills Farms, LLC v. ClassicStar, LLC*, 2013

17  WL 4515046, at *1 (E.D. Ky. Aug. 23, 2013) ("[T]he Court concludes that it has

18  authority to issue any necessary injunctive relief 'in aid of its jurisdiction' [over

19  defendants who may waste, dissipate, or secret assets.]"); *Gambone v. Lite Rock*

20  *Drywall*, 288 F. App'x 9, 12 (3rd Cir. 2009) (affirming post-judgment preliminary

21  injunction in proceedings supplementary, explaining "so long as the plaintiffs'

22  demand for injunctive relief qualifies as a post-judgment enforcement proceeding,

23  which is a proceeding that functions as a means for executing a judgment, the District

24  Court has subject matter jurisdiction."); *Axiom Worldwide, Inc. v. HTRD Grp. H.K.*

25  *Ltd.*, No. 8:11-cv-1468-T-33TBM, 2015 U.S. Dist. LEXIS 174042 (M.D. Fla. Dec. 8,

26  2015) (holding district courts do not have "any less equitable power to order

27  injunctive relief in the post-judgment setting, including an asset freeze, so long as

28  such satisfies procedural and substantive rules for [prejudgment injunctive relief]").

1   Similarly, in *Innovation Ventures, LLC v. N2G Distrib.*, No. SACV 12-717
2   ABC (Ex), 2014 U.S. Dist. LEXIS 184729 (C.D. Cal. July 9, 2014), the Central
3   District of California granted a post-judgment temporary restraining order prohibiting
4   judgment debtors from transferring assets, opening new bank accounts, forming new
5   business operations and engaging in the spoliation of evidence.

6   In his Response to the Court's Order to Show Cause why injunctive relief
7   should not issue, Mr. Yegiazaryan relies on *Grupo Mexicano de Desarrollo S.A. v.*
8   *Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). However, *Grupo* is not controlling
9   under these circumstances, as it only addresses a worldwide asset freeze in the context
10  of pre-judgment injunctive relief in a suit for money damages prior to judgment. *See*
11  *id.* at 319-21, 333 (holding that worldwide asset freeze is not available to "a general
12  creditor (one *without a judgment*)") (emphasis added). At this stage in the
13  proceedings, Mr. Smagin is not merely a potential judgment creditor—rather, the
14  Court has issued a final and enforceable judgment in his favor.

15  Additionally, the Court's judgment in this case is not simply a damages award.
16  Rather, Mr. Smagin filed this case to seek Court enforcement and confirmation of an
17  arbitration award – a situation the Ninth Circuit has recognized as "tantamount to
18  granting a request for specific performance of the [contract.]" *See United States v.*
19  *Park Place Assocs.*, 563 F.3d 907, 931 (9th Cir. 2009). Accordingly, even if *Grupo*
20  were otherwise applicable, which it is not, its holding would not preclude the
21  injunction granted by this Court herein.

22  The Court has reviewed in detail the additional authority cited in Mr.
23  Yegiazaryan's Response, and finds that it does not preclude an injunction in this case.
24  First, Mr. Yegiazaryan cites case law holding that a pre-judgment preliminary
25  injunction freezing assets generally dissolves upon entry of a final judgment. *See U.S.*
26  *Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1093-94 (9th Cir. 2010). *Philips*
27  addressed an action by the court to modify a prejudgment injunction that had already
28  dissolved automatically upon entry of judgment. The court there did not at all address

3

1   the circumstances of a judgment creditor seeking a post-judgment asset freeze to

2   secure a right to recovery, and that opinion is therefore not controlling or persuasive

3   under these circumstances.  *See id.*

4        Next, Mr. Yegiazaryan cites several cases addressing the steps available to

5   enforce a judgment under state law.  However, at best, these cases provide that the

6   court may not issue affirmative or mandatory injunctive relief, such as holding parties

7   in contempt or ordering the deposit of funds, for purposes of post-judgment

8   enforcement of a money judgment.  *See, e.g.*, *Hilao v. Estate of Marcos*, 95 F.3d 848

9   (9th Cir. 1996); *Spain v. Mountanos*, 690 F.2d 742, 744-45 (9th Cir. 1982); *Ecopetrol*

10  *S.A. v. Offshore Exploration & Prod. LLC*, No. 14-CV-529 (JGK), 2016 U.S. Dist.

11  LEXIS 40417, at *15 (S.D.N.Y. March 28, 2016).  By contrast, Mr. Smagin does not

12  seek enforcement assistance but merely seeks a post-judgment injunction to preserve

13  the status quo so he is not precluded from enforcing his judgment through Mr.

14  Yegiazaryan's diversion of assets.

15       Moreover, this Court's injunctive authority may reach worldwide.  "Once

16  personal jurisdiction of a party is obtained, the District Court has authority to order it

17  to 'freeze' property under its control, whether the property be within or without the

18  United States."  *Hilao v. Marcos (In re Estate of Marcos)*, 25 F.3d 1467, 1478 (9th

19  Circ. 1994) (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 384

20  (1965)).  Numerous courts have invoked this power to issue preliminary injunctions

21  freezing assets worldwide to secure funds for an expected judgment.  *See, e.g., SEC v.*

22  *Int'l Swiss Inv. Corp.*, 895 F.2d 1272 (9th Cir. 1990); *Republic of Philippines v.*

23  *Marcos*, 862 F.2d 1355 (9th Cir. 1988); *Omnium Lyonnais D'Etancheit Et Revetement*

24  *Asphalte v. Dow Chem. Co.*, 441 F. Supp. 1385 (C.D. Cal. 1977).  This power is even

25  more justified here where Mr. Smagin already has a judgment.

26       Mr. Smagin has satisfied the criteria for the issuance of an injunction.  To

27  begin, he already prevailed on the merits.  His arbitral award has been confirmed and

28  he has a fully enforceable judgment.

4

In terms of irreparable injury, Mr. Yegiazaryan has fought long and hard to prevent enforcement of Mr. Smagin's award and judgment. This pattern of avoidance and concealment is well established. First, many of the findings of the London Award rest upon Mr. Yegiazaryan's concealing and misappropriating assets from Mr. Smagin through the use of entities in "offshore" jurisdictions, including Cyprus and the British Virgin Islands. Moreover, the arbitration tribunal made several findings demonstrating Mr. Yegiazaryan's lack of trustworthiness, including its rejection of his arguments that he had no interest in certain assets and that the operative agreement was forged. Those findings were echoed by the English High Court of Justice when they found that Mr. Smagin did not tell the truth in testimony about the ownership of his assets. The Court has previously made findings regarding these issues on multiple occasions and there is no reason that those findings should be any different now.

In February 2016, Mr. Smagin was able to intervene in Mr. Yegiazaryan's state court divorce proceedings and thereby gained access to documents (improperly filed under seal) establishing that in May 2015, Mr. Yegiazaryan settled a large arbitration award in his favor and placed at least $188 million of the proceeds in a trust managed by a Lichtenstein trustee with a Monaco bank account. The Los Angeles Superior Court also granted a worldwide freezing order against the transfer of assets by Mr. Yegiazaryan and his wife, and because Mr. Smagin was protected by this order until recently, he did not seek additional injunctive relief from this Court.

Mr. Yegiazaryan later convinced the Superior Court that Mr. Smagin was only a "potential judgment creditor" and therefore did not have a sufficiently direct interest in the proceedings to intervene in the divorce proceedings and obtain the freezing order that the Superior Court previously granted.

Mr. Smagin immediately filed a motion for reconsideration of this order and requested that the order be stayed and the freeze remain in effect pending resolution of this motion. The family court summarily denied the request to stay. Accordingly, the asset freeze was set to terminate on October 14, 2016. On October 13, 2016, Mr.

5

Smagin filed with this Court his application for emergency injunctive relief. (ECF No. 84).

Without relief from this Court, Mr. Smagin would be left without protection from Mr. Yegiazaryan's duplicity. Mr. Yegiazaryan's record of concealing the true beneficial owner of assets through these types of nominee structures makes it likely that, given the opportunity, he will continue to hide the proceeds of this settlement in a way to avoid payment directly to himself in California where the proceeds would be subject to execution on the judgment. This Court believes that given Mr. Yegiazaryan's past actions, it is highly likely that these assets will immediately be moved to another nominee structure in another jurisdiction unknown to Mr. Smagin and out of the immediate reach of Mr. Smagin and his judgment. The Court therefore concludes that without the injunction Mr. Smagin will suffer irreparable injury in that Mr. Yegiazaryan is highly likely to continue to move the assets yet again to force Mr. Smagin to start from scratch and even further delay (or destroy) his right to collect his enforceable judgment.

Mr. Yegiazaryan's argument that Mr. Smagin will suffer no injury because he is fully protected by the so-called "Russian freeze" is unpersuasive. Both this Court and the Ninth Circuit Court of Appeals have heard and rejected this argument before on more than one occasion. There is no reason for this Court now to revisit this issue.

The Court further finds that the balance of equities and public interest weigh in favor of an injunction because the injunction operates only to ensure that Mr. Yegiazaryan lives up to his obligations under the arbitration award.

This Court finds it appropriate to issue an injunction in these circumstances. Personal jurisdiction is undisputed. The Court therefore may unquestionably enjoin Mr. Yegiazaryan and all those acting under his direction and control from taking actions to transfer, conceal or dissipate the proceeds of the arbitration settlement. Mr. Yegiazaryan, like the defendants in *Marcos*, has used a variety of financial structures and nominees to conceal his assets. *See, e.g.*, English Judgment, ¶ 6; Mr.

6

1   Yegiazaryan's Second Kerimov Statement ¶¶ 2.5-2.7 (Mr. Yegiazaryan cataloguing

2   nominees and offshore companies holding assets on his behalf and at his direction).

3       Accordingly, this Court will issue the requested worldwide injunction to "keep

4   [Mr. Yegiazaryan's] assets from disappearing" and preserve Mr. Smagin's ability to

5   recover the judgment in his favor. *See, e.g., Philippines v. Marcos*, 862 F.2d at 1364.

6   The Court further finds that Mr. Smagin's previous deposit of $10,000 in security with

7   the Clerk of Court will constitute adequate security for the injunction granted herein.

8       **IT IS HEREBY ORDERED** that the application for post-judgment injunctive

9   relief is **GRANTED**;

10      **IT IS FURTHER ORDERED THAT**

11      Ashot Yegiazaryan, his agents, and/or any person or entity acting under his

12  direction and control shall not take any action to transfer, assign, conceal, diminish,

13  encumber, hypothecate, dissipate or in any way dispose of any proceeds, in an amount

14  up to and including $115,629,565, derived by or held for the benefit of Ashot

15  Yegiazaryan, his agents, nominees, trustees or any person or entity acting under his

16  direction and control, in payment, settlement or satisfaction of an arbitration award

17  obtained in his arbitration with Suleyman Kerimov, without prior order of the Court

18  permitting such a transfer, including specifically the "Kerimov settlement funds" as

19  identified in the Stipulation Re Advance Distribution of Funds executed by Petitioner

20  and Respondent on July 6, 2015 and filed with the Los Angeles Superior Court and

21  any proceeds of or investments made with those funds, including specifically (but not

22  limited to) any funds held by CTX Treuhand AG, Vaduz, Lichtenstein (under Alpha

23  Trust or otherwise, or any other trustee), with Savannah Advisors Inc., c/o Alpenrose

24  ///

25  ///

26  ///

27  ///

28  ///

7

1   Wealth Management (or any other investment manager) and/or in an account at

2   Compagnie Monegasque De Banque or in any other bank or financial institution.

3

4       This injunction shall remain in effect until Mr. Smagin's judgment is satisfied in

5   full or until otherwise dissolved by the Court.

6

7       **IT IS SO ORDERED.**

8

9   Dated:   November 14 , 2016.

10

11

12                                          _____
                                            MANUEL L. REAL
13                                          UNITED STATES DISTRICT JUDGE

14  CC: FISCAL

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          8

| From: | cacd_ecfmail@cacd.uscourts.gov |
|---|---|
| To: | ecfnef@cacd.uscourts.gov |
| Subject: | Activity in Case 2:14-cv-09764-R-PLA Vitaly Ivanovich Smagin v. Ashot Yegiazaryan Order |
| Date: | Monday, November 21, 2016 10:41:47 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA

### Notice of Electronic Filing

The following transaction was entered on 11/21/2016 at 10:40 AM PST and filed on 11/14/2016
**Case Name:**      Vitaly Ivanovich Smagin v. Ashot Yegiazaryan
**Case Number:**      2:14-cv-09764-R-PLA
**Filer:**
**WARNING: CASE CLOSED on 03/17/2016**
**Document Number:** 90

**Docket Text:**
**ORDER GRANTING POST-JUDGMENT INJUNCTION by Judge Manuel L. Real: Before the Court is Petitioner Vitaly Ivanovich Smagins Application for a Post-Judgment Injunction [81]. After reviewing the pleadings, evidence, and other materials, holding a hearing on 10/26/2016 to hear arguments from counsel [87], and being fully informed, the Court orders as follows: IT IS HEREBY ORDERED that the application for post-judgment injunctive relief is GRANTED. Ashot Yegiazaryan, his agents, and/or any person or entity acting under his direction and control shall not take any action to transfer, assign, conceal, diminish, encumber, hypothecate, dissipate or in any way dispose of any proceeds, in an amount up to and including $115,629,565, derived by or held for the benefit of Ashot Yegiazaryan, his agents, nominees, trustees or any person or entity acting under his direction and control, in payment, settlement or satisfaction of an arbitration award obtained in his arbitration with Suleyman Kerimov, without prior order of the Court permitting such a transfer, including specifically the "Kerimov settlement funds" as identified in the Stipulation Re Advance Distribution of Funds executed by Petitioner and Respondent on 7/6/2015 and filed with the Los Angeles Superior Court and any proceeds of or investments made with those funds, etc. This injunction shall remain in effect until Mr.**

**Smagin's judgment is satisfied in full or until otherwise dissolved by the Court. The Court further finds that Mr. Smagin's previous deposit of $10,000 in security with the Clerk of Court will constitute adequate security for the injunction granted herein. See document for further details. (gk)**

## 2:14-cv-09764-R-PLA Notice has been electronically mailed to:

Bruce Halliday Jackson    bjackson@bakernet.com,
nathaniel.wilkes@bakermckenzie.com, nada.k.hitti@bakernet.com,
bruce.jackson@bakermckenzie.com, christine.vonseeburg@bakermckenzie.com

Nicholas O'Brian Kennedy    nicholas.kennedy@bakermckenzie.com

Michael S Adler    madler@ta-llp.com

Colin H Murray    teresa.michaud@bakermckenzie.com,
nathaniel.wilkes@bakermckenzie.com, colin.murray@bakermckenzie.com,
nada.hitti@bakermckenzie.com, christine.vonseeburg@bakermckenzie.com

Anne M Kelts    jessica.libbey@bakermckenzie.com, anne.kelts@bakermckenzie.com

## 2:14-cv-09764-R-PLA Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :

# EXHIBIT C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | 04-01-02020 |
|---|---|---|---|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
|---|---|
| Not Present | Not Present |

**Proceedings:**  **(IN CHAMBERS) Order Re: Plaintiff's Motion to Clarify Post-Judgment Injunction [DE 229]**

## I.   INTRODUCTION

On November 11, 2014, Vitaly Ivanovich Smagin ("Plaintiff") obtained an arbitral award from the London Court of International Arbitration against Ashot Yegiazaryan ("Defendant") in a dispute over dealings related to the financing of a Moscow shopping center. The award ordered Defendant to pay Plaintiff $84,290,064.40 and post-award interest of 8% at an annual quarterly compounded rate.

On December 22, 2014, Plaintiff filed a petition in this Court to confirm that award, and on March 17, 2016, this Court entered a judgment in Plaintiff's favor for $92,503,652. That judgment remains uncollected.

On November 14, 2016, the Court issued a worldwide injunction prohibiting Defendant or any person acting in concert with him from transferring, concealing, or otherwise dispersing the proceeds of a settlement Defendant obtained in a separate arbitration, known as the "Kerimov settlement funds," in an amount up to $115,629,565.

On September 20, 2017, this Court issued an Order directing Defendant to turn over the Kerimov Settlement Funds, now contained in a Liechtenstein trust. On July 31, 2018, the Court of Appeals for the Ninth Circuit vacated that Order as premature, as the issue of whether Defendant had actual control of the trust remained pending before the Princely Supreme Court of Lichtenstein. On October 29, 2019, the

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:14-cv-09764-RGK-PLA | Date | |
|---|---|---|---|
| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** | | |

Liechtenstein Constitutional Court rejected Defendant's final appeal and held that he did in fact exercise control over the trust.

Presently before the Court is Plaintiff's Motion to Clarify the Court's November 2016 injunction. For the following reasons, the Court **GRANTS** Plaintiff's motion.

## II.   FACTUAL BACKGROUND

### A.   The Parties and the Trust

Plaintiff Vitaly Ivanovich Smagin is a Russian citizen and businessman residing in Moscow. Defendant Ashot Yegiazaryan is a Russian national currently residing in Beverly Hills, California. Third party Suren Yegiazaryan[1] ("Suren") is the Defendant's cousin, also a Russian national residing in Beverly Hills. Third party Vitaly Gogokhia ("Gogokhia") is Defendant's former business associate, currently residing in London, England. Third party Artem Yegiazaryan ("Artem") is Defendant's brother. Both Gogokhia and Artem were convicted in Russia alongside Defendant for working to fraudulently misappropriate Plaintiff's assets.

In May of 2015, Defendant received an arbitral award of $198 million dollars in an arbitration with Suleyman Kerimov. The funds were deposited in an account at Compagnie Monegasque de Banque ("CMB") in Monaco. In June of that year, Defendant placed $188 million of those funds into a trust formed in Liechtenstein ("the Alpha trust"). As found by the Liechtenstein Court, Defendant is settlor, protector and beneficiary of the Alpha trust, and has the authority to remove trustees at will. The present trustee is CTX Treuhand AG, a Liechtenstein corporation that provides trust services. The holder of the Monaco account is a company called Savannah Advisers on the island of Nevis in the Caribbean. Savannah Advisors is wholly owned by the Alpha trust.

### B.   The Court's Injunction

On November 14, 2016, this Court issued a worldwide post-judgment injunction prohibiting transfer of the Alpha trust assets. The Court's rationale for issuing that injunction is quoted, in part, as follows:

> Without relief from this Court, Mr. Smagin would be left without protection from Mr. Yegiazaryan's duplicity. Mr. Yegiazaryan's record of concealing the true beneficial owner of assets through these types of nominee structures makes it likely that, given the opportunity, he will continue to hide the proceeds of this settlement in a way to avoid payment directly to himself in California where the proceeds would be subject to execution on the judgment. This Court believes that given Mr. Yegiazaryan's past

---

[1] As there are multiple individuals named Yegiazaryan, the Court will refer to them by their first names in the interest of clarity.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | |
|----------|------------------------|--|------|--|
| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** | | | |

actions, it is highly likely that these assets will immediately be moved to another nominee structure in another jurisdiction unknown to Mr. Smagin and out of the immediate reach of Mr. Smagin and his judgment.

(Order Granting Post-Judgment Injunction, ECF No. 90). The text of the injunction is quoted here in part as follows:

> IT IS FURTHER ORDERED THAT Ashot Yegiazaryan, his agents, and/or any person or entity acting under his direction and control shall not take any action to transfer, assign, conceal, diminish, encumber, hypothecate, dissipate or in any way dispose of any proceeds, in an amount up to and including $115,629,565, derived by or held for the benefit of Ashot Yegiazaryan, his agents, nominees, trustees or any person or entity acting under his direction and control, in payment, settlement or satisfaction of an arbitration award obtained in his arbitration with Suleyman Kerimov, without prior order of the Court permitting such a transfer, including specifically the "Kerimov settlement funds."

(*Id.*) That injunction remains in effect.

Following the issuance of the above injunction, the Court also issued an order directing Defendant to turn over the assets in the Alpha Trust to Plaintiff. The Ninth Circuit vacated that Order as premature on the grounds that the issue of whether Defendant actually controlled the Alpha trust was on appeal to the Princely Supreme Court of Liechtenstein. On September 7, 2018, that court ruled in Plaintiff's favor, and on October 29, 2019, the Liechtenstein Constitutional Court rejected Defendant's final appeal and likewise ruled that he controlled the assets in the Alpha trust.

### C.    Suren Yegiazaryan's Lawsuit

Approximately one week later, on November 5, 2019, Defendant's Cousin Suren Yegiazaryan initiated an action in the Eastern Caribbean Supreme Court (St. Christopher and Nevis) seeking the Alpha trust's assets directly from Savannah Advisors ("the Nevis Action"). The basis of Suren's claim is a handwritten agreement from 2011 between himself, his brother Artem Yegiazaryan ("Artem"), and Defendant.

The substance of the agreement is that Suren and Artem each agreed to pay up to $20 million dollars of Defendant's living expenses and legal fees in exchange for a one-third share of the Kerimov Settlement Funds. The agreement also states that Defendant assumed an obligation to compensate Artem

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | |
|---|---|---|---|
| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** | | |

for losses in the project "Sofiyskaya Embankment" and Suren for losses in "the Northern Oil Project," both in unspecified amounts.

In Defendant's response to Suren's statement of claim in the Nevis Action, dated February 14, 2020, Defendant admitted to indebtedness, including one third of the Kerimov award, but asserted that he had no control over the Alpha Trust and could not make payments.

On March 9, 2020, the Court held a hearing on Suren's motion for default, at which only Suren's attorney appeared. On March 10, 2020, the Nevis Court entered an order granting Suren's request for default judgment in the amount of $180 million against Defendant and entitling him to recover that sum from the Kerimov Settlement funds in the Alpha Trust. Despite the fact that Plaintiff had already filed the instant request for clarification, neither Defendant nor Suren disclosed the fact of this default judgment to the Court or opposing counsel.

On March 13, 2020, Defendant filed an application to set aside default. In the attached affidavit, he claims that he no longer has control over the Trust due to the rulings in his case against Plaintiff in Liechtenstein.

### D. Vitaly Gogokhia's Lawsuit

On May 17, 2019, Defendant's former business partner Vitaly Gogokhia commenced a lawsuit against him in England claiming that Defendant had failed to repay him for his investments in certain business ventures. On October 30, 2019, Defendant consented to a judgment against himself of £149 million (approximately $180 million).

Gogokhia now likewise seeks to have his judgment enforced against Defendant in Nevis. On March 12, 2020, Gogokhia applied for a worldwide freeze of the Alpha Trust assets, and on March 18, the Nevis court granted it. A hearing is scheduled on that freeze order for April 15.

## III. JUDICIAL STANDARD

An order imposing an injunction must state its terms specifically and describe in detail the act or acts restrained or required. Fed. R. Civ. P. 65(d)(1). Accordingly, a court "may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 13 (1945). An injunction, however, binds not only the parties, but also their attorneys, agents, employees and other persons who are in active concert with the aforementioned. Fed. R. Civ. P. 65(d)(2). This gives effect to the common-law doctrine that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Regal Knitwear,* 324 U.S. at 14.

A district court has discretion to clarify the scope of an injunction. *Robinson v. Delicious Vinyl Records Inc.*, No. 13-CV-4111-CAS-PLAX, 2013 WL 12119735, at *1 (C.D. Cal. Sept. 24, 2013). By

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | |
|----------|------------------------|------|---|
| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** | | |

clarifying the scope of a previously issued injunction, a court "add[s] certainty to an implicated party's effort to comply with the order and provide[s] fair warning as to what future conduct may be found contemptuous." *See N.A. Sales Co., Inc. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984). Such clarification may be obtained on motion by a party or made on the court's own motion.

## IV.    DISCUSSION

Plaintiff seeks an order clarifying that the Court's injunction enjoins the Nevis lawsuits described above, as well as any related activity. The Court finds that such a broad exercise of Judicial power is justified by the unusual circumstances of this case.

The category of conduct that Plaintiff seeks to prevent is already foreclosed by the ongoing effect of this Court's 2016 injunction. The only question, therefore, is whether Plaintiff has satisfactorily demonstrated that Suren and Gogokhia are acting in concert with the Defendant such that their conduct as third-parties falls within its scope. The Court finds that he has done so.

Suren, in his opposition, contends that in order for the Court to apply the terms of the injunction to third parties, it must require a "clear showing" that both (1) a party violated the injunction, and (2) the non-party assisted them in doing so. Suren bases this standard on an application of the "clear showing" requirement for an injunction before trial to the requirements for finding a third party in contempt. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 953 (9th Cir. 2014). Assuming for the sake of argument that this standard is correct, the Court finds that Plaintiff has met it, as the evidence before the Court makes a clear showing that both Suren and Gorokhia are acting in concert with Defendant to evade the injunction's requirements.

### A.    Suren Yegiazaryan

Suren asserts that he is not acting in concert with Defendant but rather pursuing the Nevis action for independent reasons and for the purpose of adjudicating his own rights. Plaintiff, in turn, argues that the purported loan agreement was never genuine, that Suren has a long history of serving as Defendant's nominee to act on his behalf and conceal his assets, and that Suren's assertions regarding the sources of his own funds are both lacking in documentation and internally contradictory. The Court agrees with Plaintiff.

First, the February 2011 agreement purports to allocate two-thirds of the Kerimov Settlement—over one-hundred and twenty-six million dollars—in return for payment of legal fees and living expenses (no more than twenty million each from Suren and Artem) on the basis of a half-page, handwritten agreement among close family members. Furthermore, the agreement obligates Defendant to pay Suren and Artem a wholly unspecified amount for their losses in separate undertakings described as "Sofiyskaya Embankment" and "Northern Oil." (*See* Kennedy Decl. Ex 43, ECF No. 229-48.) Defendant has fought tooth and claw these last six years to avoid paying Plaintiff a sum of money that Plaintiff had already been awarded in arbitration, and which was originally markedly less than that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | |
|---|---|---|---|
| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** | | |

purportedly allocated by the above agreement. Further, the very financial entities at issue in this case are a testament to Defendant's sophistication. The idea that Defendant ever intended to sign away such a vast sum of money on the basis of a half-page deal with his cousin and brother is belied by his prior conduct throughout this litigation.

This conclusion is reinforced by Defendant's payments to his other creditors. At the time the settlement funds were initially distributed, Defendant made millions of dollars in payments to other creditors—including five million to Vitaly Gogokhia. (See CMB transfer statements, Decl. of Nicholas Kennedy ISO Mot. to Clarify ("Kennedy Decl.") Ex. 19-20, ECF No. 229-24, 25.) Defendant made no payments to Suren or Artem, however, despite the fact that each was purportedly entitled to over one-third of the settlement funds.

Next, the timing of Suren's Nevis suit, filed less than a week after the final Liechtenstein ruling, is suspect. Suren asserts that, although the Kerimov settlement funds were distributed years ago, he only initiated his suit following the Liechtenstein ruling because he did not feel that he needed to protect his interest in the trust until Plaintiff prevailed in that litigation. Litigation involving these trust assets has been ongoing in courts around the world for approximately five years, including here, in Los Angeles, where both Suren and the Defendant reside. The fact, therefore, that Suren decided only now, these many years later, that he suddenly needed to protect his rights to a vast amount of money guaranteed by a half-page long, ten-year-old note with his cousin, by filing a lawsuit in the Caribbean, strains credulity.

Furthermore, Suren has a history of working as a nominee in Defendant's transactions. As one example, Plaintiff presents an affidavit from Defendant's longtime Financial Advisor Andrey Gloriozov, originally submitted on Defendant's behalf in a separate proceeding, which states that Suren was only ever the nominal holder of any shares in the Northern Oil project, whereas Defendant was their true beneficial owner. (*See* Aff. Of Andrey Gloriozov, Kennedy Reply Decl. Ex. A, ECF No. 235-2.) Naturally, this also somewhat complicates the idea that Defendant owes Suren compensation for any "losses" Suren incurred arising from that project, as Suren did not actually have a beneficial interest in the shares.

The evidence described above is enough. The Court need not delve in detail into Plaintiff's other arguments regarding Suren's lack of financial independence from Defendant, his contradictory statements regarding how he purportedly financed Defendant's years of litigation, or other instances in which he operated as a front for Defendant's transactions. The evidence above, particularly when combined with Defendant's conduct in the Nevis proceedings, is more than sufficient to make a "clear showing" that Suren is working in concert with Defendant to keep the Kerimov Settlement funds "in the family" through his Nevis lawsuit.

### B. <u>Vitaly Gogokhia</u>

The Court likewise finds that Plaintiff has met his burden to demonstrate that Vitaly Gogokhia is working in concert with Defendant to circumvent the Court's prior injunction through his lawsuit in

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | |
|---|---|---|---|
| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** | | |

Nevis. Gogokhia is Defendant's former business partner, and was convicted alongside Defendant in Russia of conspiracy to commit fraud for his role in Defendant's misappropriation of Plaintiff's assets. (Kennedy Decl., Ex. 2 p. 86, ECF No. 229-7.)

Like Suren, Gogokhia claims he is a beneficiary of the Alpha trust, and filed suit seeking the trust assets in the United Kingdom on May 17, 2019. This is in spite of the fact that, as described above, Defendant had already paid Gogohkia $5 Million from the Kerimov settlement proceeds when they were first dispersed, and Gogohkia has evidently taken no other action to collect any larger amount in the several years since that time.

On October 30, 2019, the day after the Liechtenstein Constitutional Court issued its ruling, Defendant consented to a judgment against himself in the UK of £149 million pounds (approximately the amount of the trust assets). *See* Aff. of Vitaly Gogohkia, Sur-Reply Decl. Ex. 5 ¶ 12, ECF No. 242-7.) On December 9, 2019, Gogokhia then brought an action to confirm the UK judgment in Nevis. Gogokhia has since obtained an order in Nevis freezing the Alpha trust assets, the text of which states that Defendant has consented to registration of the UK Judgment there. *See* Asset Freeze Order, Sur-Reply Decl. Ex. 6 ¶ 19.3, ECF No. 242-8.)

As Plaintiff evidently only learned of Gogokhia's litigation in Nevis after the present motion had already been filed, his arguments regarding Gogohkia naturally do not include the same level of detail. Nevertheless, the Court finds that Plaintiff has made a clear showing that Gogokhia is working in concert with Defendant to circumvent this Court's injunction. This finding is based on Plaintiff's evidence regarding (1) Defendant and Gogokhia's shared criminal history as pertains to Plaintiff and the judgment at issue, (2) the fact that Defendant paid Gogokhia $5 million out of the trust assets several years ago and Gogokhia has never brought any claim against Defendant or the trust until now, and (3) Defendant's role in not only failing to oppose, but seemingly even assisting Gogokhia in the progress of his litigation. Of particular note is the fact that Defendant consented to judgment in the UK the very day after his appeal was finally rejected in Liechtenstein.

For the reasons described above, the Court likewise finds that Defendant's conduct violates the injunction. Although Defendant argues that he has recently filed an application to set aside Suren's

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | |
|---|---|---|---|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | |

default judgment, the Court is unpersuaded that this manifests evidence of anything like a sincere attempt to defend that case.

As a preventative measure based on Defendant's continued pattern of behavior, the Court will likewise clarify that the scope of this injunction extends to foreclose any actions to acquire the trust proceeds by Defendant's brother Artem as well as Suren.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion.

**IT IS FURTHER ORDERED THAT**

Mr. Yegiazaryan, his cousin Suren Yegiazaryan, his brother Artem Yegiazaryan, Vitaly Gogokhia, the trustees of the Alpha Trust and any others acting on behalf of Mr. Yegiazaryan, directly or indirectly, including but not limited to attorneys or nominees for each of these parties must immediately cease all actions in Nevis or any other jurisdiction that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust pursuant to the current and forthcoming orders of the Liechtenstein Court or this Court.

To the extent any such enforcement actions have already begun, they must be immediately stopped and any funds held by or on behalf of Suren Yegiazaryan or Judgment Debtor Yegiazaryan must be immediately returned to the Monaco Bank Account of Savannah Advisors, or any other location, from which they came.

**IT IS SO ORDERED.**

Initials of Preparer _____ : _____

_____ vpc

5/28/2021

I hereby attest and certify on ~~5/28/2021~~ 2021
that the foregoing document is a full, true
and correct copy of the original on file in
my office, and in my legal custody.

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Troy White
DEPUTY CLERK

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | July 9, 2020 |
|---|---|---|---|---|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | | Attorneys Present for Defendant: |
| Not Present | | Not Present |

**Proceedings:**     **(IN CHAMBERS) Order Re: Motion for Civil Contempt Order [DE 261]**

### I.     INTRODUCTION

On April 1, 2020 this Court granted Plaintiff Vitaly Ivanovich Smagin's request for an Order clarifying its November 14, 2016 post-judgment injunction. The Court's order stated, in part, that Defendant Ashot Yegiazaryan ("Ashot[1]"), and anyone acting in concert with him, to include his cousin Suren Yegiazaryan ("Suren") and former business partner Vitaly Gogokhia ("Gogokhia") "must immediately cease all actions in Nevis or any other jurisdiction that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust."

Presently before the Court is Plaintiff's motion seeking civil contempt sanctions against Defendant Ashot Yegiazaryan and his cousin Suren Yegiazaryan. (ECF No. 261.) Since its initial filing the parties have filed numerous items of supplemental briefing, both at the Court's direction and upon their own request.

For the following reasons, the Court **DENIES** Plaintiff's motion as to Ashot and Suren Yegiazaryan, but imposes constraints on Ashot Yegiazaryan's activity with regard to the Alpha Trust and its related entities as described below.

The Court delays ruling on whether Vitaly Gogokhia will be held in contempt pending his response to its Order to Show Cause. (ECF No. 283.)

---

[1] As multiple individuals named in this order share the surname Yegiazaryan, the Court refers to them at times by their given names.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | July 9, 2020 |
|----------|------------------------|--|------|--------------|

| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* |
|-------|-------------------------------------------------|

## II. FACTUAL BACKGROUND

The larger background of this case is described in this Court's April 1, 2020 Order on Plaintiff's motion to clarify its post-judgment injunction. That Order directed as follows:

> Mr. Yegiazaryan, his cousin Suren Yegiazaryan, his brother Artem Yegiazaryan, Vitaly Gogokhia, the trustees of the Alpha Trust and any others acting on behalf of Mr. Yegiazaryan, directly or indirectly, including but not limited to attorneys or nominees for each of these parties must immediately cease all actions in Nevis or any other jurisdiction that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust pursuant to the current and forthcoming orders of the Liechtenstein Court or this Court.

> To the extent any such enforcement actions have already begun, they must be immediately stopped and any funds held by or on behalf of Suren Yegiazaryan or Judgment Debtor Yegiazaryan must be immediately returned to the Monaco Bank Account of Savannah Advisors, or any other location, from which they came.

Plaintiff asserts that Ashot Yegiazaryan, Suren Yegiazaryan, and Vitaly Gogokhia have each individually taken actions that violate the Court's injunction as clarified in the above Order. The Court describes those actions below as they pertain to each individual Defendant.

## III. JUDICIAL STANDARD

Federal Rule of Civil Procedure 70 provides that a court may hold a party in contempt if it fails to perform any specific acts required by a judgment. There are two types of contempt penalties that can be ordered: civil or criminal. "Whether the contempt is civil or criminal depends on the intended effect of the penalty imposed." *United States v. Laurins*, 857 F.2d 529, 534 (9th Cir. 1988) (citing *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631–33 (1988)). Civil contempt is intended to be remedial, while criminal contempt is punitive. *Id.*

Civil contempt "consists of a party's disobedience to a specific and definite court order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Civil contempt sanctions are employed for two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146 (9th Cir. 1983). Generally, the minimum sanction necessary to obtain compliance is to be imposed. *See Spallone v. United States,* 493 U.S. 265, 280 (1990). Unlike the punitive nature of criminal sanctions, civil sanctions are wholly remedial. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983).

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | July 9, 2020 |
|----------|------------------------|--|------|--------------|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | | |

## IV.     DISCUSSION

As this is a motion for civil contempt, the Court considers whether Ashot, Suren, or Gogokhia is in violation of its injunction in a way that requires the issuance of sanctions to compel compliance, or has harmed the Plaintiff so as to require remediation.

To establish a prima facie case for civil contempt, the moving party must show, by clear and convincing evidence, that the non-moving party disobeyed a specific and definite court order, and that such disobedience was (1) beyond substantial compliance, and (2) not based on a good faith and reasonable interpretation of the Court's order. *Id.* Once the Court finds a prima facie case of civil contempt, the burden shifts to the alleged contemnor to demonstrate an inability to comply. *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). To do so, the accused party must demonstrate that it took all reasonable steps to comply but was unable. *Id.* at 856. When determining whether the non-moving party has met its burden, the Court may consider evidence, including the party's history of noncompliance. *Id.* at 857.

### A.    Suren Yegiazaryan

Plaintiff seeks an order issuing sanctions against Suren to compel him to (1) cease any current or future efforts to freeze or collect against the trust assets in Monaco, and (2) secure the equivalent of a dismissal of his Nevis action with prejudice. As described below, the Court finds that no sanctions are necessary as Suren is not in present violation of the injunction.

On April 3, 2020, Suren Yegiazaryan sought an asset freeze of the Alpha Trust assets from a Monaco Court on the basis of his prior default judgment in Nevis. Suren asserts that this action was taken by his Monaco attorneys on his behalf, and that he immediately instructed them to withdraw their request. Suren's U.S. attorney now affirms that the asset freeze request has been withdrawn, and Suren has no pending action in Monaco. On April 8, 2020, Suren requested that the Nevis Court discontinue his action there, and that action was discontinued on April 19, 2020.

Plaintiff contends that Suren's "discontinuance" of his action in Nevis does not prevent him from re-filing, and that it effectively amounts to a dismissal without prejudice. Plaintiff therefore urges this Court to issue sanctions against Suren in order to compel him to dismiss that action in a way that will foreclose him from pursuing it in the future. However, the Court's interest in suits against the Alpha Trust assets extends only as far as ensuring the enforcement of Plaintiff's judgment. Once that judgment has been enforced, there will be no need to enjoin future lawsuits against the remaining trust assets. The Court therefore finds that Suren has satisfied the requirements of its injunction through the terms of his present dismissal of the Nevis action. The Court likewise finds that Suren's withdrawal of his request for

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | July 9, 2020 |
|----------|------------------------|--|------|--------------|

| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** |
|-------|-----------------------------------------------------|

an asset freeze order in Monaco leaves no violation of the injunction that requires sanctions in order to correct.

### B. Vitaly Gogokhia

Plaintiff seeks sanctions against Ashot Yegiazaryan for violations of the Court's injunction by his former business partner Vitaly Gogokhia, who has continued to take actions against the trust assets in Nevis since the Court issued its clarifying order on April 1, 2020. As Gogokhia was personally named in this Court's clarifying order and has been provided with it, however, the Court may hold him individually responsible as necessary.

This Court's April 1, 2020 clarifying order found that Gogokhia had worked in concert with Ashot to hinder Plaintiff's collection efforts, and directed him to "immediately cease all actions in Nevis or any other jurisdiction that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust." The Order further stated that "[t]o the extent any such actions have already begun, they must be immediately stopped[.]" Several of Gogokhia's actions indicate that he has not ceased his action against the trust in Nevis, however, and in fact intends to continue it.

On March 18, 2020, Gogokhia obtained an ex parte asset freezing order in Nevis against the Alpha Trust. On April 15—two weeks after this Court's clarifying order prohibited him from doing so—Gogokhia submitted an application for a continuance of that order. On April 30, 2020, the Eastern Caribbean Supreme Court for St. Christopher and Nevis ("Nevis Court") set aside that asset freezing order on the grounds that Gogokhia had failed to file a substantive claim in the relevant action. The Alpha trust assets are therefore no longer encumbered by it, and to date Gogokhia has not filed a substantive claim in his Nevis litigation.

However, despite the lack of a substantive claim, to this Court's knowledge Gogokhia's suit remains active in Nevis, and he could proceed with it by filing such a claim at any time. Furthermore, Gogokhia's Nevis counsel previously confirmed that Gogokhia did not consider himself bound by this Court's injunction, and intended to continue attempting to enforce his U.K. consent judgment. (*See* Apr. 27, 2020 email, Merchant Decl. Ex. 9, ECF No. 268-15) ("We maintain our position that the U.S. Court order is not enforceable in St. Kitts and Nevis and our client is not subject to nor has he accepted the jurisdiction of the U.S. Court.")

On June 8, 2020, this Court therefore issued Gogokhia an Order to Show Cause as to why he should not be held in contempt for the above actions. On June 19, 2020, Gogokhia responded requesting additional time to secure local counsel, and attached a document purporting to show an agreement between himself and the Plaintiff, entered into before the UK High Court of Justice, stating that he will

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | July 9, 2020 |
|----------|----------------------|---|------|--------------|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | | |

attempt no further action to enforce the consent order in Nevis pending the outcome of the Plaintiff's motion for an injunction in the United Kingdom.

In light of Gogokhia's agreement with Plaintiff to temporarily cease proceedings in Nevis, the Court has granted his request for additional time to respond to its Order to Show Cause, and will delay a determination of whether he will be held in contempt until that time. The Court further notes that if Gogokhia provides evidence demonstrating that he has discontinued his Nevis action, it will consider its Order to Show Cause discharged.

### C. Ashot Yegiazaryan

Plaintiff seeks an order of sanctions against Ashot to compel him to prevent his trustees on the Alpha Trust from interfering with Plaintiff's collection of the judgment. For the following reasons, the Court declines to impose contempt sanctions at this time, but prohibits Ashot or his agents from taking further actions with respect to the Trust as described in greater detail below.

The Court first reviews the background of Plaintiff's present motion. On March 2, 2020, the Princely Court of Liechtenstein issued an Order (the "March 2 order") awarding Smagin the power to remove CTX Treuhand AG ("CTX") as trustee of the Alpha Trust and to appoint his own trustees. Smagin then nominated Rudolf Schachle ("Schachle") and Raphael Nascher ("Nascher"). The March 2 order also authorized Smagin to demand distribution from the trust assets in satisfaction of the claim that is the subject of these proceedings.

Ashot has appealed the March 2 order and insists that he retains the authority to appoint trustees as well.[2] On March 30, 2020, two days before the Court issued its clarifying order, Defendant therefore appointed two new trustees to the Alpha Trust: Artur Airapetov[3] ("Airapetov ") and Natalia Dozortseva ("Dozortseva"). He also named four of his children as trust beneficiaries.

---

[2] The Court notes that this position appears sharply at odds with the Defendant's previous filings in this litigation, in which he insisted that he had no rights with respect to the Trust whatsoever. (Opp. to Mot. to Clarify, 12:13-22, ECF No. 231) ("Ashot is currently precluded from taking any action with respect to the Alpha Trust . . . pursuant to th[e] Liechtenstein rulings, Ashot has *no rights* with respect to the Liechtenstein trust available to him at this point.")

[3] On April 16, 2020, Ashot removed Airapetov from the trust and replaced him with Murielle Jouniaux ("Jouniaux"), purportedly for reasons of ill-health.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | July 9, 2020 |
|----------|------------------------|--|------|--------------|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | | |

 

The legality of Ashot's recent appointments is heavily contested and presently subject to further litigation. On April 27, 2020, Airapetov and Dozortseva were removed as trustees from the Liechtenstein Public Registry following a finding by the Liechtenstein Office of Justice that Ashot lacked the authority to appoint them. This does not, however, have the legal effect of removing them from their positions as trustees on the Alpha Trust. On April 21, 2020, in an order on Ashot's motion to stay the March 2 Order pending appeal, the Liechtenstein Princely Regional Court made the following assessment regarding their appointment:

> The manoeuvres with the additional fictitious trustees probably do not really serve the purpose of argumentation in Liechtenstein . . . but are intended to create confusion abroad, especially in the proceedings in Nevis. They impressively show that the Liable Party shows neither inhibition nor scruples in order to cheat his creditor out of his money.

> Any concession made by the court will therefore be presented abroad a fortiori as proof that [Ashot] is correct or that everything is still pending. The confusion tactic will make it difficult or impossible for the trustees to defend the trust property.

(April 21, 2020 Order re: Stay Pending Appeal ("April 21 Order") at 12, ECF No. 274-2.)

As predicted above, Defendant once more asserts that complex issues of Liechtenstein trust law remain to be decided, or, put another way, that "everything is still pending." In support of Defendant's position that the Liechtenstein proceedings must be allowed to run their course, even at the cost of delaying satisfaction of Plaintiff's judgment, Ashot and his counsel reference the Ninth Circuit's May 18, 2018 order deferring to the Supreme Court of Liechtenstein on a particular issue regarding the extent of Ashot's control over the Alpha Trust. (ECF No. 205.)

While it is not necessary for the purposes of this order to explore the legal merits of Ashot's present appeal in Liechtenstein, the Court will again quote the findings of the Princely Regional Court regarding its prospects:

> In truth, the announced appeal has no chance of success. Its sole purpose is to give the Liable Party additional time to withdraw the assets via the (fraud) proceedings in the Caribbean.

(April 21, 2020 Order at 14.)

In support of his motion for contempt, Plaintiff contends that Ashot appointed Airapetov and Dozortseva as trustees, exercised effective control over them, and may therefore be held responsible for

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | July 9, 2020 |
|----------|----------------------|------|--------------|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | |

their actions. He further states that on April 9, 2020, Dozortseva and Airapetov sent an email to Plaintiff's trustees threatening them with criminal action if they sought to make any distributions from the Alpha trust in satisfaction of Plaintiff's Judgment without their consent. (*See* April 9 Email, Kennedy Decl. Ex. 1, ECF No. 361-3) ("By present we are obliged to warn you against assisting in any capacity to Mr Smagin and his accomplices in their actions against the Alpha Trust and its assets.")

The text of the Court's clarifying order prohibits both Ashot and any of his attorneys or nominees from taking any steps that would "prevent, hinder or delay Mr. Smagin's ability to collect on the Alpha Trust[.]" However, while the above communication may have been an attempt to do so, Smagin's own trustees have also committed not to make any distributions in satisfaction of the judgment prior to the resolution of Ashot's appeal of the March 2 order. This is due to an agreement Smagin's trustees entered into with the previous trustees, CTX, according to which CTX agreed to resign on the condition that Smagin's trustees waited to make any distributions until that appeal is decided. (Decl. of Nicholas Reithner Re: Collection of Judgment ¶ 14, ECF No. 289.)

As such, the email from Ashot's trustees described above has had no material impact on Smagin's ability to collect on the judgment to this point, nor has it caused him harm that requires remediation. The Court therefore finds that contempt sanctions are not presently required.

At the same time, however, and as the Liechtenstein courts have recognized, Defendant has a pattern of taking actions that precipitate new litigation as a stall tactic to avoid collection. Without some further check on his behavior, it is entirely possible that he will continue to do so and thereby draw out this process indefinitely. The fact that the Ninth Circuit expressed a desire to defer to Liechtenstein courts on certain issues of law does not mean that Defendant can violate this Court's injunction with regard to the Alpha Trust as long as he does it in Liechtenstein.

The Court therefore prohibits Defendant, or his trustees, associates, attorneys or agents, from making or attempting to make any further modifications to the Alpha Trust, including but not limited to the addition or substitution of trustees or beneficiaries, without first obtaining this Court's approval. It likewise prohibits Defendant from making any attempt to alter or amend the administration of either the company Savannah Advisors or the Monaco bank account, or from taking any further actions with respect to those entities, without this Court's approval. To the extent that any such acts are in progress, they must be stopped.

Moreover, while the Court denies Plaintiff's motion at this time, it does so without prejudice to his ability to refile should Defendant take any of the steps described above or otherwise seek to impede collection as prohibited by the Court's injunction.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | July 9, 2020 |
|---|---|---|---|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | |

## V.    CONCLUSION

For the foregoing reasons the Court **DENIES** Plaintiff's Motion for contempt **without prejudice** and imposes upon Defendant the additional restriction described above.

**IT IS SO ORDERED.**

:

Initials of Preparer                    VRV

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | September 16, 2020 |
|---|---|---|---|---|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | | Attorneys Present for Defendant: |
| Not Present | | Not Present |

**Proceedings:** **(IN CHAMBERS) Order Re: Motion for Civil Contempt Order [DE 300]; Requests to File Supplemental Declarations [DE 307, 308, and 309]**

## I. INTRODUCTION

On April 1, 2020 this Court granted Plaintiff Vitaly Ivanovich Smagin's request for an Order clarifying its November 14, 2016 post-judgment injunction. The April 1 Order stated, in part, that Defendant Ashot Yegiazaryan, and anyone acting in concert with him, "must immediately cease all actions in Nevis or any other jurisdiction that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust pursuant to the current and forthcoming orders of the Liechtenstein Court or this Court."

On July 9, 2020, this Court denied Plaintiff's motion seeking contempt sanctions against the Defendant. As described below, however, the Court's July 9 Order also prohibited Defendant from making any modifications to the Alpha Trust, or the administration of the company Savannah Advisors, or the Monaco Bank account in which the Alpha Trust funds are held.

Presently before the Court is Plaintiff's motion to have Defendant found in contempt for violations of both the above orders by his trustee on the Alpha Trust, Natalia Dozortseva ("Dozortseva").

For the following reasons, the Court **GRANTS** Plaintiff's motion.

## II. FACTUAL BACKGROUND

The larger background of this case is set forth in this Court's April 1, 2020 Order on Plaintiff's motion to clarify its post-judgment injunction. The Court therefore first describes the Orders presently in effect, the status of the trustees, and the actions of Natalia Dozortseva.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | September 16, 2020 |
|---|---|---|---|---|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | | |

### A.    The Court's April 1, 2020 Order

On April 1, 2020 this Court ordered as follows:

> Mr. Yegiazaryan, his cousin Suren Yegiazaryan, his brother Artem Yegiazaryan, Vitaly Gogokhia, the trustees of the Alpha Trust and any others acting on behalf of Mr. Yegiazaryan, directly or indirectly, including but not limited to attorneys or nominees for each of these parties must immediately cease all actions in Nevis or any other jurisdiction that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust pursuant to the current and forthcoming orders of the Liechtenstein Court or this Court.

> To the extent any such enforcement actions have already begun, they must be immediately stopped and any funds held by or on behalf of Suren Yegiazaryan or Judgment Debtor Yegiazaryan must be immediately returned to the Monaco Bank Account of Savannah Advisors, or any other location, from which they came.

### B.    The Present Trustees

On March 2, 2020, the Princely Court of Liechtenstein issued an Order (the "March 2 order") awarding Smagin the power to remove CTX Treuhand AG ("CTX") as trustee of the Alpha Trust and to appoint his own trustees. Smagin then nominated Rudolf Schachle ("Schachle") and Raphael Nascher ("Nascher"). The March 2 order also authorized Smagin to demand distribution from the trust assets in satisfaction of the claim that is the subject of these proceedings.

On March 30, 2020, Defendant also appointed two new trustees to the Alpha Trust: Artur Airapetov and Natalia Dozortseva. On April 16, 2020, Defendant removed Airapetov due to ill-health and replaced him as trustee with Murielle Jouniaux ("Jouniaux"). Defendant also named four of his children as trust beneficiaries.

Plaintiff contests the legality of Defendant's appointments and asserts that Dozortseva and Jouniaux are not legitimate trustees. On April 27, 2020, Airapetov and Dozortseva were removed as trustees from the Liechtenstein Public Registry following a finding by the Liechtenstein Office of Justice that Ashot lacked the authority to appoint them. This does not, however, have the legal effect of removing them from their positions as trustees on the Alpha Trust.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:14-cv-09764-RGK-PLA | Date | September 16, 2020 |
|---|---|---|---|
| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** | | |

#### C.    <u>The Court's July 9, 2020 Order</u>

On July 9, 2020, this Court denied Plaintiff's motion to hold Defendant in contempt on the basis of the above appointments as well as subsequent actions by Defendant's trustees. The Court recognized, however, that Defendant had demonstrated a pattern of taking actions that precipitate new litigation.[1] The Court therefore imposed the following additional restriction on Defendants' conduct:

> The Court . . . prohibits Defendant, or his trustees, associates, attorneys or agents, from making or attempting to make any further modifications to the Alpha Trust, including but not limited to the addition or substitution of trustees or beneficiaries, without first obtaining this Court's approval. It likewise prohibits Defendant from making any attempt to alter or amend the administration of either the company Savannah Advisors or the Monaco bank account, or from taking any further actions with respect to those entities, without this Court's approval. To the extent that any such acts are in progress, they must be stopped.

#### D.    <u>Natalia Dozortseva</u>

Since that time, Natalia Dozortseva has taken the following actions:

On July 20, 2020, Dozortseva filed an *ex parte* application in the Eastern Caribbean Supreme Court for St. Christopher and Nevis ("Nevis Court") seeking an order (1) appointing herself as a director of Savannah Advisors, (2) restraining Savannah Advisors' exercise of authority over its assets and administration without her written consent, and (3) permitting her to intervene in an action between Savannah Advisors and its registered agent in Nevis, Prestige Trust Company, LTD.

### III.    <u>JUDICIAL STANDARD</u>

Federal Rule of Civil Procedure 70 provides that a court may hold a party in contempt if it fails to perform any specific acts required by a judgment. There are two types of contempt penalties that can be ordered: civil or criminal. "Whether the contempt is civil or criminal depends on the intended effect

---

[1] The Court notes Defendant Yegiazaryan's Objections to its July 9 Order, which point out that certain excerpts of the Liechtenstein court rulings quoted in that Order were the Liechtenstein Court's restatements of the parties' arguments, rather than judicial findings regarding the parties' conduct. This does not, however, alter the Court's holding in that Order, or the restrictions the Court placed on Defendant's conduct respecting Savannah Advisors.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | September 16, 2020 |
|---|---|---|---|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | |

of the penalty imposed." *United States v. Laurins*, 857 F.2d 529, 534 (9th Cir. 1988) (citing *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631–33 (1988)). Civil contempt is intended to be remedial, while criminal contempt is punitive. *Id.*

Civil contempt "consists of a party's disobedience to a specific and definite court order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Civil contempt sanctions are employed for two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146 (9th Cir. 1983). Generally, the minimum sanction necessary to obtain compliance is to be imposed. *See Spallone v. United States,* 493 U.S. 265, 280 (1990). Unlike the punitive nature of criminal sanctions, civil sanctions are wholly remedial. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983).

## IV.   DISCUSSION

As this is a motion for civil contempt, the Court considers whether sanctions are required to compel Defendant to comply with its injunction. The Court finds that they are.

To establish a prima facie case for civil contempt, the moving party must show, by clear and convincing evidence, that the non-moving party disobeyed a specific and definite court order, and that such disobedience was (1) beyond substantial compliance, and (2) not based on a good faith and reasonable interpretation of the Court's order. *Dual-Deck Video*, 10 F.3d at 695. Once the Court finds a prima facie case of civil contempt, the burden shifts to the alleged contemnor to demonstrate an inability to comply. *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). To do so, the accused party must demonstrate that it took all reasonable steps to comply but was unable. *Id.* at 856. When determining whether the non-moving party has met its burden, the Court may consider evidence, including the party's history of noncompliance. *Id.* at 857.

### A.   Natalia Dozortseva is in Violation of this Court's July 9, 2020 Order

As described above, the Court's July 9 Order prohibited Defendant, or those acting on his behalf, from "making any attempt to alter or amend the administration of either the company Savannah Advisors or the Monaco bank account, or from taking any further actions with respect to those entities, without this Court's approval."

On July 20, 2020, Defendant's appointed trustee, Natalia Dozortseva, filed an *ex parte* application in the Eastern Caribbean Supreme Court for St. Christopher and Nevis ("Nevis Court") that seeks, among other things, to have herself appointed as a director of Savannah Advisors. (*See* Kennedy

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | | Date | September 16, 2020 |
|---|---|---|---|---|
| Title | ***Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*** | | | |

Decl. Ex. 1, Ex Parte App. for Freezing Injunction and Ancilliary Relief, ECF No. 300-3.) This is a direct violation of the above order, and, as such, her actions are beyond substantial compliance.

Defendant argues that the sentence prohibiting changes to the administration of Savannah Advisors should apply only to the Defendant himself, and not to Dozortseva, because the Court did not again recite the phrase "or his trustees, associates, attorneys or agents" at the start of the sentence in which that prohibition is contained. The Court disagrees. No rational reading of that the Court's July 9 Order would bar Defendant from acting through his trustees to amend the Alpha Trust without the Court's permission, yet simultaneously permit him to act through his trustees to alter the companies that administer the trust or its assets. Such a position—while creative—is "not based on a good faith and reasonable interpretation of the Court's order." *Stone*, 968 F.2d at 856 n.9.

Furthermore, Dozortseva's action is barred not only by the terms of the Court's July 9 Order, but by its clarifying Order of April 1, 2020 as well. That Order prohibited Defendant, or anyone acting on his behalf, from taking any action in Nevis to "prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust." Dozortseva's application seeks to restrain all disposition of Savannah Advisors' assets without her consent. Such an attempt violates the above April 1 Order, as well as the original November 14, 2016 post-judgment injunction, which prohibited encumbrance of the Alpha Trust proceeds.

### B.  Ashot Yegiazaryan has the Authority to Control Natalia Dozortseva

Defendant next makes two arguments that are in effect the same point: (1) that he cannot be found in contempt because Dozortseva's conduct is not attributable to him, and (2) that it is impossible for him to force Dozortseva to drop her Nevis application. Both points boil down to the question of whether Defendant has the power to control Dozortseva, and both resolve on the same ground: Defendant appointed Dozortseva to her position as trustee, and regardless of whether that initial appointment was valid, Defendant has the power to remove her.

"Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action." *United States v. Rylander*, 460 U.S. 752, 757 (1983).

Defendant asserts that his counsel has written to Ms. Dozortseva to demand that she withdraw her Nevis application, and that her failure to respond is evidence of his lack of control over her. The Court disagrees. If the trustee Defendant appointed is violating this Court's order against his wishes, he need only remove her from her position as trustee. Defendant has been adamant that he had the right to appoint Dozortseva to the Alpha Trust. If that is the case, then Defendant also has the power to remove her, as he removed Artur Airapetov.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:14-cv-09764-RGK-PLA | Date | September 16, 2020 |
|---|---|---|---|
| Title | *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan* | | |

Defendant does not argue that he lacks such authority, but rather that for this Court to order him to remove Dozortseva would constitute a judgment on the legality of her appointment that intrudes into the territory of the Liechtenstein Courts. However, the Court need not make a legal finding regarding the legitimacy of Dozortseva's appointment in order to require that Defendant either compel his trustee to comply with the Court's July 9 Order, or else remove her if she refuses to do so. Defendant cannot claim that compliance is "impossible" where the ability to remedy the issue is plainly within his power. Put another way, Defendant has failed to show that he has taken all reasonable steps in order to comply.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Civil Contempt is **GRANTED** as follows:

Defendant Ashot Yegiazaryan must ensure that Natalia Dozortseva's Ex Parte Application for a Freezing Injunction and Ancillary Relief, and any related filings or other filings in Nevis or elsewhere seeking relief related to the Alpha Trust and/or Savannah Advisors, are withdrawn. To the extent any relief has been granted to Ms. Dozortseva by the Nevis Court, Mr. Yegiazaryan must ensure that she takes all necessary steps to reverse the order granting relief and any effects therefrom.

In the event that Ms. Dozortseva fails to comply with any of the above directives, Mr. Yegiazaryan must remove her as a trustee of the Alpha Trust.

In the event that Defendant Yegiazaryan fails to provide the Court with proof of compliance with this order within **seven days** of its issuance, sanctions will begin to accrue at a rate of **two-thousand dollars per day**. Payment of sanctions shall be made to Plaintiff Vitaly Smagin, care of Baker McKenzie LLP.

Plaintiff Vitaly Smagin is awarded his attorneys' fees and costs incurred in bringing this motion according to proof.

The parties' requests to file supplemental declarations at ECF No. 307, 308, and 309 are **GRANTED**.

IT IS SO ORDERED.

_____ : _____

Initials of Preparer

_____

# EXHIBIT F

RECEIVED
09 March 2020

Deadline: 23-03-2020 / [illegible]

PRINCIPALITY OF LIECHTENSTEIN
# PRINCELY COURT
# OF LIECHTENSTEIN (FÜRSTLICHES LANDGERICHT)

Please mention file no. in all submissions
08 EX.2016.5802
Ref. no. (ON) 109

# ORDER

# Legal Matter

**Enforcing Party**:      Vitaly Ivanovich Smagin,
                          Krasnoproletarskaya st., h.9, R-127006 Moscow

                          represented by Advocatur Seeger, Frick & Partner
                          AG, Landstrasse 81, 9494 Schaan

**Obligated Party:**      Ashot YEGIAZARYAN,

                          655 Endrino Place Beverly Hills, USA-

                          90201 California

                          represented by Advocatur Sprenger & Partner

                          AG, Landstrasse 11, P.O. Box 140, 9495 Triesen

**Third-Party Debtor:**   CTX Treuhand AG as Trustee of the Alpha Trust

                          represented by Wilhelm & Büchel, 9490 Vaduz

**For:**                  Authorisation of Enforcement (Amount in litigation:
                          CHF 91,605,445.97)

**1.1**   The **REALIZATION** of the consolidated rights (*Gesamtrechte*) seized by
authorization of enforcement (*Exekutionsbewilligung*) of the Princely Court
(Fürstliches Landgericht) dated 21 November 2016, 08 EX.2016.5802, ref.
no. (ON) 3 of the Obligated Party as **Trustor, Protector and Beneficiary of
the Alpha Trust** (FL-0002-510.771-1), c/o Dr. iur. Thomas Wilhelm, Lova
Center, FL-9490 Vaduz existing vis-à-vis the **CTX Treuhand
Aktiengesellschaft** as Trustee of the Alpha Trust (FL-0002-510.771-1), c/o
Dr. iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz, namely in particular
the right to receive payments and contributions of any kind whatsoever from
the fiduciary

Page 2

Object *(Treugut)*, the right to appoint and remove the Trustee of the Alpha Trust (Art. (2) *Written Instrument* dated 2 June 2015), the right of the Trustee to terminate the trust (Art. 3, 14.3 *Declaration of Trust* in connection with Art. (1) and (2) of the *Written Instrument*), the right of the Trustee to appoint the Beneficiaries of the Alpha Trust (Art. 8, 14.3. *Declaration of Trust* in connection with Art. (1) and (2) of the *Written Instrument*), the right of the Trustee to amend the trust deeds of the Alpha Trust (Art. 12, 14.3. *Declaration of Trust* in connection with Art. (1) and (2) of the *Written Instrument*), the right of the Trustee to delegate all rights of the Trustee, including its discretionary powers (Art. 11, 14.3. *Declaration of Trust* in connection with Art. (1) and (2) of the *Written Instrument*) and the right of the Trustee to exercise all rights set forth in the *First Schedule* of the *Declaration of Trust* (Art. 11, 14.3. *Declaration of Trust* in connection wit Art (1) and (2) of the *Written Instrument*) shall be **<u>allowed</u>**, namely by


**Authorization** of the Enforcing Party to claim the above-mentioned rights of the Obligated Party instead of the Obligated Party, namely <u>in particular</u>

**a) Removal of CTX:**

The right to remove with immediate effect the previous trustee of the Alpha Trust, CTX Treuhand AG, Lova-Center, 9490 Vaduz, in place of the Obligated Party pursuant to Art. 14.05 of the Trust Deed of the Alpha Trust as amended by the *Written Instrument of 2-6-2015*.


**b) Nomination of new trustees:**

To nominate and appoint new trustees of the Alpha Trust in accordance with Article 10.1. of the Trust Deed

- be it is the Enforcing Party,

- be it the attorneys at law Mag.iur. Rudolf Schächle and lic. iur. Raphael Näscher or

- be it other natural persons designated by the Enforcing Party or a trust company domiciled on the national territory or abroad.

Page 3

**c) To claim and approve of distribution to Yegiazarian:**

- To demand and request the distribution of the claim which is the subject of the proceedings and which is enforceable in the amount of CHF 91,595,445.97 (08 EX.2016.5802, ref. no (ON) 3) plus interests (namely quarterly compounded annual interest rate of 8% calculated on the basis of USD 72,243,000.00 and USD 6,899,701.32 since 15 November 2016) and costs to the Obligated Party to a paying agent to be designated by the Enforcing Party,

from the current or newly appointed trustee of the Alpha Trust in place of the Obligated Party on the basis of the Letter of Wishes of the Obligated Party dated 3-7-2015 and the Trust Deed of the Alpha Trust as amended by the Written Instrument dated 2-6-2015 as well as on the basis of his actually existing right of instruction vis-à-vis the trustee of the Alpha Trust and

- To consent instead of the Obligated Party to this distribution and its execution (including the paying agent designated by the Enforcing Party) in his position as protector (within the meaning of Art. 14.4 in conjunction with Art. 8.1.2 of the Trust Deed of the Alpha Trust of 27-05-2015 as amended by the Written Instrument of 2-6-2015) and beneficiary (within the meaning of Art. 1.1.2 and the Third Schedule of the Trust Deed of the Alpha Trust of 27-05-2015).

**d) To exercise rights arising under the Agreement on the Letter of Wishes:**

To demand and request:

- the appointment of the Enforcing Party as beneficiary of the Alpha Trust,

- the distribution of the enforceable claim which is the subject of the proceedings in the amount of CHF 91,595,445.97 (08 EX.2016.5802, ON 3) plus interests (namely quarterly compounded annual interest rate of 8% calculated on the basis of USD 72,243,000.00 and USD 6,899,701.32 since 15 November 2016) and costs to the Enforcing Party (in its capacity as appointed beneficiary),

from the current or newly appointed trustee of Alpha Trust in place of the Obligated Party on the basis of the rights of the Obligated Party pursuant to the Agreement on the Letter of Wishes of 3-7-2015, as well as

- to consent - instead of the Obligated Party to this distribution and its execution (including the paying agent designated by the Enforcing Party) - in its position as

Page 4

protector (within the meaning of Art. 14.4 in connection with Art. 8.1.2 of the Trust Deed of the Alpha Trust of 27-05-2015 as amended by the Written Instrument of 2-6-2015) and beneficiary (within the meaning of Art. 1.1.2 and the Third Schedule of the Trust Deed of the Alpha Trust dated 27-05-2015).

**e) To Exercise Administrative Rights of the Protector for Execution:**

To consent - on the basis of the Deed of the Alpha Trust  as amended by the Written Instrument of 02-06-2015 and instead of the Obligated Party - to the actions of the trustee in accordance with points 4, 11, 16.2 and the First Schedule of the Trust Deed and exercise all information rights of the Obligated Party vis-à-vis the trustee.

**1.2.** The **seizure**(Pfändung) of the pecuniary claims and claims for payment to which the Obligated Party is entitled against Alpha Trust or, respectively, its fiduciary agent on the basis of the realization in question pursuant to clause 1.1, in particular distribution claims in the amount of CHF 91,595,445.97, and the **transfer** (*Überweisung)* of these seized claims for collection *(Einziehung)* up to the amount of the enforceable claim, without prejudice to any previously acquired rights of third parties, shall be approved.

The Third-Party Debtor shall be prohibited from making payment to the Obligated Party. The latter shall be prohibited from any disposal of the seized claim as well as of the pledge created for it, in particular the total or partial collection of this claim. Upon notification of this payment prohibition to the Third-Party Debtor, the approved seizure is considered to be effected and a lien is acquired in favour of the enforceable claim of the Enforcing Party regarding the above-mentioned claim.

**2.** The further enforcement costs of the Enforcing Party are determined with CHF 83,297.75.

Page 5

**Grounds**

1.  In its decision or, respectively, authorization of enforcement of 21-11-2016 (ref. no. (ON) 3), this court ruled as follows:

    Based on the enforceable arbitral award of the London Court of International Arbitration (LCIA), London, Great Britain, dated 11 November 2014 (...)

    the <u>Enforcing Party</u>, Vitaly Ivanovich SMAGIN, Krasnoproletarskaya st., h.9, 127006 Moscow, Russia,

    is <u>allowed the enforcement</u>

    against the Obligated Party Ashot YEGIAZARYAN, 655 Endrino Place, Beverly Hills, California, United States of America,

    to recover the enforceable claim of

    a.    USD 72,243,000.00 (as principal), and

    b.    USD 6,899,701.32 (as capitalised interests) and

    c.    GBP 2,776,473.68 and USD 672,354.08 and RUB 2,958,750.00 (as costs) and

    d.    further interests in the amount of a quarterly compounded annual interest rate of 8% calculated based on USD 72,243,000.00 and USD 6,899,701.32 since 11 November 2014 and

    e.    the costs of the enforcement application, determined with CHF 63,880.00,

    by means of

    1.    <u>seizure</u> of the consolidated rights belonging to the Obligated Party as trustor, protector and beneficiary of the Alpha Trust (FL- 0002.510 .771-1), c/o Dr.iur. Thomas Wilhelm, Lova Center, 9490 Vaduz, vis-à-vis the

          CTX Treuhand Aktiengesellschaft as trustee of the Alpha Trust (FL-0002-510.771-1 ), c/o Dr.iur. Thomas Wilhelm, Lova Center, FL- 9490 Vaduz, in particular the right to receive payments and benefits of all kinds from the fiduciary object, the right to appoint and remove the trustees of the Alpha Trust (Art. (2) of the Written Instrument of 2 June 2015), the Trustee's right to terminate the Trust (Art. 3, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the Trustee's right to appoint the beneficiaries of the Alpha Trust (Art. 8, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the Trustee's right to amend the Trust Deeds of the Alpha Trust (Art. 12, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the Trustee's right to delegate all the Trustee's rights, including his discretionary powers (Art. 11, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the right of the Trustee to exercise all the rights set out in the First Schedule of the Declaration of Trust (Art. 11, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument) and the rights as asset manager of the trust (Minutes of a Meeting of the Directors of CTX Treuhand AG of 3 June 2015).

Page 6

**2.** It is hereby ordered that the Obligated Party Ashot YEGIAZARYAN has to refrain from any disposal of the rights described above (1.).

**3.** It is hereby ordered that the CTX Treuhand Aktiengesellschaft as trustee of the Alpha Trust (FL- 0002-510.771-1), c/o Dr.iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz is prohibited to perform[1] out of the title of these claims or in the exercise of these rights (1. ) to the Obligated Party Ashot YEGIAZARYAN and/or a third party, in particular not to follow instructions by the Obligated Party Ashot YEGIAZARYAN and/or to accept consents by the Obligated Party Ashot YEGIAZARYAN and to base its decisions on them.

**4.** Excluded from this authorization of enforcement are the claims covered by the authorization of enforcement on receivables (*Forderungsexekutionsbewilligung*) of the Princely Court of 24 February 2016, 08 EX.2016 .839, ref. no. (ON) 4, namely the claims already seized, namely the monetary claims (*Geldforderungen*) and repayment claims (*Rückzahlungsansprüche*) to which the Obligated Party is entitled due to its legal position as beneficial owner, trustor, beneficiary and principal of the Alpha Trust or other fiduciary relationships against the Third-Party Debtors (i) CTX Treuhand AG as trustee of the Alpha Trust, (ii) Dr. Thomas Wilhelm and (iii) Nikolaus Wilhelm.

**2.** The Obligated Party and the Third-Party Debtor appealed against this order to the Princely Court of Appeal. In its decision of 03-08-2017 (ref. no. (ON) 36), the Princely Court of Appeal granted both appeals in the sense of dismissing the applications for enforcement and justified its decision as follows, among other things:

6.6.7 In the light of these general comments, the following should be said for the specific case:

Since the enforcement granted under case no..EX.2016.839 [sic] was carried out on the basis of Article 210f of the Enforcement Act (Exekutionsordnung, EO), the present enforcement relief sought is directed at the use of another enforcement instrument (Article 241 et seq. of the Enforcement Act (EO)) with the aim of seizing further rights of the Obligated Party, there is therefore no legal conflict with the enforcement already granted in favour of the same Enforcing Party, particularly since the claims already seized under 08.EX.2016.839 are expressly not to be covered by the present authorization of enforcement. However, the present authorization of enforcement, in which the partially contradictory and undefined relief sought by the Enforcing Party has been unreflectively been taken over, has proved to be so deficient that the contested order must be amended and the application for enforcement on which the contested order is based must be dismissed.

---

[1] Translator's Note: „Leisten" may be "perform" or "make payments".

Page 7

First of all, it should be noted that a seizure of the "consolidated rights" of the Obligated Party is out of question due to its position as trustor and beneficiary of the Alpha Trust, since the pecuniary claims and payment entitlements associated with this position, in particular distribution and repayment claims in the amount of at least the outstanding (enforced) claims have already been seized under case no. 08 EX.2016.839. The repeated inclusion of the "*right to receive payments and benefits of all kinds from the fiduciary object*" in the authorization of enforcement is already contradictory in itself, since these property rights are just not supposed to be included under clause 4 of the contested order. The "consolidated rights" covered by the enforcement in question are concretised in a complete inadequate way (since in an inadmissible way) and contradictorily in themselves by the following list of the rights covered "in particular", whereby the pleading in the application for enforcement, without further specification of the nature of the benefit of the Obligated Party (entitled beneficiary (*Begünstigungsberechtigter*) or discretionary beneficiary (*Ermessensbegünstigter*)), essentially only deals with his rights as protector, whereas the specification of these rights in the enforcement authorization in turn only refers to "*the right to appoint and remove the trustees of the Alpha Trust*", to which we will have to return later. Concerning this, it should also be noted that - as regards the rights of the protector - the file and the deeds submitted only contain rights of consent to the rights granted to the trustee under the Trust Deed. Moreover, the enforcement authorization is intended to seize exclusively the rights of the Alpha Trust's trustee, namely the Trustee's right to terminate the trust, the Trustee's right to appoint the beneficiaries of the Alpha Trust, the Trustee's right to amend the Alpha Trust's trust deeds, the Trustee's right to delegate all of the Trustee's rights, including his discretionary powers, the Trustee's right to exercise all of the rights set out in the First Schedule of the Declaration of Trust and, ultimately, the Trustee's rights as administrator of the Trust's assets.

Insofar as the enforcement authorization in question is not intending to seize the rights of the Obligated Party arising from the trust relationship with the trustee, this proves to be inadmissible from the outset because - as explained above - the prerequisite for seizure pursuant to sec. 241 et seq. of the Enforcement Code (EO) can only be property rights which belong to the Obligated Party, and which can be realized. According to the contents of the approved application for enforcement, however, the Enforcing Party wants however to access the rights granted to the appointed trustee in the Trust Deed, which would not only violate provisions of the enforcement law, but would also inadmissibly infringe the legal rules regulating the nature of a trust - as they were reproduced in extracts above.

Page 8

As explained above, the trustor may leave the execution of the instructions given to the free discretion of the trustee, in particular with regard to individual or all beneficiaries or, respectively, classes of beneficiaries, and may also cause the trustee to determine the amount of the endowments. The fact that the Obligated Party is an Entitled Beneficiary has neither been specified in more detail in the present case, nor does this result from the deeds. Apart from this, according to Art. 918 para. 1 of the Person and Company Law (Personen- und Gesellschaftsrecht; PGR), neither the trustor can draw up provisions obliging the trustee to comply with the trustor's continuous instructions, in particular with regard to the use of the fiduciary object, nor can the protector make dispositions of assets in place of the Trustee. The rights contractually granted to the Trustee in the trust deed shall be directly due to the Trustee's legal position as an independent asset holder, even if the Trustee must exercise them in the interest of the trustor and in accordance with the provisions in the trust deed.

6.6.8   This leaves only the Protector's right to appoint and remove Alpha Trust's trustees, which is further specified in the Enforcement Act. In the view of the Senate, this does not constitute a seizure of a right of asset value (*vermögenswertes Recht*) for the time being, because this right does not directly provide the beneficiary with a legal position of asset value. In this respect, recourse can be made to the considerations of the Austrian Supreme Court (OGH) in the aforementioned decision 3 Ob 177/10s, according to which the power to remove and appoint bodies is, from an economic point of view, only a coercive means. The right of removal serves to control and enforce the trustee's duties. For the time being, however, the lawful conduct of the trustee must be assumed. It is possible that this right would acquire significance in the context of the seizure of the consolidated rights of the Obligated Party within the meaning of the considerations of the Austrian Supreme Court (OGH) in 3 Ob 177/10s if the trustee violated his duty, in particular with regard to seized claims of the Obligated Party, according to the trust order and does not want to make payments to the entitled beneficiary. In its decision 3 Ob 177/10s, the Austrian Supreme Court (OGH) left the question open whether a corresponding authorization to exercise such potestative rights (*Gestaltungsrechte*) can be granted in the course of the realization proceedings (*Verwertungsverfahren*). In the present case, too, this question can be left open all the more, since already the seizure of these rights proves to be defective.

The Third-Party Debtor also rightly asserts that the issued third-party prohibition *(Drittverbot)* in this form cannot be maintained, because under Article 242 para. 1 of the Enforcement Act (EO) a third-party prohibition would only have to be issued if a specific third party was obliged to perform on the basis of the rights of the Obligated Party that were seized. Insofar as this should apply to the claims of the Obligated Party as trustor or,

Page 9

respectively, as Entitled Beneficiary under the trust, a corresponding third-party
prohibition was already issued in proceedings 08 EX.2016.839 anyway. On the
other hand, no other rights of the Obligated Party were seized with the present
authorization of enforcement, which would be counterbalanced by an obligation to
perform on the part of the trustee, which is why the third-party prohibition
formulated in this way lacks a legal basis.

As a result, the application for enforcement therefore had to be dismissed,
amending the contested order and granting the recourses (*Rekurse).*

**3.**     Against this order of the Court of Appeal (Obergericht), the Enforcing Party filed a
recourse on points of law (*Revisionsrekurs*) to the Supreme Court (Oberster
Gerichtshof). The Supreme Court granted the appeal on points of law by order of
07-09-2018 (ref. no. (ON) 72) and restored the order of the Princely Court
(Landgericht). The Supreme Court explained the reasons for its decision amongst
others as follows [emphasis added by the author]:

7.     The Princely Supreme Court has found the following:

7.1.   Model of sec. 331 of the Austrian Enforcement Act (EO) for Art 242 of the
       Enforcement Act (EO) for Legal Reception:

7.1.1  For the purpose of the enforcement on property rights which are not part of
       the claims, Article 242 para. 1 of the Enforcement Act (EO) (= sec. 331 para.
       1 of the Austrian Enforcement Act (EO)) requires the court, at the request of
       the creditor enforcing the claim, to issue an order to refrain from any disposal
       of the right (seizure). If, by virtue of this right, a certain person is obliged to
       make payments, the seizure is not to be regarded as having been effected
       until this third person has also been served with a court order prohibiting it
       from making payments to the Obligated Party. Pursuant to Art. 242 para. 2
       of the Enforcement Act (EO), the manner in which the right is realized is to
       be determined by the court upon application of the creditor enforcing the
       claim after having heard the Obligated Party and all creditors in whose
       favour the seizure was effected.

7.1. 2 This legal situation of the Liechtenstein Enforcement Act (EO) corresponds
       to the Austrian model for legal reception in sections 331 et seqq. Austrian
       literature and judicature can therefore be used to assess the legal issues
       in question.

7.2    Teleology of Art 242 of the Enforcement Act (EO):

7.2.1  In many cases the enforcing creditor can only rely on a "consolidated right"
       to enforce, since individual rights of asset value which are subsequently to
       be asserted or, respectively, enforced by the enforcing creditor only arise
       in the concrete factual and individual situation. **Under this aspect, only
       rights that are highly personal or otherwise obviously non-
       transferable or those the exercise of which is only economically
       reasonable for the Obligated Party are unseizable** (Austrian Supreme
       Court (OGH) 3 Ob 101 /04f;

Page 10

Oberhammer in Angst/Oberhammer, EO (Enforcement Act)[3] sec. 331 recital 4). Insofar as the opponents of the recourse on points of law (*Revisionsrekursgegner*) refer to the unseizability of individual rights that can be derived from a consolidated right, it should be pointed out to them that the contested authorization of enforcement does not refer to individual rights but to consolidated rights of the Obligated Party (Austrian Supreme Court (OGH) 3 Ob 166/11z; see also RIS-Justiz RS00041 62 [Tl ]).

7.2.2     The catch-all provision for the enforcement on other property rights is intended to ensure that all conceivable assets of the Obligated Party can be seized in enforcement. The interpretation of sections 331 et seqq. of the Austrian Enforcement Act (EO) must be guided by this purpose of the Enforcement Act (RIS Justiz RS01 20619), which must also apply to the interpretation of Art. 242 et seqq. Of the Enforcement Act (EO) "Other property rights" within the meaning of Art. 242 para. 1 of the Enforcement Act (EO) are only those substantive law claims of the respondent that can neither be assigned to the immovable property nor to those parts of the debtor's movable property that are to be defined as monetary claims, physical property or, respectively, claims for the restitution *(Herausgabe)* or performance (*Leistung*) of physical property (Supreme Court (OGH) 03 CG.2007.66 LES 2008, 266 Cons. 8.1; LES 1987, 80; recital 1956, 111). Thus, the **option right of the founder of a foundation to be able to appoint himself as a beneficiary is seen as a seizable asset value**. Even the **right to appoint a governing body**, which does not directly create a legal position of asset value, can indirectly lead to an allocation of monetary value, i.e. from the income from the foundation's assets, as the founder can influence the executive board. Sec. 333, para. 1 of the Austrian Enforcement Act (EO) (Art. 244 para. 1 of the Enforcement Act (EO)) is based on the fact that the seized right grants a claim to "hand-over of assets". **Although the right itself does not have to be realizable, it must in turn enable access to realizable assets** (Austrian Supreme Court (OGH) 3 Ob 177/10s; Oberhammer in Angst/Oberhammer, EO (Enforcement Act)[3] sec. 331 recital 3), such as for example the right to give notice of cancellation, as mentioned in the law (Art 244 para. 1 of the Enforcement Act (EO)). **In principle, several steps of legal acts can also lead to the "hand-over of assets"**; the law does not limit the enforcing creditor to a single realization step in the course of an enforcement proceedings.

7.3     <u>Delimitation of enforcement on consolidated rights and enforcement on claims:</u>

7.3.1     In the present case, contrary to the statements of the opponents of the appeal in points of law (*Revisionsgegner)*, it is not a matter of the seizure of individual "claims", for which at least a prerequisite would be that they have "come into existence", but rather of an enforcement on "other property rights" in the sense of Art 242 et seqq of the Enforcement Act (EO). It is typical of the nature of such an enforcement that realizable claims do not (yet) exist at the time of the executive seizure, because this type of execution is based on a

"consolidated right" and, as a rule, only further steps by the enforcing creditor are required in the framework of the realization proceedings in order for individual claims and entitlements to come into existence (Oberhammer in Angst/Oberhammer, EO (Enforcement Act)[3] sec. 331 recital 3 et seq).

Case 2:18-cv-09755-SK Document 126-1 Filed 05/17/21 Page 88 of 275 Page ID
#:10614
Translation from German to English                                    page **12** of **52**

Page 11

7.3.2   The Austrian jurisprudence will permit seizures under sec. 331 of the
Enforcement Act (EO) **only if further legal acts by the enforcing creditor
give rise to rights of asset value of the Obligated Party**. The
Enforcement Act (EO) does not require that these rights already exist at the
time of seizure (see Austrian Supreme Court (OGH) 3 Ob 165/10a; 6 Ob
235/08i GesRZ 2009, 237 [Arnold]).

7.3.3   The Austrian Supreme Court emphasized this difference between - on the
one hand, the seizure of claims, which presupposes conditional or old claims
because merely expected claims cannot be seized in the context of the
enforcement on monetary claims and, on the other hand, the seizure of
consolidated rights if for example seizable claims have not yet arisen due to
the lack of cancellation of the underlying contractual relationship - in a
decision on the enforcement on trustor rights (Austrian Supreme Court
(OGH) 3 Ob 223/12h ecolex 2013/211). In this specific case it was a
question of the enforcement on claims of the trustor against the trustee,
which can only be subject to enforcement in accordance with sec. 331 of the
Austrian Enforcement Act (EO) (= Art. 242 of the Enforcement Act (EO)).
This provision was applicable because the fiduciary contractual relationship
could only be terminated by a potestative declaration
(*Gestaltungserklärung*) by one of the contracting parties.

7.3.4   While not only the enforcement instrument, but also the object of
enforcement in the case of the enforcement on a claim differs from that in
the case of the enforcement on "other property rights", there is only common
ground on the question of the right that has at least already been created:
In this case, there is no difference in that the right which is subject to
enforcement has already arisen at the time of the seizure. Such a right can
then - depending on the object of execution - be subject to enforcement. An
enforcement on other property rights is thus also subject to the condition
that the consolidated right has already come into existence and is due to the
Obligated Party (Supreme Court (OGH) 25.8.2014, 8 Ob A 56/14i ecolex
2014, 1061).

7.4.   Concerning the application for execution:

7.4.1   In the present case, the Enforcing Party has asserted **several legal
positions of the Obligated Party as consolidated rights** and has applied
for their seizure: In the approved application, for example, it has brought
forward the position of the Obligated Party as **trustor, protector and
beneficiary of the Alpha Trust** vis-à-vis the Third-Party Debtor and has
applied for the seizure of the consolidated rights resulting thereout to which
the Obligated Party is entitled vis-à-vis the Third-Party Debtor (Sec. 1 para.
1 to 3). With regard to the position of the Obligated Party as protector of the
Alpha Trust, amongst others partial rights were put forward in detail, such
as, for example, that the Obligated Party has transferable rights under the
trust deed, such as the right to consent as protector to various rights and
acts of the trustee: in particular, the right to terminate the trust by the trustee,
the right to determine beneficiaries, the right to delegate all rights of the
trustee including his (alleged) discretionary power and to the amendment of

Page 12

provisions of the trust deed. Furthermore, the Obligated Party has the sole right to appoint or remove the Alpha Trust trustees. In addition, the Obligated Party had even allowed itself to be appointed as the Trust's asset manager by the Alpha Trust's trustees (which it controls).

7.4.2    However, this was sufficient assertion by the Enforcing Party as to the seizability of the consolidated rights of the Obligated Party. It is not necessary to assert and certify the individual rights of the consolidated right; if (as is exemplary here, given the linking word "in particular"), this happens nonetheless, it does not harm the Enforcing Party, even if in this context rights, which cannot be realized by the enforcing creditor, are listed by way of example. The present application for enforcement clearly states the **consolidated rights to be seized, namely those of the Obligated Party as trustor, protector and as beneficiary of the Alpha Trust vis-à-vis the Third-Party Debtor**. **There is no need for further detail or, respectively, enumeration of the individual rights resulting from these legal positions**.

7.4.3    The type of enforcement sought by the Enforcing Party is the same as the type of enforcement required by the Austrian Supreme Court (OGH) in 3 Ob 223/12h (ecolex 2013/211; see Oberhammer in Angst/Oberhammer, Enforcement Act (EO)³ sec. 325 recital 5), i.e. the enforcement on other property rights, pursuant to sec. 331 et seqq of the Austrian Enforcement Act (EO) (Austrian Supreme Court (OGH) 3 Ob 223/12h). In this context, the objection of the opponents of the recourse in points of law that the Alpha Trust merely grants a **discretionary benefit** and does not grant any entitlement to the benefit does not apply either, since - as may become apparent in the course of the realization proceedings - **the Obligated Party may, on the basis of its consolidated rights, obtain realizable monetary claims by amending the trust deed.** In addition, **in the course of the realization of its consolidated rights the Obligated Party could also come to a termination of the trust with corresponding claims.** This is not to be examined and decided in more detail here, but rather reserved for a possible realization of the Obligated Party's consolidated rights. Furthermore, it was expressly pointed out that **in the absence of a corresponding prohibition in the trust deed, the Obligated Party was even entitled to appoint himself as trustee, which is also permitted by law** (Art. 910 para. [sic] in connection with Art. 923a, sec. 40 para. 2 of the Persons and Companies' Act (PGR)). Therefore, it is neither contradictory nor incorrect if, in the context of the exemplary enumeration of the individual rights falling within the consolidated rights of the Obligated Party, the Enforcing Party, among other things, also lists rights of the trustee according to the trust deeds mentioned therein, especially since it claims that the Obligated Party could potentially become the trustee of the Alpha Trust itself (ref. no. (ON) 1 recital 38).

7.4.4    It is, moreover, incorrect that the Enforcing Party in its pleadings in the application for enforcement would have limited itself merely to the rights of the Obligated Party as protector. The Enforcing Party has also argued that

Case 2:14-cv-09764-RGK-PLA Document 26-12 Filed 04/20/21 Page 90 of 275 Page ID
#:10616
Translation from German to English                                          page **14** of **52**

the Obligated Party continues to have unrestricted control over the assets
in the trust by means of instructions to the trustees

Case 2:23-cv-03755-K/SK-06/20/2023 ID: 12738140 DktEntry: 12 Page 91 of 275 Page ID
#:10617
Translation from German to English                                           page 15 of 52

Page 13

and, in particular, may continue to give instructions to be followed by the trustees with regard to distributions from the trust assets. The enforcement was applied for in respect of the rights due to the Obligated Party vis-à-vis the trustee of the Alpha Trust, whereby the Enforcing Party was referring to the consolidated rights of the Obligated Party as trustor. With regard to the legal position of the Obligated Party, the Trust Deed of 27 May 2015 and the "Written Instrument" of 2 June 2015 supplementing it were also expressly asserted and, moreover, the individual powers of approval of the Obligated Party for the trustee's agenda were set out in the "Declaration of Trust" (ref. no. (ON) 1 recital 18 and in foot note 3).

7.4.5   There can therefore be no question of the application for enforcement being inconclusive or indeterminate: An application for enforcement is only inconclusive if it lacks the complete, specific and precise assertion of the facts which would be the legal consequence of the requested authorization of enforcement (Supreme Court (OGH) 08 EX.2006.4224 LES 2009, 221). The Enforcing Party has asserted all the legal bases from which the consolidated rights of the Obligated Party against the Third-Party Debtor arise: According to the assertion of the enforcing creditor, the Obligated Party has consolidated rights as trustor, protector and beneficiary of the Alpha Trust against the Third-Party Debtor.

7.4.6   Nor is there any lack of specification by the Enforcing Party of the rights "which it wishes to invoke", as claimed by the opponents of the recourse in points of law. The acts of realization referred to by the law in Art. 243 et seqq. of the Enforcement Act (EO), such as the division or the initiation of the winding-up proceedings, cancellations, etc., and the power of the Enforcing Party - stated in form of a general clause - to "effectively make the declarations otherwise required for the exercise and utilization of the seized right on behalf of the Obligated Party" do not have to be explained in detail in the application for enforcement. For a seizure according to the provision of Art. 242 of the Enforcement Act (EO), it is sufficient if the seized consolidated right in turn allows access to a realizable asset object (Oberhammer in Angst/Oberhammer, Enforcement Act (EO)[3] sec. 331 recital 3). **The application is only to be dismissed if the non-realizability of the right is obvious from the file** (Austrian Supereme Court (OGH) 3 Ob 28/99k SZ 72/108; 3 Ob 243/11y JBI 2012, 535; RIS-Justiz RS0127665; RS0001249, RS0000085). **However, this is not the case here: That a realizable asset object may be seized or, respectively, realized, by means of the consolidated right to be seized, has been demonstrated by the enforcing creditor in detail; a reason to assume an "obvious" unenforceability, is just not given.** The legal position of the Obligated Party as trustor asserted by the Enforcing Party alone allows, according to general principles, to affirm that it is possible to the Obligated Party to create claims of asset value against the trustee.

Page 14

7.5. <u>Indirect Realizability (*indirekte Verwertbarkeit*):</u>

7.5.1. The decision of the Austrian Supreme Court (OGH) 3 Ob 177/10s, which has been cited several times in these proceedings, was amongst others published in PSR 2011/47, 183 (Rassi/Zollner) = GesRZ 2011, 317 (Wurzer/Foglar-Deinhardstein; Zollner/Paulsen, overview on judicature of the Supreme Court in matters of foundation law in the year 2011, PSR 2012/18, 66 [68 f]) concerned an enforcement against a founder of a foundation and only dealt with the question of the realization of the consolidated rights of the Obligated Party as founder which have already been legally seized. There the "comprehensive" right of amendment as well as the founder's right to determine the beneficiary were effectively seized and the Obligated Party was ordered to refrain from any disposal of these rights and the foundation was prohibited to perform vis-à-vis the Obligated Party or, respectively, to accept the latter's disposals of seized rights. It was only in the course of the realization procedure (sec. 331 para. 2 of the Enforcement Act (EO)) that realization applications were specified and supplemented and the court of first instance empowered the Enforcing Party to appoint in its own name the Obligated Party as beneficiary, but dismissed the application for realization going beyond that, namely the application directed at the authorization to remove the members of the advisory board of the foundation (*Stiftungsbeirat*) and to appoint new advisory board members. The second instance followed the recourses (*Rekurse*) of both parties and overturned the decision of the court of first instance. Recourses on points of law (*Revisionsrekurse*) were lodged against the annulment decision, whereby the Austrian Supreme Court (OGH) allowed the Enforcing Party's recourse as partially justified. It stated that the founder's consolidated rights vis-à-vis a private foundation are subject to enforcement pursuant to sec. 331 et seq. of the Enforcement Act (EO) if it has reserved the right of revocation and is at least partially the ultimate beneficiary according to the foundation declaration or pursuant to sec 36 para. 4 of the Act on Private Foundations (Privatstiftungsgesetz, PSG) or has reserved itself the right to amend (RIS-Justiz RS0120752). For, as long as a founder reserves the right to amend or revoke, the principle of complete separation of the foundation from the founder is not realized. Contrary to the opinion of the Obligated Party, however, a cumulative reservation of both potestative rights is not a prerequisite for an enforcement under sections 331 et seqq. of the Enforcement Act (EO) (3 Ob 217/05s; 3 Ob 16/00h).

7.5.2 The enforcement case at hand is not a foundation case. However, the essential feature of the Austrian Supreme Court's judicature on the enforcement of founder's rights is however for the case subject to this decision that in order for an object of enforcement to be suitable for enforcement under sections 331 et seqq. of the Austrian Enforcement Act (EO), **its indirect realizability is already sufficient**. Thus, the Austrian Supreme Court considered a **founder's right to amend "in any case a property right"**, even if it may first require shaping of law to be caused by the Enforcing Party until it can access concrete property rights of the founder (3 Ob 217/05s cons. 3; 3 Ob 177/10s cons. III 1 et seqq.; see

Zollner/Paulsen, PSR 2012/18, 69). An amendment of the declaration of foundation to favour the founder (again) thus created the prerequisites for the establishment of realizable property rights of the founder (Austrian Supreme Court (OGH) 3 Ob 217/05s RdW 2006, 505).

Page 15

If the beneficiary is (finally) entitled to an enforceable claim against the foundation, this claim is assignable, pledgeable and seizable (with reference to Csoklich, Zugriff auf Vermögen der Privatstiftung durch Gläubiger der Stifter und Begünstigten (Access to assets of the private foundation by creditors of the founders and beneficiaries), ÖBA 2008, 416 [424 et seqq]).

7.5.3   The Austrian doctrine also took the view in the event of an enforcement against a founder that the creditor has the possibility to have himself authorized instead of the founder to amend the declaration of foundation also with regard to the concrete amount and due date of endowments in order to provide the founder with an enforceable claim (realizable in the course of an enforcement proceedings) to the payment of endowments (Rassi, PSR 2011 /47, 189 [decision discussion]; RIS-Justiz RS0120753).

7.5.4   The enforcement under Art. 242 of the Enforcement Act (EO) therefore does not require the right to be seized to be directly realizable, **but the "indirect realizability" is sufficient**. In 3 Ob 16/06h ZIK 2006, 143 the Austrian Supreme Court (OGH) took the view that a seizable other property right was given if a founder was the ultimate beneficiary; this should not be doubted. Moreover, in this decision the Supreme Court was satisfied with the fact that **seized potestative rights (of a founder) are only transferable as regards their possibility to be exercised** (with reference to Austrian Supreme Court (OGH) 3 Ob 55/80) and emphasized that **the exercise of the potestative rights (of the founder)** could also be effected **by third-parties** (see Austrian Supreme Court (OGH) 6 Ob 106/03m for the guardian of the founder or, respectively, Austrian Supreme Court (OGH) 6 Ob 332/98m GesRZ 1999, 126 for the parents of the founder with a right of custody with the approval of the guardianship court). In the present case, it is now a question of the Enforcing Party being able to exercise the individual rights contained in the consolidated rights in place of the Obligated Party. It is not apparent what obstacles under enforcement law should prevent this. Apart from this, an enforcement on other property rights is not about transferring the potestative rights to third parties, but rather about the **judicial authorization of the enforcing creditor to exercise the rights of the Obligated Party in the enforcement proceedings instead of the Obligated Party, in order to be able to access, even if only indirectly, the proceeds from the individual right to be liquidated**. **An authorization granted** by the Enforcement Court in the context of an enforcement on other **property rights entitles the enforcing creditor to do everything to which the Obligated Party was previously entitled** (Austrian Supreme Court (OGH) 3 Ob 33/84 SZ 57/102; 3 Ob 16/06h ZIK 2006, 143).

7.5.5   The provisions of the law serving as model for reception (sections 331 et seqq. of the Austrian Enforcement Act (EO)) also aim to expand the possibilities of enforcement and therefore want to cover all those assets of the Obligated Party that are not yet covered by other enforcements (see Art. 242 para. 1 sentence 1 of the Enforcement Act (EO)). It is true that the Austrian Supreme Court therefore takes the view that in case of doubt, it

Case 2:14-cv-09764-RGK-PLA   Document 26-38   Filed 04/20/12   Page 95 of 275   Page ID
#:10621
Translation from German to English                                          page **19** of **52**

has to be assumed that other property rights are subject to enforcement (Austrian Supreme Court 3 Ob 16/06h; RIS-Justiz RS0120349). In the case to be decided, however, this does not have to be taken into account, as such doubts do not exist.

Case 2:23-cv-09755-SK 06/20/2023 ID: 12738140 DktEntry: 12 Page 96 of 275 Page ID
#:10622
Translation from German to English                                        page **20** of **52**

Page 16

7.5.6   It is thus apparent that according to the doctrine and jurisprudence, a seizure of consolidated rights is always possible if - when taking further legal steps, such as in particular also **when asserting potestative rights of the Obligated Party - a realizable asset of the Obligated Party may materialize or be crated**. For the enforcement of consolidated rights pursuant to Art 242 of the Enforcement Act (EO), the so-called "indirect realizability" of the consolidated right is sufficient.

7.6.  Asset Value:

7.6.1.   From this it can be further concluded that the seized property right itself does not have to represent an asset value. The Enforcing Party does not have to certify such an asset value, either. The rights of the enforcing creditor are determined by the extent of the rights of the Obligated Party and are identical with them. The enforcing creditor must be granted the judicial authorization to exercise the rights of the obligated founder instead of the obligated founder in order to be able to access conceivable proceeds. Nothing else can apply in the case of the seizure of consolidated rights by the creditor of a trustor, who in this case is also the beneficiary and protector of a trust.

7.6.2   **Moreover, the seizure of the founder's consolidated rights does not automatically imply the admissibility of the realization by authorization of the enforcing creditor to exercise all the founder's individual rights** (Austrian Supreme Court (OGH) 3 Ob 177/10s cons. 5). The fact that consolidated rights are subject to enforcement under sections 242 of the Enforcement Act (EO) **does therefore not say anything about whether the seized consolidated rights have an asset value in the specific case to be assessed** (see Austrian Supreme Court (OGH) 6 Ob 228/17y PSR 2018, 90). The individual right of the Obligated Party resulting from the consolidated right therefore does neither have to be asserted, nor proved nor certified in the application for enforcement; otherwise the enforcing creditor would be burdened with the assertion of a possible multitude of individual rights potentially resulting from a consolidated right, which does not correspond to the teleology of the enforcement law, namely not to unnecessarily complicate an enforcing creditor access to the assets of the Obligated Party. It is only necessary to assert the asset value of the consolidated right to the extent that it may be possible that from the realization of the individual rights an asset value may result. This is in any case to be affirmed based on the allegations made by the Enforcing Party in ref. no. (ON) 1. Only if the application for enforcement would already indicate that it is obviously a non-seizable right, the application for enforcement would have to be dismissed (Oberhammer in Angst/Oberhammer, Enforcement Act (EO)³ sec. 331 recital 10; Heller/ Berger/ Stix, Kommentar zur Exekutionsordnung (Commentary on the Enforcement Act) III 2336), whereby the jurisprudence, however, assesses in a generous way the assertion that a right to be seized may have an asset value at the time of seizure (Austrian Supreme Court (OGH) 3 Ob 217/05s; 3 Ob 26/08g GeS 2008, 112) and therefore, **if it should turn out that the right cannot be realized at the time of realization, the court would have**

Page 17

**to dismiss the individual application for realization - but not already the application for enforcement with regard to the consolidated right.**

7.6.3   The decision of the Princely Supreme Court 2 R EX.2008.7877 cited by the Obligated Party concerned a restraining order (*Sicherungsbot*), which was intended to prohibit the Obligated Party from disposing of its claims against the Third-Party Debtor up to the amount of the actual trust property. Accordingly, it was not an enforcement on other property rights within the meaning of Art. 242 et seqq. of the Enforcement Act (EO), but rather a forced access to individual claims, i.e. an enforcement on claims. This decision does not answer the question of the seizure of consolidated rights under Art. 242 of the Enforcement Act (EO), since the conditions for the object of enforcement, the "claim", are fundamentally different: For the seizure of "claims", the Princely Supreme Court already stated in LES 2008, 266 that these cannot be touched by a third-party prohibition if their legal basis has not yet been created at the time of the judicial decision and regarding which it is still uncertain whether they will ever come into existence (LES 2008, 266; 2 R EX.2008.7877). In the present case, however, it is not a matter of seizure or realization of individual proprietary "claims", but solely of the seizure of a consolidated right of the Obligated Party against the Third-Party Debtor, from which - even if only indirectly, i.e. only after the addition of further legal acts (to be performed by the Enforcing Party) – asset values, in particular claims, may arise (Art. 242 para. 2, Art. 243 et seqq. of the Enforcement Act (EO)).

7.6.4   Moreover, the Princely Supreme Court has already affirmed the existence of an asset value of consolidated rights on several occasions: For example, in the decision 10 CG.2004.58 LES 2007, 141, **although the beneficiary's claim was largely dependent on the discretion of the bodies of a foundation, the administration of the foundation was carried out on the basis of a mandate contract determined by the beneficiary**. Based on this fact, the Princely Supreme Court affirmed an asset value of the opponent of the restraining order (*Sicherungsgegnerin*), because access depended solely on the declaration of intent of the Obligated Party.  The Princely Supreme Court referred to the principle according to which **conditional rights are assets if the occurrence of the condition depends solely on an act of will of the defendant.** This circumstance distinguishes this decision from the facts on which the decision 2 R EX.2008.7877 was based, according to which no - not even conditionally - disposable right of the opponent of the restraining order over the assets of the Third-Party Debtor existed (2 R EX.2008.7877 cons. 13.5.). In the decision of the Supreme Court (OGH) 03 CG.2007.66 LES 2008, 266 the rights of a founder to revoke and amend the declaration of foundation were expressly recognised as so-called "other property rights within the meaning of Art 241 et seq of the Enforcement Act (EO)".

Page 18

7.7.    Enforcement in Trustor's Rights:

7.7.1.  In the Austrian jurisprudence, the enforcement of trustor's claims was assessed from the aspect of the enforcement on the trustor's claim against the trustee for restitution of the fiduciary object. In cases, where the fiduciary object consisted of money, the seizure of the claim was then affirmed pursuant to sec. 294 of the Austrian Enforcement Act (EO) (= Art 217 of the Enforcement Act (EO)). In the event that the trust relationship has not yet been terminated and the trustor has to terminate the trust relationship first in order for the claim for repayment (*Rückforderungsanspruch*) to arise, the Austrian Supreme Court (OGH) assumes that in such a case only a seizure pursuant to sec. 331 of the Enforcement Act (EO) can be considered (Austrian Supreme Court (OGH) 3 Ob 223/12h ecolex 2013/211; Oberhammer in Angst/Oberhammer, Enforcement Act (EO)³ sec. 325 recital 5). The claim for repayment cannot be seized beforehand because it has not yet arisen due to the lack of cancellation. Since the boundaries between the individual types of enforcement in question are "blurred", the Austrian Supreme Court even allows an application for the wrong type of enforcement to be reinterpreted without further ado (Austrian Supreme Court (OGH) 3 Ob 223/12h ecolex 2013/211; Oberhammer in Angst/Oberhammer, Enforcement Act (EO)³ sec. 325 recital 5). In the decision of the Austrian Supreme Court (OGH) 2 Ob 166/02d ecolex 2002, 882, it was expressly pointed out that the creditors of the trustor cannot directly enforce into the fiduciary object, but only into the trustor's claims against the trustee. The Austrian Supreme Court also confirmed this legal view in 3 Ob 85/08h ecolex 2008, 1021 = ÖBA 2009, 322.

7.7.2   That the **right to designate beneficiaries can be seized and exercised by the enforcing creditor** was already confirmed by the Austrian Supreme Court in the decision 3 Ob 177/10s, so that from this fact alone it is clear that the seizure of the consolidated rights of the Obligated Party as trustor on the one hand and of the **right of the protector entitled to consent to the determination of the beneficiaries (Art. 8 Declaration of Trust) can be at least indirectly relevant to the trustee under property law**.[2]

7.7.3.  In the case of enforcement of trustor's rights, the Supreme Court did not address the existence or non-existence of the allegedly seized property right due to the lack of an application for realization (Austrian Supreme Court (OGH) 3 Ob 143/93), which clearly shows that 1) trustor's rights are in principle seizable under sec. 331 of the Austrian Enforcement Act (EO) as consolidated right and 2) this is possible irrespective of whether at the time of this seizure the consolidated right in the concrete case also allows access under enforcement law to the right claimed to be realizable (there a property) or not. Therefore, to the extent that the opponents to the recourse in points

---

[2] Translator's note: The German sentence seems ambiguous. In the sentence "und dem zur Bestimmung der Begünstigten zustimmungsberechtigten Protektor…." (engl. "and the Protector entitled to consent to the determination of the beneficiaries (…) can be"), a part seems to have been missed out, namely probably "und des Rechtes zur Bestimmung der Begünstigten des zustimmungspflichtigen Protektors (…) dem Treuhänder gegenüber…"; the translation of the last version was inserted above.

of law object that individual rights of the Obligated Party are not seizable, this is not the subject of the proceedings on the application for seizure of trustor's consolidated rights.

Page 19

7.8.    "Double seizure" (*Doppelpfändung*)?

7.8.1  Contrary to the statements of the opponents to the recourse in points of law, there is no "double seizure" because it is sufficiently clear from the application for enforcement and the pleading of the Enforcing Party that the **consolidated rights of the Obligated Party** are to be seized vis-à-vis the **Third-Party Debtor** and the Obligated Party brings forward his **position as trustor, protector and beneficiary of the Alpha Trust** as legal argument. It is not necessary to request seizure of various individual rights by way of example in the application for seizure of the consolidated right pursuant to Point 1 para. 3 (from "in particular" to "3 June 2015") to specify the consolidated right to be seized. **At the realization stage, it is necessary to examine in detail which individual rights flowing from the consolidated right of the Obligated Party are exploitable and which have asset value.**

7.8.2  Point 4 of the authorization for enforcement does not lead to the enforcement authorization (or, respectively, the application for enforcement) to become contradictory either, because it is clear from the above-stated that the Enforcing Party does not wish to seize the already seized claims with this enforcement, because this has already been done in proceedings 08 EX.2016.839. With the present application for enforcement, exclusively only consolidated rights are seized, not individual claims, so that this point can be retained solely to clarify that individual claims are not to be seized, even though this restriction would not have been necessary. **A "double seizure", which has been repeatedly described as inadmissible by the opponents of the recourse in points of law, is not given for the reason alone that the objects of enforcement are different: In the present proceedings, objects of enforcement were the consolidated rights of the Obligated Party, in the proceedings 08 EX.2016.839 it was claims.** However, the objection raised that the authorization of the present enforcement would lead to a multiple seizure is therefore devoid.

8.    In summary, it can therefore be stated that the enforcing creditor is admissibly seizing the consolidated rights of the Obligated Party as trustor, protector and beneficiary of the Alpha Trust against the Third-Party Debtor. The decision of the Princely Court of Appeal therefore had to be overturned and the decision of the court of first instance had to be restored.

**4.**    The Obligated Party and the Third-Party Debtor filed in each case an individual complaint (*Individualbeschwerde*) against this order of the Supreme Court with the Constitutional Court (*Staatsgerichtshof*). In its rulings of 29-10-2019 case number StGH 2018/111 (ref. no. (ON) 94) and case number StGH 2018/114 (ref. no. (ON) 95), the Constitutional Court did not grant the individual complaints. The reasons given by the Constitutional Court included amongst others [emphasis added by the author]:

Page 20

In ref. no. (ON) 94:

3.2.1. The complainant's above-mentioned complaint does not conform, neither to the relevant literature nor to the relevant judicature: As the Supreme Court correctly points out, Article 242 of the Enforcement Act (EO) corresponds to the Austrian model of reception of sections 331 et seqq. of the Austrian Enforcement Act (EO), which is why Austrian literature and judicature can be used (see in detail ref. no. (ON) 72, p. 34). When authorizing an enforcement, it is necessary to **examine** on the basis of the file (application for enforcement), **whether the right that has been seized in enforcement is available for realization**. No further investigations are to be made; the enforcing creditor does neither have to prove nor to certify in his application for enforcement that the seized right can be realized. Similarly to cases of enforcement on a claim, the authorizing court does not have to examine whether the seized right exists. **Thus, the enforcement must be authorized if it is not obvious from the outset that the right is unseizable because it cannot be realized. If, however, it becomes apparent in the course of the realization proceedings that a realization of the seized right is impossible for legal or factual reasons, the proceedings are to be discontinued.** Before the decision on the application for realization is made, the Obligated Party and all creditors in whose favour the seizure was made must mandatorily be heard, otherwise the proceedings will be null and void (see Oberhammer, in: Angst/Oberhammer, Enforcement Act (EO)³, N 1O as regards sec. 331 of the Austrian Enforcement Act (EO) with reference to extensive literature and judicature; as correctly also the Supreme Court, see in particular ref. no. (ON) 72, pp. 35 and 42). Referring to the teleology of Article 242 of the Enforcement Act (EO), the Supreme Court then correctly states that the catch-all provision of the enforcement on other property rights is intended to ensure that all conceivable assets of the Obligated Party can be drawn into enforcement. The interpretation of sec. 331 et seqq. of the Austrian Enforcement Act (EO) must be guided by this purpose of the law, which also applies to the interpretation of Art. 242 et seqq. of the Enforcement Act (EO) (see ref. no. (ON) 72, p. 35).

3.2.2 From the jurisprudence which has just been referred to, it is naturally to see that the Supreme Court has by no means, as the complainant thinks, failed to exercise its own competence with regard to the assessment of the realizability of the seized consolidated rights. The complainant fails to recognise that the Supreme Court does not have to examine in the context of Article 242 para. 1 of the Enforcement Act (EO) whether there is a "simple non-realizability" (*schlichte Unverwertbarkeit*), whatever that may mean in detail, but only **whether the non-realizability is not obvious from the outset**, which the Supreme Court undoubtedly did in the contested order (see in particular ref. no. (ON) 72, p. 38 f.). In this respect, the complainant also consistently fails to recognise that **the question of the concrete (actual) realizability is reserved for the realization proceedings** (see also Article 242 para. 2 of the Enforcement Act (EO)).

Case 2:23-cv-55526 06/20/2023  ID: 12739140 DktEntry: 212 Page 102 of 275 Page ID
#:10628
Translation from German to English                                    page 26 of 52

Page 21

The jurisprudence referred to above, according to which the Supreme Court ruled in ref. no. (ON) 72, is not objectionable from a constitutional point of view: The teleology of Article 242 of the Enforcement Act (EO) namely aims to ensure that all conceivable assets of the Obligated Party can be enforced into. As the Supreme Court correctly states, the interpretation of sections 331 et seqq. of the Austrian Enforcement Act (EO) and thus also Art. 242 et seqq. of the Enforcement Act (EO) has to take this purpose of the law as a basis. In this respect, there is also nothing to object to if the Supreme Court, in accordance with the relevant literature, comes to the conclusion that in assessing whether a property right is seizable, it must be generous and, in case of doubt, assume that it is subject to enforcement. In addition, as stated above, the realization proceedings are reserved, so that the enforcement proceedings are to be discontinued **if further examination within the framework of the realization stage shows that the realization of the seized right is impossible for legal or factual reasons.**

Furthermore, the complainant must be informed that it already follows from the remarks of the Supreme Court on the non-existence of an obvious non-realizability (see above) that a non-transferable right is also not obviously present. In addition, the Supreme Court, - referring to Austrian jurisprudence - also points out that **seized potestative rights must be transferable only in view of their possibility to be exercised and that the potestative rights can also be exercised by third parties.** Furthermore, the Supreme Court correctly holds that the issue here is that the Enforcing Party can exercise **the individual rights contained in the consolidated rights in place of the Obligated Party** and it is not apparent what obstacles under enforcement law should stand in the way of this (see ref. no. (ON) 72, p. 45). It is not clear to the Constitutional Court, to what extent the specification of the Supreme Court and the reference to Austrian jurisprudence would now be contradictory, which outline that - when enforcing into other property rights - this is all about the judicial authorization of the enforcing creditor to exercise the rights of the Obligated Party in the enforcement proceedings instead of the Obligated Party **in order to be able to access, even if only indirectly, the proceeds arising out of the individual right to be liquidated.** (... )

4.3     The complainant now fails to recognise that the order of the Austrian Supreme Court of 14 July 2011 regarding case number 3 Ob 177/10s or, respectively, RS01 20752 is considered to be a foundation case, whereas the present case is based on a trust, namely with regard to the seizure of the complainant's relevant consolidated rights. For this reason alone, no change in practice as alleged by the complainant can be made from the outset, and thus also no violation of the duty to state reasons with regard to

Page 22

the change in practice claimed by the complainant. It is, moreover, clear from the contested decision that the Supreme Court refers to the Austrian decisions mentioned above in order to justify the "indirect realizability" (see ref. no (ON) 72, p. 42 et seqq.). Concretely, the Supreme Court states, with reference to the afore-mentioned Austrian judicature that the enforcement case in question is not a foundation case. However, the essential feature of the Austrian Supreme Court's judicature on the enforcement on founder's rights for the case at issue in the decision is that for the suitability of an object of enforcement under sections 331 et seqq. of the Austrian Enforcement Act (EO) already the indirect realizability of an object of enforcement under sections 331 et seqq. is sufficient. With reference to other Austrian judicature, the Supreme Court finally reaches the correct conclusion that the enforcement under Art. 242 of the Enforcement Act (EO) does not require the right to be seized to be directly realizable, but that indirect realizability is sufficient (see in detail ref. no. (ON) 72, p. 45 et seq.). (... )

5.2    With regard to clause 9 of his individual complaint, the complainant brings forward that the sole reason why the Supreme Court concluded that obvious non-realizability was not given was that the complainant's position as a trustor would allow to affirm that "it was possible for him already according to general principles to create claims of asset value against the trustees".

5.3    Contrary to the complainant's view, the Supreme Court did not merely base its conclusion that obvious non-realizability was not given on the expression which was initially mentioned (see also ref. no. (ON) 72, p. 42). Rather, in further passages of the challenged decision, the Supreme Court gave extensive reasons, with reference to doctrine and jurisprudence, as to why an obvious non-realizability cannot be assumed. In particular, the Supreme Court stated that in the light of the respondent's application for enforcement, which is brought forward by the Supreme Court over several pages (see p. 38 et seqq. in ref. no. (ON) 72), it is clear that there is no obvious non-realizability (see also the Supreme Court's reference to p. 42 of the challenged order). As mentioned, the contested order contains various further remarks on the (indirect) realizability of the seized rights (see in particular p. 42 et seqq. and p. 50 et seqq. in ref. no. (ON) 72), which is why there can be no question that the realizability or, respectively, the obvious non-realizability of the seized rights not being substantiated, as the complainant alleges. There is thus no violation of the duty to state reasons. (... )

6.2    With regard to clause 3.9 and clause 10.10 of the individual complaint, the complainant argues that the Supreme Court failed to recognise that, first of all, a realization with regard to the seizure that took place under case number 08 EX.2016.839 must take place before further rights, thus

Page 23

consolidated rights as in the present case, would be seized. In this respect, the complainant also considers the contested decision to be disproportionate.

First of all, it has to be pointed out to the complainant that the Supreme Court makes detailed considerations in this context regarding "**double seizure**" (*Doppelpfändung*) and "**multiple seizure**" (*Mehrfachpfändung*) (see ref. no. (ON) 72, p. 52 f.). In particular, **the Supreme Court correctly states that in the present proceedings, the consolidated rights of the Obligated Party were seized, but in the proceedings with case number 08 EX.2016.839 claims of the Obligated Party were seized**. In addition, the complainant fails to recognise that there may only be a restriction with regard to the means of enforcement if there is no doubt that individual means of enforcement are sufficient to fully satisfy the Enforcing Party's claim. Mere probability is not sufficient. It is undisputed that, as a rule, this condition is not recognisable with sufficient certainty to the court at the stage of the authorisation of enforcement, as is the case here, which is why the second half sentence of Article 9 of the Enforcement Act (EO), which the complainant apparently (implicitly) refers to, is hardly ever applied in practice at the present stage of the proceedings (see on the whole topic Jakusch, in: Angst, loc. cit., N 6 regarding sec. 14 of the Austrian Enforcement Act (EO)) The same applies to the present case all the more so, since the contested decision imposed a seizure on consolidated right and it therefore only has to be examined in detail at the realization stage  as to which individual rights flowing from the consolidated rights of the Obligated Party are realizable and are to be considered an asset value. In this respect, the decision of the Supreme Court stands up to scrutiny for arbitrariness from that point of view.

6.3    Furthermore, the complainant considers it arbitrary that, by means of the enforcement proceedings in question, the complainant's consolidated rights with regard to the Alpha Trust are accessed at all or, respectively, that the latter are seized, since "enforcement proceedings are not the right place for this". Rather, such an argumentation would have to be presented in rescission proceedings (*Anfechtungsverfahren*).

This complaint by the complainant, in turn, fails to recognise that the fall-back clause of the enforcement on other property rights pursuant to Article 242 of Enforcement Act (EO) is intended to ensure that all conceivable assets of the Obligated Party can be seized for enforcement. It is precisely this purpose of the law that shall form the basis for the interpretation of Art. 242 et seqq. of the Enforcement Act (EO) (see also ref. no. (ON) 72, p. 35 with reference to judicature and jurisprudence). Consequently, it is sufficient, as already extensively discussed, that the seized consolidated rights can be indirectly realized (see ref. no. (ON) 72, p. 42 et seqq.). In this respect, there can be no question of the respondent being in the "wrong" proceedings, as the complainant believes: Rather, it must be held - together with the

Page 24

respondent - that in the context of the seizure of consolidated rights, it is precisely not necessary that the exercise of individual powers of the Obligated Party directly makes an asset usable, as long as and to the extent that the concrete exercise is aimed at subjecting assets of the Obligated Party to enforcement. Furthermore, as mentioned above, it must be examined in detail in the realization stage which individual rights flowing from the consolidated right of the Obligated Party are realizable and can be considered asset values. In this respect there can be no question of a violation of the prohibition of arbitrariness.

6.4     Finally, the complainant considers it arbitrary that the Supreme Court has seized his consolidated right as protector of the Alpha Trust. All these rights were not rights of asset value and this approach by the Supreme Court failed to recognise "the nature of the trust".

That this pleading by the complainant is unjustified is already apparent from the above statements of the Constitutional Court (see in particular also the statements on the criteria of sufficient obvious non-realizability and indirect realizability). To the extent that the complainant relies on the unseizability of individual rights that can be derived from a consolidated right, he in any case fails to recognise that the contested enforcement authorization does not relate to individual rights but to the consolidated rights of the Obligated Party (as the Supreme Court correctly stated with reference to jurisprudence, see ref. no. (ON) 72, p. 35). Ultimately and consistently, the complainant fails to recognise, as the Supreme Court has extensively reiterated, that the complainant may obtain realizable monetary claims on the basis of his consolidated rights. Whether the latter is in fact the case in the further proceedings is neither to be examined more closely nor has it to be decided at the present stage of the proceedings, as the Supreme Court correctly states, but is rather to be reserved to a possible realization of the complainant's consolidated rights (see in particular ref. no. (ON) 72, p. 40). For this reason too, the objections raised by the complainant, in particular with regard to Article 918 para. 1 of the Persons and Companies' Act (PGR), are irrelevant. Even in the light of these remarks, it therefore cannot be assumed that the Supreme Court's decision was mistaken in a qualified or, respectively, gross manner.

In ref. no. (ON) 95:

6.2     The complainant considers that its constitutionally guaranteed right to a statement of reasons has been infringed, since the Supreme Court failed to deal with the alleged unseizability of rights to appoint and dismiss bodies. Again, as in the previous case, the complainant points out that the Supreme Court "only" "refers to the (subsequent) realization proceedings".

Page 25

That this argument of the complainant is unjustified is already apparent from the above statements of the Constitutional Court (see in particular also the statements on the criteria of sufficient obvious non-realizability and indirect realizability). To the extent that the complainant relies on the unseizability of individual rights that can be derived from a consolidated right, it fails to recognise in any case that the contested enforcement authorization does **not relate to individual rights but to the consolidated rights of the Obligated Party** (as correctly stated by the Supreme Court with reference to jurisprudence, see ON 72, p. 35). Ultimately and consistently, the complainant fails to recognise, as the Supreme Court has extensively argued, that the **party involved may obtain realizable monetary claims on the basis of its consolidated rights**. Whether the latter is subsequently in fact the case is neither to be examined more closely nor has it to be decided at the present stage of the proceedings, as the Supreme Court correctly states, but is rather reserved to a possible realization of the involved party's consolidated rights (see ref. no. (ON) 72, p. 40).In the light of these considerations, it is in particular unnecessary to go into the further decisions cited by the complainant, namely LES 2007, 141 and LES 2008, 266, since, as has been shown, a comprehensible statement of reasons by the Supreme Court is at any rate not entirely lacking.

Moreover, the Supreme Court points out more precisely that even the **right to appoint bodies, which does not directly create asset values in legal terms, as a possibility for the founder to influence the board of directors could indirectly lead to an allocation of monetary value, for example from the income from the foundation's assets**. The Supreme Court went on to say that although the right itself does not have to be realizable, it **must in turn allow access to realizable assets** (see ref. no. (ON) 72, p. 36 with reference to judicature and jurisprudence). According to the Supreme Court, it is typical of the nature of an enforcement on consolidated rights that realizable claims do not (yet) exist at the time of the seizure under enforcement law, because this type of enforcement is based on a consolidated right and, as a rule, only further steps by the enforcing creditor in the course of the realization are required for individual claims and entitlements to arise. According to the Austrian Supreme Court, Austrian jurisprudence also permits seizures under sec. 331 of the Austrian Enforcement Act (EO) if only further legal acts by the enforcing creditor create rights of asset value for the Obligated Party. The Enforcement Act does not require that these rights already exist at the time of seizure (see ref. no. (ON) 72, p. 37 with reference to jurisprudence and literature). Moreover, the Supreme Court states that the individual rights of the consolidated right do not have to be asserted and certified, but if the latter should nevertheless occur, this would not harm the Enforcing Party, even if rights were exemplary listed which were not realizable by the enforcing creditor. Ultimately, according to the Supreme Court, the present application for enforcement clearly stated the consolidated rights to be seized, namely

Page 26

those of the Obligated Party as trustor, protector and beneficiary of the Alpha Trust vis-à-vis the complainant (see ref. no. (ON) 72, p. 39). Moreover, with reference to the decision of the Austrian Supreme Court (OGH) 3 Ob 143/93, the Supreme Court reaches the conclusion that trustor's rights are in principle seizable as consolidated right under sec. 331 of the Austrian Enforcement Act (EO); and this is possible, irrespective of whether at the time of this seizure the consolidated right in the concrete case also allows access under enforcement law to the right claimed to be realizable or not. Insofar as the complainant therefore objects that individual rights of the Obligated Party were not seizable, this was not the subject of the proceedings on the application for seizure of the trustor's consolidated rights.

In the light of the fact that there is no right to a detailed statement of reasons and that the constitutional duty to state reasons only includes a minimum requirement to state reasons, the Supreme Court not only complied with its duty to state reasons, as has just been shown, but it even extensively and detailed stated as to why it considers the seizablility of rights of appointment and dismissal of governing bodies to be seizable [sic] as consolidated right. Incidentally, the complainant itself even states in its individual complaint that the Austrian Supreme Court "only" takes a critical view of the seizability of the right of appointment. What the complainant is trying to gain from this is not apparent to the Constitutional Court. The result is that the complainant's statements and objections to clause 5.5 of its individual complaint are not convincing. Insofar, there is no violation of the duty to state reasons.

6.3     The complainant further complains that the Supreme Court, on the one hand, failed to take account of the "state of the file" and, on the other hand, had seized rights that were not seizable at all. Ultimately, the Supreme Court had merely taken the allegations of the Enforcing Party and the state of the file and the pleadings of "the opponents" as a basis.[3]

The Constitutional Court has already pointed out that the contested decision did not involve "seizure of unseizable rights", as the complainant alleged. The Constitutional Court has also already stated that the Supreme Court has given detailed and, in the opinion of the Constitutional Court, also correct reasons for the fact that the consolidated rights, namely those of the party involved as trustor, protector and beneficiary of the Alpha Trust are seizable   vis-à-vis the complainant. Insofar, it is not necessary for the Constitutional Court to go into the complainant's partly repetitive statements again.

---

[33] Traslator's Note: The part-sentence „und die Aktenlage und darauf beruhendes Vorbringen „der Gegner"" seems to refer to „abgestellt".

Page 27

If the complainant additionally states on this subject that "not only the rights of the Obligated Party were seized", this is not evident to the Constitutional Court from the outset, since the enforcement authorization of 21 November 2016 (ref. no. (ON) 3) - now confirmed by the contested decision - the rights of the Obligated Party as trustor, protector and beneficiary of the Alpha Trust were seized. If the complainant further objects that the Supreme Court did not (concretely) deal with the state of the file and in this respect also ignores the pleadings of "the opponents", the complainant must again be referred to the above statements of the Constitutional Court, from which it follows informally, that the Supreme Court correctly assumed, namely on the basis of the application for enforcement, that the position of the party involved as trustor, protector and beneficiary of the Alpha Trust vis-à-vis the complainant and the consolidated rights accruing to the party involved vis-à-vis the complainant as a result thereof are seizable. Within the framework of the authorization of enforcement, it must be examined, in accordance with jurisprudence, on the basis of the application for enforcement, whether the right subject to enforcement is available for realization. No further inquiries are to be made. The authorizing court does not even have to examine whether the seized right exists (see Oberhammer, loc.cit., N 10 regarding sec. 331 of the Austrian Enforcement Act (EO)). It follows from all this that the Supreme Court was not obliged to respond to the complainant's renewed pleadings regarding clause 5.1 of her individual complaint.

6.4     Contrary to the complainant's view, the Supreme Court did not base the fact that obvious non-realizability was not given solely on the passage in the contested decision mentioned by the complainant, see p. 42 in ref. no. (ON) 72. Rather, in further passages of the contested decision, the Supreme Court has extensively and with reference to doctrine and jurisprudence substantiated why it cannot be assumed that obvious non-realizability was given. Specifically, the Supreme Court held that in the light of the respondent's application for enforcement, which the Supreme Court replied to over several pages (see p. 38 et seqq. in ref. no. (ON) 72), it is clear that there is no obvious non-realizability (see also the Supreme Court's reference to p. 42 of the contested order). As mentioned, the contested order contains various further statements on the (indirect) realizability of the seized rights (see in particular p. 42 et seqq. and p. 50 et seqq. in ref. no. (ON) 72), which is why there can be no question of the realizability or, respectively, the obvious non-realizability of the seized rights not being substantiated, as the complainant has argued. There is thus no violation of the duty to state reasons with regard to this complaint of the complainant either. (... )

Page 28

5. In a written submission dated 24-07-2017 (ref. no. (ON) 34), substantiated
   by a written submission dated 11-02-2020 (ref. no. (ON) 105), the Enforcing
   Party filed the application for realization, which is evident from the award. In
   summary, it was argued that the enforcement in question would aim at
   taking out assets from the Alpha Trust, whereupon the Enforcing Party could
   then have access to these assets by way of enforcement. Pursuant to Article
   244 para. 1 of the Enforcement Act (EO), the enforcing creditor was
   therefore to be authorized to perform the necessary legal acts on behalf of
   the Obligated Party. It was not necessary that the exercise of individual
   powers of the Obligated Party made an asset directly usable[4], as long as
   and to the extent that the concrete exercise - even if indirectly - is aimed at
   subjecting assets of the Obligated Party to enforcement.

   As a possible type of realization, the Enforcing Party should in particular be
   authorized – instead of the Obligated Party and vis-à-vis the Alpha Trust- to
   request the removal of the previous trustees of the Alpha Trust and the
   appointment of a person designated by the Enforcing Party as trustee of the
   Alpha Trust and then to request the trustee of the Alpha Trust designated
   by the Enforcing Party to distribute the amount of CHF 91,595,445. 97 plus
   costs and interests to the Obligated Party to a paying agent to be determined
   by the Enforcing Party and to consent to this distribution and its execution
   in its position as protector and beneficiary in place of the Obligated Party.

   An alternative option would be to authorize the Enforcing Party to make a
   distribution directly to the beneficiary, to which the Enforcing Party could at
   the same time have executive access pursuant to Art. 244 para. 2 of the
   Enforcement Act (EO).

6. The Obligated Party requested the application for realization to be rejected,
   or in eventu the dismissal of the application for realization (ref. no (ON) 88
   and 97), and in summary brought forward and justified as justification:

   The Enforcing Party had failed to explain to what extent the consolidated
   rights of the Obligated Party or individual rights thereof would be subject to
   realization. The Enforcing Party had not

---

[4] Translator's Note: The German phrase says: "dass die Ausübung einzelner Befugnisse des Verpflichteten
unmittelbar ein Vermögenswert nutzbar mache". There seems to be a grammatical error (einen
Vermögenswwert nutzbar machen).

Page 29

fulfilled its obligation to provide substantiation and the application for realization had to be rejected for this reason alone.

Even if the application for realization were formally admissible, it would have to be dismissed as regards its contents, since there would be no realizability of the consolidated rights of the Obligated Party or of individual rights resulting therefrom.

The beneficiaries of the Alpha Trust would all be discretionary beneficiaries. There would therefore be no reason why the Obligated Party in particular should receive a sum of more than USD 80 million as distribution from the trust assets.

Furthermore, any pecuniary claims of the Obligated Party against the Alpha Trust arising from its position as trustor and beneficiary would have already been seized in the proceedings under 08 EX.2016.839. The rights of the Obligated Party against the Alpha Trust arising from its position as protector would only be rights to consent and not rights of asset value. Therefore, the Enforcing Party simply could not obtain any money.

Since the Obligated Party had reserved neither a right of revocation (*Widerrufsrecht*) nor a right to amend (*Änderungsrecht*), the consolidated rights would not be subject to realization. In accordance with the principle of gradual enforcement (*Grundsatz der stufenweisen Zwangsausübung*), the Enforcing Party would first of all also have had to realize the pecuniary claims and claims for payment to which the Obligated Party is entitled as the beneficial owner, trustor, beneficiary and principal of the Alpha Trust with regard to the seizure effected under 08 EX.2016.839 before it can seize further rights.

Apart from that, the realization was not proportionate. First of all, a realization should have been carried out with regard to the seizure that took place under 08 EX.2016.839. On the other hand, the realization proposals made by the Enforcing Party would interfere disproportionately with the nature of the Alpha Trust. Finally, the Enforcing Party would avoid the rescission proceedings and the reduction of the rights of the Obligated Party as party.

Page 30

**7.**     The Third-Party Debtor argued that the application for realization should be
dismissed because the seized rights were not realizable. The realization of
the rights of removal and appointment by the Enforcing Party would also be
an inadmissible interference because, among other things, it would be a
disproportionate interference with the nature and the organisational
constitution of the trust. The seized rights would not grant access to the trust
assets. It would therefore not be possible for the Enforcing Party to obtain
satisfaction through the seized rights.

**8.**     Based on the documents submitted by the parties, in particular deeds
pursuant to ref. no. (ON) 1 [Certified copy of the Final Award of the London
Court of International Arbitration in Case No. 101721 of 11 November 2014,
Enclosure A.1, LCIA Rules 1998 in German and English, Enclosure A.2,
LCIA Rules 2014 in English, Enclosure A.3, List of interpreters and
translators admitted to Liechtenstein courts and administrative authorities,
as of 1 October 2015, Enclosure A.4, Corrigendum to the Arbitral Award of
9 January 2015, Enclosure A.5, Certified Translation of the Corrigendum to
the Arbitral Award of 9 January 2015, Enclosure A.6, Order of the Princely
Court of 24 February 2016, 08 EX.2016.839, ref. no. (ON) 4, Enclosure A.7,
Certified Commercial Register Extract of the Alpha Trust of 12 February
2016, Enclosure A.8, Certified Commercial Register Extract of CTX
Treuhand AG dated 11 February 2016, Enclosure A.9, Declaration of Trust
dated 27 May 2015 including German translation (in envelope), Enclosure
A.10, Written Instrument dated  2 June 2015 including German translation
(in envelope), Enclosure A.11, Minutes of a Meeting of the Directors of CTX
Treuhand AG as Trustees of the Alpha Trust dated 3 July 2015 (in
envelope), Enclosure A.12, Letter of Wishes of 3 July 2015 (in envelope)
with German translation, Enclosure A.13, Instrument of Nomination of 3 July
2015 (in envelope) with German translation, Enclosure A.14, Statement by
Menelaos Kyprianou concerning case no. 14-CV-09764- R, United States
District Court California (September 2015), Enclosure A.15, Second Witness
Statment [sic] of Ashot Yegiazaryan in the Kerimov Proceedings of 17
February 2013, together with an excerpt of the German translation,
Enclosure A.16, bank transfer receipt from CMB Monaco – Campagnie [sic]
Monégasque de Banque of 6 May 2015, Enclosure A.17, e-mail Jamra &
Jamra LLP of 17 July 2015 with German translation, Enclosure A.18, email
Roland

Page 31

Anteau of 6 August 2015 to Codex Treuhand AG together with German
translation, Enclosure A.19, Stipulation re. Advance Distribution of Funds,
etc. of 6 July 2015 together with excerpt of the German translation,
Enclosure A.20, Instructions to the Trustee of 28 July 2015 together with
German translation, Enclosure A.21, e-mail Yegiazaryan to Nikolaus
Wilhelm of 21 July 2015 (18:49) with German translation, Enclosure A.22
and Responsive Declaration regarding Case No. BD 595136 of 18 August
2015 with German translation, Enclosure A.23], [sic] Memorandum of points
and Authorities together with an extract of the translation (Enclosure B),
minutes of the interrogation of 23/24-06-2015 and 11-07-2017 together with
an extract of the translation (Enclosure C), judgment of 31-05-2018
(Enclosure D), deed of 08-06-2017 (Enclosure D1), individual complaint of
10-10-2018 (Enclosure D2), interrogation of the suspect (Enclosure E),
email of 18-06-2015 (Enclosure F), email of 01-07-2015 (Enclosure G), letter
of wishes of 03-07-2015 (Enclosure H), form of 03-06-2015 (Enclosure I),
signature card of the CMB with translation in extracts (Enclosure J), letter of
02-06-2015 (Enclosure K), Payment Order (Enclosure L), Confirmation of
Bank Transfer of 26-08-2015 (Enclosure M), Confirmation of Bank Transfer
dated 11-08-2015 (Enclosure N), Confirmation of Bank Transfer dated 27-
07-2015 (Enclosure O), Confirmation of Bank Transfer dated 25-06-2015
(Enclosure P), Payment Order of 16-12-2015 (Enclosure Q), Invoice Drew
Holinger of 05-06-2016 (Enclosure R), Request for Mutual Legal Assistance
(Enclosure S), Email of 30-10-2019 (Enclosure T), Written Submission of
15-03-2019 (Enclosure U), Written Submission of 12-03-2019 (Enclosure
V), Minutes of CG.2019.5 (Enclosure W), edict of 23-09-2016 (Enclosure X),
decision of the Austrian Supreme Court (OGH) of 26-04-2018 (Enclosure 1),
extract from PSR 2018/21, p. 90 et seqq. (Enclosure 2), decision Princely
Court of Appeal (OG) of 11-04-2017 regarding 11 UR.2016.77-119
(Enclosure 3), Deed of 08-06-2017 (Enclosure D1), individual complaint of
10-10-2018 (Enclosure D2) as well as the herein mentioned file 08
EX.2016.839, the **facts** are therefore as follows:

The Alpha Trust is a trust established under Liechtenstein law on 27 May
2015. The Trust has been registered in the Liechtenstein Commercial
Register under registration number FL-0002.510.771-1 since 30 November
2015. CTX Treuhand AG acts as sole trustee.

(Enclosure A8)

Page 32

CTX Treuhand AG is a stock corporation established under Liechtenstein law with its registered office in 9490 Vaduz, Lova-Center. It has been registered under the registration number FL-0002.042.435-5 in the Liechtenstein Commercial Register on 27 November 2001 and is (inter alia) represented by members of the Board of Directors Dr. Thomas Wilhelm and lic.iur. Martin Hörnig. Nikolaus Wilhelm is an authorized signatory (*Prokurist*) with collective right to sign in pairs

(Enclosure A9)

The trust agreement of the Alpha Trust, the "Declaration of Trust" of 27 May 2015, has, inter alia, the following contents:

THIS DECLARATION OF TRUST was made on 27 May two thousand and fifteen

**BY**

CTX Treuhand AG ("Trustee", the term including - if the context permits it – the respective Trustee or the Trustees existing for the Trust in question)

**PREREQUISITES**

i.      The Trustees confirm that they have received the assets listed in the second Annex,
        to hold them in trust under the following conditions.

ii.     This Trust is irrevocably established.

iii.    This Trust is called "ALPHA TRUST".

*THIS* **DEED attests** the following:

**1. Definitions**

(...)

1.1.2. "The beneficiaries" are and include the persons mentioned or described in the third Annex;
(...)

**3. Termination of the Trust Relationship**

The Trustees have the power to fix a date (which may not be earlier than the date of issuance of this Deed) in the framework of a deed which is to be regarded as the end of the trust relationship.

Page 33

**4.**  **Sale of Trust Assets**

The Trustees will manage the Trust Assets in trust with respect to investments or property (other than cash) at their sole discretion in order to sell, collect or convert into cash all or part of such investments or property, subject however to the possibility of *deferring* such sale, collection or conversion *and* granting the possibility that these investments will be maintained and the money will be managed in trust, having equal discretion to invest the money or property in their name or under their control in a manner authorized by this Trust or by law, and the authority to alter or exchange such investments for other permitted ones as they deem appropriate in their sole discretion.

**5.**  **Trust of Income and Capital**

5.1.   The Trustees shall administer the capital and income of the Trust Assets in trust for the benefit of all, one or more beneficiaries, one or more other beneficiaries possibly being excluded, in the form of shares or in a certain proportion if more than one beneficiary is provided for, with and on the basis of powers and provisions for their maintenance, training, further development or other benefits or for the purpose of accumulating income (including administrative powers and regulations or discretionary trusts and powers to be performed or exercised by one or more persons whether or not they act as Trustees or whether or not the Trustees or a Trustee is/are included) so that the exercise of this power to designate beneficiaries may be delegated to a certain extent and in a manner which the Trustees may designate by one or more deeds which may be revoked during the trust period or which are irrevocable and are exercised during the trust period; PROVIDED, however, that the exercise of such power shall not invalidate any prior payment or use of all of the capital or income, or of any part of the capital or income from the Trust Assets, made under any authority conferred by such deed or by law.

5.2.   Up to, subject to or in the absence of any provision under clause 5.1.

5.2.1.   the Trustees shall pay the income of the Trust Assets to, or use it for the benefit of, all, a particular Beneficiary or several Beneficiaries, the other or others possibly being excluded, if any, at the relevant time and - where there are several Beneficiaries - in such proportions and in such a manner as the Trustees, in their sole discretion, may deem appropriate from time to time.

5.2.2.   Notwithstanding the provisions of clause 5.2.1. the Trustees may, at one or more dates during the term of the Trust, in their sole discretion, accumulate the income by way of accrual rather than use it in whole or in part by investing or otherwise using the income or" [sic] the income derived therefrom, each in such manner as may be permitted by this Deed or by law; on the basis of clause 5.2.3. they shall manage such accumulations of capital as capital appreciation.

5.2.3.   The Trustees, may, at one or more dates during the term of the Trust, use all or part of the income accrued under clause 5.2.2. as if it was income accrued in the relevant year.

5.2.4.   Notwithstanding the Trustees' powers of attorney and provisions set out and contained in this clause, the Trustees may

## Page 34

5.2.4.1     at any time during the term of the Trust, pay the capital of the Trust Assets in whole or in part to all, one Beneficiary or more Beneficiaries under the exclusion of other Beneficiaries or to use it for the benefit of such Beneficiary/Beneficiaries; in the case of more Beneficiaries providing for appropriate shares and making payment(s) or using such in such a manner as the Trustees, in their sole discretion, may deem appropriate.

5.2.4.2.    pay income or capital from the Trust Assets to the Trustees of another trust or transfer such, irrespective of the place of establishment, in which one or more beneficiaries are involved (whether all beneficiaries or one or more beneficiaries are the only persons involved in that other trust or are eligible as usufructuaries), where the Trustees, in their sole discretion, consider that all, one or more beneficiaries should benefit from such payment or transfer.

5.3     In the event of failure to exercise the aforesaid powers granted to the Trustees by the preceding sub-clauses, and subject to the exercise of these powers, the Trustees may, upon the expiration of the term of the Trust, dispose of the Trust Assets FIDUCIALLY, the beneficiaries living at that time receiving absolutely equal shares.

5.4     On the basis of the foregoing, and if and to the extent that capital and income of the Trust Assets are not disposed of in their entirety for any reason whatsoever according to the foregoing provisions, capital and income of the Trust Assets shall be managed in trust for the Red Cross and Amnesty International, and in the event of failure of this Trust for charitable purposes in general.

**8.     Power to add and exclude Beneficiaries**

8.1     The Trustees may at any time during the term of the Trust declare in writing that

8.1.1.  a person, group or description of persons is no longer a beneficiary, so that such person, group or description of persons is no longer a beneficiary afterwards as if that beneficiary had initially been expressly excluded as a beneficiary, but without prejudice to previous payments of capital or income to such beneficiary/beneficiaries.

8.1.2.  any person, group or description of persons designated by the Trustees shall henceforth be a beneficiary; PROVIDED that any addition of beneficiaries shall not affect, alter or influence the provision already made for the use of capital or income.

(... )

**10.    Change of trustees**

10.1    This Trust must have at least two Trustees or a trust company and a maximum of five Trustees.

10.2    Where more than one Trustee is appointed, all Trustees must act unanimously. The Trustees shall, however, have the right to delegate all business transactions, the exercise

Page 35

of powers of attorney and discretionary powers to one or more of their Co-Trustees; provided that they consider such delegation to be advisable at their own discretion

10.3.   A Trustee who wishes to resign and/or be removed from the trust relationships may send a written notice to the Co-Trustees (if any), and to the person(s) authorised to appoint new Trustees, and shall be dismissed one month after such notice has been sent, or at an earlier date if the person(s) entitled to appoint new Trustees pursuant to the provisions of this Clause 10 give(s) its/their written consent, PROVIDED that such dismissal shall not take effect until at least one Trustee is in place after the dismissal.

10.4    If a Trustee wishes to resign and be dismissed from all trust relationships, or refuses to act, or becomes incapable of acting, or ceases to be legally competent, or dies, or if a company acting as a Trustee is dissolved, then

10.4.1.   the protector or if he is deceased (or in case of a company, if the company is being wound up) or if he is unable or unwilling to act;

10.4.2.   the beneficiaries (*other than* charity organizations), if they have legal capacity and have a majority vote, or if they are unable or unwilling to act;

10.4.3.   the Trustees respectively in office or if there are no Trustees;

10.4.4    the Liechtenstein Princely Court of Vaduz, by written instrument, appoints one or more persons, whether resident at the Trust's administrative seat or elsewhere, to act as Trustees at the place of the deceased or dissolved Trustee or of the Trustee who wishes to be dismissed, refuses to act or is incapable or no longer legally competent to act, as stated above.

10.5.   The person entitled to appoint new Trustees according to subparagraphs 10.4.1. and 10.4.2. may appoint one or more persons as further Trustees in the same order as described above until the maximum permissible number is reached.

10.6.   A Trustee may reside anywhere in the world.

10.7.   The person entitled to appoint additional Trustees may at any time and without cause remove one or more Trustees by service of a notice in writing.

**11.   Power to Delegate**

11.1.   A Trustee shall have the power (notwithstanding any statutory provisions to the contrary), by a deed which may be revoked during the term of the trust or which is irrevocable, to delegate to a person the execution or exercise of all the fiduciary powers and discretionary powers which are hereby conferred upon the Trustee or by law.

Page 36

**12.**      <u>**Power to Amend or to Revoke**</u>

12.1     The Trustees may at any time, at their discretion, amend any of the provisions of this deed, but the exercise of such power shall not have the effect of a revocation of this Trust.

**13.**      <u>**Other Powers**</u>

13.1     The Trustees shall, in addition to and without prejudice to any statutory powers, have the powers-of attorney and immunities defined in the first Annex, provided that the Trustees shall not exercise any of the powers in such a way as to conflict with the provisions of this Trust that are in relation with the benefits.

**14.**      <u>**The Protector**</u>

14.1     The Protector may have its place of residence or, in the case of a company, its registered office anywhere in the world.

14.2     The First Protector is Ashot Egiazaryan.

14.3     The Protector may delegate or transfer its powers, rights and/or duties for a fixed period of time or permanently at any time by written deed to any person or persons and on such terms and conditions as it deems appropriate, provided always that such transfer shall not take effect until the Trustees have been notified thereof in writing.

14.3.1     If such delegation fails or there is no Protector or if a Protector dies (or, in the case of a Company, is dissolved) or is unable or unwilling to act *without having* validly delegated its powers, rights and/or duties, then

14.3.1.1.     the beneficiaries (except in the case of charitable organisations), who have legal capacity and majority voting rights or if they are incapable or unwilling to act, appoint;

14.3.1.2.     the Liechtenstein Princely Court in Vaduz appoints a Protector within 90 days.

14.4.     The written consent of the Protector shall be required for the exercise by the Trustees of the powers and rights under clauses 2.4, 2.5.1, 3.5, 8, 11, 12, 16.2, 16.3 and clause 11 of the first Annex.

(...)

**16.**      <u>**Accountability and Information**</u>

16.1     The Trustees[5] shall keep full and accurate records of all transactions relating to the Trust Assets.

16.2     The records shall be available for inspection by the beneficiaries or their legal or duly authorized representatives within a reasonable period of time. Notwithstanding the foregoing, the Trustees are not required to inform a beneficiary of any other beneficiary to whom they have transferred capital or income from the Trust Assets or to whom they have made a payment from the capital or income of the Trust Assets, nor are they required to state reasons

---

[5] Translator's note: Due to a spelling error in the German text, it says "De Treuhänder führen"; since the verb is in plural, it probably should say "Die Treuhänder führen".

## Page 37

for the exercise or non-exercise or the manner in which they exercise their powers, rights and discretionary powers under the Trust

16.3    The Trustees may, at their own discretion, appoint a control authority under Art. 923 of the Persons' and Companies' Act (PGR), in which case the control authority shall be the only person to receive the above-mentioned information.

(... )

THIRD ANNEX

1. Ashot Egiazaryan
2. A person or persons respectively designated by the Trustees as further beneficiaries.

(Enclosure A10)

This trust agreement would be supplemented through the "*Written Instrument*" of 2 June 2015, which was concluded between the Trustee CTX on the one hand and the Obligated Party in its capacity as Protector of the Alpha Trust and signed by the Obligated Party. Among other things, it has the following contents:

(1)    In exercise of the powers set forth in clause 12 of the principal deed, the Trustee hereby amends the following Articles of the principal deed:

(A)    Article 14.4 now reads as follows: "The prior written consent of the Protector shall be required when the Trustees exercise their powers and rights under clauses 2.4, 2.5.1, 3, 5, 8, 11, 12, 16.2, 16.3 and the powers set forth in the First Annex."

(B)    In Article 14, the following clause is added:

"14.05. The Protector has the power to dismiss and appoint Trustees by written instructions."

[Enclosure A11]

The letter of wishes of 27 May 2015 signed by the Obligated Party has the following contents:

## LETTER OF WISHES OF MR. ASHOT EGIAZARYAN

To:    The Trustees of the ALPHA TRUST, established on 27 May 2015

1.     You are the Trustees of the ALPHA Trust, established on 27 May 2015.

2      I am writing this Letter of Wishes to inform you of my wishes regarding the administration of the Trust Assets both during my lifetime and also after my death. With regard to the ALPHA Trust, this is my first Letter of Wishes. I reserve the right to revoke or amend the wishes at any time. The information contained herein does not release you from the need to seek the consent of the Protector whenever required according to the Trust Deed.

Page 38

It is my wish that you include me in the circle of possible beneficiaries of the Trust and that you provide me with income and capital respectively upon my request.

Furthermore, it is my wish that you accept _____

_____ _____ _____ into the circle of possible beneficiaries of the Trust.

4.     For the time after my death, my wishes are the following:

A.     Should there be an outstanding balance which I owe from the time before establishment of the Trust and which can be legally determined to be owed to _____ and to_____; it is my wish that you will first settle this before the discretionary beneficiaries benefit from the Trust Assets.

B.     The Trust Assets are to be held in favour of _____.

5.     I am aware that you are not legally bound to comply with my wishes as set out above, but I hope that you will take my wishes into account when exercising your power of discretion in the framework of the trust relationship.

3 July 2015

Ashot Egiazaryan

(Enclosure H)


In an e-mail dated 1 July 2015, Nikolaus Wilhelm had sent the (new) draft of the Letter of Wishes to the Obligated Party, stating the following:

"Enclosed you will find a new draft for your Letter of Wishes.

As it is now drafted, you are the primary beneficiary of the Trust. This means that you will have access to the trust funds during your lifetime. If you have a creditor and want to pay, you can apply for a distribution to yourself so that you can pay the creditor. You don't have to name the creditors in the Letter of Wishes."

(Enclosure G)


In the internal form of the Third-Party Debtor, which has been countersigned by the Obligated Party, concerning the mandate "The Alpha Trust" (form "Discretionary Trust"), the Obligated Party is indicated under point IV. ("Information on curators/protectors and persons entitled to give instructions").

(Enclosure I)

**9.**     From a legal point of view, the following results therefrom:

**9.1**    The Enforcing Party applies herein for the realization of the seized rights within the meaning of Art. 244 of the Enforcement Act (EO). This provision provides for a two-stage realization procedure:

<u>In the first step</u>, the Enforcing Party must be authorized by way of application to claim the right of the Obligated Party on its behalf. For this purpose, it may perform all legal acts on behalf of the Obligated Party that are necessary for this purpose. Due to the fact that in the case of enforcement under Art. 242 et seqq. of the Enforcement Act (EO) the object of enforcement is always the consolidated right of the Obligated Party, the enforcing creditor is also authorized to exercise this consolidated right, provided this serves to liquidate realizable assets. The enumeration in Art. 244 para. 1 of the Enforcement Act (EO) ("to request the division or the initiation of winding-up proceedings, to give notice of cancellations and to make the declarations otherwise required for the exercise and utilization of the seized right on behalf of the Obligated Party") is only non-exhaustive. If such individual powers are mentioned in the application or, respectively, the authorization by the court, this serves the purpose of illustrating ("in particular") and emphasizing the respective powers of the enforcing creditor. This authorization is a special case of transfer for collection (*Überweisung zur Einziehung*) (see Oberhammer in Angst/Oberhammer, Enforcement Act (EO)[3] sec. 333 of the Enforcement Act (EO) recital 2; Heller/Berger/Stix III 2379; LGZ Wien ZBl 1937/500). The dogmatics developed on the legal consequences of the transfer for collection can therefore be used mutatis mutandis to clarify questions of doubt regarding the authorization under para. 1 (see Oberhammer in Angst/Oberhammer, Enforcement Act (EO)[3] sec. 308 of the Enforcement Act (EO) recital 1 et seqq; 3 Ob 225/07 w ecolex 2008/232 = JBl 2008, 726 = RdW 2008/492).

The provisions on the enforcement on "other property rights" are deliberately "broadly"[6] formulated in order to allow any access to realizable assets of the debtor. This also applies to the provision of Art. 244 para 1 of the Enforcement Act (EO) (see Oberhammer, wobl 1997, 252 et seq.), in which no narrow-minded formalism is to be cultivated, particularly with regard to the interpretation of applications for enforcement.

---

[6] Translator's note: The expression „offen formuliert" can be interpreted as "broadly formulated" or "formulated in an open manner".

Page 40

In principle, the rights of the authorized enforcing creditor are equal in contents to those of the Obligated Party (Heller/Berger/Stix III 2379; see 3 Ob 165/10 a SZ 2010/127 = ecolex 2011 /20 = GesRZ 2011, 126 [Eckert]; RIS Justiz RS0003934).

The fact that the seizure within the meaning of Article 242 of the Enforcement Act (EO) also includes all the ancillary rights of the Obligated Party to which it is entitled against a possible Third-Party Debtor becomes even essentially more apparent here than in the case of an enforcement under Article 237 et seqq. of the Enforcement Act (EO), since this circumstance already results from the fact that in this type of enforcement the object of enforcement is always the "consolidated right" of the Obligated Party.

In a second step, the assets used in this way must be realized in accordance with Art. 244 para. 2 of the Enforcement Act (EO). This is done by analogous application of the type of realization provided for in the Enforcement Act (EO) for the respective assets. Thus, if moveable property is to be handed over, the realization pursuant to para. 2 is carried out in accordance with the provisions on the enforcement on moveable goods (*Fahrnisexekution*). If the Obligated Party incurs a monetary claim as a result of the exercise of rights by the enforcing creditor, here the provisions of the execution on receivables (*Forderungsexekution*) etc. apply.

The question remains unanswered as to how, at what time and therefore in what rank the lien right of the enforcing creditor regarding the assets thus used arises with regard to its satisfaction within the framework of realization under Article 244 para 2 of the Enforcement Act (EO). In this connection almost every conceivable opinion is represented (see Oberhammer in Angst/Oberhammer, Enforcement Act (EO)[3] sec. 333 recital 6 et seqq.; Frauenberger in Burgstaller/Deixler-Hübner, Enforcement Act (EO) sec. 333 recital 3 et seqq.; Heller/Berger/Stix III 2394 et seqq. with further citations).

There is much to suggest that after the enforcing creditor has successfully exercised the right of the Obligated Party in accordance with Art. 244 para. 1 of the Enforcement Act (EO), there shall be no further seizure of the assets used. This would not least result from the systematic interpretation of para. 2 leg. cit: This would also apply to the execution on receivables (in which, for example, the lien right on

Case 2:23-cv-55524-06/20/2023   ID: 12739140   DktEntry: 212   Page 122 of 275   Page ID
#:10648
Translation from German to English                                    page 46 of 52

Page 41

the claim is ipso iure converted into such a claim regarding a court deposit (*Gerichtserlag*) pursuant to Art. 228 of the Enforcement Act (EO) without the need for a new seizure) and in the case of the enforcement on claims for restitution (*Exekution auf Herausgabeansprüche)* pursuant to Art. 237 et seqq. of the Enforcement Act (EO) (in which the lien right on the claim for restitution is also ipso iure converted into a lien right on the surrendered object) no new seizure of the proceeds of the collected object (*Einziehungsrealisat*) is provided for. Above all, the parallel provision of Article 238 para. 2 of the Enforcement Act (EO) clearly indicates that, under the Enforcement Act (EO), following the successful "use" of assets by collection of a claim directed towards it, only realization of the asset, but not a new seizure of the proceeds is effected.

**9.2**    In the present case, therefore, the realization must take place - as applied for - by authorizing the Enforcing Party to assert the sized rights on behalf of the Obligated Party and to perform the necessary legal acts on behalf of the Obligated Party (Article 244 para. 1 of the Enforcement Act (EO)). The court need not, in principle, enumerate individual legal acts that may be taken into consideration. It is sufficient if - as applied for in the present case - the enforcing creditor – indicating the seized proprietary right -  is authorized[7] to exercise the rights to which the Obligated Party is entitled or, respectively, to carry out the necessary acts regarding the consolidated rights on behalf of the Obligated Party that are seized with the enforcement authorization in question. As explained, it is not necessary that the exercise of individual powers of the Obligated Party makes assets directly usable as long as and to the extent that the concrete exercise - even if indirectly - is aimed at subjecting assets of the Obligated Party to enforcement.

In the present case, pursuant to Art. 244 para. 2 of the Enforcement Act (EO), the Enforcing Party has applied for the enforcement on the assets used in the manner of para. 2 leg.cit. (i.e. all conceivable

---

[7] Translator's note: The German text says "Es genügt, wenn (…) der betreibende Gläubiger unter Anführung des gepfändeten Vermögensrechts zur Ausübung der dem Verpflichteten zustehenden Rechte bzw. dazu ermächtigt wird, die (…) Gesamtrechtshandlungen (…) vorzunehmen". Probably, the verb „ermächtigen" shall also be valid fort he first part of the sentence, i.e. „ Es genügt, wenn (…) der betreibende Gläubiger unter Anführung des gepfändeten Vermögensrechts zur Ausübung der dem Verpflichteten zustehenden Rechte <u>ermächtigt wird</u> bzw. dazu ermächtigt wird, die (…) Gesamtrechtshandlungen (…) vorzunehmen".

Page 42

proceeds from the Trust). Even if - as explained above - there are plenty indications for the fact that the lien right obtained by way of the enforcement authorization will also have an effect on the proceeds pursuant to Art. 244 para. 2 of the Enforcement Act (EO), or, respectively, that the lien right on the seized right (*Pfändungspfandrecht*) will - upon successful "use" of assets in the sense of para. 2 leg.cit. – turn into a lien on the seized right regarding these assets, the application of the Enforcing Party was to be granted with regard to the various - quite different - opinions represented in doctrine and jurisprudence. In any case, it should be clearly laid down for debtors and third parties what is affected by the lien right. The Third-Party Debtor should be prevented by a clear prohibition of payment from making payments to the Obligated Party.

**9.3**   The application for realization was therefore to be completely granted in full. All of the potestative rights and legal acts of the Obligated Party specified by the Enforcing Party, which the Enforcing Party is to be authorized to exercise, can all be transferred and are at least indirectly relevant in terms of assets under property law. All of them are realizable and have an asset value. The removal of the existing trustee, to which the Obligated Party is entitled to, and the appointment of new trustees [Art. (1) (B) of the Written Instrument], its right to request distributions [Letter of Wishes] or its rights to consent [Art. 14.3 Declaration of Trust in connection with Art. (1) (A) of the Written Instrument] are all suitable to realize realizable assets or, respectively, to enable access to realizable assets.

As the Supreme Court has already stated in ref. no. (ON) 72 (cons. 7.4.3.), the Obligated Party is also entitled in this case, among other things, to appoint himself as a trustee, which is legally permissible (Art. 910 para. 5 in conjunction with 932a sec. 40 para. 2 of the Persons' and Companies' Act (PGR)).

Pursuant to Art. 14.3 Declaration of Trust in conjunction with Art. (1)(A) of the Written Instrument, the prior express consent of the Protector is required for a large number of the (formally existing) rights and duties and actions of the Trustee, namely in particular

-      for the termination of the Trust by the trustee (Art. 3 Declaration of Trust)

-      for the management of the assets of the Trust and the proceeds thereof for the benefit of the beneficiaries (Art. 5 Declaration of Trust),

-      for determining the beneficiaries (Art. 8 Declaration of Trust),

Page 43

- for the delegation of all rights of the trustee, including his discretionary powers (Art. 11 Declaration of Trust),
- for the amendment of provisions of the Trust Deed (Art. 12 Declaration of Trust).

The exercise of the mentioned individual rights together is in any case suitable for realizing realizable assets: Firstly, by means of the authorization, the Enforcing Party may, instead of the Obligated Party vis-à-vis the Alpha Trust, request the removal of the previous trustee of the Alpha Trust (CTX) and the appointment of a person designated by the Enforcing Party as trustee of the Alpha Trust; secondly, then request a distribution – the distribution of the amount owed - from the trustee of the Alpha Trust (designated by the Enforcing Party) to the Obligated Party to a paying agent to be designated by the Enforcing Party; and thirdly, instead of the Obligated Party (in its position as protector and beneficiary), agree to this distribution and its execution.

Also the alternative applied for by the Enforcing Party in eventu, namely to authorize the Enforcing Party - on the basis of the Letter of Wishes - to request and approve a distribution directly to the beneficiary, undoubtedly constitutes a right of asset value, especially since the Enforcing Party has access to this distribution under Art. 244 para. 2 of the Enforcement Act (EO).

Finally, the exercise of the rights under the Letter of Wishes (appointment of the Enforcing Party as beneficiary, requesting and approving of the distribution to the latter) is also realizable and enables the Enforcing Party to access realizable assets.

9.4    The objections of the Obligated Party and the Third-Party Debtor repeat to a large extent the pleadings set out in the writs of legal remedies in the "proceedings for seizure", which is of no longer relevance in the present realization proceedings and regarding which the Supreme Court and the Constitutional Court have already made a number of final and conclusive statements regarding which they have already made a final decision, so that there is no need to go into it further.

Page 44

The application for realization has been filed in good time, is sufficiently substantiated and is undoubtedly admissible. In the sense of the cited jurisprudence of the Supreme Court and the Constitutional Court, the seized consolidated rights are in principle realizable, as are[8], as stated above, also the individual potestative rights and acts to which the Enforcing Party is to be authorized.

As the Supreme Court has also already stated, even an actual discretionary benefit would not prevent the realization of the seized rights (ref. no. (ON) 72, cons. 7.4.3., see also cons. 7.6.4.).  The Enforcing Party also rightly points out that - even if one wanted to formally shape the administration on the basis of discretionary powers - this would not change the fact that the claim of the Enforcing Party with an enforceable title is to be satisfied from the Trust Assets.

Even if the Obligated Party, making reference to the jurisdiction, argues that a right of removal would only serve the "control and enforcement of the trustee's duties", they must at the same time admit that in the present case the Protector's right to appoint and remove the Alpha Trust's trustee "is not bound by any preconditions according to the deeds". In this respect, the Obligated Party in the present case is simply - at least objectively - entitled to appoint and remove the trustees, without any preconditions or any reasons having to be given by the Obligated Party. But even if one were to interpret the Trust Deed subjectively like the by-laws of a foundation, even in conjunction with the Letter of Wishes one arrives at no other conclusion than that the Obligated Party wanted to secure control of the Trust Assets – including with the aid of the competence to remove the trustee.

If the Obligated Party refers to the "principle of proportionality" (*Verhältnismässigkeitsprinzip*) and invokes an "unwritten constitutional principle" (*ungeschriebener Verfassungsgrundsatz*) for this purpose, the Obligated Party has to be referred to Article 9 of the Enforcement Act (EO), where this principle has become the wording of the law. Accordingly, the simultaneous use of several means of enforcement is permitted. Only if the application for enforcement clearly shows that one or more of the means of

---

[8] Translator's Note: The German part-sentence "grundsätzlich verwertbar und sind dies …. auch die einzelnen", was interpreted in a way that „dies" made reference to „verwertbar".

Page 45

enforcement applied for are already sufficient to satisfy the enforcing
creditor, the authorization may be limited to individual means of
enforcement. The latter is not even claimed, let alone certified, by the
Obligated Party.

With regard to the pleadings of the Obligated Party regarding its right
to be heard by way of mutual legal assistance, it should be noted that
according to Art. 242 para. 2 of the Enforcement Act (EO), the type of
realization is to be determined after the interrogation of the Obligated
Party, among others. This refers to an interrogation in accordance
with Art. 34 of the Enforcement Act (EO), which can be oral or by
requesting to make a written statement. Which form the court chooses
is at its free discretion. The law expressly provides for that the
provisions of Art. 38 of the Enforcement Act (EO) that apply to the oral
hearing, which mainly concern the keeping of the minutes, do not
apply to the interrogation. Rather, it is sufficient to record the result of
the interrogation in a brief memorandum (Art. 34 para. 1 of the
Enforcement Act (EO)).

In the present case, the court, by order of 09-11- 2018 (ref. no. (ON)
80), requested the Obligated Party to submit written comments on the
application for realization of the Enforcing Party dated 24 July 2017
(ref. no. (ON) 34) in accordance with Art. 242 para. 2 in conjunction
with Art. 34 of the Enforcement Act (EO) within 14 days of service of
this order, otherwise it was assumed that the party agrees to this
application (Art. 34 and Art. 35 para. 2 and 3 of the Enforcement Act
(EO))". [sic] The Obligated Party also submitted comments, even
twice in detail, and this in written submissions dated 28-11-2018 (ref.
no. (ON) 88) and 20-12-2019 (ref. no. (ON) 97). Since both parties
requested the holding of a hearing (for oral hearings) - which is not
mandatory by law - the court - in order to avoid multiple written
statements and counter-statements [also in the sense of the
jurisprudence on the protection of the right to be heard] - also ordered
such a hearing in order to finally deal with the application for
realization (contradictorily) in the simultaneous presence of the
parties.

As follows from Article 34 para. 3 of the Enforcement Act (EO), the
evidence in the enforcement proceedings is in principle not limited.
Besides the certificates and the taking of evidence "in accordance
with the provisions of the Code of Civil Procedure", the court is entitled
to conduct all appropriate inquiries.

Page 46

The interrogation of the parties or parties involved is - as stated above with regard to Art. 34 para. 1 of the Enforcement Act (EO) - not necessarily bilateral and a formal, direct interrogation of the parties is only possible where the law provides for an oral hearing (e.g. Art. 140 para. 1 of the Enforcement Act (EO) - distribution of the highest bid (*Meistbotsverteilung*) or Art. 290 para. 3 lit. c of the Enforcement Act (EO) – hearing on oppositions (*Einspruchsverhandlung*)). And in the case of Art. 242 para. 2 of the Enforcement Act (EO), the law only provides for an interrogation, but not for an oral hearing. And the court has ordered the interrogation in writing. The Obligated Party has also submitted a written statement in accordance with the court order and was thus interrogated in accordance with Art. 242 para. 2 in conjunction with Art. 34 of the Enforcement Act (EO). There was and is no room for a formal, direct interrogation or even an interrogation by way of legal mutual assistance of the Obligated Party and the Obligated Party had "all the time in the world" to prove its allegations (and also used the ordered written interrogation to do so).

In addition, reference should be made once again to the statements of the Supreme Court and the Constitutional Court, which have been cited above and which deal with the pleadings of the Obligated Party and of the Third-Party Debtor.

**9.5** The costs which were recorded by the Enforcing Party in the proceedings on the realization in due time and which were essentially correct (no order fee is incurred and was not awarded; the joint-party surcharge (*Streitgenossenzuschlag*) for the written statement ref. no. (ON) 105 and for the hearing of 18-02-2020 is not due) were to be determined as further enforcement costs with CHF 83,297.75.

Princely Court (Fürstliches Landgericht)

Vaduz, on 02-03-2020

Mag. Konrad Lanser

Judge of the Princely Court

For the correctness of the execution.

[Signature illegible]

Iris Feuerstein

[Seal: PRINCELY COURT; National Emblem]

Page 47

**Legal Remedies**

Against this decision, the legal remedy of "Recourse" *(Rekurs)* may be lodged with the Princely Court of Appeals (Fürstliches Obergericht), Vaduz, within the unextendable period of 14 days from service. The Recourse must be lodged in writing in duplicate with the Princely Court (Fürstliches Landgericht) in Vaduz, but may also be declared orally for the record. The Recourse must contain a specific declaration as to the extent to which the order is contested, the brief description of the grounds of the contestation (grounds of recourse) which also has to be specific, the actual pleadings and means of evidence by which the truth of the grounds of recourse can be proven, and the declaration as to whether the order is to be set aside or amended and, if so, which grounds are to be applied for (recourse petition).

EINGEGANGEN

0 9. März 2020

FÜRSTENTUM LIECHTENSTEIN

**FÜRSTLICHES**
# LANDGERICHT

FRIST: 23.03.2020/F

Aktenzeichen bitte immer anführen

<u>08 EX.2016.5802</u>

ON 109

# BESCHLUSS

## Rechtssache

| | |
|---|---|
| **Betreibende Partei:** | Vitaly Ivanovich Smagin, Krasnoproletarskaya st., h.9, R-127006 Moskau |
| | vertreten durch Advocatur Seeger, Frick & Partner AG, Landstrasse 81, 9494 Schaan |
| **Verpflichtete Partei:** | Ashot YEGIAZARYAN, 655 Endrino Place Beverly Hills, USA-90201 California |
| | vertreten durch Advocatur Sprenger & Partner AG, Landstrasse 11, Postfach 140, 9495 Triesen |
| **Drittschuldnerin:** | CTX Treuhand AG als Treuhänderin des Alpha Trust, vertreten durch Wilhelm & Büchel, 9490 Vaduz |
| **wegen:** | Exekutionsbewilligung (StW: CHF 91'605'445.97) |

1.1 Die **VERWERTUNG** der mit Exekutionsbewilligung des Fürstlichen Landgerichts vom 21. November 2016, 08 EX.2016.5802, ON 3, gepfändeten, der verpflichteten Partei **als Treugeber, Protektor und Begünstiger des Alpha Trusts** (FL-0002-510.771-1), c/o Dr. iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz gegenüber der **CTX Treuhand Aktiengesellschaft** als Treuhänderin des Alpha Trust (FL-0002-510.771-1), c/o Dr .iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz zustehenden Gesamtrechte, nämlich insbesondere des Rechts zum Erhalt von Zahlungen und Zuwendungen aller Art aus dem Treugut, des Rechts zur Bestellung und Abberufung der Treuhänder des

SPANIAGASSE 1 · 9490 VADUZ · TELEFON +423 - 236 61 11 · TELEFAX +423 - 236 65 39

Alpha Trusts (Art. (2) *Written Instrument* vom 2. Juni 2015), des Rechts des Treuhänders zur Beendigung des Trusts (Art. 3, 14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument),* des Rechts des Treuhänders zur Bestellung der Begünstigten des Alpha Trusts (Art. 8, 14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument),* des Rechts des Treuhänders zur Änderung der Treuhandurkunden des Alpha Trusts (Art. 12, 14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument),* des Rechts des Treuhänders zur Delegation sämtlicher Rechte des Treuhänders einschliesslich seiner Ermessensbefugnisse (Art. 11,14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument)* und des Rechts des Treuhänders zur Ausübung sämtlicher der im *First Schedule* des *Declaration of Trust* festgelegten Rechte (Art. 11, 14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument),* wird **bewilligt,** und zwar durch

**Ermächtigung** der betreibenden Partei, die oben bezeichneten Rechte der verpflichteten Partei anstelle des Verpflichteten geltend zu machen, nämlich <u>insbesondere</u>:

**a)  Abberufung der CTX:**

Das Recht anstelle des Verpflichteten gemäss Art. 14.05 des Trust Deeds des Alpha Trusts i.d.F.d. des *Written Instruments vom 2.6.2015* die bisherige Treuhänderin des Alpha Trusts, die CTX Treuhand AG, Lova-Center, 9490 Vaduz mit sofortiger Wirkung abzuberufen.

**b)  Benennung neuer Treuhänder:**

Im Einklang mit Art. 10.1. der Treuurkunde neue Treuhänder des Alpha Trust zu benennen und zu bestellen,

- sei dies die betreibende Partei,
- *die* Herren Rechtsanwälte Mag.iur. Rudolf Schächle und lic. iur. Raphael Näscher oder
- sonstige von der betreibenden Partei bestimmte natürliche Personen oder eine Treuhandgesellschaft mit Sitz im In- oder Ausland,

**c) Ausschüttung an Yegiazarian begehren und genehmigen:**

Von der gegenwärtigen oder neu bestellten Treuhändern des Alpha Trust anstelle des Verpflichteten auf Basis des Letter of Wishes des Verpflichteten vom 3.7.2015 und der Treuurkunde des Alpha Trusts i.d.F.d. des Written Instruments vom 2.6.2015 sowie auf Basis seines tatsächlich bestehenden Instruktionsrechts gegenüber der Treuhändern des Alpha Trusts

- die Ausschüttung der verfahrensgegenständlich vollstreckbaren Forderung von CHF 91'595'445.97 (08 EX.2016.5802, ON 3) zuzüglich Zinsen (nämlich vierteljährlich aufgezinsten Jahreszinssatz von 8% aus USD 72'243'000.00 und USD 6'899'701.32 seit 15. November 2016) und Kosten an die verpflichtete Partei an eine von der betreibenden Partei zu bestimmende Zahlstelle zu fordern und zu wünschen, und
- anstelle des Verpflichteten dieser Ausschüttung und ihrer Durchführung (einschliesslich der von der betreibenden Partei bestimmten Zahlstelle) in seiner Position als Protektor (i.S.d. Art. 14.4 i.V.m. Art. 8.1.2 des Trust Deeds des Alpha Trust vom 27.5.2015 i.d.F.d. des Written Instruments vom 2.6.2015) und Begünstigter (i.S.d. Art. 1.1.2 und des Third Schedules des Trust Deeds des Alpha Trust vom 27.5.2015) zuzustimmen.

**d) Rechte aus der Vereinbarung zum Letter of Wishes ausüben:**

Von der gegenwärtigen oder neu bestellten Treuhänderin des Alpha Trust anstelle des Verpflichteten auf Basis der Rechte des Verpflichteten gemäss der Vereinbarung zum Letter of Wishes vom 3.7.2015

- die Bestellung der betreibenden Partei als Begünstigter des Alpha Trusts,
- die Ausschüttung der verfahrensgegenständlich vollstreckbaren Forderung von CHF 91'595'445.97 (08 EX.2016.5802, ON 3) zuzüglich Zinsen (nämlich vierteljährlich aufgezinsten Jahres-zinssatz von 8% aus USD 72'243'000.00 und USD 6'899'701.32 seit 15. November 2016) und Kosten an die betreibende Partei (in deren Eigenschaft als bestellte Begünstigte) zu fordern und zu wünschen, sowie
- anstelle des Verpflichteten dieser Ausschüttung und ihrer Durchführung (einschliesslich der von der betreibenden Partei bestimmten Zahlstelle) in seiner Position als Protektor (i.S.d. Art.

14.4 i.V.m. Art. 8.1.2 des Trust Deeds des Alpha Trust vom 27.5.2015 i.d.F.d. des Written Instruments vom 2.6.2015) und Begünstigter (i.S.d. Art. 1.1.2 und des Third Schedules des Trust Deeds des Alpha Trust vom 27.5.2015) zuzustimmen

**e)** **Administrative Rechte des Protektors zur Durchführung ausüben:**

Anstelle des Verpflichteten auf Basis der Treuurkunde des Alpha Trusts i.d.F.d. des Written Instruments vom 2.6.2015 die Zustimmung zu Handlungen des Treuhänders gemäss der Punkte 4,11,16.2 und des First Schedule der Treuurkunde geben sowie alle Informationsrechte des Verpflichteten gegenüber dem Treuhänder auszuüben.

1.2 Die **Pfändung** der der verpflichteten Partei aufgrund der gegenständlichen Verwertung nach Ziff. 1.1 gegen den Alpha Trust bzw. dessen Treuhänder zustehenden Geldforderungen und Zahlungsansprüche, insbesondere Ausschüttungsansprüche in Höhe von CHF 91'595'445.97 und **Überweisung** dieser gepfändeten Forderungen zur Einziehung bis zur Höhe der vollstreckbaren Forderung unbeschadet etwa früher erworbener Rechte dritter Personen, wird bewilligt.

Der Drittschuldnerin wird verboten, an die verpflichtete Partei Zahlung zu leisten. Letzterer wird jede Verfügung über die gepfändete Forderung sowie über das für sie bestellte Pfand insbesondere die gänzliche oder teilweise Einziehung dieser Forderung untersagt. Mit Zustellung dieses Zahlungsverbotes an die Drittschuldnerin ist die bewilligte Pfändung als bewirkt anzusehen und zu Gunsten der vollstreckbaren Forderung der betreibenden Partei an der oben bezeichneten Forderung ein Pfandrecht erworben.

2. Die weiteren Exekutionskosten der betreibenden Partei werden mit CHF 83'297.75 bestimmt.

# Begründung

1. Mit Beschluss bzw. Exekutionsbewilligung vom 21.11.2016 (ON 3) hat dieses Gericht wie folgt entschieden:

Aufgrund des vollstreckbaren Schiedsspruches des London Court of International Arbitration (LCIA), London, Grossbritannien, vom 11. November 2014 (…)
wird der betreibenden Partei, Vitaly Ivanovich SMAGIN, Krasnoproletarskaya st., h.9, 127006 Moskau, Russland,
wider die verpflichtete Partei Ashot YEGIAZARYAN, 655 Endrino Place, Beverly Hills, California, Vereinigte Staaten von Amerika,

zur Hereinbringung der vollstreckbaren Forderung von

a. USD 72'243'000.00 (an Hauptsache), und
b. USD 6'899'701.32 (an kapitalisierten Zinsen) und
c. GBP 2'776'473.68 und USD 672'354.08 und RUB 2'958'750.00 (an Kosten) und
d. weiteren Zinsen in Höhe eines vierteljährlich aufgezinsten Jahreszinssatz von 8% aus USD 72'243'000.00 und USD 6'899'701.32 seit 11. November 2014 sowie
e. der mit CHF 63'880.00 bestimmten Kosten des Exekutionsantrages,

die Exekution bewilligt durch

1. Pfändung der der verpflichteten Partei als Treugeber, Protektor und Begünstigter des Alpha Trusts (FL-0002.510.771-1), c/o Dr.iur. Thomas Wilhelm, Lova Center, 9490 Vaduz, gegenüber der

CTX Treuhand Aktiengesellschaft als Treuhänderin des Alpha Trust (FL-0002-510.771-1), c/o Dr.iur. Thomas Wilhelm, Lova Center, FL- 9490 Vaduz,

zustehenden Gesamtrechte, insbesondere das Recht zum Erhalt von Zahlungen und Zuwendungen aller Art aus dem Treugut, das Recht zur Bestellung und Abberufung der Treuhänder des Alpha Trusts (Art. (2) Written Instrument vom 2. Juni 2015), das Recht des Treuhänders zur Beendigung des Trusts (Art. 3, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument), das Recht des Treuhänders zur Bestellung der Begünstigten des Alpha Trusts (Art. 8, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument), das Recht des Treuhänders zur Änderung der Treuhandurkunden des Alpha Trusts (Art. 12, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument), das Recht des Treuhänders zur Delegation sämtlicher Rechte des Treuhänders einschliesslich seiner Ermessensbefugnisse (Art. 11, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument), das Recht des Treuhänders zur Ausübung sämtlicher der im First Schedule des Declaration of Trust festgelegten Rechte (Art. 11, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument) und den Rechten als Vermögensverwalter des Trusts (Minutes of a Meeting of the Directors of CTX Treuhand AG vom 3. Juni 2015).

2. An die verpflichtete Partei Ashot YEGIAZARYAN wird das Gebot erlassen, sich jeder Verfügung über die oben (1.) bezeichneten Rechte zu enthalten.

3. An die CTX Treuhand Aktiengesellschaft als Treuhändern des Alpha Trust (FL-0002-510.771-1), c/o Dr.iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz, wird das Verbot erlassen, aus diesen Ansprüchen oder unter Ausübung dieser Rechte (1.) an die verpflichtete Partei Ashot YEGIAZARYAN und/oder einen Dritten zu leisten, insbesondere Weisungen durch die verpflichtete Partei Ashot YEGIAZARYAN zu befolgen und/oder Zustimmungen durch die verpflichtete Partei Ashot YEGIAZARYAN zu akzeptieren und ihren Entscheidungen zugrunde zu legen.

4. Ausgenommen von dieser Exekutionsbewilligung sind die durch die Forderungsexekutionsbewilligung des Fürstlichen Landgerichtes vom 24. Februar 2016, 08 EX.2016.839, ON 4, bereits gepfändeten Forderungen, nämlich die der verpflichteten Partei aufgrund seiner Rechtsstellung als wirtschaftlich Berechtigter, Treugeber, Begünstigter und Auftraggeber des Alpha Trusts oder anderer Treuhand-verhältnisse gegen die Drittschuldner (i) CTX Treuhand AG als Treuhändern des Alpha Trust, (ii) Dr. Thomas Wilhelm und (iii) Nikolaus Wilhelm zustehenden Geldforderungen und Rückzahlungsansprüche.

**2.**    Gegen diesen Beschluss erhoben die verpflichtete Partei und die Drittschuldnerin Rekurs an das Obergericht. Dieses gab mit Beschluss vom 03.08.2017 (ON 36) beiden Rekursen im Sinne einer Abweisung der Exekutionsanträge Folge und begründete seine Entscheidung unter anderem wie folgt:

6.6.7  Vor dem Hintergrund dieser allgemeinen Ausführungen ist für den konkreten Fall Folgendes zu sagen:

Da die zu EX.2016.839 bewilligte Exekution auf Grundlage der Art. 210f EO erfolgte, das gegenständliche Exekutionsbegehren auf die Anwendung eines anderen Exekutionsmittels (Art. 241f EO) mit dem Ziel der Pfändung weiterer Rechte des Verpflichteten gerichtet ist, besteht von daher kein rechtlicher Konflikt zur schon bewilligten Exekution zugunsten derselben betreibenden Partei, zumal von der gegenständlichen Exekutionsbewilligung die bereits zu 08 EX.2016.839 gepfändeten Forderungen ausdrücklich nicht erfasst sein sollen. Allerdings erweist sich die vorliegende Exekutionsbewilligung, die das teilweise widersprüchliche und unbestimmte Begehren der betreibenden Partei unreflektiert übernommen hat, als derart mangelhaft, dass der angefochtene Beschluss abzuändern und der dem angefochtenen Beschluss zugrunde liegende Exekutionsantrag abzuweisen ist.

So ist zunächst festzuhalten, dass von einer Pfändung von „Gesamtrechten" des Verpflichteten aufgrund seiner Stellung als Treugeber und Begünstigter des Alpha Trusts schon deshalb keine Rede sein kann, weil ja die mit dieser Stellung verbundenen Geldforderungen und Zahlungsansprüche, insbesondere Ausschüttungs- und Rückzahlungsansprüche in Höhe der ausstehenden (betriebenen) Forderungen bereits zu 08 EX.2016.839 gepfändet wurden. Die nochmalige Aufnahme des „*Rechtes zum Erhalt von Zahlungen und Zuwendungen aller Art aus dem Treugut*" in die Exekutionsbewilligung ist schon deshalb in sich widersprüchlich, weil unter Z 4 des angefochtenen Beschlusses diese Vermögensrechte gerade nicht erfasst sein sollen. Die mit der gegenständlichen Exekution erfassten „Gesamtrechte" werden völlig unzureichend (weil unzulässig) und in sich widersprüchlich durch die nachfolgende Auflistung der darunter „insbesondere" fallenden Rechte konkretisiert, wobei sich das Antragsvorbringen im Exekutionsantrag ohne nähere Spezifizierung der Art der Begünstigung des Verpflichteten (Begünstigungsberechtigter oder Ermessens-begünstigter) im Wesentlichen nur mit seinen Rechten als Protektor auseinandersetzt, wogegen in der Spezifizierung dieser Rechte in der Exekutionsbewilligung sich wiederum lediglich „*das Recht zur Bestellung und Abberufung der Treuhänder des Alpha Trusts*" wiederfindet, worauf noch zurückzukommen ist. Dazu ist auch festzuhalten, dass sich aus dem Akt und den vorgelegten Urkunden für die Rechte des Protektors lediglich Zustimmungsrechte zu den dem Treuhänder eingeräumten Rechten gemäss Treuhandurkunde finden. Im Übrigen sollen mit der Exekutionsbewilligung ausschliesslich Rechte der Treuhänderin des Alpha Trusts gepfändet werden, nämlich das Recht der Treuhänderin zur Beendigung des Trusts, das Recht der Treuhänderin zur Bestellung der Begünstigten des Alpha Trusts, das Recht der Treuhänderin zur Änderung der Treuhandurkunden des Alpha Trusts, das Recht der Treuhänderin zur Delegation sämtlicher Rechte des Treuhänders einschliesslich seiner Ermessensbefugnisse, das Recht der Treuhänderin zur Ausübung sämtlicher der im First Schedule des Declaration of Trust festgelegten Rechte und letztlich die Rechte der Treuhänderin als Vermögens-verwalterin des Trusts.

Soweit also mit der gegenständlichen Exekutionsbewilligung nicht Rechte des Verpflichteten aus dem Treuhandverhältnis mit der Treuhänderin gepfändet werden sollen, erweist sich dies von vornherein als unzulässig, weil Voraussetzung der Pfändung nach § 241 f. EO – wie oben ausgeführt – lediglich dem Verpflichteten gehörende und verwertbare Vermögensrechte sein können. Nach Inhalt des bewilligten Exekutionsantrages will die betreibende Partei allerdings auf die der bestellten Treuhänderin in der Treuhandurkunde eingeräumten Rechte zugreifen, womit aber nicht nur exekutionsrechtliche Bestimmungen verletzt würden, sondern auch unzulässig in die das Wesen eines Trusts regelnden Normen – wie sie oben auszugsweise wiedergegeben wurden

- eingegriffen würde. Wie schon ausgeführt kann der Treugeber die Ausführung der getroffenen Anordnungen in das freie Ermessen des Trustee, insbesondere in Bezug auf einzelne oder alle Begünstigten bzw. Begünstigtenklassen stellen und auch die Höhe der Zuwendungen durch den Trustee festlegen lassen. Dass es sich um den Verpflichteten um einen Begünstigungsberechtigten handelt, wurde vorliegend weder näher konkretisiert, noch ergibt sich dies aus den Urkunden. Abgesehen davon kann nach Art. 918 Abs. 1 PGR weder der Treugeber Bestimmungen aufstellen, mit welchen der Treuhänder zur Befolgung fortlaufender Weisungen des Treugebers verpflichtet wird, insbesondere mit Bezug auf die Verwendung des Treugutes, noch der Protektor anstelle des Treuhänders Vermögensverfügungen treffen. Die dem Treuhänder in der Treuhandurkunde vertraglich eingeräumten Rechte stehen diesem aufgrund seiner Rechtstellung als selbständiger Vermögensträger unmittelbar zu, auch wenn er sie im Interesse des Treugebers und gemäss den Bestimmungen in der Treuhandurkunde auszuüben hat.

6.6.8   Damit verbleibt lediglich das in der Exekutionsordnung näher spezifizierte Recht des Protektors zur Bestellung und Abberufung der Treuhänder des Alpha Trusts. Nach Auffassung des Senates wird damit vorderhand kein vermögenswertes Recht gepfändet, weil dieses Recht dem Berechtigten nicht unmittelbar eine vermögenswerte Rechtsposition verschafft. Insoweit kann auf die Erwägungen des öOGH in der erwähnten Entscheidung 3 Ob 177/10s zurückgegriffen werden, wonach die Befugnis auf Abberufung und Bestellung von Organen, wirtschaftlich betrachtet, lediglich ein Beugemittel darstellt. Das Abberufungsrecht dient der Kontrolle und Durchsetzung der Pflichten des Treuhänders. Vorderhand ist jedoch vom rechtmässigen Verhalten der Treuhänderin auszugehen. Möglicherweise würde dieses Recht im Rahmen der Pfändung von Gesamtrechten des Verpflichteten im Sinne der Erwägungen des öOGH in 3 Ob 177/10s dann eine Bedeutung erlangen, wenn der Treuhänder seine Pflicht, insbesondere mit Bezug auf gepfändete Ansprüche des Verpflichteten, gemäss der Treuhand-anordnung verletzte und dem anspruchsberechtigten Begünstigten keine Zuwendungen zukommen lassen will. Der öOGH hat in seiner Entscheidung 3 Ob 177/10s die Frage offen gelassen, ob im Zuge des Verwertungsverfahrens eine entsprechende Ermächtigung zur Ausübung derartiger Gestaltungsrechte erteilt werden kann. Auch im hier vorliegenden Fall kann diese Frage umso mehr offen gelassen werden, weil sich schon die Pfändung dieser Rechte als mangelhaft erweist.

Die Drittschuldnerin macht auch zu Recht geltend, dass das erlassene Drittverbot in dieser Form keinen Bestand haben kann, weil nach Art. 242 Abs. 1 EO ein Drittverbot nur dann zu erlassen wäre, wenn eine bestimmte dritte Person aufgrund der gepfändeten Rechte des Verpflichteten zu Leistungen verpflichtet wäre. Soweit das auf die

Forderungen des Verpflichteten als Treugeber bzw. Begünstigungs-berechtigter aus dem Trust zutreffen sollte, wurde ein entsprechendes Drittverbot ohnehin schon im Verfahren 08 EX.2016.839 erlassen. Dagegen wurden mit der vorliegenden Exekutionsbewilligung keine sonstigen Rechte des Verpflichteten gepfändet, denen eine Leistungspflicht der Treuhänderin gegenüberstünde, weshalb dem so formulierten Drittverbot die rechtliche Grundlage fehlt.

Im Ergebnis war daher in Abänderung des angefochtenen Beschlusses und in Stattgebung der Rekurse der Exekutionsantrag abzuweisen.

**3.** Gegen diesen Beschluss des Obergerichts erhob die betreibende Partei Revisionsrekurs an den Obersten Gerichtshof. Dieser gab dem Revisionsrekurs mit Beschluss vom 07.09.2018 (ON 72) Folge und stellte den Beschluss des Landgerichts wieder her. Zur Begründung führte der Oberste Gerichtshof unter anderem folgendes aus [Hervorh. d. Verf.]:

7.    Hiezu hat der Fürstliche Oberste Gerichtshof erwogen:

7.1.    Rezeptionsvorlage § 331 öEO für Art 242 EO:

7.1.1.    Gem Art 242 Abs 1 EO (= § 331 Abs 1 öEO) hat zum Zwecke der Exekution auf Vermögensrechte, die nicht zu den Forderungen gehören, das Gericht auf Antrag des betreibenden Gläubigers das Gebot zu erlassen, sich jeder Verfügung über das Recht zu enthalten (Pfändung). Ist kraft dieses Rechts eine bestimmte Person zu Leistungen verpflichtet, so ist die Pfändung erst dann als bewirkt anzusehen, wenn auch dieser dritten Person das gerichtliche Verbot, an den Verpflichteten zu leisten, zugestellt wurde. Gem Art 242 Abs 2 EO ist die Art der Verwertung des Rechtes vom Gericht auf Antrag des betreibenden Gläubigers nach Einvernahme des Verpflichteten und aller Gläubiger, zu deren Gunsten Pfändung erfolgte, zu bestimmen.

7.1.2.    Diese Rechtslage der liechtensteinischen EO entspricht dem österreichischen Rezeptionsvorbild in §§ 331 ff öEO. Es ist daher österreichische Literatur und Judikatur zur Beurteilung der gegenständlichen Rechtsfragen heranziehbar.

7.2.    Teleologie des Art 242 EO:

7.2.1.    In vielen Fällen vermag der betreibende Gläubiger nur auf ein „Gesamtrecht" die Exekution zu führen, zumal sich vermögenswerte Einzelrechte, die vom betreibenden Gläubiger in der Folge geltend zu machen bzw durchzusetzen sind, erst in der konkreten Sachlage und Einzelsituation ergeben. **Unpfändbar sind unter diesem Aspekt nur höchstpersönliche oder sonst offenkundig nicht übertragbare Rechte oder solche, deren Ausübung nur für den Verpflichteten wirtschaftlich sinnvoll ist** (öOGH 3 Ob 101/04f; Oberhammer in Angst/Oberhammer,

EO³ § 331 Rz 4). Soweit sich daher die Revisionsrekursgegner auf die Unpfändbarkeit einzelner aus einem Gesamtrecht ableitbarer Rechte verweisen, ist ihnen entgegenzuhalten, dass sich die bekämpfte Exekutionsbewilligung nicht auf Einzelrechte, sondern auf Gesamtrechte des Verpflichteten bezieht (öOGH 3 Ob 166/11z; vgl auch RIS-Justiz RS0004162 [T1]).

7.2.2. Der Auffangtatbestand der Exekution auf andere Vermögensrechte soll sicherstellen, dass alle denkbaren Vermögenswerte des Verpflichteten in Exekution gezogen werden können. An dieser Zwecksetzung des Gesetzes hat sich die Interpretation der §§ 331 ff öEO zu orientieren (RIS-Justiz RS0120619), was auch für die Auslegung der Art 242 ff EO zu gelten hat. "Andere Vermögensrechte" iS des Art 242 Abs 1 EO sind nur solche materiellrechtliche Ansprüche des Antragsgegners, die weder dem unbeweglichen Vermögen noch jenen Teilen des beweglichen Vermögens des Schuldners zuzuordnen sind, die als Geldforderungen, körperliche Sachen bzw als Ansprüche auf Herausgabe oder Leistung körperlicher Sachen zu definieren sind (OGH 03 CG.2007.66 LES 2008, 266 Erw 8.1; LES 1987, 80; RZ 1956, 111). So wurde in dem **Optionsrecht des Stifters, sich selbst als Begünstigten einsetzen zu können**, ein **pfändbarer Vermögenswert** erblickt. Sogar das **Recht auf Organbestellung**, welches unmittelbar keine vermögenswerte Rechtsposition verschafft, kann als Einflussmöglichkeit des Stifters auf den Vorstand mittelbar zu einer Geldwertzuwendung, zB aus den Erträgnissen des Stiftungsvermögens, führen. § 333 Abs 1 öEO (Art 244 Abs 1 EO) stellt darauf ab, dass das gepfändete Recht Anspruch auf „Ausfolgung einer Vermögensmasse" gewähre. **Das Recht selbst muss zwar nicht verwertbar sein, es muss aber seinerseits den Zugriff auf ein verwertbares Vermögen ermöglichen** (öOGH 3 Ob 177/10s; Oberhammer in Angst/Oberhammer, EO³ § 331 Rz 3), wie etwa das im Gesetz beispielsweise angeführte Recht, eine Kündigung vorzunehmen (Art 244 Abs 1 EO). **Grundsätzlich können auch mehrere Schritte von Rechtshandlungen zur „Ausfolgung einer Vermögensmasse" führen**, das Gesetz beschränkt den betreibenden Gläubiger nicht auf einen einzigen exekutiven Verwertungsschritt.

7.3. <u>Abgrenzung Exekution auf Gesamtrechte und Exekution auf Forderungen:</u>

7.3.1. Im gegenständlichen Fall geht es nun entgegen den Ausführungen der Revisionsgegner nicht um die Pfändung einzelner „Forderungen", für die zumindest das „Entstandensein" vorauszusetzen wäre, sondern um eine Exekution auf „andere Vermögensrechte" im Sinne der Art 242 ff EO. Es ist wesenstypisch für eine derartige Exekution, dass verwertbare Forderungen im Zeitpunkt des exekutiven Zugriffs (noch) nicht vorhanden sind, weil diese Art der Exekution auf ein „Gesamtrecht" greift und zum Entstehen einzelner Forderungen und Ansprüche in aller Regel erst weitere Schritte durch den betreibenden Gläubiger im Rahmen der Verwertung vorauszusetzen sind (Oberhammer in Angst/Oberhammer, EO³ § 331 Rz 3 f).

7.3.2. Die öRsp lässt denn auch Pfändungen gem § 331 EO dann zu, **wenn erst weitere Rechtsakte durch den betreibenden Gläubiger vermögenswerte Rechte des Verpflichteten entstehen lassen**. Dass diese bereits im Pfändungszeitpunkt bestehen setzt die EO nicht voraus (vgl öOGH 3 Ob 165/10a; 6 Ob 235/08i GesRZ 2009, 237 [Arnold]).

7.3.3. Diesen Unterschied – einerseits Pfändung von Forderungen, die bedingte oder betagte Forderungen voraussetzt, weil bloss erwartete Forderungen nicht im Rahmen der Exekution auf Geldforderungen pfändbar sind und andererseits die Pfändung von Gesamtrechten, wenn zB mangels Kündigung des zugrundeliegenden Vertragsverhältnisses pfändbare Forderungen noch gar nicht entstanden sind – hob der öOGH gerade in einer Entscheidung zur Exekution auf Treugeberrechte hervor (öOGH 3 Ob 223/12h ecolex 2013/211). Im konkreten Fall ging es um die Exekution auf Ansprüche des Treugebers gegen den Treuhänder, auf die nur nach § 331 öEO (= Art 242 EO) Exekution geführt werden kann. Diese Bestimmung kam deshalb zur Anwendung, weil das treuhänderische Vertragsverhältnis nur durch eine Gestaltungserklärung einer der Vertragsparteien beendet werden konnte.

7.3.4. Während sich sohin nicht nur das Exekutionsmittel, sondern auch das Exekutionsobjekt im Fall der Forderungsexekution von jenem im Fall der Exekution auf „andere Vermögensrechte" unterscheidet, ist lediglich in der Frage des bereits zumindest entstandenen Rechts eine Gemeinsamkeit gegeben: Diesfalls besteht kein Unterschied darin, dass das Recht, auf das Exekution geführt wird, zum Zeitpunkt der Pfändung bereits entstanden ist. Auf ein solches Recht kann dann - je nach Exekutionsobjekt - Exekution geführt werden. Auch für eine Exekution auf andere Vermögensrechte ist somit vorausgesetzt, dass das Gesamtrecht bereits entstanden und dem Verpflichteten zusteht (OGH 25.8.2014, 8 Ob A 56/14i ecolex 2014, 1061).

7.4. <u>Zum Exekutionsantrag</u>:

7.4.1. Die betreibende Partei hat im vorliegenden Fall **mehrere Rechtspositionen des Verpflichteten als Gesamtrechte** geltend gemacht und deren Pfändung beantragt: So hat sie im bewilligten Antrag die Stellung der verpflichteten Partei **als Treugeber, Protektor und Begünstigter des Alpha Trust** gegenüber der Drittschuldnerin vorgebracht und die Pfändung der hieraus dem Verpflichteten gegenüber der Drittschuldnerin zustehenden Gesamtrechte begehrt (Pkt 1 Abs 1 - 3). Zur Position des Verpflichteten als Protektor des Alpha Trust wurden im Einzelnen ua Teilrechte vorgebracht, wie zB dass der Verpflichtete nach der Trust-Urkunde übertragbare Rechte so etwa das Recht zur Zustimmung als Protektor zu diversen Rechten und Handlungen des Treuhänders habe: so insbesondere zur Beendigung des Trusts durch den Trustee, zur Bestimmung der Begünstigten, zur Delegation sämtlicher Rechte des Trustees einschliesslich seiner (angeblichen) Ermessensbefugnis und zur Änderung von Bestimmungen der Treuhandurkunde. Überdies habe der Verpflichtete das alleinige Recht,

die Trustees des Alpha Trusts zu bestellen oder abzuberufen. Es komme hinzu, dass sich der Verpflichtete von den (von ihm kontrollierten) Trustees des Alpha Trusts sogar als Vermögensverwalter des Trusts einsetzen habe lassen.

7.4.2. Damit wurden aber von der betreibenden Partei hinlängliche Behauptungen zur Pfändbarkeit der Gesamtrechte des Verpflichteten aufgestellt. Die Einzelrechte des Gesamtrechts müssen nicht behauptet und bescheinigt werden, wenn es doch (wie hier beispielhaft, verb „insbesondere") geschieht, schadet es dem Betreibenden nicht, selbst wenn idZ Rechte beispielhaft aufgezählt werden, die für den betreibenden Gläubiger nicht verwertbar sind. Der vorliegende Exekutionsantrag gibt klar die zu **pfändenden Gesamtrechte**, nämlich die des Verpflichteten **als Treugeber, als Protektor und als Begünstigter des Alpha Trust gegenüber der Drittschuldnerin** an. **Einer näheren Detaillierung bzw Aufzählung der aus diesen Rechtspositionen resultierenden Einzelrechte bedarf es nicht.**

7.4.3. Die vom Betreibenden begehrte Exekutionsart deckt sich mit der vom öOGH in 3 Ob 223/12h (ecolex 2013/211; vgl Oberhammer in Angst/Oberhammer, EO³ § 325 Rz 5) geforderten Exekutionsart, nämlich der Exekution auf andere Vermögensrechte gem §§ 331 ff öEO (öOGH 3 Ob 223/12h). Es verfängt in diesem Zusammenhang auch nicht der Einwand der Revisionsrekursgegner, dass der Alpha Trust lediglich eine **Ermessensbegünstigung** und keine Begünstigungsberechtigung einräume, da – was sich im Rahmen des Verwertungsverfahrens herausstellen kann – **der Verpflichtete aufgrund seiner Gesamtrechte durch Änderungen der Treuhandurkunde zu verwertbaren Geldforderungen gelangen kann.** Es kommt hinzu, dass **im Rahmen der Verwertung seiner Gesamtrechte der Verpflichtete auch zu einer Beendigung des Trusts mit entsprechenden Forderungen gelangen könnte**. Dies ist hier nicht näher zu prüfen und zu entscheiden, sondern vielmehr einer allfälligen Verwertung der Gesamtrechte des Verpflichteten vorzubehalten. Darüber hinaus wurde ausdrücklich darauf hingewiesen, dass **mangels eines entsprechenden Verbots in der Treuhandurkunde der Verpflichtete sogar berechtigt sei, sich selbst als Treuhänder einzusetzen, was auch gesetzlich zulässig sei** (Art 910 Abs iVm Art 923a, § 40 Abs 2 PGR). Daher ist es weder widersprüchlich noch unrichtig, wenn der Betreibende im Rahmen der beispielhaften Aufzählung der in die Gesamtrechte des Verpflichteten fallenden Einzelrechte ua auch Rechte des Treuhänders laut den dort genannten Trusturkunden aufzählt, zumal er behauptet, der Verpflichtete könne potentiell selbst der Treuhänder des Alpha Trust werden (ON 1 Rz 38).

7.4.4. Es ist im Übrigen unrichtig, dass sich die betreibende Partei in ihrem Vorbringen im Exekutionsantrag bloss auf die Rechte des Verpflichteten als Protektor beschränkt hätte. Die betreibende Partei hat auch vorgetragen, dass der Verpflichtete das Vermögen im Trust mittels Instruktionen an die Trustees nach wie vor uneingeschränkt kontrolliere

und insbesondere von den Trustees zu befolgende Instruktionen in Bezug auf Ausschüttungen aus dem Trustvermögen erteilen könne. Beantragt wurde die Exekution auf die dem Verpflichteten gegenüber dem Treuhänder des Alpha Trust zukommenden Rechte, womit sich der Betreibende auf die Gesamtrechte des Verpflichteten als Treugeber bezogen hat. Hinsichtlich der Rechtsposition des Verpflichteten wurde auch die Treuhandvereinbarung vom 27.Mai 2015 und das diese ergänzende „Written Instrument" vom 2. Juni 2015 ausdrücklich behauptet und überdies die einzelnen Zustimmungsbefugnisse des Verpflichteten zu Agenden des Treuhänders in der „Declaration of Trust" dargelegt (ON 1 Rz 18 und FN 3).

7.4.5. Von einer Unschlüssigkeit oder Unbestimmtheit des Exekutionsantrags kann daher keine Rede sein: Unschlüssig ist ein Exekutionsantrag nur dann, wenn er die vollständige, bestimmte und genaue Behauptung jener Tatsachen vermissen lässt, welche als Rechtsfolge die begehrte Exekutionsbewilligung nach sich zögen (OGH 08 EX.2006.4224 LES 2009, 221). Der Betreibende hat alle Rechtsgrundlagen behauptet, aus denen sich Gesamtrechte des Verpflichteten gegen die Drittschuldnerin ergeben: Der Verpflichtet hat nach dem Vorbringen des betreibenden Gläubigers Gesamtrechte als Treugeber, Protektor und Begünstigter des Alpha Trust der Drittschuldnerin gegenüber.

7.4.6. Auch die von den Revisionsrekursgegnern behauptete mangelnde Spezifizierung der Rechte durch den Betreibenden, „auf die er greifen will", liegt nicht vor. Die vom Gesetz in den Art 243 ff EO genannten Verwertungshandlungen, wie die Teilung oder die Einleitung eines Auseinandersetzungsverfahrens, Kündigungen etc und die generalklauselhaft angeführte Befugnis des Betreibenden, die „sonst zur Ausübung und Nutzbarmachung des gepfändeten Rechtes erforderlichen Erklärungen wirksam für den Verpflichteten abzugeben", müssen im Exekutionsantrag nicht im Einzelnen dargetan werden. Für eine Pfändung nach der Bestimmung des Art 242 EO ist es ausreichend, wenn das gepfändete Gesamtrecht seinerseits den Zugriff auf ein verwertbares Vermögensobjekt ermöglicht (Oberhammer in Angst/Oberhammer, EO[3] § 331 Rz 3). **Der Antrag ist nur dann abzuweisen wenn die Unverwertbarkeit des Rechts aus der Aktenlage offensichtlich ist** (öOGH 3 Ob 28/99k SZ 72/108; 3 Ob 243/11y JBI 2012, 535; RIS-Justiz RS0127665; RS0001249, RS0000085). **Solches ist aber hier nicht der Fall: Dass ein verwertbares Vermögensobjekt mittels des zu pfändenden Gesamtrechts ergriffen bzw verwertet werden kann, hat der betreibende Gläubiger ausführlich dargetan, ein Grund, eine „offensichtliche" Unverwertbarkeit anzunehmen, liegt gerade nicht vor.** Allein die vom Betreibenden geltend gemachte Rechtsposition des Verpflichteten als Treugeber lässt schon nach allgemeinen Grundsätzen dessen Möglichkeit zur Herbeiführung vermögenswerter Forderungen gegen die Treuhänderin bejahen.

7.5.   Mittelbare Verwertbarkeit:

7.5.1. Die in diesem Verfahren mehrfach zitierte Entscheidung des öOGH 3 Ob 177/10s, publiziert ua in PSR 2011/47, 183 (Rassi/Zollner) = GesRZ 2011, 317 (Wurzer/Foglar-Deinhardstein; Zollner/Paulsen, Überblick über die höchstgerichtliche Judikatur in Stiftungssachen im Jahr 2011, PSR 2012/18, 66 [68 f]) betraf eine Exekution gegen einen Stifter und befasste sich lediglich mit der Frage der Verwertung von bereits rechtskräftig gepfändeten Gesamtrechten des Verpflichteten als Stifter. Dort wurde das „umfassende" Änderungsrecht sowie das dem Stifter zustehende Recht zur Bestimmung des Begünstigten wirksam gepfändet und gegenüber dem Verpflichteten das Gebot, sich jeder Verfügung über diese Rechte zu enthalten und der Stiftung gegenüber das Verbot ausgesprochen, an den Verpflichteten zu leisten bzw dessen Verfügungen über gepfändete Rechte zu akzeptieren. Erst im Rahmen des Verwertungsverfahrens (§ 331 Abs 2 EO) wurden Verwertungsanträge präzisiert und ergänzt und ermächtigte das Erstgericht die betreibende Partei im eigenen Namen zur Bestellung des Verpflichteten als Begünstigten, wies aber das auf die Ermächtigung zur Abberufung der Mitglieder des Beirats der Stiftung und Bestellung neuer Beiratsmitglieder gerichtete Verwertungsmehrbegehren ab. Die zweite Instanz gab den Rekursen beider Parteien Folge und hob den Beschluss des Erstgerichtes auf. Gegen den Aufhebungsbeschluss richteten sich Revisionsrekurse, wobei der öOGH den Rekurs des Betreibenden als teilweise berechtigt erkannte. Er sprach aus, dass die dem Stifter gegenüber einer Privatstiftung zustehenden Gesamtrechte der Exekution nach §§ 331 f EO dann unterliegen, wenn er sich das Recht auf Widerruf vorbehalten hat und nach der Stiftungserklärung oder gem § 36 Abs 4 PSG zumindest zum Teil Letztbegünstigter ist oder sich ein Änderungsrecht vorbehalten hat (RIS-Justiz RS0120752). Denn, solange sich ein Stifter Änderungs- oder Widerrufsrechte vorbehält, sei das Prinzip der vollständigen Trennung der Stiftung vom Stifter nicht verwirklicht. Ein kumulativer Vorbehalt beider Gestaltungsrechte sei entgegen der Auffassung des Verpflichteten jedoch keine Voraussetzung für eine Exekution nach §§ 331 ff EO (3 Ob 217/05s; 3 Ob 16/00h).

7.5.2. Bei der hier vorliegenden Exekutionssache handelt es nicht um einen Stiftungsfall. Wesentlich an der Judikatur des öOGH zur Exekution auf Stifterrechte ist aber für den entscheidungsgegenständlichen Fall, dass für die Tauglichkeit eines Exekutionsobjektes nach §§ 331 ff öEO bereits dessen **mittelbare Verwertbarkeit genügt**. So erblickte der öOGH im **Änderungsrecht eines Stifters „jedenfalls ein Vermögensrecht"**, mag es auch zuerst entsprechend der durch den Betreibenden zu veranlassenden Rechtsgestaltungen bedürfen, bis er auf konkrete Vermögensrechte des Stifters greifen könne (3 Ob 217/05s Erw 3; 3 Ob 177/10s Erw III 1 ff; vgl Zollner/Paulsen, PSR 2012/18, 69). Eine Änderung der Stiftungserklärung, den Stifter (wieder) zu begünstigen, schaffe dergestalt die Voraussetzungen für die Begründung von verwertbaren Vermögensrechten des Stifters (öOGH 3 Ob 217/05s RdW 2006, 505).

Steht dem Begünstigten (schliesslich) ein klagbarer Anspruch gegen die Stiftung zu, sei dieser zedierbar, verpfändbar und pfändbar (unter Hinweis auf Csoklich, Zugriff auf Vermögen der Privatstiftung durch Gläubiger der Stifter und Begünstigten, ÖBA 2008, 416 [424 ff]).

7.5.3.  In der öLehre wurde für den Fall der Exekution gegen einen Stifter ebenso der Standpunkt vertreten, dass für den Gläubiger die Möglichkeit besteht, sich anstelle des Stifters dazu ermächtigen zu lassen, die Stiftungserklärung auch hinsichtlich der konkreten Höhe und Fälligkeit von Zuwendungen zu ändern, um dem Stifter damit einen klagbaren (und exekutiv verwertbaren) Anspruch auf die Leistung von Zuwendungen zu verschaffen (Rassi, PSR 2011/47, 189 [Entscheidungs-besprechung]; RIS-Justiz RS0120753).

7.5.4.  Die Exekution nach den Art 242 EO fordert daher keine unmittelbare Verwertbarkeit des zu pfändenden Rechts, sondern **es genügt die „mittelbare Verwertbarkeit".** In 3 Ob 16/06h ZIK 2006, 143 nahm der öOGH ein pfändbares anderes Vermögensrecht an, wenn ein Stifter Letztbegünstigter ist, dies sei nicht in Zweifel zu ziehen. Überdies liess es der OGH in dieser Entscheidung genügen, dass **gepfändete Gestaltungsrechte (eines Stifters) bloss ihrer Ausübung nach übertragbar** sind (unter Verweis auf öOGH 3 Ob 55/80) und hob hervor, dass die **Ausübung der Gestaltungsrechte (des Stifters) auch durch Dritte** erfolgen könnte (vgl öOGH 6 Ob 106/03m für den Sachwalter des Stifters bzw öOGH 6 Ob 332/98m GesRZ 1999, 126 für die obsorgeberechtigten Eltern des Stifters mit pflegschaftsbehördlicher Genehmigung). Vorliegenden-falls geht es nun darum, dass der Betreibende die in den Gesamtrechten enthaltenen Einzelrechte anstelle des Verpflichteten ausüben kann. Es ist nicht ersichtlich, welche exekutionsrechtlichen Hindernisse dem entgegenstehen sollten. Abgesehen davon geht es bei einer Exekution auf andere Vermögensrechte nicht um Übertragung der Gestaltungs-rechte an Dritte, sondern um **die gerichtliche Ermächtigung des betreibenden Gläubigers, im Exekutionsverfahren anstelle des Verpflichteten dessen Rechte auszuüben, um dadurch, wenngleich auch erst mittelbar, auf den Erlös aus dem zu liquidierenden Einzelrecht greifen zu können.** Eine vom Exekutionsgericht im Rahmen einer Exekution auf andere **Vermögensrechte erteilte Ermächtigung berechtigt nämlich den betreibenden Gläubiger zu all dem, zu dem zuvor der Verpflichtete berechtigt war** (öOGH 3 Ob 33/84 SZ 57/102; 3 Ob 16/06h ZIK 2006, 143).

7.5.5.  Auch die Bestimmungen der Rezeptionsvorlage (§§ 331 ff öEO) zielen auf eine Erweiterung der Exekutionsmöglichkeiten ab und wollen daher all jene Vermögenspositionen des Verpflichteten erfassen, die noch nicht von anderen Exekutionen erfasst werden (vgl Art 242 Abs 1 Satz 1 EO). Es ist zutreffend, dass der öOGH deshalb auf dem Standpunkt steht, dass im Zweifel von einer Exekutionsunterworfenheit anderer Vermögensrechte auszugehen ist (öOGH 3 Ob 16/06h; RIS-Justiz RS0120349). Hierauf muss im zu entscheidenden Fall aber nicht rekurriert werden, da solche Zweifel gar nicht bestehen.

7.5.6. Es zeigt sich somit, dass nach Lehre und Rsp eine Pfändung von Gesamtrechten immer dann möglich ist, wenn durch weitere rechtliche Schritte, so insbesondere auch **durch Geltendmachung von Gestaltungsrechten des Verpflichteten, ein verwertbarer Vermögenswert des Verpflichteten entstehen oder geschaffen werden kann**. Für die Exekution auf Gesamtrechte gem Art 242 EO genügt daher die sog „mittelbare Verwertbarkeit" des Gesamtrechts.

7.6. <u>Vermögenswert</u>:

7.6.1. Hieraus ist weiter zu folgern: Das gepfändete Vermögensrecht muss selbst noch keinen Vermögenswert repräsentieren. Der Betreibende muss einen solchen Vermögenswert auch nicht bescheinigen. Die Rechte des betreibenden Gläubigers bestimmen sich nach dem Umfang der Rechte des Verpflichteten und sind mit ihnen identisch. Dem Betreibenden ist die gerichtliche Ermächtigung zu erteilen, anstelle des verpflichteten Stifters dessen Rechte auszuüben, um in der Folge auf einen denkbaren Erlös greifen zu können. Nichts anderes kann im Fall der Pfändung von Gesamtrechten durch den Gläubiger eines Treugebers gelten, der hier überdies Begünstigter und Protektor eines Trusts ist.

7.6.2. **Überdies bedeutet die Pfändung der Gesamtrechte des Stifters noch nicht automatisch die Zulässigkeit der Verwertung durch Ermächtigung des betreibenden Gläubigers, alle Einzelrechte des Stifters auszuüben** (öOGH 3 Ob 177/10s Erw 5). Dass auf Gesamtrechte Exekution nach §§ 242 EO geführt werden kann, **sagt daher nichts darüber aus, ob in der Folge im konkret zu beurteilenden Fall die gepfändeten Gesamtrechte einen Vermögenswert haben** (vgl öOGH 6 Ob 228/17y PSR 2018, 90). Das sich aus dem Gesamtrecht ergebende Einzelrecht des Verpflichteten muss daher im Exekutionsantrag weder behauptet, bewiesen noch bescheinigt werden, andernfalls würde man dem betreibenden Gläubiger die Behauptung einer möglichen Vielzahl der aus einem Gesamtrecht potentiell sich ergebenden Einzelrechte aufbürden, was nicht der Teleologie des Exekutionsrechts entspricht, einem betreibenden Gläubiger den Zugriff auf Vermögensobjekte des Verpflichteten nicht unnötig zu erschweren. Eine Behauptung des Vermögenswertes des Gesamtrechts ist nur insoweit erforderlich, als sich aus der Verwertung der Einzelrechte die Möglichkeit eines Vermögenswertes ergibt. Dies ist aufgrund der Ausführungen des Betreibenden in ON 1 jedenfalls zu bejahen. Nur dann, wenn sich schon aus dem Exekutionsantrag ergeben würde, dass es sich offensichtlich um ein nicht pfändbares Recht handelt, wäre der Exekutionsantrag abzuweisen (Oberhammer in Angst/Oberhammer, EO³ § 331 Rz 10; Heller/Berger/Stix, Kommentar zur Exekutionsordnung III 2336), wobei jedoch die Rsp die Behauptung der möglichen Vermögenshaltigkeit des zu pfändenden Rechts im Pfändungsstadium grosszügig beurteilt (öOGH 3 Ob 217/05s; 3 Ob 26/08g GeS 2008, 112) und daher, **sollte sich eine fehlende Verwertbarkeit im Verwertungsstadium herausstellen, der**

**einzelne Verwertungsantrag – nicht aber schon der Pfändungsantrag hinsichtlich des Gesamtrechts – abzuweisen ist.**

7.6.3. In der vom Verpflichteten zitierten Entscheidung des Fürstlichen Obersten Gerichtshofs 2 R EX.2008.7877 ging es um ein Sicherungsbot, mit dem der Verpflichteten verboten werden sollte, über ihre Forderungen gegenüber dem Drittschuldner bis zur Höhe des tatsächlichen Trustvermögens zu verfügen. Demnach handelte es sich nicht um eine Exekution auf andere Vermögensrechte im Sinne Art 242 ff EO, sondern um einen zwangsweisen Zugriff auf einzelne Forderungen, daher also um eine Forderungsexekution. Diese Entscheidung gibt für die Frage nach der Pfändung von Gesamtrechten gem Art 242 EO nichts her, da bei der Forderungsexekution schon grundsätzlich die Voraussetzungen für das Exekutionsobjekt „Forderung" andere sind: Für die Pfändung von „Forderungen" sprach der Fürstliche Oberste Gerichtshof bereits in LES 2008, 266 aus, dass diese dann nicht durch ein Drittverbot getroffen werden können, wenn deren Rechtsgrund im Zeitpunkt der richterlichen Beschlussfassung noch nicht geschaffen ist und von denen es daher noch ungewiss ist, ob sie überhaupt jemals zur Entstehung gelangen (LES 2008, 266; 2 R EX.2008.7877). Im vorliegenden Fall geht es aber nicht um die Pfändung oder Verwertung einzelner vermögenswerter „Forderungen", sondern allein um die Pfändung eines Gesamtrechts des Verpflichteten gegen die Drittschuldnerin, aus dem – wenn auch nur mittelbar, also erst nach Hinzukommen weiterer (vom Betreibenden vorzunehmender) Rechtshandlungen – Vermögenswerte, insbesondere Forderungen, entstehen können (Art 242 Abs 2, Art 243 ff EO).

7.6.4. Einen Vermögenswert von Gesamtrechten hat der Fürstliche Oberste Gerichtshof im Übrigen bereits mehrfach bejaht: So war etwa in der Entscheidung 10 CG.2004.58 LES 2007, 141 der **Anspruch des Begünstigten zwar weitgehend vom Ermessen der Organe einer Stiftung abhängig, die Verwaltung der Stiftung wurde jedoch aufgrund eines vom Begünstigten bestimmten Mandatsvertrags durchgeführt.** Hievon ausgehend bejahte der Fürstliche Oberste Gerichtshof einen Vermögenswert der Sicherungsgegnerin, weil der Zugriff allein von der Willenserklärung der Verpflichteten abhing. Er wies auf den Grundsatz hin, wonach **bedingte Rechte Vermögen sind, wenn der Eintritt der Bedingung nur von einem Willensakt des Beklagten abhängt.** Dieser Umstand unterscheidet diese Entscheidung von dem der Entscheidung 2 R EX.2008.7877 zugrundeliegenden Sachverhalt, nach dem gerade kein – auch nicht bedingt – disponibles Recht der Sicherungsgegnerin über das Vermögen des Drittschuldners bestand (2 R EX.2008.7877 Erw 13.5.). In der Entscheidung OGH 03 CG.2007.66 LES 2008, 266 wurden die Rechte eines Stifters auf Widerruf und Änderung der Stiftungserklärung ausdrücklich als sogenannte „andere Vermögensrechte iS der Art 241 f EO" anerkannt.

### 7.7. Zur Exekution auf Treugeberrechte:

7.7.1. In der öRsp wurde die Exekution auf Treugeberansprüche unter dem Aspekt der Exekution auf den Anspruch des Treugebers gegen den Treuhänder auf Herausgabe des Treuguts beurteilt. Dabei wurde dann, wenn das Treugut in Geld bestand, die Pfändung der Forderung gem § 294 öEO (= Art 217 EO) bejaht. Für den Fall, dass das Treuhandverhältnis noch nicht beendigt ist und dieses zur Entstehung des Rückforderungsanspruchs durch den Treugeber erst zu beendigen ist, geht der öOGH davon aus, dass in einem solchen Fall nur eine Pfändung nach § 331 EO in Betracht kommt (öOGH 3 Ob 223/12h ecolex 2013/211; Oberhammer in Angst/Oberhammer, EO³ § 325 Rz 5). Der Rückforderungsanspruch kann zuvor nicht gepfändet werden, weil er mangels Kündigung noch nicht entstanden ist. Da die Grenzen zwischen den einzelnen in Frage kommenden Exekutionsarten „fliessend" sind, lässt es der öOGH sogar zu, einen auf die falsche Exekutionsart hinzielenden Antrag ohne weiters umzudeuten (öOGH 3 Ob 223/12h ecolex 2013/211; Oberhammer in Angst/Oberhammer, EO³ § 325 Rz 5). In der Entscheidung des öOGH 2 Ob 166/02d ecolex 2002, 882, wurde ausdrücklich darauf hingewiesen, dass die Gläubiger des Treugebers nicht direkt auf das Treugut Exekution führen können, sondern nur auf die Ansprüche des Treugebers gegen den Treuhänder. Diese Rechtsauffassung bestätigte der öOGH auch in 3 Ob 85/08h ecolex 2008, 1021 = ÖBA 2009, 322.

7.7.2. Dass das **Recht zur Benennung von Begünstigten vom betreibenden Gläubiger gepfändet und ausgeübt werden kann**, hat der öOGH in der E 3 Ob 177/10s bereits entschieden, sodass schon allein hieraus erhellt, dass die Pfändung der Gesamtrechte des Verpflichteten als Treugeber einerseits und **dem zur Bestimmung der Begünstigten zustimmungsberechtigten Protektor (Art 8 Declaration of Trust) dem Treuhänder gegenüber vermögensrechtlich zumindest mittelbar relevant** sein kann.

7.7.3. Bei der Exekution auf Treugeberrechte ging der OGH mangels Verwertungsantrags nicht auf den Bestand oder Nichtbestand des behaupteten gepfändeten Vermögensrechtes ein (öOGH 3 Ob 143/93), was deutlich zeigt, dass 1) Treugeberrechte grundsätzlich gem § 331 öEO als Gesamtrecht pfändbar sind und 2) dies unabhängig davon möglich ist, ob im Zeitpunkt dieser Pfändung das Gesamtrecht im konkreten Fall auch einen exekutiven Zugriff auf das als verwertbar behauptete Recht (dort eine Liegenschaft) zulässt oder nicht. Soweit daher die Revisionsrekursgegner einwenden, dass Einzelrechte des Verpflichteten nicht pfändbar wären, ist dies nicht Gegenstand des Verfahrens über den Antrag auf Pfändung von Treugeber-Gesamtrechten.

7.8.     „Doppelpfändung"?

7.8.1.   Eine „Doppelpfändung" liegt entgegen den Ausführungen der Revisionsrekursgegner nicht vor, weil aus dem Exekutionsantrag und dem Vorbringen des Betreibenden hinlänglich klar hervorgeht, dass die **Gesamtrechte des Verpflichteten der Drittschuldnerin** gegenüber gepfändet werden sollen und als Rechtsposition des Verpflichteten hiefür seine **Stellung als Treugeber, Protektor und Begünstigter des Alpha Trusts** angeführt werden. Die nur beispielhaft begehrte Pfändung diverser Einzelrechte aus der beantragten Pfändung des Gesamtrechts laut Pkt 1 Abs 3 (von „insbesondere" bis „3. Juni 2015)" ist zur Bezeichnung des zu pfändenden Gesamtrechts nicht erforderlich. **Im Verwertungsstadium ist im Einzelnen zu prüfen, welche aus dem Gesamtrecht des Verpflichteten fliessenden Einzelrechte verwertbar und vermögenswert sind.**

7.8.2.   Pkt 4 der Exekutionsbewilligung macht die Exekutionsbewilligung (bzw den Exekutionsantrag) auch nicht widersprüchlich, weil sich aus dem vorher Ausgeführten klar ergibt, dass der Betreibende die bereits gepfändeten Forderungen nicht ein weiteres Exekution nicht pfänden will, weil dies schon im Verfahren 08 EX.2016.839 geschehen ist. Mit dem gegenständlichen Exekutionsantrag werden ausschliesslich Gesamtrechte gepfändet, nicht einzelne Forderungen, so dass dieser Pkt allein zur Klarstellung, dass nicht einzelne Forderungen gepfändet werden sollen, bestehen bleiben kann, wenngleich diese Einschränkung gar nicht notwendig gewesen wäre. Eine von den Revisionsrekursgegnern mehrfach als unzulässig bezeichnete **„Doppelpfändung" liegt allein schon deshalb nicht vor, weil die Exekutionsobjekte unterschiedlich sind: Im gegenständlichen Verfahren sind es Gesamtrechte des Verpflichteten, im Verfahren 08 EX.2016.839 waren es Forderungen.** Damit geht aber der erhobene Einwand, die Bewilligung der gegenständlichen Exekution würde zu einer Mehrfachpfändung führen, ins Leere.

8.       Zusammenfassend ist daher festzuhalten, dass der betreibende Gläubiger zulässigerweise die Gesamtrechte des Verpflichteten als Treugeber, Protektor und Begünstigter des Alpha Trust der Drittschuldnerin gegenüber pfändet. Die Entscheidung des Fürstlichen Obergerichts war daher aufzuheben und der Beschluss des Erstgerichts wieder herzustellen.

**4.**    Gegen diesen Beschluss des Obersten Gerichtshofs erhoben die verpflichtete Partei und die Drittschuldnerin jeweils Individualbeschwerde an den Staatsgerichtshof. Dieser gab mit Urteilen vom 29.10.2019 zu StGH 2018/111 (ON 94) und zu StGH 2018/114 (ON 95) den Individualbeschwerden keine Folge. Zur Begründung führte der Staatsgerichtshof unter anderem aus [Hervorh. d. Verf.]:

In ON 94:

3.2.1 Die oben genannte Rüge des Beschwerdeführers geht weder mit der einschlägigen Literatur noch mit der einschlägigen Judikatur konform: Wie der Oberste Gerichtshof richtig ausführt, entspricht Art. 242 EO dem österreichischen Rezeptionsvorbild der §§ 331 ff. ÖEO, weshalb auf österreichische Literatur und Judikatur zurückgegriffen werden kann (vgl. ausführlich ON 72, S. 34). Im Rahmen der Bewilligung der Exekution ist auf der Grundlage der Aktenlage (Exekutionsantrag) **zu prüfen, ob das in Exekution gezogene Recht einer Verwertung zugänglich ist.** Darüberhinausgehende Nachforschungen sind nicht anzustellen, der betreibende Gläubiger muss insbesondere in seinem Exekutionsantrag weder beweisen noch bescheinigen, dass das gepfändete Recht verwertbar ist. Gleich wie bei der Forderungsexekution hat das Bewilligungsgericht nicht zu prüfen, ob das gepfändete Recht besteht. **Die Exekution ist sohin zu bewilligen, wenn die Unpfändbarkeit des Rechts wegen Unverwertbarkeit nicht von vornherein offenkundig ist. Sollte sich jedoch im Laufe des Verwertungsstadiums herausstellen, dass eine Verwertung des gepfändeten Rechts aus rechtlichen oder tatsächlichen Gründen unmöglich ist, so ist das Verfahren einzustellen.** Vor der Entscheidung über den Verwertungsantrag sind bei sonstiger Nichtigkeit des Verfahrens zwingend der Verpflichtete und alle Gläubiger zu deren Gunsten Pfändung erfolgte, zu vernehmen (vgl. Oberhammer, in: Angst/Oberhammer, EO3, N 10 zu § 331 ÖEO unter Hinweis auf umfangreiche Literatur und Judikatur; so richtigerweise auch der Oberste Gerichtshof, vgl. namentlich ON 72, S. 35 und 42). Unter Verweis auf die Teleologie des Art 242 EO hält der Oberste Gerichtshof sodann zutreffend fest, dass der Auffangtatbestand der Exekution auf andere Vermögensrechte sicherstellen soll, dass alle denkbaren Vermögenswerte des Verpflichteten in Exekution gezogen werden können. An dieser Zwecksetzung des Gesetzes hat sich die Interpretation der §§ 331 ff. ÖEO zu orientieren, was sohin auch für die Auslegung der Art. 242 ff. EO zu gelten hat (vgl. ON 72, S. 35).

3.2.2 Aus der soeben referierten Rechtsprechung ergibt sich zwanglos, dass der Oberste Gerichtshof mitnichten, wie der Beschwerdeführer vermeint, seine eigene Kompetenz im Hinblick auf die Beurteilung der Verwertbarkeit der gepfändeten Gesamtrechte nicht wahrgenommen hat. Der Beschwerdeführer verkennt, dass der Oberste Gerichtshof im Rahmen von Art. 242 Abs. 1 EO nicht zu prüfen hat, ob eine "schlichte Unverwertbarkeit", was auch immer das im Detail bedeuten mag, vorliegt, sondern lediglich, **ob die Unverwertbarkeit nicht von vornherein offenkundig ist**, was der Oberste Gerichtshof im angefochtenen Beschluss zweifelsohne unternommen hat (vgl. insbesondere ON 72, S. 38 f.). Der Beschwerdeführer verkennt insoweit auch durchgängig, dass die **Frage der konkreten (tatsächlichen) Verwertbarkeit dem Verwertungsverfahren** (vgl. auch Art. 242 Abs. 2 EO) **vorbehalten** ist. Die oben

referierte Rechtsprechung, gemäss welcher der Oberste Gerichtshof in
ON 72 judiziert hat, ist unter verfassungsmässigen Gesichtspunkten nicht
zu beanstanden: Die Teleologie des Art. 242 EO zielt nämlich darauf ab,
sicherzustellen, dass alle denkbaren Vermögenswerte des Verpflichteten
in Exekution gezogen werden können. An dieser Zwecksetzung des
Gesetzes hat sich, wie der Oberste Gerichtshof richtig festhält, die
Interpretation der §§ 331 ff. ÖEO und damit auch der Art. 242 ff. EO zu
richten. Insoweit ist auch nicht zu beanstanden, wenn der Oberste
Gerichtshof im Einklang mit der einschlägigen Literatur zum Ergebnis
gelangt, dass bei der Beurteilung, ob ein Vermögensrecht pfändbar ist,
grosszügig vorzugehen und im Zweifel die Exekutionsunterworfenheit
anzunehmen ist. Hinzukommt, dass, wie oben releviert, das
Verwertungsverfahren vorbehalten ist, das Exekutionsverfahren sohin
einzustellen ist, **wenn die weitere Prüfung im Rahmen des
Verwertungsstadiums ergibt, dass die Verwertung des gepfändeten
Rechts aus rechtlichen oder tatsächlichen Gründen unmöglich ist.**

Weiter ist der Beschwerdeführer darauf hinzuweisen, dass sich bereits aus
den Ausführungen des Obersten Gerichtshofes zum NichtVorliegen einer
offensichtlichen Unverwertbarkeit (vgl. oben) ergibt, dass gegen-
ständlich auch nicht offenkundig ein nicht übertragbares Recht vorliegt.
Ergänzend weist der Oberste Gerichtshof in weiterer Folge unter Hinweis
auf österreichische Rechtsprechung darauf hin, dass **gepfändete
Gestaltungsrechte bloss ihrer Ausübung nach übertragbar sein müssen
und die Ausübung der Gestaltungsrechte auch durch Dritte erfolgen
kann.** Weiter hält der Oberste Gerichtshof richtigerweise fest, dass es
gegenständlich darum geht, dass der Betreibende **die in den
Gesamtrechten enthaltenen Einzelrechte anstelle des Verpflichteten
ausüben kann** und nicht ersichtlich ist, welche exekutionsrechtlichen
Hindernisse dem entgegenstehen sollten (vgl. ON 72, S. 45). Inwieweit
nunmehr die Konkretisierung des Obersten Gerichtshofes und der
Hinweis auf österreichische Rechtsprechung dahingehend, wonach es
bei einer Exekution auf andere Vermögensrechte um die gerichtliche
Ermächtigung des betreibenden Gläubigers geht, im Exekutions-
verfahren anstelle des Verpflichteten dessen Rechte auszüüben, **um
dadurch, wenn gleich auch erst mittelbar, auf den Erlös aus dem zu
liquidierenden Einzelrecht greifen zu können,** widersprüchlich sein soll,
erschliesst sich dem Staatsgerichtshof nicht. (…)

4.3.   Der Beschwerdeführer verkennt nunmehr, dass es sich beim Beschluss
des österreichischen Obersten Gerichtshofes vom 14. Juli 2011 zu 3 Ob
177/10s bzw. bei RS0120752 um einen Stiftungsfall handelt, wohingegen
dem gegenständlichen Fall ein Trust, nämlich hinsichtlich der Pfändung
der bezüglichen Gesamtrechte des Beschwerdeführers, zugrunde liegt.
Schon deshalb kann von Vorneherein keine Praxisänderung wie vom
Beschwerdeführer vermeint und damit auch keine Verletzung der
Begründungspflicht hinsichtlich der vom Beschwerdeführer behaupteten

Praxisänderung vorliegen. Aus der angefochtenen Entscheidung ergibt sich im Übrigen klar, dass der Oberste Gerichtshof die erwähnten österreichischen Entscheidungen zwecks Begründung der "mittelbaren Verwertbarkeit" (vgl. ON 72, S. 42 ff.) heranzieht. Konkret führt der Oberste Gerichtshof unter Hinweis auf die erwähnte österreichische Judikatur aus, dass es sich bei der gegenständlich vorliegenden Exekutionssache um keinen Stiftungsfall handle. Wesentlich an der Judikatur des österreichischen Obersten Gerichtshofes zur Exekution auf Stifterrechte sei aber für den entscheidungsgegenständlichen Fall, dass für die Tauglichkeit eines Exekutionsobjekts nach den §§ 331 ff. ÖEO bereits dessen mittelbare Verwertbarkeit genüge. Unter Hinweis auf anderweitige österreichische Judikatur gelangt der Oberste Gerichtshof dann schliesslich zum richtigen Schluss, dass die Exekution nach den Art. 242 EO keine unmittelbare Verwertbarkeit des zu pfändenden Rechts einfordere, sondern eine mittelbare Verwertbarkeit genügt (vgl. ausführlich ON 72, S. 45 f.). (…)

5.2.    Zu Ziff. 9. seiner Individualbeschwerde führt der Beschwerdeführer aus, dass der Oberste Gerichtshof das mangelnde Vorliegen einer offensichtlichen Unverwertbarkeit einzig daraus schliesse, dass die Position des Beschwerdeführers als Treugeber "schon nach allgemeinen Grundsätzen dessen Möglichkeit zur Herbeiführung vermögenswerter Forderungen gegen die Treuhänder bejahen" lasse.

5.3.    Entgegen der Ansicht des Beschwerdeführers hat der Oberste Gerichtshof das mangelnde Vorliegen einer offensichtlichen Unverwertbarkeit nicht lediglich auf die einleitend erwähnte Wendung gestützt (vgl. auch ON 72, S. 42). Vielmehr hat der Oberste Gerichtshof an weiteren Stellen der angefochtenen Entscheidung umfangreich und unter Hinweis auf Lehre und Rechtsprechung begründet, weshalb nicht von einer offensichtlichen Unverwertbarkeit auszugehen ist. Namentlich hat der Oberste Gerichtshof festgehalten, dass sich im Lichte des durch den Beschwerdegegner gestellten Exekutionsantrages, welcher vom Obersten Gerichtshof über mehrere Seiten hinweg releviert wird (vgl. S. 38 ff. in ON 72), ergibt, dass keine offensichtliche Unverwertbarkeit vorliegt (vgl. auch den Hinweis des Obersten Gerichtshofes auf S. 42 des angefochtenen Beschlusses). Wie erwähnt, beinhaltet der angefochtene Beschluss diverse weitere Ausführungen zur (mittelbaren) Verwertbarkeit der gepfändeten Rechte (vgl. namentlich S. 42 ff. und S. 50 ff. in ON 72), weshalb keine Rede davon sein kann, dass die Verwertbarkeit bzw. die offensichtliche Unverwertbarkeit der gepfändeten Rechte, wie vom Beschwerdeführer vermeint, nicht begründet worden sei. Eine Verletzung der Begründungspflicht liegt somit nicht vor. (…)

6.2.    Zu Ziff. 3.9 und Ziff. 10.10 der Individualbeschwerde führt der Beschwerdeführer ins Feld, dass der Oberste Gerichtshof verkenne, dass zunächst eine Verwertung im Hinblick auf die zu 08 EX.2016.839 erfolgte Pfändung

zu erfolgen habe, bevor weitere Rechte, eben Gesamtrechte wie gegenständlich, gepfändet würden. Insoweit erachtet der Beschwerdeführer die angefochtene Entscheidung auch als nicht verhältnismässig.

Zunächst ist der Beschwerdeführer darauf hinzuweisen, dass der Oberste Gerichtshof in diesem Zusammenhang ausführliche Erwägungen zur "**Doppelpfändung**" und "**Mehrfachpfändung**" vornimmt (vgl. ON 72, S. 52 f.). Namentlich **hält der Oberste Gerichtshof richtigerweise fest, dass im gegenständlichen Verfahren Gesamtrechte des Verpflichteten, im Verfahren zu 08 EX.2016.839 jedoch Forderungen des Verpflichteten gepfändet wurden**. Zudem verkennt der Beschwerdeführer, dass es nur dann zu einer Beschränkung hinsichtlich der Exekutionsmittel kommen darf, wenn keine Zweifel am Hinreichen einzelner Exekutionsmittel zur vollen Befriedigung des Betreibendenanspruchs bestehen. Die blosse Wahrscheinlichkeit genügt nicht. Unstrittig ist, dass diese Voraussetzung in der Regel im Stadium der Exekutionsbewilligung, wie gegenständlich, für das Gericht mit ausreichender Sicherheit nicht erkennbar ist, weshalb der vom Beschwerdeführer offenbar (implizit) angesprochene Art. 9, 2. Halbsatz EO im gegenständlichen Verfahrensstadium in der Praxis kaum zur Anwendung kommt (vgl. zum ganzen Jakusch, in: Angst, a. a. O., N 6 zu § 14 ÖEO). Soebiges gilt für den gegenständlichen Fall umso mehr, als mit der angefochtenen Entscheidung Gesamtrechte gepfändet wurden und sohin erst im Verwertungsstadium im Einzelnen zu prüfen ist, welche aus dem Gesamtrecht des Verpflichteten fliessenden Einzelrechte verwertbar und vermögenswert sind. Insoweit hält der Beschluss des Obersten Gerichtshofes unter diesem Aspekt einer Willkürprüfung stand.

6.3.     Weiter erachtet es der Beschwerdeführer als willkürlich, dass mittels dem gegenständlichen Exekutionsverfahren überhaupt auf die Gesamtrechte des Beschwerdeführers hinsichtlich des Alpha Trusts zugegriffen wird bzw. Letztere gepfändet werden, da "ein Exekutionsverfahren nicht der richtige Ort dafür" sei. Vielmehr müsste eine solche Argumentation in einem Anfechtungsverfahren vorgebracht werden.

Diese Rüge des Beschwerdeführers verkennt zunächst wiederum, dass der Auffangtatbestand der Exekution auf andere Vermögensrechte gemäss Art. 242 EO sicherstellen soll, dass alle denkbaren Vermögenswerte des Verpflichteten in Exekution gezogen werden können. An eben dieser Zwecksetzung des Gesetzes hat sich die Interpretation der Art. 242 ff. EO zu richten (vgl. auch ON 72, S. 35 unter Hinweis auf Judikatur und Rechtsprechung). Es genügt dabei konsequenterweise, wie bereits schon ausführlich releviert, eine mittelbare Verwertbarkeit der gepfändeten Gesamtrechte (vgl. ON 72, S. 42 ff.). Es kann insoweit keine Rede davon sein, dass sich der Beschwerdegegner, wie der Beschwerdeführer vermeint, im "falschen" Verfahren befindet: Vielmehr ist mit dem Beschwerdegegner dafür zu halten, dass es im Rahmen der Pfändung von Gesamtrechten gerade

nicht erforderlich ist, dass die Ausübung einzelner Befugnisse des Verpflichteten unmittelbar einen Vermögenswert nutzbar macht, solange und insoweit die konkrete Ausübung darauf gerichtet ist, Vermögen des Verpflichteten der Zwangsvollstreckung zuzuführen. Im Übrigen ist in weiterer Folge, wie erwähnt, dann im Verwertungsstadium im Einzelnen zu prüfen, welche aus dem Gesamtrecht des Verpflichteten fliessenden Einzelrechte verwertbar und vermögenswert sind. Von einer Verletzung des Willkürverbots kann insoweit keine Rede sein.

6.4.    Schliesslich erachtet es der Beschwerdeführer als willkürlich, dass der Oberste Gerichtshof sein Gesamtrecht als Protektor des Alpha Trusts gepfändet hat. All diese Rechte seien keine Vermögenswerten Rechte und diese Vorgehensweise des Obersten Gerichtshofes verkenne "das Wesen des Trusts".

Dass dieses Vorbringen des Beschwerdeführers unberechtigt ist, ergibt sich bereits aus den vorstehenden Ausführungen des Staatsgerichtshofes (vgl. insbesondere auch die Ausführungen zu den Kriterien der hinreichenden offensichtlichen Unverwertbarkeit und der mittelbaren Verwertbarkeit). Soweit sich der Beschwerdeführer auf die Unpfänd-barkeit einzelner aus einem Gesamtrecht ableitbarer Rechte stützt, verkennt er ohnehin, dass sich die bekämpfte Exekutionsbewilligung nicht auf Einzelrechte, sondern auf Gesamtrechte des Verpflichteten bezieht (so zutreffend der Oberste Gerichtshof unter Hinweis auf Rechtsprechung, vgl, ON 72, S. 35). Letztlich und durchgängig verkennt der Beschwerdeführer, wie vom Obersten Gerichtshof ausführlich releviert, dass der Beschwerdeführer aufgrund seiner Gesamtrechte zu verwertbaren Geldforderungen gelangen kann. Ob Letzteres in weiterer Folge tatsächlich der Fall ist, ist, wie der Oberste Gerichtshof richtig festhält, im gegenwärtigen Verfahrensstadium weder näher zu prüfen, noch zu entscheiden, sondern vielmehr einer allfälligen Verwertung der Gesamtrechte des Beschwerdeführers vorzubehalten (vgl. namentlich ON 72, S. 40). Auch deshalb sind die vom Beschwerdeführer erhobenen Einwendungen, namentlich mit Blick auf Art. 918 Abs. 1 PGR, unbeachtlich. Auch im Lichte dieser Ausführungen ist sohin nicht von einer qualifiziert bzw. grob verfehlten Entscheidung des Obersten Gerichtshofes auszugehen.

In ON 95:

6.2.    Die Beschwerdeführerin erachtet sich im verfassungsmässig gewährleisteten Begründungsanspruch als verletzt, da es der Oberste Gerichtshof verabsäumt habe, sich mit der angeblichen Unpfändbarkeit von Organbestellungs- und Abberufungsrechten auseinanderzusetzen. Wiederum, wie bereits vorgängig, weist die Beschwerdeführerin daraufhin, dass der Oberste Gerichtshof "lediglich auf das (anschliessende) Verwertungsverfahren" verweise.

Dass dieses Vorbringen der Beschwerdeführerin unberechtigt ist, ergibt sich bereits aus den vorstehenden Ausführungen des Staatsgerichtshofes (vgl. insbesondere auch die Ausführungen zu den Kriterien der hinreichenden offensichtlichen Unverwertbarkeit und der mittelbaren Verwertbarkeit). Soweit sich die Beschwerdeführerin auf die Unpfändbarkeit einzelner aus einem Gesamtrecht ableitbarer Rechte stützt, verkennt sie ohnehin, dass sich die bekämpfte Exekutionsbewilligung **nicht auf Einzelrechte, sondern auf Gesamtrechte des Verpflichteten bezieht** (so richtigerweise der Oberste Gerichtshof unter Hinweis auf Rechtsprechung, vgl. ON 72, S. 35). Letztlich und durchgängig verkennt die Beschwerdeführerin, wie vom Obersten Gerichtshof ausführlich releviert, **dass die beteiligte Parte aufgrund ihrer Gesamtrechte zu verwertbaren Geldforderungen gelangen kann**. Ob Letzteres in weiterer Folge tatsächlich der Fall ist, ist, wie der Oberste Gerichtshof richtig festhält, im gegenwärtigen Verfahrensstadium weder näher zu prüfen, noch zu entscheiden, sondern vielmehr einer allfälligen Verwertung der Gesamtrechte der beteiligten Partei vorzubehalten (siehe ON 72, S. 40). Im Lichte dieser Erwägungen erübrigt sich insbesondere ein Eingehen auf die weiteren von der Beschwerdeführerin angeführten Entscheidungen, namentlich LES 2007, 141 und LES 2008, 266, da eine nachvollziehbare Begründung des Obersten Gerichtshofes jedenfalls, wie gezeigt, nicht gänzlich fehlt.

Im Übrigen führt der Oberste Gerichtshof weiter aus, dass sogar das **Recht auf Organbestellung, welches unmittelbar keine Vermögenswerte Rechtsposition verschaffe, als Einflussmöglichkeit des Stifters auf den Vorstand mittelbar zu einer Geldwertzuwendung, zum Beispiel aus den Erträgnissen des Stiftungsvermögens, führen könne**. Das Recht selbst, so der Oberste Gerichtshof weiter, müsse zwar nicht verwertbar sein, es **müsse aber seinerseits den Zugriff auf ein verwertbares Vermögen ermöglichen** (vgl. ON 72, S. 36 unter Hinweis auf Rechtsprechung und Judikatur). Für eine Exekution auf Gesamtrechte, so der Oberste Gerichtshof richtig, ist es eben gerade wesenstypisch, dass verwertbare Forderungen im Zeitpunkt des exekutiven Zugriffs (noch) nicht vorhanden sind, weil diese Art der Exekution auf ein Gesamtrecht greift und zum Entstehen einzelner Forderungen und Ansprüche in der Regel erst weitere Schritte durch den betreibenden Gläubiger im Rahmen der Verwertung vorauszusetzen sind. Die österreichische Rechtsprechung, so der Oberste Gerichtshof, lasse denn auch Pfändungen gemäss § 331 ÖEO zu, wenn erst weitere Rechtsakte durch den betreibenden Gläubiger Vermögenswerte Rechte des Verpflichteten entstehen lassen. Dass diese bereits im Pfändungszeitpunkt bestehen, setze die Exekutionsordnung nicht voraus (vgl. ON 72, S. 37 unter Hinweis auf Rechtsprechung und Literatur). Mehr noch hält der Oberste Gerichtshof fest, dass die Einzelrechte des Gesamtrechts nicht behauptet und bescheinigt werden müssen, wenn letzteres aber dennoch geschehe, schade dies dem Betreibenden nicht, selbst wenn Rechte beispielhaft

aufgezählt würden, die für den betreibenden Gläubiger nicht verwertbar seien. Letztlich, so der Oberste Gerichtshof, gebe der vorliegende Exekutionsantrag klar die zu pfändenden Gesamtrechte an, nämlich die des Verpflichteten als Treugeber, als Protektor und als Begünstigten des Alpha Trusts gegenüber eben der Beschwerdeführerin (vgl. ON 72, S. 39). Mehr noch gelangt der Oberste Gerichtshof unter Hinweis auf öOGH 3 Ob 143/93 zum Ergebnis, dass Treugeberrechte grundsätzlich gemäss § 331 ÖEO als Gesamtrecht pfändbar sind und dies unabhängig davon möglich ist, ob im Zeitpunkt dieser Pfändung das Gesamtrecht im konkreten Fall auch einen exekutiven Zugriff auf das als verwertbar behauptete Recht zulässt oder nicht. Soweit daher die Beschwerdeführerin einwendet, dass Einzelrechte des Verpflichteten nicht pfändbar wären, sei dies nicht Gegenstand des Verfahrens über den Antrag auf Pfändung von Treugeber-Gesamtrechten.

Im Lichte der Tatsache, dass ein Anspruch auf ausführliche Begründung nicht existiert und die verfassungsmässige Begründungspflicht nur einen Minimalanspruch auf Begründung beinhaltet, ist der Oberste Gerichtshof seiner Begründungspflicht, wie soeben gezeigt, nicht nur nachgekommen, sondern er hat sogar ausführlich und detailliert releviert, weshalb er eine Pfändbarkeit von Organbestellungs- und Abberufungsrechten als Gesamtrecht für pfändbar erachtet. Im Übrigen hält die Beschwerdeführerin in ihrer Individualbeschwerde gar selbst fest, dass sich der ÖOGH hinsichtlich der Pfandbarkeit des Bestellungsrechts "lediglich" kritisch äussere. Was die Beschwerdeführerin hieraus für sich zu gewinnen versucht, erschliesst sich dem Staatsgerichtshof nicht. Im Ergebnis überzeugen somit die Ausführungen und Einwendungen der Beschwerdeführerin zu Ziff. 5.5 ihrer Individualbeschwerde nicht. Eine Verletzung der Begründungspflicht liegt insoweit nicht vor.

6.3.    Die Beschwerdeführerin rügt weiter, dass der Oberste Gerichtshof einer-seits die "Aktenlage" nicht beachtet habe und andererseits Rechte ge-pfändet habe, die gar nicht pfändbar seien. Der Oberste Gerichtshof habe letztlich bloss auf die Behauptungen der betreibenden Partei abgestellt und die Aktenlage und darauf beruhendes Vorbringen "der Gegner".

Der Staatsgerichtshof hat bereits darauf hingewiesen, dass mit der angefochtenen Entscheidung keine "Pfändung nicht pfändbarer Rechte", wie die Beschwerdeführerin vermeint, vorgenommen worden ist. Auch hat der Staatsgerichtshof bereits festgehalten, dass der Oberste Gerichtshof ausführlich und nach Ansicht des Staatsgerichtshofes auch richtig begründet hat, dass die Gesamtrechte, nämlich die der beteiligten Partei als Treugeber, als Begünstigter des Alpha Trusts gegenüber der Beschwerdeführerin, pfändbar sind. Insoweit ist es nicht notwendig, dass der Staatsgerichtshof auf die teils repetierenden Ausführungen der Beschwerdeführerin nochmals eingeht.

Wenn die Beschwerdeführerin zu diesem Themenfeld ergänzend anführt, dass "nicht nur Rechte des Verpflichteten gepfändet wurden", erschliesst sich dies dem Staatsgerichtshof zum Vornhinein nicht, da mit der Exekutionsbewilligung vom 21. November 2016 (ON 3), nunmehr bestätigt durch die angefochtene Entscheidung, die der verpflichteten Partei als Treugeber, Protektor und Begünstiger des Alpha Trusts zustehende Rechte gepfändet worden sind. Wenn die Beschwerdeführerin weiter einwendet, dass sich der Oberste Gerichtshof nicht (konkret) mit der Aktenlage auseinandergesetzt habe und insoweit auch Vorbringen "der Gegner" ignoriere, ist die Beschwerdeführerin wiederum auf die obigen Ausführungen des Staatsgerichtshofes zu verweisen, aus welchen sich zwanglos ergibt, dass der Oberste Gerichtshof richtigerweise, nämlich auf der Grundlage des Exekutionsantrages, davon ausgegangen ist, dass die Stellung der beteiligten Partei als Treugeber, Protektor und Begünstiger des Alpha Trusts gegenüber der Beschwerdeführerin und die hieraus der beteiligten Partei gegenüber der Beschwerdeführerin zustehenden Gesamtrechte pfändbar sind. Im Rahmen der Bewilligung der Exekution ist nämlich, der Rechtsprechung folgend, auf Grundlage des Exekutions-antrages zu prüfen, ob das in Exekution gezogene Recht einer Verwertung zugänglich ist. Darüber hinausgehende Nachforschungen sind nicht anzustellen. Das Bewilligungsgericht hat nicht einmal zu prüfen, ob das gepfändete Recht besteht (vgl. Oberhammer, a. a. O., N 10 zu § 331 ÖEO). Aus alledem ergibt sich im Ergebnis, dass der Oberste Gerichtshof nicht gehalten war, auf das von der Beschwerdeführerin zu Ziff. 5.1 ihrer Individualbeschwerde erneut Vorgetragene einzugehen.

6.4.   Entgegen der Ansicht der Beschwerdeführerin hat der Oberste Gerichtshof das mangelnde Vorliegen einer offensichtlichen Unverwert-barkeit auch nicht lediglich auf die von der Beschwerdeführerin erwähnte Stelle in der angefochtenen Entscheidung, vgl. S. 42 in ON 72, gestützt. Vielmehr hat der Oberste Gerichtshof an weiteren Stellen der angefochtenen Entscheidung umfangreich und unter Hinweis auf Lehre und Rechtsprechung begründet, weshalb nicht von einer offensichtlichen Unverwertbarkeit auszugehen ist. Namentlich hat der Oberste Gerichtshof festgehalten, dass sich im Lichte des durch den Beschwerdegegner gestellten Exekutionsantrages, welcher vom Obersten Gerichtshof über mehrere Seiten hinweg releviert wird (vgl. S. 38 ff. in ON 72), ergibt, dass keine offensichtliche Unverwertbarkeit vorliegt (vgl. auch den Hinweis des Obersten Gerichtshofes auf S. 42 des angefochtenen Beschlusses). Wie erwähnt, beinhaltet der angefochtene Beschluss diverse weitere Ausführungen zur (mittelbaren) Verwertbarkeit der gepfändeten Rechte (vgl. namentlich S. 42 ff. und S. 50 ff. in ON 72), weshalb keine Rede davon sein kann, dass die Verwertbarkeit bzw. die offensichtliche Unverwertbarkeit der gepfändeten Rechte, wie von der Beschwerdeführerin vorgebracht, nicht begründet worden sei. Eine Verletzung der Begründungspflicht liegt somit auch hinsichtlich dieser Rüge der Beschwerdeführerin nicht vor.  (...)

**5.** Mit Schriftsatz vom 24.07.2017 (ON 34), konkretisiert mit Schriftsatz vom 11.02.2020 (ON 105), stellte die betreibende Partei den aus dem Spruch ersichtlichen Verwertungsantrag. Zur Begründung wurde zusammengefasst vorgetragen, dass es bei der gegenständlichen Exekution darum gehen würde, das Vermögen aus dem Alpha Trust herauszulösen, wo dann die betreibende Partei auf dieses Vermögen exekutiv zugreifen könne. Nach Art. 244 Abs. 1 EO sei der betreibende Gläubiger somit zu ermächtigen, die erforderlichen Rechtshandlungen namens des Verpflichteten vorzunehmen. Nicht erforderlich sei, dass die Ausübung einzelner Befugnisse des Verpflichteten unmittelbar ein Vermögenswert nutzbar mache, so lange und insoweit die konkrete Ausübung – wenn auch indirekt – darauf gerichtet sei, Vermögen des Verpflichteten der Zwangsvollstreckung zuzuführen.

Als mögliche Verwertungsart sei die betreibende Partei insbesondere zu ermächtigen, anstelle des Verpflichteten gegenüber dem Alpha Trust die Abberufung der bisherigen Treuhänder des Alpha Trusts und die Einsetzung einer von der betreibenden Partei bestimmen Person als Trustee des Alpha Trusts zu begehren und sodann vom von der betreibenden Partei bestimmten Trustee des Alpha Trusts die Ausschüttung des Betrages von CHF 91'595'445.97 zuzüglich Kosten und Zinsen an die verpflichtete Partei an eine von der betreibenden Partei zu bestimmende Zahlstelle zu begehren und anstelle des Verpflichteten diese Ausschüttung und ihre Durchführung in seiner Position als Protektor und Begünstigter zuzustimmen.

Eine alternative Variante bestehe darin, die betreibende Partei zu ermächtigen, eine Ausschüttung direkt an den Begünstigten vorzunehmen, auf welche die betreibende Partei gleichzeitig nach Art. 244 Abs 2 EO exekutiv greifen könne.

**6.** Die verpflichtete Partei beantragte die Zurückweisung, in eventu Abweisung des Verwertungsantrages (ON 88 und 97) und brachte zur Begründung zusammengefasst folgendes vor:

Die betreibende Partei habe es unterlassen darzulegen, inwiefern die Gesamtrechte der verpflichteten Partei oder einzelne Rechte daraus der Verwertung unterliegen würden. Die betreibende Partei sei ihrer

Substantiierungspflicht nicht nachgekommen und sei der Verwertungs-
antrag schon aus diesem Grund zurückzuweisen.

Selbst wenn der Verwertungsantrag formell zulässig wäre, wäre er
inhaltlich abzuweisen, nachdem keine Verwertbarkeit der Gesamtrechte
der verpflichteten Partei oder einzelner sich daraus ergebender Rechte
bestehen würde.

Die Begünstigten des Alpha Trusts wären allesamt Ermessensbegünstigte.
Es gäbe somit keinen Grund warum gerade die verpflichtete Partei eine
Summe von über USD 80 Mio aus dem Trustvermögen ausgeschüttet
erhalten solle.

Im Übrigen wären jegliche geldwerten Ansprüche der verpflichteten
Partei gegen den Alpha Trust aus ihrer Stellung als Treugeber und
Begünstigter bereits im Verfahren zu 08 EX.2016.839 gepfändet worden.
Die Rechte der verpflichteten Partei gegen den Alpha Trust aus ihrer
Stellung als Protektor wären lediglich Zustimmungsrechte und keine
vermögenswerten Rechte. Die betreibende Partei könne daher schlicht
nicht an Geld kommen.

Nachdem sich die verpflichtete Partei weder ein Widerrufsrecht noch ein
Änderungsrecht vorbehalten habe, würden die Gesamtrechte nicht der
Verwertung unterliegen. Im Sinne des Grundsatzes der stufenweisen
Zwangsausübung habe die betreibende Partei zunächst auch eine
Verwertung im Hinblick auf die zu 08 EX.2016.839 erfolgte Pfändung der
der verpflichteten Partei als wirtschaftlich Berechtigte, Treugeber,
Begünstigter und Auftraggeberin des Alpha Trusts zustehenden
Geldforderungen und Zahlungsansprüche vorzunehmen, bevor sie
weitere Rechte pfänden könne.

Im Übrigen fehle es an der Verhältnismässigkeit der Verwertung. Zunächst
hätte eine Verwertung im Hinblick auf die zu 08 EX.2016.839 erfolgte
Pfändung erfolgen sollen. Andererseits würden die Verwertungs-
vorschläge der betreibenden Partei unverhältnismässig in das Wesen des
Alpha Trusts eingreifen. Schliesslich umgehe die betreibende Partei das
Anfechtungsverfahren und die Verkürzung der Parteirechte der
verpflichteten Partei.

7.  Die Drittschuldnerin brachte vor, dass der Verwertungsantrag abzuweisen sei, weil die gepfändeten Rechte nicht verwertbar wären. Die Verwertung von Abberufungs- und Bestellungsrechten durch die betreibende Partei wäre auch ein unzulässiger, weil unter anderem unverhältnismässiger Eingriff in das Wesen und in die Organisationsverfassung des Trusts. Die gepfändeten Rechte würden keinen Zugriff auf das Trustvermögen gewähren. Es sei der betreibenden Partei damit nicht möglich, über die gepfändeten Rechte Befriedigung zu erlangen.

8.  Aufgrund der von den Parteien vorgelegten Urkunden, insbesondere Urkunden laut ON 1 [Beglaubigte Kopie des Final Awards des London Court of International Arbitration zu Case No. 101721 vom 11. November 2014, Beilage A.1, LCIA Rules 1998 in deutscher und englischer Version, Beilage A.2, LCIA Rules 2014 in englischer Sprache, Beilage A.3, Liste der vor liechtensteinischen Gerichten und Verwaltungsbehörden zuge-lassenen Dolmetscher und Übersetzer, Stand 1. Oktober 2015, Beilage A.4, Berichtigung des Schiedspruches vom 9. Januar 2015, Beilage A.5, Beglaubigte Übersetzung der Berichtigung des Schieds-pruches vom 9. Januar 2015, Beilage A.6, Beschluss des Fürstlichen Landgerichtes vom 24. Februar 2016, 08 EX.2016.839, ON 4, Beilage A.7, Beglaubigter Handels-registerauszug des Alpha Trusts vom 12. Februar 2016, Beilage A.8, Beglaubigter Handelsregisterauszug der CTX Treuhand AG vom 11. Februar 2016, Beilage A.9, Declaration of Trust vom 27. Mai 2015 samt deutscher Übersetzung (im Kuvert), Beilage A.10, Written Instrument vom 2. Juni 2015 samt deutscher Übersetzung (im Kuvert), Beilage A.11, Minutes of a Meeting of the Directors of CTX Treuhand AG as Trustees of the Alpha Trust vom 3. Juli 2015 (im Kuvert), Beilage A.12, Letter of Wishes vom 3. Juli 2015 (im Kuvert) samt deutscher Übersetzung, Beilage A.13, Instrument of Nomination vom 3. Juli 2015 (im Kuvert) samt deutscher Übersetzung, Beilage A.14, Erklärung des Menelaos Kyprianou zu Case No. 14-CV-09764-R, United States District Court California (September 2015), Beilage A.15, Second Witness Statment von Ashot Yegiazaryan im Kerimov-Verfahren vom 17. Februar 2013 samt auszugsweiser deutscher Übersetzung, Beilage A.16, Überweisungsbeleg der CMB Monaco - Campagnie Monégasque de Banque vom 6. Mai 2015, Beilage A.17, E-Mail Jamra & Jamra LLP vom 17. Juli 2015 samt deutscher Übersetzung, Beilage A.18, E-Mail Roland

Anteau vom 6. August 2015 an die Codex Treuhand AG samt deutscher Übersetzung, Beilage A.19, Stipulation re. Advance Distribution of Funds, etc. vom 6. Juli 2015 samt auszugsweiser deutscher Übersetzung, Beilage A.20, Instructions to the Trustee vom 28. Juli 2015 samt deutscher Übersetzung, Beilage A.21, E-Mail Yegiazaryan an Nikolaus Wilhelm vom 21. Juli 2015 (18:49) samt deutscher Übersetzung, Beilage A.22 und Responsive Declaration zu Case No. BD 595136 vom 18. August 2015 samt deutscher Übersetzung, Beilage A.23], Memorandum of points and Authorities samt auszugsweiser Übersetzung (Beilage B), Vernehmungs-protokoll vom 23/24.06.2015 und 11.07.2017 samt auszugsweiser Über-setzung (Beilage C), Urteil vom 31.05.2018 (Beilage D), Urkunde vom 08.06.2017 (Beilage D1), Individualbeschwerde vom 10.10.2018 (Beilage D2), Vernehmung des Verdächtigen (Beilage E), Email vom 18.06.2015 (Beilage F), Email vom 01.07.2015 (Beilage G), Letter of wishes vom 03.07.2015 (Beilage H), Formular vom 03.06.2015 (Beilage I), Unter-schriftenkarte der CMB samt auszugsweiser Übersetzung (Beilage J), Schreiben 02.06.2015 (Beilage K), Zahlungsauftrag (Beilage L), Überweisungsbestätigung 26.08.2015 (Beilage M), Überweisungs-bestätigung vom 11.08.2015 (Beilage N), Überweisungsbestätigung vom 27.07.2015 (Beilage O), Überweisungsbestätigung vom 25.06.2015 (Beilage P), Zahlungsauftrag vom 16.12.2015 (Beilage Q), Invoice Drew Holinger 05.06.2016 (Beilage R), Rechtshilfeersuchen (Beilage S), Email 30.10.2019 (Beilage T), Schriftsatz 15.03.2019 (Beilage U), Schriftsatz 12.03.2019 (Beilage V), Protokoll zu CG.2019.5 (Beilage W), Edikt vom 23.09.2016 (Beilage X), Beschluss öOGH vom 26.04.2018 (Beilage 1), Auszug aus PSR 2018/21, S, 90ff (Beilage 2), Beschluss OG vom 11.04.2017 zu 11 UR.2016.77-119 (Beilage 3), Urkunde vom 08.06.2017 (Beilage D1), Individualbeschwerde vom 10.10.2018 (Beilage D2) sowie den hg. Akt 08 EX.2016.839 ist von folgendem **Sachverhalt** auszugehen:

Der Alpha Trust ist eine am 27. Mai 2015 nach liechtensteinischem Recht errichtete Treuhänderschaft. Der Trust ist seit 30. November 2015 unter Registernummer FL-0002.510.771-1 im liechtensteinischen Handelsregister eingetragen. Als alleinige Treuhänderin (Trustee) agiertl die CTX Treuhand AG.

(Beilage A8)

Die CTX Treuhand AG ist eine nach liechtensteinischem Recht errichtete Aktiengesellschaft mit Sitz in 9490 Vaduz, Lova-Center. Sie ist seit 27. November 2001 unter der Registernummer FL-0002.042.435-5 im liechtensteinischen Handelsregister eingetragen und wird (u.a.) durch Mitglieder des Verwaltungsrates Dr. Thomas Wilhelm und lic.iur. Martin Hörnig vertreten. Nikolaus Wilhelm ist Prokurist mit Kollektivzeichnungsrecht zu zweien.

(Beilage A9)

Die Treuhandvereinbarung des Alpha Trust, die „Declaration of Trust" vom 27. Mai 2015, hat unter anderem folgenden Inhalt:

DIESE TREUHANDERKLÄRUNG erfolgt am 27. Mai zweitausendfünfzehn

**DURCH**

CTX Treuhand AG („Treuhänder", wobei der Begriff - sofern der Kontext es erlaubt - den oder die zum jeweiligen vorhandenen Treuhänder des Trusts einschliesst).

**VORAUSSETZUNGEN**

    i.  Die Treuhänder bestätigen, das im zweiten Anhang angegebene Vermögen erhalten zu haben,
         um es nach den folgenden Bedingungen treuhänderisch zu verwalten.

    ii.  Dieser Trust wird unwiderruflich errichtet.

    iii.  Dieser Trust wird als „ALPHA TRUST" bezeichnet.

**_DIESE_ URKUNDE BEZEUGT** Folgendes:

**1.**    **Definitionen**

(…)

1.1.2. „die Begünstigten" sind und umfassen die Personen, die im dritten Anhang genannt oder beschrieben werden;

(…)

**3.**    **Beendigung des Treuverhältnisses**

Die Treuhänder haben die Befugnis, im Rahmen einer Urkunde ein Datum festzulegen (das nicht vor dem Datum der Ausfertigung dieser Urkunde liegen darf), das als Ende des Treuhandverhältnisses anzusehen ist.

**4. Verkauf von Trustvermögen**

Die Treuhänder verwalten das Trustvermögen im Hinblick auf Investitionen oder Eigentum (ausser Geld) treuhänderisch nach ihrem eigenen Ermessen, um diese Investitionen oder das Vermögen insgesamt oder teilweise zu verkaufen, einzuziehen oder in Geld umzuwandeln, wobei jedoch die Möglichkeit besteht, diesen Verkauf, die Einziehung oder die Umwandlung *zu verschieben und* die Möglichkeit einzuräumen, dass diese Investitionen erhalten bleiben und das Geld treuhänderisch verwaltet wird, wobei sie denselben Ermessensspielraum haben, das Geld oder Eigentum in ihrem Namen oder unter ihrer Kontrolle in einer von diesem Trust oder vom Gesetz genehmigten Weise anzulegen, und die Befugnis diese Anlagen zu ändern oder gegen andere zulässige auszutauschen, wenn sie dies nach eigenem Ermessen für angebracht halten.

**5. Treuhänderschaft von Einkünften und Kapital**

5.1.   Die Treuhänder verwalten das Kapital und die Einkünfte des Treuhandvermögens treuhänderisch zugunsten von allen, einem oder mehreren Begünstigten, wobei ein oder mehrere andere Begünstigte ausgeschlossen sein können, in Form von Anteilen oder in einem bestimmten Verhältnis, wenn mehr als ein Begünstigter vorgesehen ist, mit und auf der Basis von Befugnissen und Bestimmungen für deren Unterhalt, Ausbildung, Weiterentwicklung oder sonstigen Vorteilen oder zur Ansammlung von Einkünften (einschliesslich Verwaltungsbefugnissen und Bestimmungen oder Ermessens-Trusts und Befugnissen, die von einer oder mehreren Personen auszuführen oder auszuüben sind, ob diese nun als Treuhänder fungieren oder nicht oder ob die Treuhänder oder ein Treuhänder eingeschlossen ist oder nicht), so dass die Ausübung dieser Befugnis zur Bestimmung von Berechtigten in einem bestimmten Umfang und in einer Art und Weise delegiert werden kann, die die Treuhänder durch eine oder mehrere Urkunden, die während der Trust-Dauer widerrufen werden können oder die unwiderruflich sind und während der Trust-Dauer ausgeübt werden, benennen können, wobei jedoch VORAUSGESETZT wird, dass durch die Ausübung dieser Befugnis eine vorherige Zahlung oder Verwendung des gesamten Kapitals oder Einkommens oder eines Teils des Kapitals oder Einkommens aus dem Treuhandvermögen nicht ungültig gemacht wird, die im Rahmen einer Befugnis vorgenommen wurde, welche von dieser Urkunde oder vom Gesetz erteilt wird.

5.2.   Bis zu einer Bestimmung nach Klausel 5.1., in Abhängigkeit oder in Ermangelung davon

5.2.1.   zahlen die Treuhänder die Einkünfte des Treuhandvermögens an alle, einen bestimmten oder mehrere Begünstigte oder verwenden es zu dessen/deren Gunsten, wobei der andere oder andere ausgeschlossen sein können, wenn zum jeweiligen Zeitpunkt vorhanden und - bei mehreren Begünstigten - in Anteilen und in einer Art und Weise, die die Treuhänder nach ihrem alleinigen Ermessen jeweils für angemessen halten.

5.2.2.   Ungeachtet der Bestimmungen in Klausel 5.2.1. können die Treuhänder zu einem oder mehreren beliebigen Zeitpunkten während der Trust-Dauer nach ihrem alleinigen Ermessen die Einkünfte im Wege der Aufzinsung ansammeln anstatt es insgesamt oder teilweise zu verwenden, indem sie die Einkünfte oder" die daraus resultierenden Einkünfte jeweils in einer Art und Weise anlegen oder anderweitig verwenden, die von dieser Urkunde oder vom Gesetz gestattet ist; auf der Basis von Klausel 5.2.3. verwalten sie diese Kapitalansammlungen als Kapitalzuwachs.

5.2.3.   Die Treuhänder können zu einem oder mehreren Zeitpunkt/en während der Trust-Dauer die nach Unterpunkt 5.2.2. angesammelten Einkünfte insgesamt oder teilweise verwenden, als wenn es sich um Einkünfte handeln würde, die in dem jeweiligen Jahr angefallen sind.

5.2.4.   Ungeachtet der Treuhandvollmachten und Bestimmungen, die in dieser Klausel aufgeführt werden und enthalten sind, können die Treuhänder

5.2.4.1 zu einem beliebigen Zeitpunkt während der Trust-Dauer das Kapital des Trustvermögens insgesamt oder teilweise an alle, einen oder mehrere Begünstigte/n unter Ausschluss von anderen Begünstigten zahlen oder zu dessen/deren Gunsten verwenden, wobei bei mehreren Begünstigten entsprechende Anteile vorzusehen sind und die Auszahlung oder Verwendung in einer Art und *Weise* erfolgen kann, die die Treuhänder nach ihrem alleinigen Ermessen für angebracht halten.

5.2.4.2. Einkommen oder Kapital aus dem Trustvermögen an die Treuhänder eines anderen Trusts bezahlen der übertragen, unabhängig von dem Ort der Errichtung, an dem ein oder mehrere Begünstigte beteiligt sind (unabhängig davon ob alle Begünstigten oder ein oder mehrere Begünstigte die einzigen Personen sind, die an diesem anderen Trust beteiligt sind oder als Nutzniesser in Frage kommen), wenn die Treuhänder nach ihrem alleinigen Ermessen der Meinung sind, dass diese Zahlung oder Übertragung allen, einem oder mehreren Begünstigten zugute kommen soll.

5.3. Bei Nichtausübung der genannten Befugnisse, die den Treuhändern durch die vorhergehenden Unterpunkte erteilt wurden, und in Abhängigkeit von der Ausübung dieser Befugnisse können die Treuhänder bei Ablauf der Trust-Dauer TREUHÄNDERISCH Ober das Trustvermögen verfügen, wobei die Begünstigten, die zu dem betreffenden Zeitpunkt leben, absolut gleiche Teile erhalten.

5.4 Auf der Basis der obigen Ausführungen und wenn und sofern Kapital und Einkünfte des Treuhandvermögens nicht aus einem beliebigen Grund nach den obigen Bestimmungen insgesamt veräussert werden, werden Kapital und Einkünfte des Treuhandvermögens treuhänderisch für das Rote Kreuz und Amnesty International verwaltet, und im Falle eines Scheiterns dieses Trusts für wohltätige Zwecke im Allgemeinen.

(…)

## 8.   Befugnis. Begünstigte hinzuzufügen und auszuschliessen

8.1. Die Treuhänder können zu einem beliebigen Zeitpunkt während der Trust-Dauer schriftlich erklären, dass

8.1.1. eine Person, Gruppe oder Beschreibung von Personen kein Begünstigter mehr ist, so dass diese Person, Gruppe oder Beschreibung von Personen daraufhin kein Begünstigter mehr ist, als wenn dieser Begünstigte bereits ursprünglich als Begünstigter ausdrücklich ausgeschlossen worden wäre, jedoch unbeschadet bisheriger Zahlungen von Kapital oder Einkünften an diese/n Begünstigten.

8.1.2. eine Person, Gruppe oder Beschreibung von Personen, die von den Treuhändern benannt worden ist, von nun an Begünstigter ist, VORAUSGESETZT, dass eine Hinzufügung von Begünstigten die bereits getroffene Bestimmung für die Verwendung von Kapital oder Einkünften nicht beeinträchtigt, ändert oder beeinflusst.

(…)

## 10.   Änderung der Treuhänder

10.1. Für diesen Trust sind mindestens zwei Treuhänder oder eine Trustgesellschaft und maximal fünf Treuhänder vorzusehen.

10.2. Bei mehr als einem ernannten Treuhänder müssen alle Treuhänder einstimmig handeln. Die Treuhänder haben jedoch das Recht, alle geschäftlichen Vorgänge, die Ausübung von

Vollmachten und Ermessensfragen an einen oder mehreren ihrer Mit-Treuhänder zu delegieren, sofern sie diese Übertragung nach eigenem Ermessen für ratsam halten.

10.3. Ein Treuhänder, der zurücktreten und oder aus dem Treuhandverhältnis entlassen werden möchte, kann den Mit-Treuhändern (sofern vorhanden), und der/den Person/en, die befugt sind, neue Treuhänder zu ernennen, eine schriftliche Nachricht schicken und wird einen Monat nach dem Versand dieser Nachricht entlassen, oder zu einem früheren Zeitpunkt, wenn die Person/en, die zur Ernennung neuer Treuhänder berechtigt sind, nach den Bestimmungen dieser Klausel 10 ihre schriftliche Zustimmung erteilen, VORAUSGESETZT, dass diese Entlassung erst dann wirksam wird, wenn nach der Entlassung mindestens ein Treuhänder vorhanden ist.

10.4. Wenn ein Treuhänder zurücktreten und aus allen Treuhandverhältnissen entlassen werden möchte oder er es ablehnt zu handeln oder er handlungsunfähig wird, oder er nicht mehr geschäftsfähig ist oder stirbt oder wenn eine Gesellschaft, die als Treuhänder fungiert, aufgelöst wird, dann ernennt

10.4.1. der Protektor oder wenn er verstorben ist (oder es sich dabei um eine Gesellschaft handelt, die aufgelöst wird) oder wenn er nicht in der Lage oder bereit ist zu handeln;

10.4.2. die Begünstigten *(ausser* Wohltätigkeitsorganisationen), wenn sie geschäftsfähig sind und mehrheitlich entscheiden, oder wenn sie nicht in der Lage oder bereit sind zu handeln;

10.4.3. die jeweils im Amt befindlichen Treuhänder oder wenn es keine Treuhänder gibt;

10.4.4 das Liechtensteinische Landgericht Vaduz durch schriftliche Urkunde eine oder mehrere Personen, unabhängig davon, ob sie am Verwaltungssitz des Trusts wohnen oder an einem anderen Ort, zu Treuhändern am Ort des verstorbenen oder aufgelösten Treuhänders oder des Treuhänders, der entlassen werden möchte, eine Handlung ablehnt oder handlungsunfähig ist oder nicht mehr geschäftsfähig ist, wie oben angegeben.

10.5. Die Person, die zur Ernennung neuer Treuhänder nach Unterpunkt 10.4.1. und 10.4.2. berechtigt ist kann in derselben Reihenfolge wie oben beschrieben eine oder mehrere Personen zu weiteren Treuhändern ernennen bis die maximal zulässige Anzahl erreicht ist.

10.6. Ein Treuhänder kann überall in der Welt wohnen.

10.7. Die Person, die zur Ernennung zusätzlicher Treuhänder berechtigt ist, kann jederzeit und ohne Grund einen oder mehrere Treuhänder durch Zustellung einer schriftlichen Nachricht absetzen.

**11.** **Befugnis zu delegieren**

11.1 Ein Treuhänder hat die Befugnis (ungeachtet aller anderslautenden gesetzlichen Vorschriften), mit einer Urkunde, die während der Trust-Dauer widerrufen werden kann oder die unwiderruflich ist, an eine Person die Ausführung oder Ausübung aller treuhänderischen Befugnisse und Ermessensspielräume zu delegieren, die dem Treuhänder hiermit oder per Gesetz übertragen wurden.

**12.**    <u>Befugnis zu ändern oder zu widerrufen</u>

12.1.   Die Treuhänder können jederzeit nach ihrem Ermessen Bestimmungen dieser Urkunde ändern, wobei die Ausübung dieser Befugnis nicht die Wirkung einer Widerrufung dieses Trusts hat.

**13.**    <u>Weitere Befugnisse</u>

13.1.   Die Treuhänder haben zusätzlich und unbeschadet aller gesetzlichen Befugnisse die Vollmachten und Immunitäten, die im ersten Anhang definiert werden, vorausgesetzt, dass die Treuhänder keine der Befugnisse so ausüben, dass sie mit den Bestimmungen dieses Trusts in Verbindung mit den Begünstigungen in Konflikt geraten.

**14.**    <u>Der Protektor</u>

14.1.   Der Protektor kann seinen Wohnsitz oder - im Falle einer Gesellschaft - seinen Firmensitz an einem beliebigen Ort in der Welt haben.

14.2.   Der erste Protektor ist Ashot Egiazaryan.

14.3.   Der Protektor kann seine Befugnisse, Rechte und/oder Pflichten für einen bestimmten Zeitraum oder dauerhaft zu jeder Zeit durch ein Schriftstück an eine Person oder Personen delegieren oder übertragen und zu Bedingungen, die er für angemessen hält, wobei immer vorausgesetzt wird, dass diese Übertragung erst wirksam wird, wenn die Treuhänder darüber schriftlich in Kenntnis gesetzt wurden.

14.3.1. Wenn diese Übertragung scheitert oder kein Protektor vorhanden ist oder wenn ein Protektor stirbt (oder - im Falle einer Gesellschaft - aufgelöst wird) oder unfähig oder nicht bereit ist zu handeln, *ohne seine* Befugnisse, Rechte und/oder Pflichten gültig übertragen zu haben, dann ernennt/ernennen

14.3.1.1. die Begünstigten (ausser im Falle von Wohltätigkeitsorganisationen), die geschäftsfähig sind und mehrheitlich entscheiden oder wenn sie unfähig oder nicht bereit sind zu handeln

14.3.1.2. das Liechtensteinische Landgericht Vaduz innerhalb von 90 Tagen einen Protektor.

14.4.   Für die Ausübung der Befugnisse und Rechte nach den Klauseln 2.4., 2.5.1., 3.5., 8., 11., 12., 16.2., 16.3. und Klausel 11 des ersten Anhangs durch die Treuhänder ist die schriftliche Zustimmung des Protektors erforderlich.

(...)

**16.**    **Rechenschaftspflicht und Informationen**

16.1.   De Treuhänder führen vollständige und genaue Aufzeichnungen über alle Transaktionen im Zusammenhang mit dem Trustvermögen.

16.2.   Die Aufzeichnungen stehen den Begünstigten oder ihren rechtlichen oder ordnungsgemäss bevollmächtigten Vertretern innerhalb eines angemessenen Zeitraums zur Prüfung zur Verfügung. Ungeachtet der obigen Ausführungen sind die Treuhänder nicht verpflichtet, einem Begünstigten mitzuteilen, welchem anderen Begünstigten sie Kapital oder Einkünfte aus dem Trustvermögen haben zukommen lassen oder an welchen Begünstigten sie eine Zahlung aus dem Kapital oder den Einkünften des Trustvermögens geleistet haben; sie müssen auch keine Gründe für die

Ausübung oder Nichtausübung oder die Art der Ausübung ihrer Befugnisse, Rechte und Ermessensspielräume im Rahmen des Trusts nennen.

16.3. Die Treuhänder können nach eigenem Ermessen eine Kontrollstelle nach Art. 923 PGR ernennen, wobei die Kontrollstelle dann die einzige Person ist, die die oben genannten Informationen erhält.

(…)

DRITTER ANHANG

1.    Ashot Egiazaryan
2.    Eine Person oder Personen, die die Treuhänder jeweils als weitere Begünstigte benennen.

(Beilage A10)

Diese Treuhandvereinbarung werde durch das „*Written Instrument*" vom 2. Juni 2015 ergänzt, welches zwischen dem Treuhänder CTX einerseits und dem Verpflichteten in seiner Eigenschaft als Protektor des Alpha Trusts geschlossen und vom Verpflichteten unterfertigt worden ist. Dieses hat unter anderem folgenden Inhalt:

(1)    In Ausübung der in Klausel 12 der Haupturkunde genannten Befugnisse ändert der Treuhänder hiermit die folgenden Paragraphen der Haupturkunde:

(A)    Paragraph 14.4 hat ab jetzt den folgenden Wortlaut: „Die vorherige schriftliche Zustimmung des Protektors ist erforderlich, wenn die Treuhänder ihre Befugnisse und Rechte nach den Klauseln 2.4, 2.5.1, 3., 5., 8., 11., 12., 16.2., 16.3 und die Befugnisse in ersten Anhang ausüben".

(B)    In Paragraph 14 wird die folgende Klausel hinzugefügt:
        „14.05. Der Protektor hat die Befugnis, durch schriftliche Anweisungen Treuhänder zu entlassen und zu ernennen."

(Beilage A11)

Das vom Verpflichtete unterfertigte Letter of wishes vom 27. Mai 2015 hat folgenden Inhalt:

LETTER OF WISHES VON HERRN ASHOT EGIAZARYAN

An:    Die Treuhänder des ALPHA TRUSTS, errichtet am 27. Mai 2015

1.    Sie sind die Treuhänder des ALPHA Trusts, errichtet am 27. Mai 2015.

2.    Ich erstelle diesen Letter of Wishes, um Ihnen meine Wünsche in Bezug auf die Verwaltung des Treuvermögens sowohl zu meinen Lebzeiten als auch nach meinem Ableben zur Kenntnis zu bringen. In Bezug auf den ALPHA Trust handelt es sich dabei um meinen ersten Letter of Wishes. Ich behalte mir das Recht vor, die Wünsche jederzeit zu widerrufen oder abzuändern. Die hierin enthaltenen Angaben entbinden Sie nicht von der Notwendigkeit, die Zustimmung des Protektors einzuholen, wann immer dies gemäss Treuhandurkunde erforderlich ist.

Es ist mein Wunsch, dass Sie mich in den Kreis möglicher Begünstigter der Treuhänderschaft aufnehmen und mir jeweils auf mein Verlangen Erträgnisse und Kapital zur Verfügung stellen.

Weiters ist es mein Wunsch, dass Sie _____

_____ _____ in den Kreis möglicher Begünstigter des Trusts aufnehmen.

4.      Für die Zeit nach meinem Ableben sind meine Wünsche folgende:

A.      Sollte es einen ausstehenden Saldo geben, den ich aus der Zeit vor Errichtung des Trusts schulde und von dem rechtskräftig festgestellt werden kann, dass er _____ und _____ und _____ gebührt, so ist es mein Wunsch, dass Sie diesen zuerst ausgleichen, bevor die Ermessensbegünstigten in den Genuss des Treuvermögens kommen.

B.      Das Treuvermögen ist zugunsten von _____ zu halten.

5.      Ich bin mir bewusst, dass Sie rechtlich nicht gebunden sind, meine oben dargelegten Wünsche zu befolgen, hoffe jedoch, dass Sie meine Wünsche bei der Ausübung Ihrer Ermessensfreiheit im Rahmen des Treuhandverhältnisses berücksichtigen.

3. Juli 2015

Ashot Egiazaryan

(Beilage H)

Mit E-Mail vom 1. Juli 2015 hatte Nikolaus Wilhelm den (neuen) Entwurf für den Letter of Wishes an den Verpflichteten übermittelt und dabei folgendes ausgeführt:

„Anbei finden Sie einen neuen Entwurf für Ihren Letter of Wishes.

So wie er jetzt verfasst ist, sind  Sie der Erstbegünstigte des Trusts. Das bedeutet, dass Sie zu Ihren Lebzeiten Zugriff auf den Treuhandfonds haben. Falls Sie einen Gläubiger haben und zahlen wollen, könnes Sie eine Ausschüttung an sich selbst beantragen, damit Sie den Gläubiger bezahlen können. Sie müssen die Gläubiger im Letter of Wishes nicht nennen."

(Beilage G)

Im internen, vom Verpflichteten gegengezeichneten Formular der Drittschuldnerin betreffend das Mandat „The Alpha Trust" (Form „Discretionary Trust") ist unter Punkt IV. („Angaben zu Kuratoren/Protektoren und weisungsberechtigten Personen") der Verpflichtete angeführt.

(Beilage I)

**9.** In rechtlicher Hinsicht ergibt sich Folgendes:

**9.1** Die betreibende Partei beantragt vorliegend die Verwertung der gepfändeten Rechte im Sinne des Art. 244 EO. Diese Bestimmung sieht ein zweistufiges Verwertungsverfahren vor:

Im ersten Schritt ist die betreibende Partei auf Antrag zu ermächtigen, das Recht des Verpflichteten in dessen Namen geltend zu machen. Sie kann zu diesem Zweck alle Rechtshandlungen für den Verpflichteten abgeben, die dazu notwendig sind. Aufgrund des Umstandes, dass bei der Exekution nach Art. 242 ff EO immer das Gesamtrecht des Verpflichteten Exekutionsobjekt ist, wird der betreibende Gläubiger auch zur Ausübung dieses Gesamtrechtes ermächtigt, sofern dies der Liquidierung verwertbarer Aktiven dient. Die Aufzählung in Art. 244 Abs. 1 EO („Teilung oder die Einleitung des Auseinandersetzungsverfahrens zu begehren, Kündigungen vorzunehmen und die sonst zur Ausübung und Nutzbarmachung des gepfändeten Rechtes erforderlichen Erklärungen für den Verpflichteten abzugeben") ist bloss demonstrativ. Wenn im Antrag bzw der Ermächtigung durch das Gericht solche Einzelbefugnisse genannt werden, so dient dies dem Zweck, die jeweiligen Befugnisse des betreibenden Gläubigers verdeutlichend („insbesondere") hervorzuheben. Bei dieser Ermächtigung handelt es sich um einen Sonderfall der Überweisung zur Einziehung (vgl Oberhammer in Angst/Oberhammer, EO³ § 333 EO Rz 2; Heller/Berger/Stix III 2379; LGZ Wien ZBl 1937/500). Die zu den Rechtsfolgen der Überweisung zur Einziehung entwickelte Dogmatik kann daher zur Klärung von Zweifelsfragen der Ermächtigung nach Abs 1 mutatis mutandis herangezogen werden (vgl. Oberhammer in Angst/Oberhammer, EO³ § 308 EO Rz 1 ff; 3 Ob 225/07 w ecolex 2008/232 = JBl 2008, 726 = RdW 2008/492).

Die Bestimmungen über die Exekution auf „andere Vermögensrechte" sind bewusst „offen" formuliert, um jedweden Zugriff auf verwertbare Vermögensaktiven des Schuldners zu ermöglichen. Dies gilt auch für die Bestimmung des Art. 244 Abs. 1 EO (vgl dazu Oberhammer, wobl 1997, 252 f), bei dem insbesondere im Hinblick auf die Auslegung von Exekutionsanträgen kein engherziger Formalismus zu pflegen ist.

Grundsätzlich sind die Rechte des ermächtigten betreibenden Gläubigers jenen des Verpflichteten inhaltsgleich (Heller/Berger/Stix III 2379; vgl 3 Ob 165/10 a SZ 2010/127 = ecolex 2011/20 = GesRZ 2011, 126 [Eckert]; RIS-Justiz RS0003934).

Der Umstand, dass die Pfändung iSv Art. 242 EO auch alle Nebenrechte des Verpflichteten, die ihm gegen einen etwaigen Drittschuldner zustehen, umfasst, wird hier noch wesentlich deutlicher als bei der Exekution nach Art. 237 ff EO, da sich dieser Umstand schon daraus ergibt, dass das Exekutionsobjekt bei dieser Exekutionsart immer das „Gesamtrecht" des Verpflichteten ist.

<u>In einem zweiten Schritt</u> hat es gemäss Art. 244 Abs. 2 EO zur Verwertung des auf diese Weise herangezogenen Vermögens zu kommen. Diese erfolgt in sinngemässer Anwendung der in der EO für den jeweiligen Vermögensgegenstand vorgesehenen Verwertungsart. Kommt es also zB zur Ausfolgung von beweglichen Sachen, so erfolgt die Verwertung gemäss Abs. 2 nach den Vorschriften der Fahrnisexekution. Entsteht dem Verpflichteten im Gefolge der Rechtsausübung durch den betreibenden Gläubiger eine Geldforderung, so greifen hier die Bestimmungen der Forderungsexekution usw.

Ungeklärt ist die Frage, wodurch, zu welchem Zeitpunkt und damit in welchem Rang das Pfändungspfandrecht des betreibenden Gläubigers an dem auf diese Weise herangezogenen Vermögen im Hinblick auf seine Befriedigung im Rahmen der Verwertung nach Art. 244 Abs. 2 EO entsteht. In diesem Zusammenhang wird so gut wie jede denkbare Meinung vertreten (vgl. Oberhammer in Angst/Oberhammer, EO[3] § 333 Rz 6 ff; Frauenberger in Burgstaller/Deixler-Hübner, EO § 333 Rz 3 ff; Heller/Berger/Stix III 2394 ff mwN).

Vieles spricht dafür, dass es nach der erfolgreichen Ausübung des Rechtes des Verpflichteten durch den betreibenden Gläubiger gemäss Art. 244 Abs. 1 EO zu keiner neuerlichen Pfändung der herangezogenen Aktiven zu kommen hat. Dies würde sich nicht zuletzt aus der systematischen Interpretation von Abs. 2 leg. cit. ergeben: Auch bei der Forderungsexekution (bei der sich etwa das Pfandrecht an der

Forderung ipso iure in ein solches an einem Gerichtserlag nach Art. 228 EO umwandelt, ohne dass es einer neuerlichen Pfändung bedarf) und bei der Exekution auf Herausgabeansprüche nach Art. 237 ff EO (bei der sich ebenfalls das Pfandrecht am Herausgabeanspruch ipso iure in ein Pfandrecht an der herausgegebenen Sache umwandelt) ist keine neuerliche Pfändung des Einziehungsrealisats vorgesehen. Vor allem die Parallelbestimmung des Art. 238 Abs. 2 EO stellt deutlich darauf ab, dass es nach der EO im Gefolge der erfolgreichen „Heranziehung" eines Aktivums durch Einziehung eines darauf gerichteten Anspruchs nur noch zu einer Verwertung, nicht aber zu einer neuerlichen Pfändung des Realisats kommt.

**9.2** Vorliegend hat die Verwertung also – wie beantragt – dadurch zu geschehen, dass die betreibende Partei ermächtigt wird, die gepfändeten Rechte im Namen der verpflichteten Partei geltend zu machen und die erforderlichen Rechtshandlungen namens des Verpflichteten vorzunehmen (Art. 244 Abs. 1 EO). Dabei muss vom Gericht grundsätzlich keine Aufzählung einzelner in Betracht kommender Rechtshandlungen vorgenommen werden. Es genügt, wenn – wie vorliegend beantragt – der betreibende Gläubiger unter Anführung des gepfändeten Vermögensrechts zur Ausübung der dem Verpflichteten zustehenden Rechte bzw. dazu ermächtigt wird, die erforderlichen und mit der gegenständlichen Exekutionsbewilligung gepfändeten Gesamtrechtshandlungen namens des Verpflichteten vorzunehmen. Wie ausgeführt ist es nicht erforderlich, dass die Ausübung einzelner Befugnisse des Verpflichteten unmittelbar einen Vermögenswert nutzbar macht, solange und insoweit die konkrete Ausübung - wenn auch indirekt - darauf gerichtet ist, Vermögen des Verpflichteten der Zwangsvollstreckung zuzuführen.

Die betreibende Partei hat vorliegend gemäss Art. 244 Abs. 2 EO die Exekution des auf die Weise des Abs 2 leg.cit. herangezogenen Vermögens (das sind sämtliche denkbare Erlöse aus dem Trust) beantragt. Auch wenn – wie oben ausgeführt – vieles dafür spricht, dass das im Wege der Exekutionsbewilligung erlangte Pfandrecht auf das Realisat nach Art. 244 Abs. 2 EO durchschlägt bzw. sich das Pfändungspfandrecht am gepfändeten Recht mit der erfolgreichen

„Heranziehung" von Aktiven iSv Abs. 2 leg. cit. in ein Pfändungspfandrecht an diesen Aktiven verwandelt, war dem Antrag der betreibenden Partei im Hinblick auf die verschiedenen, in Lehre und Rechtsprechung vertretenen – recht unterschiedlichen – Meinungen stattzugeben. Es soll jedenfalls für Schuldner und Dritte klar festgeschrieben sein, was vom Pfandrecht betroffen ist. Der Drittschuldner soll durch ein klares Zahlungsverbot gehindert sein, an den Verpflichteten zu leisten.

**9.3**  Dem Verwertungsantrag war daher vollinhaltlich stattzugeben. Die von der betreibenden Partei genannten Gestaltungsrechte und Rechtshandlungen des Verpflichteten, zu deren Ausübung die betreibende Partei ermächtigt werden soll, können allesamt übertragen werden und sind vermögensrechtlich zumindest mittelbar relevant. Alle sind verwertbar und vermögenswert. Die dem Verpflichteten mögliche Abberufung der bisherigen Treuhänderin und Bestellung neuer Treuhänder [Art. (1)(B) des Written Instrument], sein Recht, Ausschüttungen zu begehren [Letter of Wishes] oder seine Zustimmungsrechte [Art. 14.3 Declaration of Trust iVm. Art. (1)(A) des Written Instrument] sind allesamt geeignet, verwertbares Vermögen zu realisieren bzw. den Zugriff auf verwertbares Vermögen zu ermöglichen.

Wie schon der Oberste Gerichtshof in ON 72 (Erw. 7.4.3.) ausgeführt hat, ist vorliegend der Verpflichtete unter anderem auch berechtigt, sich selbst als Treuhänder einzusetzen, was gesetzlich zulässig ist (Art. 910 Abs. 5 iVm. 932a §40 Abs. 2 PGR).

Gemäss Art. 14.3 Declaration of Trust iVm. Art. (1)(A) des Written Instrument benötigt es für eine Vielzahl der (formell bestehenden) Rechte und Pflichten und Handlungen des Treuhänders die vorherige ausdrücklich Zustimmung des Protektors, und zwar insbesondere:

- für die Beendigung des Trusts durch den Trustee (Art. 3 Declaration of Trust),
- für die Verwaltung der Vermögenswerte des Trusts und der Erträgnisse daraus zugunsten der Begünstigten (Art. 5 Declaration of Trust),
- für die Bestimmung der Begünstigten (Art. 8 Declaration of Trust),

- für die Delegation sämtlicher Rechte des Trustees einschliesslich seiner Ermessensbefugnis (Art. 11 Declaration of Trust),
- für die Änderung von Bestimmungen der Treuhandurkunde (Art. 12 Declaration of Trust).

Die Ausübung der genannten Einzelrechte zusammen ist jedenfalls geeignet, verwertbares Vermögen zu realisieren: Durch die Ermächtigung kann die betreibende Partei erstens anstelle des Verpflichteten gegenüber dem Alpha Trust die Abberufung der bisherigen Treuhänderin des Alpha Trusts (CTX) und die Einsetzung einer von der betreibenden Partei bestimmten Person als Trustee des Alpha Trusts begehren, zweitens sodann vom (von der betreibenden Partei bestimmten) Trustee des Alpha Trusts eine Ausschüttung – jene des geschuldeten Betrages – an die verpflichtete Partei an eine von der betreibenden Partei zu bestimmende Zahlstelle begehren und drittens anstelle des Verpflichteten (in dessen Position als Protektor und Begünstigter) dieser Ausschüttung und ihrer Durchführung zustimmen.

Auch die von der betreibenden Partei alternative beantragte Variante, sie – auf Basis des Letter of Wishes – zu ermächtigen, eine Ausschüttung direkt an den Begünstigten zu begehren und zu genehmigen, stellt zweifellos ein vermögenswertes Recht dar, zumal die betreibende Partei auf diese Ausschüttung nach Art. 244 Abs. 2 EO exekutiv zugreifen kann.

Schliesslich ist auch die Ausübung der Rechte aus dem Letter of Wishes (Bestellung der betreibenden Partei als Begünstigte, Begehren und Genehmigung der Ausschüttung an diese) verwertbar und ermöglicht der betreibenden Partei den Zugriff auf ein verwertbares Vermögen.

**9.4** Die Einwendungen der verpflichteten Partei und der Drittschuldnerin wiederholen über weite Strecken das in den Rechtsmittelschriften im „Pfändungs-Verfahren" Vorgebrachte, was im gegenständlichen Verwertungsverfahren nicht mehr relevant ist und zu dem der Oberste Gerichtshof und der Staatsgerichtshof bereits viel und abschliessend ausgeführt und rechtskräftig entscheiden haben, sodass darauf nicht weiter einzugehen ist.

Der Verwertungsantrag ist rechtzeitig gestellt, ausreichend substantiiert und zweifellos zulässig. Im Sinne der zitierten Rechtsprechung des Obersten Gerichtshofs und des Staatsgerichtshofs sind die gepfändeten Gesamtrechte grundsätzlich verwertbar und sind dies – wie oben ausgeführt – auch die einzelnen Gestaltungsrechte und Handlungen, zu denen die betreibende Partei ermächtigt werden soll.

Wie der Oberste Gerichtshof auch bereits ausgeführt hat, würde selbst eine tatsächliche Ermessensbegünstigung der Verwertung der gepfändeten Rechte nicht entgegenstehen (ON 72, Erw 7.4.3., vgl. auch Erw. 7.6.4.). Die betreibende Partei weist zu Recht auch darauf hin, dass – selbst wenn man die Verwaltung formal anhand einer Ermessensausübung gestalten wollte – dies nichts daran ändern würde, dass aus dem Trustvermögen die titulierte Forderung der betreibenden Partei zu befriedigen sei.

Auch wenn die verpflichtete Partei unter Berufung auf die Rechtsprechung vorträgt, dass ein Abberufungsrecht lediglich der „Kontrolle und Durchsetzung der Pflichten des Treuhänders" dienen würde, müssen sie gleichzeitig einräumen, dass vorliegend das Recht des Protektors zur Bestellung und Abberufung des Treuhänders des Alpha Trusts „gemäss den Urkunden nicht an Voraussetzungen gebunden" sei. So gesehen steht dem Verpflichteten vorliegend schlicht und einfach – zumindest objektiv gesehen – das Recht der Bestellung und Abberufung der Treuhänder zu, ohne dass irgendeine Voraussetzung vorliegen muss oder der Verpflichtete Gründe angeben müsste. Aber auch wenn man die Treuurkunde subjektiv wie Stiftungsstatuten auslegen würde, kommt man schon bei Zusammenschau mit dem Letter of Wishes zu keinem anderen Ergebnis, als dass der Verpflichtete sich die Kontrolle über das Treuhandvermögen sichern wollte – unter anderem mit der Kompetenz zur Abberufung des Treuhänders.

Wenn die verpflichtete Partei das „Verhältnismässigkeitsprinzip" anspricht und hierfür einen „ungeschriebenen Verfassungsgrundsatz" bemüht, ist sie auf Art. 9 EO zu verwiesen, wo dieser Grundsatz Gesetzestext geworden ist. Demnach ist die gleichzeitige Anwendung mehrerer Exekutionsmittel gestattet. Nur wenn aus dem Exekutionsantrag offensichtlich hervorgeht, dass bereits eines oder mehrere der beantragten Exekutionsmittel zur Befriedigung des betreibenden Gläubigers hin-

reichen, *kann* die Bewilligung auf einzelne Exekutionsmittel beschränkt werden. Letzteres wird von der verpflichteten Partei gar nicht behauptet, geschweige denn bescheinigt.

Zum Vorbringen der verpflichteten Partei betreffend ihre rechtshilfeweise Einvernahme ist darauf zu verweisen, dass nach Art. 242 Abs. 2 EO die Art der Verwertung nach der Einvernahme unter anderem des Verpflichteten zu bestimmen ist. Damit ist eine Einvernahme nach Art. 34 EO gemeint, die mündlich oder durch die Aufforderung, eine schriftliche Stellungnahme abzugeben, geschehen kann. Welche Form das Gericht wählt, liegt in seinem freien Ermessen. Ausdrücklich sieht das Gesetz vor, dass die für die mündliche Verhandlung geltenden Vorschriften des Art. 38 EO, die vor allem die Führung des Protokolls betreffen, für die Einvernehmung nicht gelten. Es genügt vielmehr, das Ergebnis der Einvernehmung in einem kurzen Aktenvermerk festzuhalten (Art. 34 Abs. 1 EO).

Das Gericht hat vorliegend die verpflichtete Partei mit Beschluss vom 09.11.2018 (ON 80) aufgefordert, sich über den Verwertungsantrag der betreibenden Partei vom 24. Juli 2017 (ON 34) gemäss Art. 242 Abs. 2 iVm Art. 34 EO binnen 14 Tagen nach Zustellung dieses Beschlusses schriftlich zu äussern, ansonsten angenommen wird, dass sie diesem Antrag zustimmt (Art. 34 und Art. 35 Abs. 2 und 3 EO)". Die verpflichtete Partei hat sich auch geäussert, sogar zweimal ausführlich, und zwar mit Schriftsätzen vom 28.11.2018 (ON 88) und vom 20.12.2019 (ON 97). Weil beide Seiten die Abhaltung einer – im Gesetz nicht zwingend vorgesehenen – Tagsatzung (zu mündlichen Verhandlung) beantragt haben, hat das Gericht – zur Vermeidung eines Hin-und-Her von schriftlichen Stellungnahmen und ebensolchen Gegenstellungnahmen [auch im Sinne der Rechtsprechung zur Wahrung des rechtlichen Gehörs] – eine solche auch angeordnet, um abschliessend und bei gleichzeitiger Anwesenheit der Parteien über den Verwertungsantrag (kontradiktorisch) zu verhandeln.

Wie sich aus dem Art. 34 Abs. 3 EO ergibt, sind die Beweismittel im Exekutionsverfahren grundsätzlich nicht beschränkt. Ausser den Bescheinigungen und Beweisaufnahmen „nach den Vorschriften der Zivilprozeßordnung" stehen dem Gericht alle geeigneten Erhebungen zur

Verfügung. Die Vernehmung der Parteien oder Beteiligter ist – wie oben zu Art. 34 Abs. 1 EO ausgeführt – nicht zwingend zweiseitig und eine förmliche, unmittelbare Parteienvernehmung kommt nur dort in Frage, wo das Gesetz eine mündliche Verhandlung vorsieht (etwa Art. 140 Abs. 1 EO – Meistbotsverteilung oder Art. 290 Abs. 3 Bst. c EO – Einspruchs-verhandlung). Und im Falle des Art. 242 Abs. 2 EO sieht das Gesetz nur eine Einvernahme, nicht aber eine mündliche Verhandlung vor. Und die Einvernahme hat das Gericht schriftlich angeordnet. Die verpflichtete Partei hat auch entsprechend dem gerichtlichen Auftrag schriftlich Stellung genommen und wurde damit im Sinne des Art. 242 Abs. 2 iVm Art. 34 EO einvernommen. Für eine förmliche, unmittelbare oder gar rechtshilfeweise Einvernahme der verpflichteten Partei war und ist kein Raum und hatte die verpflichtete Partei „alle Zeit der Welt", ihre Behauptungen unter Beweis zu stellen (und hat die aufgetragene schriftlichen Einvernahme auch dazu benutzt).

Im Übrigen ist noch einmal auf die oben wiedergegebenen, die Einwendungen der verpflichteten Partei und der Drittschuldnerin erledigenden Ausführungen des Obersten Gerichtshofs und des Staatsgerichtshofs zu verweisen.

**9.5** Die von der betreibende Partei im Verfahren über die Verwertung rechtzeitig und im Wesentlichen richtig (Beschlussgebühr fällt keine an und war nicht zuzusprechen; der Streitgenossenzuschlag für den Schriftsatz ON 105 und die Tagsatzung vom 18.02.2020 gebührt nicht) verzeichneten Kosten waren als weitere Exekutionskosten mit CHF 83'297.75 zu bestimmen.

Fürstliches Landgericht<br>
Vaduz, 02.03.2020<br>
Mag. Konrad Lanser<br>
Fürstlicher Landrichter<br>
Für die Richtigkeit der Ausfertigung

Iris Feuerstein

## Rechtsmittel

Gegen diesen Beschluss ist binnen der unerstreckbaren Frist von 14 Tagen ab Zustellung das Rechtsmittel des Rekurses an das Fürstliche Obergericht, Vaduz, zulässig, Der Rekurs ist schriftlich in zweifacher Ausfertigung beim Fürstlichen Landgericht in Vaduz einzubringen, kann aber auch mündlich zu Protokoll erklärt werden. Er hat eine bestimmte Erklärung, inwieweit der Beschluss angefochten wird, die ebenso bestimmte kurze Bezeichnung der Gründe der Anfechtung (Rekursgründe), das tatsächliche Vorbringen und die Beweismittel, durch welche die Wahrheit der Rekursgründe erwiesen werden kann, und die Erklärung, ob die Aufhebung oder Abänderung des Beschlusses und gegebenenfalls welche beantragt werde (Rekursantrag) zu enthalten.

# EXHIBIT G

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

RECEIVED ON
17 APRIL 2023
[handwritten: 20142-20]

[National Emblem]
PRINCIPALITY OF LIECHTENSTEIN
**PRINCELY COURT**
**OF LIECHTENSTEIN (FÜRSTLICHES LANDGERICHT)**

Please mention file no. in all submissions
15 CG.2021.81
Ref. no. (ON) 127

## JUDGEMENT

### in the name of the Prince and the People

The Princely Court of Liechtenstein in Vaduz, by the Princely Judge Dr. Jasmin Walch, LL.M., in the
**Legal Matter**

of the

| | | |
|---|---|---|
| **Claimant Parties:** | 1st | Rudolf **Schächle**, born on 29-09-1968 |
| | 2nd | Raphael Alexander **Näscher**, born on 17-09-1977 both c/o and represented by Wohlwend Näscher Schächle Rechtsanwälte (attorneys-at-law) Pflugstrasse 16, P.o.B. 635, 9490 Vaduz |
| **Defendant Parties:** | 1st | Natalia **Dozortseva**, 9, rue des Etables, F-06620 Gréolières |
| | 2nd | Capucine Murielle **Jouniaux**, 271 Chemin de Saint-Julien, F-06410 Biot represented by Mag. iur. Sabine Fröhlich, as curator for service (Zustellkurator) law firm, Lettstrasse 5, LI-9490 Vaduz |
| **Intervening Party:** | | Ashot **Yegiazaryan**, 910 North Cresent Drive, USA-Beverly Hills, CA 90210 represented by Schurti Partners Rechtsanwälte AG, Zollstrasse 2, FL-9490 Vaduz |
| **For:** | | Declaration (amount in litigation: CHF 30,000.00) |

after public and oral hearing

Page 2

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

**ruled as follows:**

1.   **It is established between the Claimant parties as trustees of the Alpha Trust and the Defendant parties that the Claimant parties, Rudolf Schächle and Raphael Alexander Näscher, are the sole trustees of the Alpha Trust (FL- 0002.510. 771).**

2.   **The Defendant parties are jointly and severally liable to reimburse the Claimant parties for the costs of the proceedings in the amount of CHF 14,640.60 to the attention of their legal representatives within four weeks, failing which execution measures shall be initiated.**

**Facts of the case:**

Deadline recorded on:

[handwritten: 15-05-23; Initials illegible]

Page 3

1.1   By an <u>action</u> (ref. no. ON 1) filed on 29-03-2021 before this court, the Claimant Parties seek a declaration that it is established between the Claimant Parties as trustees of the Alpha Trust and the Defendant Parties that the Claimant Parties are the sole trustees of the Alpha Trust, or alternatively that it is established between the parties that the Defendant Parties are not trustees of the Alpha Trust, or alternatively that the "Instrument of Appointments of Additional Trustees of the Alpha Trust" dated 31-03-2020 and 16-04-2020 were void as well as ineffective and could not have any legal effect.

In summary, the Claimant Parties argued and justified that they were the trustees of the Liechtenstein trust registered under the name "Alpha Trust" in the Liechtenstein Commercial Register under the registration number FL-0002.510.771. As trustees of the Alpha Trust, they would hold 100% shares in the Savannah Advisors AG. The Savannah Advisors AG could untechnically be described as a subsidiary of the Alpha Trust. The Defendant Parties would pride themselves and claimed to be trustees of the Alpha Trust and to appear as such before authorities and courts in

Page 3

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Liechtenstein as well as abroad. In doing so, they would expressly rely on the applicability of provisions 10.4.1, 10.5 and 14.2, of the "Third Schedule" of the Trust Deed dated 27-05-2015 as well as on resolutions of Ashot Yegiazaryan based on these Trust Deed provisions, such as the "Instruments of Appointments of Additional Trustees" dated 31-03-2020 and 16-04-2020. The Defendant Parties would therefore derive their claimed rights and powers from the said Trust Deed dated 27-05-2015 and the Settlor of the Alpha Trust.

On 09-03-2020, the Claimant Parties were appointed as trustees of the Alpha Trust, which appointment was based on a lengthy history and several court cases as well as decisions. Since then, no other persons had been validly appointed as trustees of the Alpha Trust, which means that only the Claimant Parties could therefore act for the Alpha Trust. The Claimant Parties were also registered in the commercial register as the only trustees of the Alpha Trust.

The Defendant Parties, on the other hand, were not trustees of the Alpha Trust and as such were not entered in the commercial register and their unlawful entry in the commercial register on 23-04-2020 had already been corrected and reversed ex officio on 27-04-2020 by order of the Office of Justice (Amt für Justiz).

The Claimant Parties had a legal interest vis-à-vis the Defendant Parties in establishing that they alone were the sole trustees of the Alpha Trust. The Defendant Parties namely allegedly claimed that they (together with Artur Ariapetov, who has since "resigned") were appointed as trustees of the Alpha Trust by Ashot Yegiazaryan and referred to the aforementioned "Instrument of Appointments of Additional Trustees of the Alpha Trust" dated 31-03-2020 and 16-04-2020, by which they were appointed as alleged trustees of the Alpha Trust. At that time, however, the consolidated rights (Gesamtrechte) of Ashot Yegiazaryan as beneficiary, protector

Page 4

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

and settlor of the Alpha Trust had long since been legally seized as a result of the execution proceedings on 08 EX.2016.5802 and these seized rights had been transferred to Vitaly Smagin for the purpose of realisation by order of 02-03-2020, who had then appointed the Claimant Parties as trustees.

Ashot Yegiazaryan had therefore not been able to appoint new trustees for the Alpha Trust on 31-03-2020 and 16-04-2020. The "Instrument of Appointments of Additional Trustees of the Alpha Trust" dated 31-03-2020 and 16-04-2020 was therefore void and ineffective. All these facts were known to the Defendant Parties and yet they acted as trustees as well as caused massive damage to the Alpha Trust and its subsidiary the Savannah Advisors AG.

For example, the Defendant Parties had also intervened with CMB Monaco as sham trustees and, as a result of these interventions, the CMB Monaco had denied the Savannah Advisors AG access to the assets of Alpha Trust of approximately USD 210 million. In Monaco, the Savannah Advisors AG, the wholly-owned subsidiary of the Alpha Trust, had therefore initiated a kind of summary proceedings against the CMB Monaco with the request to hand over the funds and transfer them to a bank account at Kaiser Partner Privatbank AG in Vaduz, also in the name of the Savannah Advisors AG. The Defendant Parties had filed applications to join as intervening parties, which had been granted. The CMB Monaco had filed a counterclaim for the deposit of the funds. The court in Monaco had dismissed the claims of the Savannah Advisors AG and granted the counterclaim for deposit by order on the interim injunction. The assets of the Savannah Advisors AG - and thus the trust assets of the Alpha Trust – were now blocked at CMB Monaco due to this court decision until a Liechtenstein decision, in which the trustees would be determined, or an agreement between the parties was available. The appeal proceedings regarding this decision were still pending.

Page 5

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

The Monegasque court was thus demanding a Monegasque exequatur decision based on a foreign decision clarifying who was the trustee of the Alpha Trust. The parties to the Monegasque proceedings in which the decision of 09-11-2020 ordered the deposit of the assets with CMB Monaco were, in addition to CMB Monaco, the Savannah Advisors AG and the Defendant Parties. A corresponding court decision on the clarification of the trustee status at the Alpha Trust was therefore necessary in order to fulfil the requirement of the Monegasque court pursuant to the decision of 09-11-2020 and so that the Claimant Parties as trustees of the Alpha Trust would finally have access to the assets held in the name of their subsidiary the Savannah Advisors AG at CMB Monaco.

The Claimant Parties, as trustees of the Alpha Trust, therefore had a legal interest in having it finally and conclusively judicially clarified vis-à-vis the Defendant Parties in the present proceedings in Liechtenstein at the place of jurisdiction and domicile of the Alpha Trust that the Claimant Parties were the sole trustees of the Alpha Trust.

The Claimant Parties cite other acts of the Defendant Parties that would give rise to a judicial clarification of the fiduciary status of the Alpha Trust. For example, the application of Batliner Wanger Batliner Attorneys-at-Law as representatives of the First Defendant Party is mentioned, by which those of Ashot Yegiazaryan as protector of the Alpha Trust were appointed as additional trustees and therefore their entry in the commercial register was requested, whereby, however, the legally valid seizure of the protector rights was concealed. By order of 27-04-2020, the Office of Justice then cancelled the First Defendant Party's inadmissible entry ex officio. An appeal filed against this by the First Defendant Party was declared withdrawn by decision of the Complaints Commission for Administrative Matters (Beschwerdekommission für Verwaltungsangelegenheiten, VBK) of 15-12-2020. In Nevis, the First Defendant Party as a sham trustee had intervened in the proceedings by application dated 20-07-2020

Page 6

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

and had, inter alia, applied for her admission as a party and for her registration as a director of the Savannah Advisors AG, which application had been dismissed in its entirety by decision dated 18-09-2020. In the pending proceedings between Vitaly Smagin and the Alpha Trust at 04 CG.2019.5, the Defendant Parties had also declared themselves to be joined as intervening parties in the dispute, and in those proceedings they were also claiming inadmissibly that they had been appointed as (co-) trustees of the Alpha Trust by resolution of Ashot Yegiazaryan dated 31-03-2020 and 16-04-2020 respectively.

Furthermore, the Defendant Parties had mandated the law firm Niederer Kraft Frey AG in Zurich, which had approached the Claimant Parties and made baseless accusations and allegations in that letter, namely that the Defendant Parties were trustees of the Alpha Trust and that the Claimant Parties had also been threatened with legal steps under criminal law in that letter, as well as being requested in a defamatory and unprofessional manner to submit all documents, such as in particular the shares in the Savannah Advisors AG.

Contrary to the clear factual and legal situation, the Defendant Parties were therefore inadmissibly claiming to be trustees of the Alpha Trust, both in Liechtenstein and abroad, and were continuously subjecting Alpha Trust and the Savannah Advisors AG to corresponding attacks, which is why clarity had to be provided once and for all by a court for the legal relations between the parties to the dispute with regard to the Alpha Trust. For all these reasons, the Claimant Parties had a current legal interest in clarifying the fiduciary status of the Alpha Trust.

In a preparatory written submission (ref. no. ON 106) submitted on 21-12-2022 before this court, the Claimant Parties brought forward as follows:

Page 7

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

In her answer to the claim (Klagebeantwortung), the Second Defendant Party would not allege a different set of facts, but only a different legal effect. There had been numerous court decisions which had led to the appointment of the Claimant Parties as trustees of the Alpha Trust.

In the execution proceedings on 08 EX.2016.839, the starting point had been a fraud committed by Ashot Yegiazaryan against Vitaly Smagin, which had led to Ashot Yegiazaryan's final conviction in Russia and his flight to the USA. This fraud had led to the arbitral award of 11-11-2014 before the London Court of International Arbitration. In the course of the enforcement of this arbitral award, Vitaly Smagin had first seized the beneficiary rights of Ashot Yegiazaryan in the Alpha Trust. The execution had been granted by the aforementioned order and had also been confirmed by the Constitutional Court (Staatsgerichtshof) in the last instance. However, these proceedings had not been decisive for the appointment as trustee.

In the course of a further enforcement of the arbitral award on 08 EX.2016.5802, Vitaly Smagin had seized the consolidated rights of Ashot Yegiazaryan as settlor, protector and beneficiary of the Alpha Trust; this order had also been confirmed by the Constitutional Court in the final instance. Specific consolidated rights had been seized by order of the Princely Court of 21-11-2016 on 08 EX.2016.5802-3. As this was legally binding, there was no need to discuss the correctness of the decision. The realisation of the consolidated rights had been granted by order of the Princely Court of 02-03-2022 under 08 EX.2016.5802-109, specifically by authorising Vitaly Smagin to exercise these rights. The order had been immediately enforceable. The order of realisation (ref. no. ON 109 in the execution proceedings there) was corrected by the Princely Court of Appeal (Obergericht) by order of 15-09-2020 (ref. no. ON 143 there), fully confirmed by the order of the Princely Court of Appeal of 15-12-2020 (ref. no. ON 152) and this decision had also been confirmed by the Constitutional Court in the last instance.

## Page 8

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Vitaly Smagin had exercised the rights transferred to him by passing a resolution on 09-03-2020 that the CTX Treuhand AG be removed as trustee of the Alpha Trust with immediate effect and that Mr. Rudolf Schächle and Mr. Raphael Näscher be jointly appointed as trustees of the Alpha Trust with immediate effect. The Claimant Parties had accepted the appointment on the same day. The seizure of the consolidated rights had still not been lifted. The Defendant Parties would also not claim a rescission.

The Second Defendant Party's argument was grossly incorrect and had already been rejected by the offices and courts with legal effect on several occasions. The Second Defendant Party argued that the Claimant Parties were not trustees of the Alpha Trust because both the authorization of enforcement (Exekutionsbewilligung) (08 EX.2016.5802-39) and the realisation order (08 EX.2016.5802-109) were directed at the consolidated rights due to the CTX Treuhand AG as trustee of the Alpha Trust, which, according to the Second Defendant Party, meant that the Claimant Parties only had rights vis-à-vis the CTX Treuhand AG and not vis-à-vis the Trust, as is the case with any trustee. Furthermore, the Second Defendant Party argued that Vitaly Smagin exercised the seized consolidated rights on 09-03-2020 by dismissing the CTX Treuhand AG. With the dismissal of the CTX Treuhand AG, there were no further seized consolidated rights anymore. According to the Second Defendant Party, the dismissal of the CTX Treuhand AG would have taken place before the intended reappointment of the Claimant Parties as trustees, with which all the rights of Ashot Yegiazaryan would have been revived.

This basic theory of the Second Defendant Party was incorrect. In fact, the wording in the execution orders simply followed the rules of execution and trust law. Thus, the sentence of the realisation order on 08 EX.2016.5802-109, page 1, clause 1, point 1 would read "The realisation of the assets seized by execution (... ), belonging to the obligated party as settlor, protector and beneficiary of the Alpha Trust (... ) vis-à-vis the CTX Treuhand AG as trustee of the

Page 9

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]


Alpha Trust (... )". The addition ((as trustee of the Alpha Trust" did not mean a
limitation of the rights to the CTX Treuhand AG, but was solely due to the fact that
the trust itself was not a legal entity. It was therefore a necessity under execution law
that the enforcement of the seized rights ("against the CTX as trustee" was stated in
the order for the correct designation of the third party debtor at the time.  The
Supreme Court had also expressly stated this in the specific proceedings on 08
EX.2016.5802-72 under clause 7.1.1.. Irrespective of this, the wording in the
realisation order (ref. no. ON 109) even explicitly referred to the old or new trustees:
"by the current or newly appointed trustee of the Alpha Trust (... )". (08
EX.2016.5802-109, page 3 and 4, decision points 1. 1. c and 1. 1. d).


With regard to the course of events, the Second Defendant Party argued in an
exaggeratedly formalistic manner. In their view, the dismissal of the CTX Treuhand
AG had taken place before the new appointment of the Claimant Parties , because
the dismissal had taken place in the Vitaly Smagin resolution of 09-03-2020 under
clause 1 and the new appointment had taken place under clause 2. With the
dismissal of the CTX Treuhand AG, the consolidated rights had been fully exercised
according to the Second Defendant Party.

However, according to the Claimant Parties, the dismissal of the CTX Treuhand AG
and the appointment of the Claimant Parties as new trustees of the Alpha Trust had
of course taken place simultaneously with the same resolution on 09-03-2020. A
sequence could not be read out of the resolution. The court was also not required to
list individual legal acts that could be considered and certainly not to order the legal
acts to be exercised. The Second Defendant Party could therefore not demand
compliance with a certain order of legal acts. The Princely Court had also explicitly
stated in the proceedings on 08 EX.2016.5802-109 that the obligated party was
entitled to the right to appoint and dismiss the trustees, without any precondition
having to be present. The seizure of the consolidated rights of Ashot Yegiazaryan as
settlor, protector and beneficiary of the Alpha Trust as well as their transfer for
realisation

Page 10

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

would thus remain valid even after the dismissal of the CTX Treuhand AG and would continue to exist after the appointment of the new trustees. This would continue until the execution proceedings were terminated or, respectively, for example, the enforcing creditor seeking satisfaction was satisfied.

If the trustee changed, this was a case of universal succession of the third party debtor, in which the new trustees took over the trust property with all encumbrances as they had existed before. It followed from Article 911 para. 4 of the Persons' and Companies' Act (Personen- und Gesellschaftsrecht; PGR) that if the old trustee was dismissed and the new trustee appointed, the latter entered into the rights and obligations of the trust relationship by way of universal succession.

The Claimant Parties had thus entered uno actu and ipso iure into the rights and obligations of the CTX Treuhand AG as trustee of the Alpha Trust, without the need for a special act or a court order.

Since the appointment of the new trustees, the Liechtenstein courts and authorities had judged them legally on several occasions.

In the execution proceedings on 08 EX.2016.5802, the change of trustee had also been accepted immediately and without any problems and the order of realisation had been issued (ref. no. ON 109 in the proceedings there). This had also been confirmed by the Princely Court of Appeal and the correct change of trustee had also been specifically addressed in the reasons for the decision of the Princely Court of Appeal (ref. no. ON 152).

The Claimant Parties were also registered as trustees in the Commercial Register at the Office of Justice. The First Defendant Party had attempted to have itself entered in the Commercial Register as trustee of the Alpha Trust, whereby this had also been done inadvertently for a moment, but the Office of Justice had immediately cancelled

### Page 11

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

this entry ex officio. In the corresponding order, reference was also made to the enforcement authorisation and the realisation order on 08 EX.2016.5802 and it was explicitly stated that Ashot Yegiazaryan was prohibited from appointing and removing trustees for the Alpha Trust. The application for registration of the additional trustee had been dismissed with final force.

In the proceedings on 07 HG.2020.93-6, the Princely Court had considered that Ashot Yegiazaryan lacked the capacity to sue (Aktivlegitimation) due to the seizure of his (valid) consolidated rights. This had been after the realisation of 09-03-2020. In the proceedings on 07 HG.2020.112-9, the son of Ashot Yegiazaryan, Stefan Yegiazaryan, had turned to the Princely Court as the trust supervisory court and had applied for an order for appropriate measures to prevent over realisation. The Princely Court had found clear words to the effect that the citation of the CTX Treuhand AG in the award did not mean a fixation, but merely the correct designation of the seized trust relationship at the time.

In the final judgment under 05 CG.2020.133-32, it was stated that Ashot Yegiazaryan was no longer a protector of the Alpha Trust and that he had also lost his consolidated rights in relation to the Alpha Trust. The consolidated rights had been legally seized and transferred to Vitaly Smagin for realisation, so that Ashot Yegiazaryan lacked locus standi ratione materiae (Sachlegitimation) and capacity to sue.

The Claimant Parties also had a right to sue in case 04 CG.2021.275-30, where the Claimant Parties, as trustees of the Alpha Trust, had sought repayment of the loan from the trust's subsidiary, the Savannah Advisors AG. In the aforementioned judgment, it had been legally established that the Claimant Parties were the sole trustees of the Alpha Trust.

Page 12

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

The Second Defendant Party's idea regarding the theory of "executive partial trustees" (exekutive Treuhänder) was incorrect or, respectively, would not be possible, because there could be no partial ineffectiveness. Either the Claimant Parties were trustees of the Alpha Trust or they were not. An intermediate solution as a "partial trustee" could not be possible.

The Second Defendant Party's allegation that the Claimant Parties were seeking "absoluteness" in relation to the Alpha Trust, i.e. that they want to be trustees forever, is also ill-conceived. Vitaly Smagin had been authorised by the courts to remove the previous trustee, appoint new trustees and otherwise exercise the protector rights. If he did this, it would legally have the effect of a protector's decision. What that was depended on the trust instrument. According to clause 14, point 5, of the Trust Deed of 02-06-2015, the resolution had the effect of changing the trustee in every respect.

It was of course correct that after payment of the debt in accordance with the execution order against Vitaly Smagin or, respectively, his legal successors, the seizure and power of realisation would have been revoked again in the execution proceedings. This was a possible scenario, but not relevant here. Nothing had yet been paid and all execution steps were still in place.

The present judgement was to be made on the basis of the present factual and legal situation. Any declaratory judgement only reflects the factual and legal situation at the time of the conclusion of the oral proceedings. If the Defendant Parties did not continue to feel that something had changed, they would have to bring an action or, respectively, action for cessation on the grounds of opposition (Oppositionsklage).

The Second Defendant Party herself derived her own trustee position solely from the "Instrument of Appointments of Additional Trustees of the Alpha Trust" by Ashot Yegiazaryan dated 31-03-2020 and 16-04-2020. She did not

Page 13

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

make any further statements regarding her own trustee position. As already explained, Ashot Yegiazaryan no longer had any right of appointment. The Second Defendant Party also disregarded the fact that by order of the Princely Court on 08 EX.2016.5802-3, point of the award no. 2, the order was issued to Ashot Yegiazaryan to refrain from any disposal of the designated consolidated rights.

By order of the Princely Court of 12-04-2022 (ref. no. ON 52), a curator for service in the person of Mag. iur. Sabine Fröhlich was appointed for the Second Defendant Party.

The First Defendant Party was served with the action together with the order of the Princely Court of 30-12-2021 (ref. no. ON 37) concerning the request for the appointment of a representative for service pursuant to Article 9 of the Service of Documents Act (Zustellgesetz; ZustG) by way of legal assistance on 26-07-2022 (see ref. no. ON 84).

1.2　In her answer to the claim filed on 05-12-2022 (ref. no. ON 98) before this court, the Second Defendant Party requested the court to dismiss the action and, respectively, the contingent claims with costs. In summary, the Second Defendant Party argued and justified that the Claimant Parties lacked the capacity to sue. On the basis of the enforceable arbitral award, the enforcing party Vitaly Smagin was entitled to execution against the obligated party Ashot Yegiazaryan to recover the enforceable claim of USD 72,243,000.00 (on the merits), USD 6,899,701.32 (in capitalised interest) as well as a further amount in costs and interest by, inter alia, seizure of the assets due to the obligated party as settlor, protector and beneficiary of the Alpha Trust vis-à-vis the CTX Treuhand AG as trustee of the Alpha Trust and specified in the award of the enforcement authorization dated 21-11-2016 under 08 EX.2016.5802-3, including in particular the right to appoint and dismiss the trustees of the Alpha Trust.

Page 14

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

By order of the Princely Court of 02-03-2020 under 08 EX.2016.5802-109, the realisation of the consolidated rights incumbent on the obligated party as trustee, protector and beneficiary of the Alpha Trust, against the CTX Treuhand AG, seized by enforcement authorization of the Princely Court of 21-11-2016 under 08 EX.2016.5802-3, namely, inter alia, the right to appoint and dismiss the trustees of the Alpha Trust, was authorized, namely by authorising the enforcing party to realise the rights granted in the realisation order of the Princely Court of 02-03-2020 under 08 EX.2016.5802- 109 in lieu of the obligated party.

With the present action, the Claimant Parties would now seeking, in summary, a declaration between them and the Defendant Parties that they were the sole trustees of the Alpha Trust. The Claimant Parties derived their rights as trustees of the Alpha Trust from the fact that they were appointed trustees of the Alpha Trust by Vitaly Smagin on 09-03-2020, whereby Vitaly Smagin had been authorized, pursuant to an order of the Princely Court dated 02-03-2020 under 08 EX.2016.5802- 109 to exercise certain rights of protector of the Alpha Trust, including the right under clause 10.05 of the Trust Deed, as amended on 02-06-2015, to remove and appoint trustees by written order, as expressly stated in point 1.1 (a and b) of the award of the Court Order.

The Defendant Parties, on the other hand, would derive their trustee status from the fact that they were appointed trustees of the Alpha Trust by Ashot Yegiazaryan by way of "Instrument of Appointments of Additional Trustees of the Alpha Trust" dated 31-03-2020 and 16-04-2020. The Claimant Parties were of the opinion that this appointment of the Defendant Parties was invalid. However, they misjudged several things. The appointment of the Claimant Parties as trustees of the Alpha Trust was completely invalid.

Page 15

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Both the enforcement authorization (08 EX.2016.5802-3) and the realisation order
(08 EX.2016.5802-109) were directed in their respective sentences to the seizure
and realisation of the consolidated rights due to the CTX Treuhand AG as trustee of
the Alpha Trust. However, Vitaly Smagin had already effectively dismissed the CTX
Treuhand AG as trustee of the Alpha Trust by resolution of 09-03-2020. After the
dismissal of the CTX Treuhand AG as trustee of the Alpha Trust on 09-03-2020,
there would no longer be any consolidated rights due to the CTX Treuhand AG as
trustee of the Alpha Trust.

According to Vitaly Smagin's resolution of 09-03-2020, the dismissal of the CTX
Treuhand AG had clearly taken place prior to the (intended) reappointment of the
Claimant Parties as trustees of the Alpha Trust. The dismissal of the CTX Treuhand
AG referred to in clause 1 of the said resolution preceded the new appointment of the
Claimant Parties in clause 2 of the said resolution. With the dismissal of the CTX
Treuhand AG as trustee according to clause 1 of Vitaly Smagin's resolution of 09-03-
2020, the consolidated rights due to the CTX Treuhand AG as trustee of the Alpha
Trust (which had been seized) had been exercised conclusively.

With the withdrawal of the CTX Treuhand AG as trustee of the Alpha Trust, there
were no further seized consolidated rights to which Vitaly Smagin was entitled
against the CTX Treuhand AG as trustee of the Alpha Trust. Therefore, the seized
consolidated rights to which Vitaly Smagin would be entitled against the CTX
Treuhand AG were exhausted with the dismissal.

Vitaly Smagin had not complied with the sequence set out in the enforcement
authorization under 08 EX.2016.5802-3, namely "appointment and dismissal of the
trustees of the Alpha Trust" according to the ruling, because he had not first
appointed the Claimant Parties as trustees and then dismissed the CTX Treuhand
AG as trustee of the Alpha Trust, but exactly the opposite. Thus, the new
appointment of the Claimant Parties as trustees of the Alpha Trust

Page 16

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

had taken place outside the seized consolidated rights and was therefore not effective, which is why the Claimant Parties lacked the necessary capacity to sue.

In any case, the appointment of the Claimant Parties as trustees of the Alpha Trust was at least partially ineffective, because the Claimant Parties had overlooked the fact that the lien was a pale security interest that did not extend beyond the secured claim. According to prevailing doctrine and jurisprudence, what Art. 288 of the Law of Things (Sachenrecht; SR) explicitly stipulated for pledges on real estate (Grundpfandrechte) also applied to all liens, namely that according to Art. 288 para. 1 of the Law of Things, a creditor had a right to be paid out of the proceeds of the property in the event of non-satisfaction. Pursuant to Art. 288 para. 2 of the Law of Things, an agreement according to which the pledge on the real property would accrue to the creditor as property if he was not satisfied was invalid. Thus, in the event of non-payment of a debt, the person entitled to the pledge only had the right to realise the seized object (or the seized right) or to have it realised and to be paid out of the proceeds.

However, the Claimant Parties' current statement would go far beyond the power they themselves claim to have, which was derived from the seizure of consolidated rights in the proceedings on 08 EX.2016.5802, because the relief sought in the claim did not contain any limitation to the recovery of the claim to be recovered, which was based on their alleged position as trustee of the Alpha Trust, because the Claimant Parties derived their alleged position from that of Vitaly Smagin. The latter in turn derived his rights from the order under 08 EX.2016.5802, in that he had been granted a lien on the consolidated rights of Ashot Yegiazaryan described in 08 EX.2016.5802-3 in order to recover his claim.

However, a lien would not confer ownership and was accessory to the secured claim. With the fulfilment of the secured claim, the lien on it was also extinguished. The requested declaration was completely unjustified and the

Page 17

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]
Claimant Parties therefore lacked at least a partial right to bring an action, as the requested declaration did not in any way contain the limitation to the secured claim that was in any case required; the same applied to the (sub-) contingent claims.

Because if it were established that the Claimant Parties were (the only) trustees of the Alpha Trust, this would go far beyond the entitlement asserted by the Claimant Parties themselves, which was only to be valid insofar as it was necessary to satisfy the claim pursued in accordance with the enforcement authorization under 08 EX.2016.5802-3. If the trustee position of the Claimant Parties was justified at all - which remained disputed - then in any case only to the extent necessary to realise the pursued claim, and not in the requested absolute form and thus in relation to the entire assets of the Alpha Trust of approximately USD 200 million claimed by the Claimants Parties. The relief sought in the claim was therefore to be dismissed in any case to the extent that the (alleged) trustee position included the power of disposition over the assets, which went beyond the claim secured in the execution proceedings under 08 EX.2016.5802 in the principal, the capitalised interest as well as costs, interest and further costs of the execution proceedings.

1.3     On 21-12- 2022, Ashot Yegiazaryan declared his <u>intervention as an intervening party</u> (ref. no. ON 107), which was declared admissible by order of the Princely Court of 22-12-2022 (ref. no. ON 108).

The intervening party raised the plea of lack of jurisdiction and argued that the Claimant Parties based their jurisdiction on the clause stipulating jurisdiction in clause 2.2 of the Trust Deed of the Alpha Trust. However, according to the Claimant Parties' submissions in the claim, the Defendant Parties were not trustees and therefore not parties to the Alpha Trust. The lack of jurisdiction was based on the nullity of the Alpha Trust. With regard to the proceedings before the Princely Court under case number 04 CG.2019.5-185, it had been asserted

Page 18

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]
that Ashot Yegiazaryan had never been a settlor of the Alpha Trust. The Declaration of Trust had then be examined and it was found that there was no information at all about a settlor of the Alpha Trust, but that it was a pale unilateral declaration by the trustee. On page 1 of the Declaration, it was defined that the CTX Treuhand AG had acted as "the trustees" [OMISSIS] and not as "settlor" [OMISSIS]. The declaration would not contain any information on the settlor of the Alpha Trust. In addition, the Claimant Parties would have violated the Sanctions Ordinance (Sanktionsverordnung) of 10-03-2022 on measures in connection with the situation in Ukraine, especially since, according to their own submissions, they had been appointed by Vitaly Smagin, a Russian resident in Russia, to whom the consolidated rights of the Alpha Trust had been transferred. The Claimant Parties were thus acting as trustees for Vitaly Smagin, which was a violation of the Sanctions Ordinance against Russia (Art. 29 para. 2 in conjunction with para. 1), because one may not act as trustee for a trust if the settlor or beneficiary of the trust is a Russian national or a natural person resident in the Russian Federation, both of which apply to Vitaly Smagin.

1.4   The Claimant Parties countered (ref. no. ON 113) that the question of whether someone was a party to a trust would not be determined by the Claimant Party's submissions. Clause 2.2 of the Trust Deed read: "*the rights of all parties as well as the <u>interpretation and effect</u> of the individual provisions shall be subject to the exclusive jurisdiction of the Principality of Liechtenstein and shall be interpreted only in accordance with the law of the Principality of Liechtenstein*". The appointing resolutions of the intervening party for the Defendant Parties would be based precisely on the Trust Deed. Whether these resolutions of appointment would have effect was to be assessed in the present legal dispute. The interpretation and effect of the provisions of the trust agreement were subject to the exclusive jurisdiction of the courts of Liechtenstein. It

## Page 19

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

was undisputed that the former trustee CTX Treuhand AG was not (any longer)
the trustee of the Alpha Trust. There must therefore be some legal successor
and in fact this is the Claimant Parties. According to the wording and meaning
of the clause stipulating jurisdiction in clause 2.2, it was in any case applicable
and therefore the Princely Court had jurisdiction over the dispute. The
Defendant Parties repeatedly referred to themselves as "parties" and "trustees"
(of the Alpha Trust), so that both the formal and the substantive concept of party
of the present clause stipulating jurisdiction (clause 2.2) were fulfilled.

There would be no nullity of the Alpha Trust. The Alpha Trust was registered in
the Commercial Register and it was also not disputed that the intervening party
had commissioned the CTX Treuhand AG to set up the Alpha Trust. The
intervening party remained the economic founder. The CTX Treuhand AG had
established the trust for him in a fiduciary capacity with a Trust Deed, which had
been permissible. The CTX Treuhand AG was thus the (civil) legal settlor, and
at that time the sole trustee, which was permissible and customary in practice.
The creation of the trust had therefore been legally effective and was not void.

It was not a question of the clause stipulating jurisdiction whether the underlying
trust agreement was void or not. The clause stipulating jurisdiction shared the
fate of the substantive principal agreement and remained in force irrespective of
whether the principal agreement was disputed, its existence denied or its
dissolution sought. The clause stipulating jurisdiction could therefore not be
contested on substantive grounds, such as the nullity of the trust.

Moreover, the Princely Court had carried out a positive preliminary examination
of jurisdiction, otherwise it would have had to dismiss the action a limine.

Furthermore, the plea of lack of jurisdiction would be time-barred because the
Second Defendant Party had already entered an appearance in the legal
dispute pursuant to section 251 of the Code of Civil Procedure

Page 20

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

(Zivilprozessordnung; ZPO) in conjunction with section 53 para. 3 of the Act on Jurisdictions (Jurisdiktionsnorm; JN). The Second Defendant Party had already filed its answer to the claim (see ref. no. ON 98), the main proceedings had also been held, a decision had been taken on the taking of evidence and settlement discussions had been held. The intervening party had to accept the legal dispute in every situation in which it would be at the time of its entry. Therefore, the intervening party could not undo the Second Defendant Party's default.

The Claimant Parties further allege abuse of rights, especially since the Defendant Parties said that they were trustees and now claimed that the Princely Court did not have jurisdiction.

The Claimant Parties had also not violated the Sanctions Order because they had fulfilled all reporting obligations.

1.5  In addition, the intervening party argued (ref. no. ON 121) that the Claimant Parties had overlooked the fact that the legal succession had to be proven by documents, unless the agreement on jurisdiction had been made between the litigation parties themselves. Even if this documentary proof were successful, the claim had to be dismissed as to its substance, because as legal successors of the CTX Treuhand AG, the Defendant Parties would be trustees of the Alpha Trust with regard to the "Declaration of Trust".

The "Declaration of Trust" was not a contract. Even if the clause stipulating jurisdiction did not share the fate of the main agreement and remained in force irrespective of whether the main agreement was disputed, its existence denied or its dissolution sought, the agreement on jurisdiction also mandatorily had to be concluded between the parties to the proceedings, which was not the case here. The Claimant Parties themselves argued that only the CTX Treuhand AG had participated in the establishment as settlor and trustee.

Page 21

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Liechtenstein's jurisdiction could not be derived from the Monegasque judgment.

1.6 The Claimant Parties countered (ref. no. ON 124) that the Second Defendant Party precisely meant to be a party, also wanted to be a party to the Alpha Trust and explicitly based its legal status on the clauses of the Trust Deed (Annex B). She also admitted that the resolutions of appointment were based on the Trust Deed. It could not be said any more clearly than that.

Furthermore, in the opinion of the Claimant Parties, other court status elements were also relevant, such as the place of jurisdiction for assets according to sec. 50 of the Act on Jurisdictions (JN), especially since Alpha Trust had assets in Liechtenstein in the form of 100% shareholdings in its Liechtenstein subsidiary, the Savannah Advisors AG, and the shares were located in Liechtenstein. The Claimant Parties' claim for declaratory relief would also include clarification of the ownership of the Savannah Advisors AG, especially since the legally effective trustees are allowed to dispose of the trust property. These potential claims of the Defendant Parties, who claimed that they were the trustees and thus had a claim to the transfer of the shares in the Savannah Advisors AG, would constitute assets within the meaning of sec. 50 para. 1 first case of the Act on Jurisdictions (JN).

Furthermore, the second case of sec. 50 para. 1 of the Act on Jurisdictions (JN) was also applicable, especially since the Alpha Trust in Liechtenstein was the sole shareholder of Savannah Advisors AG, which was domiciled in Liechtenstein and whose shares were held in Liechtenstein. This legal relationship was therefore in any case located in Liechtenstein. Furthermore, the place of jurisdiction for actions against foreigners according to sec. 52 of the Act on Jurisdictions (JN) was given, because the claim for declaratory relief could also be pursued before French courts.

With regard to the timeliness of the plea of lack of jurisdiction, the Claimant Parties further additionally argued that the order in which the parties' submissions were recorded was irrelevant, and that the principle of orality did not change this. It was clear from ref. no. ON 08 that the answer to the claim (ref. no. ON 98) had been submitted after receipt of the application for security deposit for costs (aktorische Kaution) (ref. no. ON 96)

Page 22

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

and that it had been agreed that the hearing would be continued directly after the decision on the security deposit on costs. The answer to the claim had then been discussed at the hearing, to which the Claimant Parties replied (ref. no. ON 106). Only then was the plea of lack of jurisdiction raised by the intervening party and recorded in the minutes (ref. nos. ON 107 and ON 108). Neither the representative of the Second Defendant Party nor the representative of the intervening party had objected to the recording. In order to assess the timeliness of the plea of lack of jurisdiction, it was correct to consider only when the substance of the matter had actually been presented. Such a submission could be made both in writing and orally. The Second Defendant Party had not stated in her answer to the claim (ref. no. ON 98) that she had made this statement before entering into the case, whereas she had done so with regard to the application for security deposit for costs. She had also not raised a plea of lack of jurisdiction in her answer to the claim and thus had not raised the plea at the latest before the case was brought and thus not with the answer to the claim, which is why the plea of lack of jurisdiction had to be dismissed for being out of time.

The Defendant Parties also did not form a necessary joint litigant, because they could have sued separately.

The clause stipulating jurisdiction in clause 2.2 of the Trust Deed applied because, according to the arguments brought forward by the Second Defendant Party, the Defendant Parties were parties to the Alpha Trust.

The facts in connection with the appointment process between the parties were undisputed; the parties disagreed only with regard to the legal consequences. Under Liechtenstein law, the establishment of a

Page 23

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

trusteeship of the "Declaration of Trust" was also to be necessarily affirmed. It was also completely undisputed that the trust had been established by a declaration of the CTX Treuhand AG on behalf of the intervening party.

The Defendant Parties had been parties to the proceedings at the latest with the service of the complaint.

At the hearing on 06-03-2023 (ref. no. ON 126), the representative of the Second Defendant Party stated, upon request, that if there were contradictions in her own submission, she would expressly declare that the submission of the intervening party should apply instead of her own submission, as well as the corresponding offer of proof.

1.7    In these proceedings, the Second Defendant Party's answer to the claim was submitted in a written submission (ref. no. ON 98) filed on 05-12-2022 before this court. The Second Defendant Party did not raise a plea of lack of jurisdiction. On 21-12-2022 Ashot Yegiazaryan declared his intervention as an intervening party (ref. no. ON 107). On the occasion of the hearing on 22-12-2022 (ref. no.ON 108), the Second Defendant Party filed the application for the imposition of security deposit for costs as already in ref. no. ON 96. Thereafter, the pleading on the joinder of the intervening party was presented and the counterparts were handed over to the Claimant Parties' representative as well as to the representative of the Second Defendant Party. Subsequently, the intervention of the ordinary intervening party Ashot Yegiazaryan was declared admissible. The application of the ordinary intervening party concerning the imposition of the security deposit for costs was subsequently dismissed. After the issue of the assessment of the value in dispute and the determination of the value in dispute for the declaratory action at CHF 30,000.00, it was explicitly stated in the minutes that the Second Defendant Party's answer to the claim under ref. no. ON 98 was filed after the receipt of the application for a security deposit for costs under ref.no. ON 96. It was agreed that the hearing should be continued directly after the decision on the application for security deposit for costs (cf. page 14 of ref. no. ON 108). A copy of the answer to the claim (ref. no. ON 98) was subsequently

Page 24

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

handed over to the Claimant Parties at the hearing and the representative of the Second Defendant Party handed over a copy of her answer to the claim to the representative of the intervening party. It was then recorded in the minutes that the Claimant Parties contested and continued to argue as they had done in ref. no. ON 106. After the intervening party's representative had been granted a period of four weeks to respond, the intervening party's plea of lack of jurisdiction (ref. no, ON107) was addressed and both the Claimant Parties's representative and the Second Defendant Party's representative were granted a period of time to respond.

1.8  The questioning of Ashot and Stefan Yegiazaryan on the issue of the alleged interventions by the intervening party had to be dismissed because this issue is not relevant to the legal question of who the sole trustees of the Alpha Trust are.

Moreover, this application must also be dismissed on the grounds of lateness, especially since the proceedings have been ongoing for 1.5 years and thus this offer of evidence was grossly culpable in not being brought forward earlier. The same applies with regard to the request to question the Second Defendant Party by way of legal assistance. The Second Defendant Party's representative had already been informed by the Princely Court of the consequences of section 375 para. 2 of the Code of Civil Procedure (ZPO) by letter dated 07-02-2023 (ref. no. ON 117), to which she replied that the Second Defendant Party would not respond to attempts by the Defendant Party's representative to contact her and that it was therefore unlikely that she would travel to the hearing. Nothing more was said in this regard. The Second Defendant Party's representative was also reminded of section 375 para. 2 of the Code of Civil Procedure (ZPO) at the hearing on 06-03-2022. This, especially since the Second Defendant Party's representative only requested to question the Second Defendant by way of legal assistance on 06-03-2023, although sec. 375 para. 2 of the Code of Civil Procedure (ZPO) had already been pointed out a month before. The Second

Page 25

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Defendant Party's' representative did not give any reasons why a hearing of evidence by a requested judge was necessary; in particular, nothing was submitted as to why the Second Defendant Party's personal appearance would face insurmountable obstacles or cause disproportionate costs. The application for the Second Defendant Party to be heard - especially on the part of the Second Defendant Party's representative - could have been made much earlier without further ado. There are no apparent reasons why this request was not made earlier. Furthermore, it was not explained or, respectively, certified why the Second Defendant should be questioned by way of legal assistance at all and cannot travel to the court here. The legal questions in these proceedings, namely with regard to jurisdiction as well as the legally relevant question of who the trustees are at the Alpha Trust, were clear to the Second Defendant Party as well as the intervening party from the beginning and therefore the corresponding applications could have been made at a much earlier point in time, in particular immediately after the hearing in December 2022 and not only on the occasion of the hearing on 06-03-2023. Incidentally, the present proceedings already know an estimated duration of 1.5 years, whereby the curator for service was already appointed on 12-04-2022. On 04-10-2022, the action was sent to the curator for service (cf. ref. no. ON 82). The Second Defendant Party's representative thus had more than enough time to submit the Second Defendant Party's application for her to be heard by way of legal assistance or, respectively, to explain why she could not appear at the Princely Court.

Furthermore, the representative of the Second Defendant Party offered the examination of the Defendant Party for facts that could be assumed to be proven purely on the basis of undisputed documents, especially since these facts are also undisputed (see ref. no. ON 98). Due to the clarified factual and legal situation with regard to the relevant legal question of who the trustees of the Alpha Trust are, it was therefore possible, for all these reasons, to refrain from questioning both the Second Defendant Party, regardless of whether in legal assistance or before the Princely Court, the intervening party and the offered witness Stefan Yegiazaryan.

Page 26

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

1.9   In the present proceedings, evidence was taken by inspecting the <u>documents</u>
      submitted by the parties, namely:

1) Documents of the Claimant Parties

| | |
|---|---|
| Extract from the Companies' register of the Alpha Trust dated 07-12-2020 | Enclosure A |
| Trust deed dated 27-05-2015 | Enclosure B |
| Instruments of Appointments of Additional Trustees of 31-03-2020 and of 16-04-2020, in copy | Enclosure C |
| Resolution of Vitaly Smagin of 09-03-2020 | Enclosure D |
| Declaration of Acceptance of Mag. iur. Rudolf Schächle and Mag. iur. Raphael Näscher of 09-03-2020 | Enclosure E |
| Order of the Office of Justice of 27-04-2020 | Enclosure F |
| Order of the Complaints Commission for Administrative Matters of 15-12-2020 (VBK 2020/35-17) | Enclosure G |
| Order of the Complaints Commission for Administrative Matters of 15-12-2020 (VBK 2020/34-13) | Enclosure H |
| E-mail from the Chairman of the Appeals Commission (to attorney-at-law RA Dr. Tschofen) dated 09-02-2021, in copy | Enclosure I |
| Letter of the Chairman dated 18-01-2021 including copies of the attempts to serve the First Defendant Party | Enclosure J |
| Publication of the Notice of Deposition in the eAmtsblatt dated 23-01-2021, in copy | Enclosure K |
| Affidavit of Service concerning Murielle Jouniaux of 03-03-2021 | Enclosure L |
| Regus de signification of 12-11-2021 | Enclosure M |
| Signification d'acte et pieces of 22-11-2021 concerning Natalia Dozottseva [sic] | Enclosure N |
| Recepisse de remise d' un acte of 23-11-2021 concerning Natalia Dozottseva [sic] | Enclosure O |
| Signification d'acte et pieces of 17-11-2021 concerning Murielle Jouniaux | Enclosure P |
| Enforcement authorization of 21-11-2016 (ref. no. ON 3) | Enclosure Q |
| Order of the Princely Court of 02-03-2020 (ref. no. ON 109) | Enclosure R |
| Appeal together with application for suspensive effect of 23-03-2020 | Enclosure S |

Page 27

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

| | |
|---|---|
| Order of the Princely Court of 21-04-2020 (ref. no. ON 125) | Enclosure T |
| Order of the Princely Court of Appeal of 15-09-2020 (ref. no. ON 143) | Enclosure U |
| Constitutional Court (StGH) judgement of 29-10-2019 | Enclosure V |
| Constitutional Court (StGH) judgement of 29-06-2021 | Enclosure W |
| Commercial register extract of the Alpha Trust of 09-11-2022 | Enclosure X |
| Order of the Princely Court of 24-02-2016 under 08 EX.2016.839 (ref. no, ON 4) | Enclosure Y |
| Judgment of the Constitutional Court of 26-03-2018 under StGH 2017/29 | Enclosure Z |
| Order of the Princely Court of 21-04-2020 under 08 EX.2016.5802 (ref. no. ON 125) | Enclosure AA |
| Order of the Princely Supreme Court of 07-09-2018 under 08 EX.2016.5802 (ref. no. ON 72) | Enclosure AB |
| Letter of the Princely Court of 26-08-2020 under 13 UR.2016.77, ref. no. ON 360 | Enclosure AC |
| Order of the Princely Court of 27-07-2020 under 07 HG.2020.93 (ref. no. ON 6) | Enclosure AD |
| Order of the Princely Court of 24-08-2020 under 07 HGJ2020.112 [sic] (ref. no. ON 9) | Enclosure AE |
| Judgment of the Princely Court of Appeal of 09-11-2021 under 05 CG.2020.133 (ref. no. ON 32) | Enclosure AF |
| Judgment of the Princely Court of 12-09-2022 under 06 CG.2021.275 (ref. no. ON 30) | Enclosure AG |
| Written Statement dated 02-06-2015 | Enclosure AH |
| Commercial Register extract of the Alpha Trust dated 19-01-2023 | Enclosure AI |
| Commercial Register extract of the Savannah Advisors AG dated 03-11-2022 | Enclosure AJ |
| Share certificate of the Savannah Advisors AG No. 3 dated 22-07-2021 | Enclosure AK |
| Legal Opinion DMLO dated 03-03-2023 including DeepL- Translation | Enclosure AL |

2) Documents of the Second Defendant Party

Order of the Princely Court of 21-11-2016 under 08 EX.2016.5802,

Page 28

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

| | |
|---|---|
| ref. no. ON 3 | Enclosure 1 |
| Order of the Princely Court of 02-03-2020 under 08 EX.2016.5802, ref. no. ON 109 | Enclosure 2 |

3) Documents of the intervening party

| | |
|---|---|
| Minutes of the public oral hearing before the Princely Court of 10-11-2022 in the proceedings under 04 CG.2019.5, ref. no. ON 185, in copy | Enclosure a |

4) as well as by questioning the First Claimant Party (ref. no. ON 126).

With regard to the results of the evidence, reference is made to the contents of the file (sec. 417 para. 2 of the Code of Civil Procedure (ZPO)).

**Grounds for the decision:**

1.2  On the basis of the evidence taken, the following **facts**, which are material to the decision, are established as proven:

2.1  On 27-05-2015, a declaration of trust was issued by the CTX Treuhand AG as "trustee" for the establishment of the Alpha Trust. (Enclosure B)

The economic founder was Ashot Yegiazaryan. The CTX Treuhand AG established the Alpha Trust in a fiduciary capacity for Ashot Yegiazaryan by means of the aforementioned declaration of trust. The facts of the case and the appointment process are not in dispute between the parties.

Under the heading "Applicable Law, Place of Administration, Jurisdiction", clause 2.2 of the declaration of trust states:

*"The administrative seat of this trust is in the Principality of Liechtenstein and the rights of all parties as well as the interpretation and effect of the individual provisions are subject to the exclusive jurisdiction of the Principality of Liechtenstein and shall be interpreted only in accordance with the law of the Principality of Liechtenstein."*

## Page 29

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Clause 10.4.1 reads:

*"The Protector or if he is deceased (or it is a company which is being wound up) or if he is unable or unwilling to act."*

Clause 10.5 reads:

*"The person entitled to appoint new trustees under sub-clauses 10.4.1 and 10.4.2 may appoint one or more persons to be additional trustees in the same order as described above until the maximum number permitted is reached."*

Clause 14.2 reads:

*"The first Protector shall be Ashot Yegiazaryan."*

2.2   In the execution proceedings under 08 EX.2016.839, Vitaly Smagin had the beneficiary rights of Ashot Yegiazaryan in the Alpha Trust seized in the course of the enforcement of the arbitral award of 11-11-2014 before the London Court of International Arbitration. The enforcement was authorized by this order and it was also upheld in the last instance by the Constitutional Court at StGH 2017/27 dated 26-03-2018. (Enclosure Y)

In the course of further enforcement of the arbitral award under 08 EX.2016.5802, Vitaly Smagin had the consolidated rights of Ashot Yegiazaryan as settlor, protector and beneficiary in the Alpha Trust seized. Specifically, the consolidated rights were seized by order of the Princely Court dated 21-11-2016 under 08 EX.2016.5802-3. This order became res judicata and was upheld by the Constitutional Court of Final Instance in its judgment of 29-10-2019 on StGH 2018/111. (Enclosures 1, Q and V)

Page 30

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

The realisation of the consolidated rights was granted by order of the Princely Court dated 02-03-2022 under 08 EX.2016.5802-109, specifically by authorising the exercise of these rights by Vitaly Smagin. The order was immediately enforceable. Suspensive effect was applied for, but the necessary deposit was never lodged. Suspensive effect was not claimed by the Defendant Party. The order of realisation was fully confirmed by the Princely Court of Appeal in its order of 15-09-2020 (08 EX.2016.5802-143), corrected by the Princely Court of Appeal in its order of 15-10-2020 (08 EX.2016.5802-152), as well as also ultimately by the Constitutional Court under StGH 2020/099. This order thus became final. (Enclosures R to U, W)

2.3  On 09-03-2020, the Claimant Parties were appointed as trustees by Vitaly Smagin, who accepted the appointment.

(Enclosures D and E)

Page 31

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

**Resolution[1]**          [OMISSIS]

Pursuant to the order of the Princely Court dated 2 March 2020, ref. no. ON 109 in proceedings 08 EX.2016.5802, Mr. Vitaly Ivanovich Smagin was authorised to exercise certain rights of the protector of the Alpha Trust, Liechtenstein registration number FL-002.510.771-7 (the **"Alpha Trust"**). This includes the right under Clause 14.05 of the Trust Deed, as amended on 2 June 2015, to remove and appoint Trustees by written order, as expressly set out in the Award of the Court in Clause 1.1 (a and b).

On this basis and in exercise of the rights of the Protector, Mr Vitaly Ivanovich Smagin hereby orders and directs as follows:

1.    The CTX Treuhand AG be removed as Trustee of the Alpha Trust with immediate effect.

2.    Mag. Rudolf Schächle and lic. iur. Raphael Näscher, both of Pfluggasse 16, 9490 Vaduz, Liechtenstein are jointly appointed as trustees of the Alpha Trust with immediate effect.

Date / [OMISSIS: [handwritten: 09-03-2020]
[Signature illegible]
(Signature / [OMISSIS] Vitaly Ivanovich Smagin)
*Signature witnessed by / [OMISSIS]:*
[Signature illegible], [handwritten: Baker McKenzie Moskau]]
[Signature illegible]
(Signature / [OMISSIS]]

(Enclosure D)

---

[1] Translator's note: The German version has been translated by the translator again so that the terminology used in the translation of this judgement corresponds to the translation of the resolution.

Page 32

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

The seizure of the consolidated rights was still not lifted.

2.4　By Instruments of Appointments of Additional Trustees dated 31-03-2020 and 16-04-2020, Ashot Yegiazaryan declared, based on Clauses 10.4.1 and 10.5 of the Declaration of Trust, declared the Defendant Parties as Trustees of the Alpha Trust:

THIS INSTRUMENT OF APPOINTMENTS OF ADDITIONAL TRUSTEES is made this 31st day of March two thousand and twenty by the party named in the first part of the Schedule hereto, as Protector, and by the party named in the second part of the Schedule hereto, as Additional Trustee, on the one hand, and by a trust settlement [OMISSIS] created by the party named in the third part of the Schedule hereto, as Original Trustee, brief details of which are set out in the fourth part of the Schedule hereto (hereinafter referred to as the "Declaration of Trust"), on the other hand:

**IN CONSIDERATION OF THE GROUNDS BELOW**

(A)　Subject to the powers contained in Clauses 10.4.1 and 10.5. of the Declaration of Trust, the power to appoint one or more person(s) to act as Additional Trustee(s) up to the limit specified in Clause 10.1 of the Declaration of Trust shall be reserved to the Protector.

(B)　The Protector desires to exercise such powers under the foregoing provisions,

(C)　This declaration is an addition to the Declaration of Trust.

(D)　Except as otherwise provided in this Declaration or as otherwise required by the terms of this Declaration, all terms, phrases and expressions used in this Declaration shall have the meanings ascribed to them in the Declaration of Trust.

**NOW, THEREFORE, BY THIS DECLARATION**, the Protector **HEREBY DECIDES**, in exercise of the powers conferred on the Protector by Clauses 10.4.1 and 10.5. of the Declaration of Trust, to appoint the following person in addition to the Original Trustee with the same powers as the Original Trustee and with effect from this date;

**NATALIA DOZORTSEVA**, born 16 May 1969, French Residence Permit N JKTSOF4U1, residing at 9 rue Ouest, Saint-Paul-de-Vence, France (the "Additional Trustee"),

Page 33

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

The Schedule mentioned above:

Part One:
Ashot Egiazaryan
910 North. Crescent Drive
Beverly Hills
90210 California
United States of America

Part Two:
Natalia Dozortseva
9 rue des Remparts Ouest
Saint-Paul-de-Vence France

Part Three:
CTX Treuhand AG
c/o Dr. iur. Thomas Wilhelm
Lova.Center
9490 Vaduz
Principality of Liechtenstein

Part Four:
The Trust (the trusteeship) with the
name "ALPHA TRUST registered in the
Liechtenstein Commercial Register
under number FL--0002.510.771-1

IN WITNESS WHEREOF, this Deed has been signed on the date first written above.

The Protector:                                      [Signature]
**ASHOT EGIAZARYAN**
                                                    _____

APPOINTMENT CONFIRMED AND ADOPTED:

The Additional Trustee                              [Signature]
**MURIELLE JOUNIAUX**
                                                    _____

Page 34

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]


THIS INSTRUMENT OF APPOINTMENTS OF ADDITIONAL TRUSTEES is made this 16th day of April two thousand and twenty by the party named in the first part of the Schedule hereto, as Protector, and by the party named in the second part of the Schedule hereto, as Additional Trustee, on the one hand, and by a trust settlement [OMISSIS] created by the party named in the third part of the Schedule hereto, as Original Trustee, brief details of which are set out in the fourth part of the Schedule hereto (hereinafter referred to as the "Declaration of Trust"), on the other hand:


**IN CONSIDERATION OF THE GROUNDS BELOW**

(A)     Subject to the powers contained in Clauses 10.4.1 and 10.5. of the Declaration of Trust, the power to appoint one or more person(s) to act as Additional Trustee(s) up to the limit specified in Clause 10.1 of the Declaration of Trust shall be reserved to the Protector.

(B)     The Protector desires to exercise such powers under the foregoing provisions,

(C)     This declaration is an addition to the Declaration of Trust.

(D)     Except as otherwise provided in this Declaration or as otherwise required by the terms of this Declaration, all terms, phrases and expressions used in this Declaration shall have the meanings ascribed to them in the Declaration of Trust.


**NOW, THEREFORE, BY THIS DECLARATION**, the Protector HEREBY DECIDES, in exercise of the powers conferred on the Protector by Clauses 10.4.1 and 10.5. of the Declaration of Trust, to appoint the following person in addition to the Original Trustee with the same powers as the Original Trustee and with effect from this date;

**MURIELLE JOUNIAUX**, born 04 March 1987, French Personal ID Card N 070706204753, residing at 108 avenue St Labert, Nice, France (the "Additional Trustee"),

Page 35

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]


Part One:                               Ashot Egiazaryan
                                        910 North. Crescent Drive
                                        Beverly Hills
                                        90210 California
                                        United States of America

Part Two:                               Natalia Dozortseva
                                        9 rue des Remparts Ouest
                                        Saint-Paul-de-Vence France

Part Three:                             CTX Treuhand AG
                                        c/o Dr. iur. Thomas Wilhelm
                                        Lova.Center
                                        9490 Vaduz
                                        Principality of Liechtenstein

Part Four:                              The Trust (the trusteeship) with the
                                        name "ALPHA TRUST registered in the
                                        Liechtenstein Commercial Register
                                        under number FL--0002.510.771-1


IN WITNESS WHEREOF, this Deed has been signed on the date first written above.


The Protector:                          [Signature]
**ASHOT EGIAZARYAN**                    _____



APPOINTMENT CONFIRMED AND ADOPTED:



The Additional Trustee                  [Signature]
**MURIELLE JOUNIAUX**                   _____

(Enclosure C)

Page 36

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

2.5    In a letter dated 09-04-2020, the First Defendant Party, represented by BWB
       Rechtsanwälte AG, applied for registration as an additional trustee of the
       Alpha Trust in the Liechtenstein Commercial Register, based on the
       Declaration of Trust and the Instrument of Appointments of Additional Trustees
       of the Alpha Trust. The registration of the First Defendant Party as trustee of
       the Alpha Trust in the Liechtenstein Commercial Register took place on 23-04-
       2020. After the Office became aware of the enforcement authorization of the
       Princely Court of 21-11-2016 under 08 EX.2016.5802- 3 and thus of the fact
       that the consolidated rights to which the protector Ashot Yegiazaryan is
       entitled vis-à-vis the CTX Treuhand AG, such as in particular the right to
       appoint and remove trustees of the Alpha Trust, have been seized and that
       Ashot Yegiazaryan has been ordered to refrain from any disposal of, inter alia,
       the right to appoint and remove trustees of the Alpha Trust, the registration of
       the First Defendant Party as trustee of the Alpha Trust was corrected or,
       respectively, reversed by the Office. A complaint filed against this by the First
       Defendant Party was declared withdrawn by decision of the Complaints
       Commission for Administrative Matters (VBK) of 15-12-2020.
       (Enclosures F to H)

2.6    In the lawsuit pending before the Princely Court between Vitaly Smagin and
       the Alpha Trust under file number 04 CG.2019.5 (formerly 04
       CG.2016.115), the Defendant Parties declared their intervention as
       intervening parties having joined the proceedings as party
       (Streitgenössischer Nebenintervenient). Also in that lawsuit, they argue
       that they were appointed as (co-) trustees of the Alpha Trust by resolution
       of Ashot Yegiazaryan dated 31-03-2020 and 16-04-2020, respectively.
       (Enclosure a, undisputed).

2.7    The Claimant Parties have complied with their reporting obligations as
       trustees, including to the FIU.

       Moreover, the Claimant Parties have no knowledge of any other trustees
       or, respectively, acts of appointment, with the exception of those
       concerning the Defendant Parties.

Page 37

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

(Interrogation of the parties)

2.8   The Claimant Parties are the registered trustees of the Liechtenstein trust
      (trusteeship) registered under the name "Alpha Trust" in the Liechtenstein
      Commercial Register under the registration number FL-0002.510.771. As
      trustees of the Alpha Trust, they hold 100% shares in the Savannah
      Advisors AG, a company domiciled in the Federation of St. Kitts and Nevis,
      represented by Silvio Vogt and JGT Treuunternehmen reg. Vaduz. The
      shares are located in Liechtenstein.

      (Enclosures A and X)

2.9   The Defendant Parties invoke their appointment as trustees and, as a
      result, a type of summary proceeding was initiated in Monaco by the
      Savannah Advisors AG, the wholly-owned subsidiary of the Alpha Trust,
      against CMB Monaco with the request to hand over the funds and transfer
      them to a bank account in Vaduz, also in the name of the Savannah
      Advisors AG. Since the CMB Monaco filed a counterclaim for the deposit
      of the funds, the court in Monaco rejected the claims of the Savannah
      Advisors AG with a decision on an interim injunction and granted the
      counterclaim for deposit, whereby the assets of the Savannah Advisors AG
      and thus the trust assets of the Alpha Trust are now blocked at the CMB
      Monaco due to this court decision.

3.    **Regarding the Assessment of evidence:**

3.1   Pursuant to section 272 para. 1 of the Code of Civil Procedure (ZPO), the
      court must, with careful consideration of the results of the entire hearing
      and the presentation of evidence, freely assess whether a factual
      statement is to be considered true or not. The law therefore does not
      prescribe the judge's assessment of the results of the evidence procedure,
      but leaves it to his or her personal conviction. The judge is required to be
      convinced that, with regard to a factual statement, such a degree of
      probability has been reached that, taking into account his or her life
      experience, the special knowledge acquired by him or her and the average
      wealth of experience

Page 38

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

and knowledge of reasonable people in our circle of life, justifies him or her, as a judge, to consider the fact in question to be true (cf. Rechberger in Fasching/Konecny III, sec. 272 marginal numbers 4 and 5 with further citations). However, free assessment of evidence does not mean free discretion, which is why sec. 272 para. 3 of the Code of Civil Procedure (ZPO) obliges the court to also make a free assessment of evidence in its reasons for judgement.

Whether a fact is to be considered proven or not is a question of the assessment of evidence. The general standard of proof of the Code of civil procedure is the high certainty and not the probability bordering on certainty (RIS-Justiz RS011070; Rechberger in Fasching/Konecny ante sec. 266 Code of Civil Procedure (ZPO) marginal numbers 11, 13; 7Ob 210/17h; 8Ob 18/18g, and many more). Whether the factual statements of a party are to be considered true or false has to be assessed by the judge to the best of his/her knowledge and belief based on his/her experience of life and knowledge of human nature, whereby the results of the entire proceedings, i.e. all hearings of evidence as well as the entire submissions of the parties, their behaviour during the proceedings, i.e. all hearings of evidence as well as the entire submissions of the parties, their behaviour during the proceedings as well as the personal impression conveyed by them - as far as this is possible - are to be included in this assessment. It depends on the objective circumstances of the case as well as on the subjective assessment of the judge when he/She considers this "high" probability to be given (cf. Fasching/Konecny of sec. 266 Code of Civil Procedure (ZPO), marginal number 10).

Having said this, the following applies:

The established facts are primarily and directly based on the evidence respectively listed in brackets following the individual findings, which - unless a further assessment of the certified facts is made below or negative findings had to be made - remained uncontradicted and appear completely

Page 39

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

unobjectionable to the court. Where negative findings have been made or where there are contradictory certification findings, the following assessment is based on the means of certification:

3.2  The finding that the seizure of the consolidated rights was still not lifted at the time of the appointment of the Claimant Parties as trustees by Vitaly Smagin is based on the fact that the relevant court decisions mentioned, in particular the decisions of the Princely Court of 02-03-2020 under 08 EX.2016.5802-109 and of 21-11-2016 under 08 EX.2016.5802-3, were still legally binding. It is also undisputed that the Defendant Parties do not claim rescission.

The fact that the CTX Treuhand AG established the Alpha Trust fiduciarily for Ashot Yegiazaryan by means of the Declaration of Trust is based on the corresponding Declaration of Trust and is, moreover, also undisputed, as are the entire facts regarding the appointment process between the parties.

3.3  Based on the credible testimony of the First Claimant Party, the Claimant Parties fulfilled their reporting obligations as trustees, in particular also vis-à-vis the FIU. No corresponding counter-evidence was provided by the other party. The same applies with regard to the Claimant Parties' knowledge of other trustees or acts of appointment, with the exception of those of the Defendant Parties

**Legal assessment**

4.1  <u>On the plea of lack of jurisdiction:</u>

The intervening party and the Second Defendant Party argue that the Princely Court lacks jurisdiction because the clause stipulating jurisdiction in clause 2.2 of the Trust Deed of the Alpha Trust does not apply here, because it only covered *parties* (to the Alpha Trust).

Page 40

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

The Defendant Parties were not parties to the Alpha Trust because the Claimant Parties had disputed their trustee status.

The wording of the relevant clause in the Trust Deed under clause 2.2 reads:

*"( ... ) The rights of all parties as well as the interpretation and effect of the individual provisions shall be subject to the exclusive jurisdiction of the Principality of Liechtenstein and shall be construed only in accordance with the jurisdiction of the Principality of Liechtenstein."*

The appointment decisions of the intervening party are based precisely on the Trust Deed, especially since the corresponding Instruments of Appointments of Additional Trustees of 31-03-2020 and 16-04-2020 refer precisely to provisions in the Trust Deed, namely to Clauses 10.4.1 and 10.5. It is precisely the effect of these appointment decisions that must be assessed in the present case. However, it is precisely the interpretation and effect of the provisions of the Trust Deed that are subject to Liechtenstein jurisdiction in accordance with clause 2.2 of the Trust Deed.

It is undisputed that the CTX Treuhand AG is no longer a trustee, which is why there must be a legal successor. The facts concerning the appointment process are undisputed between the parties, as is the fact that Ashot Yegiazaryan had commissioned the CTX Treuhand AG to set up the Alpha Trust and that the Alpha Trust was set up by declaration of the CTX Treuhand AG on behalf of the intervening party. It is also clear that the intervening party remained the beneficial settlor. A Declaration of Trust is a unilateral establishment of the Trust Instrument by the trustees with corresponding documents in the internal relationship. If the CTX Treuhand AG had established the trust fiduciarily for Ashot Yegiazaryan with the

Page 41

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Trust Deed, this was permissible and there is no apparent defect or, respectively, nullity in the establishment of the trust.

As the Claimant Parties correctly suggest, it is also not a question of jurisdiction agreement whether the underlying trust agreement is void or not, especially since the clause stipulating jurisdiction does not share the fate of the substantive principal agreement and remains in force irrespective of whether the principal agreement is disputed, its existence denied or dissolution sought. In any case, the establishment of the present Alpha Trust by the Declaration of Trust is to be affirmed.

It should also be noted that the Defendant Parties refer to themselves as "parties" and "trustees", which fulfils the formal and material concept of a party under clause 2.2 (cf. e.g. ref. no. ON 98, page 3, fourth paragraph, and page 6, second sentence; application for the imposition of a security deposit for costs of 28-11-2022, page 2, first paragraph). The Second Defendant Party herself claims to be a party and also wishes to be a party to the Alpha Trust (see ref. no. ON 98, Answer to the Claim, as well as ref. no. ON 115). It explicitly bases its legal position on the clauses of the Trust Deed (Enclosure B, for example, clause 10.4.1. and 10.5). In ref. no. ON 115 (Ordered Statement of 31-01-2023), it itself admits that the appointment decisions are based on the Trust Deed. Only when the intervening party argued and disputed that the Defendant Parties were covered by the Trust Deed as parties, did the Second Defendant Party state in ref. no. ON 126 that not her previous arguments brought forward, but that of the intervening party would also apply to her by analogy.

Now, however, all rights of the parties are covered by the clause stipulating jurisdiction, also with regard to its interpretation and effect. Since it is precisely the question of whether the appointment decisions of the intervening party, which are based precisely on the Trust Deed, are valid, Liechtenstein law is not only applicable in accordance with the clause stipulating jurisdiction, clause 2.2 of the Trust Deed,

Page 42

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

but the Liechtenstein Princely Court also has jurisdiction.

4.2    However, the Princely Court has jurisdiction not only on the basis of clause 2.2 of the Trust Deed, but also due to the fact that the place of jurisdiction for the property in question is sec. 50 of the Act on Jurisdictions (JN). The Alpha Trust has been entered in the commercial register. It has assets in Liechtenstein in the form of 100% shareholdings in the Liechtenstein subsidiary, the Savannah Advisors AG. The shares are located in Liechtenstein. In their action, the Claimant Parties seek a declaration that they are the sole trustees of the Alpha Trust and this includes clarification of the ownership of the Savannah Advisors AG, especially since the legally effective trustees are allowed to dispose of this trust property. Should the Defendant Parties prevail in their claim, they are the trustees of the Alpha Trust, could dispose of the trust property and in that event they would be entitled to a transfer of the shares in the Savannah Advisors AG. This potential claim of the Defendant Parties constitutes property within the meaning of sec. 50 para. 1 first case of the Act on Jurisdictions (JN).

However, section 50 para. 1 second case of the Act on Jurisdictions (JN) is also given in the present case, especially since the Alpha Trust in Liechtenstein is the sole shareholder of the Savannah Advisors AG, which is domiciled in Liechtenstein and whose shares are located in Liechtenstein and thus the legal relationship is in any case located in Liechtenstein.

4.3    Vitaly Smagin had the beneficiary rights of Ashot Yegiazaryan in the Alpha Trust seized, which was confirmed by the Constitutional Court (cf. proceedings under 08 EX.2016.839). In the course of the further enforcement of the arbitral award, Vitaly Smagin had the consolidated rights of Ashot Yegiazaryan as settlor, protector and beneficiary in the Alpha Trust seized (see proceedings under 08 EX.2016.5802); this was also confirmed by the Constitutional Court. This seizure of the consolidated rights was granted by order of the Princely Court dated 02-03-2020 and was immediately enforceable. Thus, at the time when Ashot Yegiazaryan appointed the Defendant Parties as trustees for the Alpha Trust on 31-03-

Page 43

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

and 16-04-2020, the consolidated rights of Ashot Yegiazaryan as beneficiary, protector and settlor of the Alpha Trust were already long and finally seized - based on the aforementioned EX proceedings under 08 EX.2016.5802 - and these seized rights were transferred to Vitaly Smagin for the purpose of realisation by the aforementioned decision of 02-03-2020 under 08 EX.2016.5802-109, who then appointed the Claimant Parties as trustees. Thus, the Instrument of Appointments of Additional Trustees of the Alpha Trust dated 31-03- and 16-04-2020 (Enclosure C) is void and ineffective.

The execution is carried out in each case first by seizure and then by realisation. The consolidated rights were seized by order of the Princely Court dated 21-11-2016 under 08 EX.2016.5802-3 and this order became final. The *realisation* of the consolidated rights was granted by order of the Princely Court of 02-03-2020 under 08 EX.2016.5802-109, specifically by authorising Vitaly Smagin to exercise these rights. This order was immediately enforceable. The suspensive effect was also not asserted by the Defendant Parties. On 09-03-2020 Vitaly Smagin exercised the rights transferred to him by removing the CTX Treuhand AG as trustee of the Alpha Trust with immediate effect and jointly appointed the Claimant Parties as trustees of the Alpha Trust with immediate effect. The Claimant Parties accepted this appointment as trustees on the same day. At that time, the seizure of the consolidated rights was still not lifted. Nor did the Defendant Party claim that it had been lifted.

For all these reasons, the appointment procedure of the Claimant Parties as trustees of the Alpha Trust was undoubtedly correct and not objectionable. Vitaly Smagin was authorised to exercise the rights by the Princely Court and he exercised that right by a resolution dated 09-03-2020.

Page 44

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

The wording in the realisation order (08 EX.2016.5802-109) explicitly
refers to the old or new trustees ("by the present or newly appointed
trustee of the Alpha Trust [... ]". When "trustee" is referred to here, this
does not imply a limitation of rights to the CTX Treuhand AG, but is due to
the nature of the trust, which itself does not have legal personality, but is a
legal relationship between persons.

If the Second Defendant Party criticises the chronological sequence,
namely by stating that the dismissal of the CTX Treuhand AG took place
chronologically before the new appointment of the Claimant Parties,
because the dismissal took place in the Vitaly Smagin resolution of 09-03-
2020 under clause 1 and the new appointment took place under clause 2,
it has to face the accusation of exaggerated formalism. Admittedly, an
order cannot be read out of a resolution. In accordance with the
Enforcement Act (EO; Exekutionsordnung), the realisation is merely to be
effected by authorising the enforcing party to assert the seized rights in the
name of the obligated party and to perform the necessary legal acts in the
name of the obligated party. The court does not have to enumerate
individual legal acts that come into consideration and certainly does not
have to order the sequence of the legal acts to be performed. In the
decision under 08 EX.2016.5802-109, the Princely Court explicitly stated
that the right to appoint and dismiss the trustees is vested without any
prerequisite having to be met. The seizure of the consolidated rights of
Ashot Yegiazaryan as settlor, protector and beneficiary of the Alpha Trust
as well as their transfer for realisation thus remain valid even after the
dismissal of the CTX Treuhand AG and continue to exist after the
appointment of the new trustees, und this until the execution proceedings
are terminated. In addition, reference should be made to Art. 911 para.4,
from which it follows that if the old trustee is dismissed and the new trustee
is appointed, the new trustee takes over the rights and obligations of the
trust relationship by way of universal succession.

Page 45

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

In the present case, this applies to the Claimant Parties. The Claimant Parties have also already been entered in the Commercial Register by the Office of Justice as new trustees.

For all these reasons, the Claimant Parties are to be regarded as the sole trustees of the Alpha Trust.

4.4    Pursuant to section 234 para. 1 of the Code of Civil Procedure (ZPO), an action may be brought for a declaration of the existence or non-existence of a legal relationship or right if the Claimant has a legal interest in having that legal relationship or right determined by a court decision as soon as possible. The admissibility of an action for a declaratory judgement pursuant to sec. 234 of the Code of Civil Procedure (ZPO) thus presupposes on the one hand that the legal relationship is capable of being established and on the other hand that the Claimant has a legal interest in having the legal relationship established as soon as possible.

For the sake of completeness only, it is pointed out that the Claimant Parties have a legal interest in establishing that they are the sole trustees of the Alpha Trust, especially since the Defendant Parties question their position as trustees based on the Instruments of Appointments of Additional Trustees of 31-03- and 16-04-2020, which is also shown in particular by the statements of the Second Defendant Party made in the present proceedings. Furthermore, the immanent interest is also given with regard to the course of the proceedings to date based on the available documents, according to which the Defendant Parties have caused their registration in the Liechtenstein Commercial Register as trustees by a Liechtenstein legal representative based on the aforementioned Instruments of Appointments of Additional Trustees dated 31-03- and 16-04-2020, and that this entry then had to be corrected after the relevant decisions from the execution proceedings had been made.

Page 46

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Furthermore, due to the conduct of the Defendant Parties in Monaco, where they also invoked their appointment as trustees, and as a result of this in Monaco, Savannah Advisors AG, the wholly owned subsidiary of Alpha Trust, initiated a type of summary proceedings against the CMB Monaco with the request to hand over the funds and transfer them to a bank account in Vaduz, also in the name of the Savannah Advisors AG. Since CMB Monaco filed a counterclaim for the deposit of the funds, the court in Monaco rejected the claims of the Savannah Advisors AG with a decision on an interim injunction and granted the counterclaim for deposit, whereby the assets of the Savannah Advisors AG and thus the trust assets of the Alpha Trust are now blocked at the CMB Monaco due to this court decision. This intervention, which still has repercussions today because the assets are blocked, once again demonstrates the legal interest of the Claimant Parties in establishing that they are the sole trustees of the Alpha Trust. The legal interest in establishing the existence of a right exists whenever the Defendant Parties dispute such a right. In the present case, the threat to the Claimant Parties' legal position is already given by the mentioned interventions of the Defendant Parties in Monaco as well as in Liechtenstein at the commercial register. It is sufficient here if the Claimant Parties are hindered in their "freedom of movement" in legal life or in taking measures. The requested declaration that the Claimant Parties are the sole trustees of the Alpha Trust is also the appropriate means to eliminate this danger.

## 5. Regarding the award of costs

The award of costs is based on sec. 41 para. 1 of the Code of Civil Procedure (ZPO). The Defendant Parties are thus jointly and severally obliged to pay the Claimant Parties the timely and correctly assessed costs of the proceedings in the amount of CHF 14,640.60 to the attention of their legal representatives within four weeks by other means of execution.

Page 47

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

Princely Court of Liechtenstein

Vaduz, on 13-04-2023

Judge of the Princely Court of Liechtenstein          The secretary

Dr. Jasmin Walch, LL.M.                                Kimberly Kriss

For the correctness of the copy

[Signature: illegible]

Kimberly Kriss

[Seal: PRINCELY COURT OF LIECHTENSTEIN; national emblem]

Page 48
[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]
Deadline recorded on:
[handwritten: 15-05-23; Initials illegible]

**Instruction on legal remedies**

An appeal ("Berufung") against this judgment may be lodged with the Princely
Court of Appeal (Fürstliches Obergericht) in Vaduz within a non-extendable
period of four weeks from the date of service. The appeal must be submitted in
writing in duplicate to the Princely Court (Fürstliches Landgericht) in Vaduz, but it
may also be declared orally on the record. It shall contain the name of the
judgment against which an appeal is lodged, a specific statement of the extent to
which the judgment is contested, an equally specific brief description of the
grounds for the challenge (grounds of appeal), the factual submissions and the
evidence by which the truth of the grounds of appeal can be proved, and a
statement as to whether the reversal or amendment of the judgment is sought
and, if so, what amendment is sought (application for appeal). Within the scope
of the motions and grounds of appeal, new means of attack and defence which
were not raised at first instance, in particular new facts and evidence, may be
raised. If the sum of money claimed in the action or the value of the subject
matter of the litigation does not exceed CHF 5,000.- or if the plaintiff declares that
he or she wishes to accept a sum of money not exceeding CHF 5,000.- instead
of the subject matter claimed in the action (small claims case), the judgement of
the court of first instance may only be challenged by means of an appeal on the
grounds listed in section 472 of the Code of Civil Procedure (ZPO).

The decision on the point of costs contained in the judgement may only be
challenged by means of a recourse ("Rekurs") without a simultaneous challenge
of the decision rendered on the merits.

Deadline recorded on:
[handwritten: 01-05-23 (2-5-23); Initials illegible]
The recourse shall be lodged within the non-extendable period of 14 days from
the date of delivery of the decision to the Princely Court of Appeals (Obergericht)
in Vaduz. The recourse may be declared orally on the record at the Princely
Court or must be submitted in writing in two copies to the Princely Court. The
recourse must contain a specific statement of the extent to which the order is
challenged, an equally specific brief description of the grounds for the challenge
(grounds for appeal) and a statement as to whether annulment or modification
and, if so, what modification of the challenged order is sought (application for
appeal). If the order is challenged on the grounds of an incorrect legal
assessment, the grounds on which the legal assessment of the case appears
incorrect shall be set out in the recourse without elaboration. In addition, the
factual submissions and the evidence by which the truth of the grounds of the
recourse can be proven shall be stated exhaustively.

[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]
[Seal: PRINCELY COURT OF LIECHTENSTEIN; NATIONAL EMBLEM]

[Stamp: Identical to the original; Princely Court, Secretary; Anja Irma Gassner, Registrar; Vaduz, on 11 May 2023]

[Signature illegible]

[Seal: PRINCIPALITY OF LIECHTENSTEIN; National Emblem; CHF [handwritten: 240.-]; RECEIPT OF FEES]

---

### APOSTILLE
(Convention of The Hague of 5 October 1961)

1. Country:        Principality of Liechtenstein

This public document
2. has been signed by Mrs. Anja Irma Gassner
3. acting in the capacity as Authentication officer
4. bears the seal/stamp of
   The Cabinet Office of the Princely Court of Liechtenstein

Certified
5. at 9490 Vaduz                 6. the [stamp : **11 May 2023**]
7. by the Cabinet Office of the Government of Vaduz
8. under no. [handwritten : 23.03864-]
9. Sceal/Stamp                          10. Signature

[Seal : PRINCIPALITY OF LIECHTENSTEIN ;   [Signature : illegible]
CABINET OFFICE OF THE GOVERNMENT ;
National Emblem]

.......................................................
...........................

                              [Stamp : Sabine Breuss
                              admistrative employee]

*In my capacity as a translator for the English and French language, duly appointed, commissioned and sworn in by the President of the Regional Court of Innsbruck, Austria, as well as in my capacity as interpreter and translator accredited before the Liechtenstein courts and authorities, I hereby certify that the foregoing is a true and complete English translation of the copy submitted to me in the German language and was established to my best knowledge and belief.*
*IN WITNESS WHEREOF I have hereunder set my hand and seal*

*Innsbruck, on 22-05-2023*





FÜRSTENTUM LIECHTENSTEIN

**FÜRSTLICHES**
LANDGERICHT

EINGEGANGEN AM 1 7. APR. 2023
20142-20

Aktenzeichen bitte immer anführen
15 CG.2021.81
ON 127

# URTEIL
## Im Namen von Fürst und Volk

Das Fürstliche Landgericht in Vaduz hat durch die Fürstliche Landrichterin Dr. Jasmin Walch, LL.M., in der

# Rechtssache

| | | |
|---|---|---|
| **Klagende Parteien:** | 1. | Rudolf **Schächle,** geb. 29.09.1968 |
| | 2. | Raphael Alexander **Näscher,** geb. 17.09.1977 |
| | | beide p. A. und vertreten durch Wohlwend Näscher Schächle Rechtsanwälte, Pflugstrasse 16, Postfach 635, 9490 Vaduz |
| **Beklagte Parteien:** | 1. | Natalia **Dozortseva,** 9, rue des Etables, F-06620 Gréolières |
| | 2. | Capucine Murielle **Jouniaux,** 271 Chemin de Saint Julien, F-06410 Biot |
| | | vertreten durch Zustellkuratorin Mag. iur. Sabine Fröhlich, Rechtsanwaltskanzlei, Lettstrasse 5, LI-9490 Vaduz |
| **Nebenintervenient:** | | Ashot **Yegiazaryan,** 910 North Cresent Drive, USA–Beverly Hills, CA 90210 |
| | | vertreten durch Schurti Partners Rechtsanwälte AG, Zollstrasse 2, FL-9490 Vaduz |
| **wegen:** | | Feststellung (Streitwert: CHF 30'000.00) |

nach öffentlich und mündlich durchgeführter Streitverhandlung

SPANIAGASSE 1 · 9490 VADUZ · TELEFON +423 - 236 61 11 · TELEFAX +423 - 236 65 39

## zu Recht erkannt:

1. **Zwischen den klagenden Parteien als Treuhänder des Alpha Trust und den beklagten Parteien wird festgestellt, dass die klagenden Parteien, Rudolf Schächle und Raphael Alexander Näscher, die einzigen Treuhänder des Alpha Trusts (FL-0002.510.771) sind.**

2. **Die beklagten Parteien sind zur ungeteilten Hand schuldig, den klagenden Parteien die Prozesskosten in Höhe von CHF 14'640.60 zu Handen deren Rechtsvertretung binnen vier Wochen bei sonstiger Exekution zu ersetzen.**

## Tatbestand:

*Frist vorgemerkt am: 15. 05. 23 uu*

1.1   Mit hg. am 29.03.2021 eingereichter <u>Klage</u> (ON 1) begehren die Kläger die Feststellung, dass zwischen den Klägern als Treuhändern des Alpha Trust und den Beklagten festgestellt werde, dass die Kläger die einzigen Treuhänder des Alpha Trust seien, eventualiter wolle festgestellt werden, dass zwischen den Parteien festgestellt sei, dass die Beklagten keine Treuhänder des Alpha Trust seien, subeventualiter wolle zwischen den Parteien festgestellt werden, dass das «Instrument of Appointment of Additional Trustees of the Alpha Trust» vom 31.03.2020 und 16.04.2020 nichtig sowie unwirksam sei und keine Rechtswirkungen entfalten könne.

Begründend brachten die Kläger zusammengefasst vor, dass sie die Treuhänder der unter dem Namen «Alpha Trust» im liechtensteinischen Handelsregister unter der Registernummer FL-0002.510.771 eingetragenen liechtensteinischen Treuhänderschaft seien. Als Treuhänder des Alpha Trust würden sie 100% Anteile an der Savannah Advisors AG halten. Die Savannah Advisors AG könne untechnisch als Tochtergesellschaft des Alpha Trust bezeichnet werden. Die Beklagten würden sich berühmend Treuhänderinnen des Alpha Trust zu sein und als solche vor Behörden und Gerichte in Liechtenstein sowie im Ausland auftreten. Sie würden sich

dabei ausdrücklich auf die Anwendbarkeit der Bestimmung 10.4.1, 10.5 und 14.2, den «dritten Anhang» des Trust Deeds vom 27.05.2015 sowie auf diesen Trust Deed-Bestimmungen basierende Beschlüsse des Ashot Yegiazaryan, wie die «Instruments of Appointment of Additional Trustees» vom 31.03.2020 und 16.04.2020 berufen. Die Beklagten würden daher ihre behaupteten Rechte und Befugnisse vom erwähnten Trust Deed vom 27.05.2015 und dem Settlor des Alpha Trust ableiten.

Am 09.03.2020 seien die Kläger als Treuhänder des Alpha Trust bestellt worden, wobei diese Bestellung auf einer längeren Vorgeschichte und mehreren Gerichtsverfahren sowie -entscheidungen basieren würden. Seither seien keine anderen Personen gültig als Treuhänder des Alpha Trust bestellt worden, womit nur die Kläger daher für den Alpha Trust tätig werden könnten. Die Kläger seien denn auch als einzige Treuhänder des Alpha Trust im Handelsregister eingetragen.

Die Beklagten seien dem gegenüber keine Treuhänderinnen des Alpha Trust, als solche auch im Handelsregister nicht eingetragen und deren unrechtmässig am 23.04.2020 erfolgte Eintragung bereits am 27.04.2020 mit Verfügung des Amtes für Justiz von Amts wegen wieder korrigiert und rückgängig gemacht worden.

Die Kläger hätten gegenüber den Beklagten ein rechtliches Interesse an der Feststellung, dass sie allein die einzigen Treuhänder des Alpha Trust seien. Die Beklagten würden nämlich behaupten, dass sie (zusammen mit Artur Ariapetov, der zwischenzeitlich wieder «zurückgetreten» sei) durch Ashot Yegiazaryan zu Treuhänderinnen des Alpha Trust bestellt worden seien und würden sich auf das erwähnte «Instrument of Appointment of Additional Trustees of the Alpha Trust» vom 31.03.2020 und 16.04.2020 berufen, mit dem sie als angebliche Treuhänderinnen des Alpha Trust benannt worden seien. Die Gesamtrechte des Ashot Yegiazaryan als Begünstigter, Protektor und Treugeber der Alpha Trust sei aber zu diesem Zeitpunkt in Folge des Exekutionsverfahrens zu 08 EX.2016.5802 aber bereits längst rechtskräftig gepfändet und seien diese

gepfändeten Rechte mit Beschluss vom 02.03.2020 zwecks Verwertung an Vitaly Smagin überwiesen worden, der dann die Kläger zu Treuhändern bestellt habe.

Ashot Yegiazaryan habe daher am 31.03.2020 und 16.04.2020 keine neuen Treuhänderinnen für den Alpha Trust bestellen können. Das «Instrument of Appointment of Additional Trustees of the Alpha Trust" vom 31.03.2020 und 16.04.2020 sei daher nichtig und unwirksam. Alle diese Sachverhalte seien den Beklagten bekannt gewesen und trotzdem würden sie sich als Treuhänderinnen gerieren sowie dem Alpha Trust und seiner Tochtergesellschaft Savannah Advisors AG massive Schäden verursachen.

So hätten die Beklagten als Scheintreuhänderinnen auch bei der CMB Monaco interveniert und als Folge dieser Interventionen habe die CMB Monaco der Savannah Advisors AG den Zugriff auf die Vermögenswerte des Alpha Trust von rund USD 210 Mio. verweigert. In Monaco seien aus diesem Grund von der Savannah Advisors AG, der 100%igen Tochtergesellschaft des Alpha Trust, eine Art Summarverfahren gegen die CMB Monaco mit dem Begehren auf Herausgabe der Gelder und Übertragung auf ein Bankkonto bei der Kaiser Partner Privatbank AG in Vaduz, ebenfalls lautend auf die Savannah Advisors AG, eingeleitet worden. Die Beklagten hätten Anträge auf Beitritt als Nebenintervenienten gestellt, dem stattgegeben worden sei. Die CMB Monaco habe Widerklage auf Hinterlegung der Gelder erhoben. Das Gericht in Monaco habe mit Beschluss über die einstweilige Verfügung die Begehren der Savannah Advisors AG abgewiesen und der Widerklage auf Hinterlegung stattgegeben. Die Vermögenswerte der Savannah Advisors AG - und damit das Trustvermögen des Alpha Trust - seien nun bei der CMB Monaco aufgrund dieser gerichtlichen Entscheidung blockiert, bis eine liechtensteinische Entscheidung, in der die Treuhänder bestimmt werden würden, oder eine Vereinbarung der Parteien vorliege. Das Rechtsmittelverfahren hinsichtlich dieser Entscheidung sei noch anhängig.

Das monegassische Gericht verlange damit eine monegassische Exequatur-Entscheidung, der eine ausländische Entscheidung zugrunde liege, in der klargestellt werde, wer Treuhänder des Alpha Trust sei. Die Parteien des monegassischen Verfahrens, in dem die Entscheidung vom 09.11.2020 die Hinterlegung der Vermögenswerte bei der CMB Monaco angeordnet worden sei, seien neben der CMB Monaco die Savannah Advisors AG sowie die Beklagten. Eine entsprechende gerichtliche Entscheidung über die Klarstellung der Treuhändereigenschaft beim Alpha Trust sei daher notwendig, um das Erfordernis des monegassischen Gerichts gemäss Entscheidung vom 09.11.2020 zu erfüllen und damit die Kläger als Treuhänder des Alpha Trust endlich Zugriff auf die im Namen ihrer Tochtergesellschaft Savannah Advisors AG bei der CMB Monaco gehaltenen Vermögenswerte erhalten würden.

Die Kläger als Treuhänder des Alpha Trust hätten daher ein rechtliches Interesse daran, dass im gegenständlichen Verfahren in Liechtenstein am Gerichtsstand und Sitz des Alpha Trust gegenüber den Beklagten abschliessend und endgültig gerichtlich klargestellt werde, dass die Kläger die einzigen Treuhänder des Alpha Trust seien.

Die Kläger führen noch weitere Handlungen der Beklagten an, die Anlass zur gerichtlichen Klärung der Treuhändereigenschaft betreffend den Alpha Trust geben würden. So werde der Antrag der Batliner Wanger Batliner Rechtsanwälte als Vertreter der Erstbeklagten genannt, mit dem jene von Ashot Yegiazaryan als Protektor des Alpha Trust als zusätzliche Treuhänderinnen bestellt worden seien und deshalb deren Eintragung im Handelsregister beantragt werde, wobei aber die rechtskräftige Pfändung der Protektorenrechte verschwiegen worden seien. Das Amt für Justiz habe mit Verfügung vom 27.04.2020 sodann die unzulässige Eintragung der Erstbeklagten von Amts wegen rückgängig gemacht. Eine hiergegen von der Erstbeklagten erhobenen Beschwerde sei mit Beschluss der VBK vom 15.12.2020 für zurückgenommen erklärt worden. In Nevis habe die Erstbeklagte als Scheintreuhänderin mit Antrag vom

20.07.2020 sich in das Verfahren eingeschaltet und u. a. ihre Zulassung als Partei sowie ihre Eintragung als Direktorin der Savannah Advisors AG beantragt, wobei mit Entscheidung vom 18.09.2020 dieser Antrag vollumfänglich abgewiesen worden sei. Auch im anhängigen Prozess zwischen Vitaly Smagin und dem Alpha Trust zu 04 CG.2019.5 hätten die Beklagten den Parteibeitritt als streitgenössische Nebenintervenienten erklärt und würden auch in diesem Verfahren in unzulässigerweise behaupten, dass sie als (Mit-) Treuhänderinnen des Alpha Trust mit Beschluss des Ashot Yegiazaryan vom 31.03.2020 bzw. 16.04.2020 bestellt worden seien.

Überdies hätten die Beklagten die Anwaltskanzlei Niederer Kraft Frey AG in Zürich mandatiert, die an die Kläger herangetreten sei und in jenem Schreiben haltlose Vorwürfe und Behauptungen erhoben hätten, und zwar, dass die Beklagten Treuhänderinnen des Alpha Trust seien und es seien den Klägern auch strafrechtliche Schritte in diesem Schreiben angedroht worden sowie auf diffamierende und standeswidrige Art und Weise um Übermittlung aller Dokumente, wie insbesondere der Aktien der Savannah Advisors AG, aufgefordert worden.

Die Beklagten würden sich daher entgegen der klaren Sach- und Rechtslage sowohl in Liechtenstein als auch im Ausland in unzulässiger Weise als Treuhänderinnen des Alpha Trust berühmen und seien Alpha Trust sowie der Savannah Advisors AG fortlaufend entsprechenden Angriffen ausgesetzt, weshalb ein für alle Mal durch ein Gericht für die Rechtsbeziehungen zwischen den Streitparteien in Bezug auf den Alpha Trust Klarheit zu schaffen sei. Aus all diese Gründen hätten die Kläger ein aktuelles rechtliches Interesse an der Klärung der Treuhändereigenschaft betreffend den Alpha Trust.

Mit hg. am 21.12.2022 eingereichtem vorbereitenden Schriftsatz (ON 106) äusserten sich die Kläger wie folgt:

In ihrer Klagebeantwortung würde die Zweitbeklagte keinen anderen Sachverhalt behaupten, sondern nur eine andere Rechtswirkung. Es hätte zahlreiche Gerichtsentscheidungen gegeben, die zur Bestellung der Kläger als Treuhänder des Alpha Trusts geführt hätten.

Im Exekutionsverfahren zu 08 EX.2016.839 sei der Ausgangspunkt ein Betrug von Ashot Yegiazaryan an Vitaly Smagin gewesen, der infolge zur rechtskräftigen Verurteilung des Ashot Yegiazaryan in Russland und seiner Flucht in die USA geführt habe. Dieser Betrug habe zum Schiedsurteil vom 11.11.2014 vor dem London Court of International Arbitration geführt. Im Zuge der Vollstreckung dieses Schiedsurteiles habe Vitaly Smagin zunächst die Begünstigtenrechte des Ashot Yegiazaryan am Alpha Trust gepfändet. Die Exekution sei mit dem erwähnten Beschluss bewilligt und auch letztinstanzlich vom Staatsgerichtshof bestätigt worden. Für die Bestellung als Treuhänder sei dieses Verfahren allerdings nicht entscheidend gewesen.

Im Zuge einer weiteren Vollstreckung des Schiedsurteils zu 08 EX.2016.5802 habe Vitaly Smagin die Gesamtrechte des Ashot Yegiazaryan als Treugeber, Protektor und Begünstigter des Alpha Trusts gepfändet; auch dieser Beschluss sei letztinstanzlich vom Staatsgerichtshof bestätigt worden. Es seien konkrete Gesamtrechte mit Beschluss des Fürstlichen Landgerichts vom 21.11.2016 zu 08 EX.2016.5802-3 gepfändet worden. Nachdem dieser rechtskräftig sei, erübrige sich eine Diskussion zur Richtigkeit. Die Verwertung der Gesamtrechte seien mit Beschluss des Fürstlichen Landgerichts vom 02.03.2022 zu 08 EX.2016.5802-109 bewilligt worden, konkret durch Ermächtigung der Ausübung dieser Rechte durch Vitaly Smagin. Der Beschluss sei sofort vollstreckbar gewesen. Der Verwertungsbeschluss (ON 109 im dortigen Exekutionsverfahren) wurde vom Fürstlichen Obergericht mit Beschluss vom 15.09.2020 (dortige ON 143) berichtigt, mit dem Beschluss des Fürstlichen Obergerichts vom 15.12.2020 (ON 152) vollumfänglich bestätigt und auch diese Entscheidung sei letztinstanzlich vom Staatsgerichtshof bestätigt worden.

Vitaly Smagin habe die ihm überwiesenen Rechte ausgeübt, indem er am 09.03.2020 den Beschluss fasste, dass die CTX Treuhand AG mit sofortiger Wirkung als Treuhänderin des Alpha Trust abberufen werde und die Herren Rudolf Schächle und Raphael Näscher gemeinsam mit sofortiger Wirkung zu Treuhändern des Alpha Trusts bestellt werden. Die Kläger hätten die Bestellung am gleichen Tag angenommen. Die Pfändung der Gesamtrechte sei nach wie vor nicht aufgehoben. Die Beklagten würden auch keine Aufhebung geltend machen.

Die Argumentation der Zweitbeklagten sei grob unrichtig und bereits mehrfach von den Ämtern und Gerichten rechtskräftig verworfen worden. Die Zweitbeklagte meine, die Kläger wären nicht Treuhänder des Alpha Trusts, weil sich sowohl die Exekutionsbewilligung (08 EX.2016.5802-39), als auch der Verwertungsbeschluss (08 EX.2016.5802-109) auf die der gegenüber CTX Treuhand AG als Treuhänderin des Alpha Trust zustehenden Gesamtrechte richte, was gemäss der Zweitbeklagten bedeutet, dass nur Rechte gegenüber der CTX Treuhand AG und nicht gegenüber dem Trust, wie eben jedem Treuhänder, bedeute. Weiters führe die Zweitbeklagte aus, dass Vitaly Smagin am 09.03.2020 durch die Abberufung der CTX Treuhand AG die gepfändeten Gesamtrechte ausgeübt habe. Mit dem Ausschreiben der CTX Treuhand AG habe es keine weiteren gepfändeten Gesamtrechte mehr gegeben. Die Abberufung der CTX Treuhand AG hätte gemäss der Zweitbeklagten zeitlich vor der beabsichtigten Neubestellung der Kläger als Treuhänder stattgefunden, womit alle Rechte des Ashot Yegiazaryan wiederaufgelebt seien.

Diese grundsätzliche Theorie der Zweitbeklagten sei unrichtig. Tatsächlich würden die Formulierungen in den Exekutionsbeschlüssen schlicht den Regeln des Exekutions- und Trustrechts folgen. So würde der Spruch des Verwertungsbeschlusses zu 08 EX.2016.5802-109, Seite 1, Ziff. 1, Punkt 1, lauten «Die Verwertung der mit Exekutionsbewilligung (...) gepfändeten, der verpflichteten Partei als Treugeber, Protektor und Begünstigter des Alpha Trusts (...) gegenüber der CTX Treuhand AG als Treuhänderin des

Alpha Trusts (...)». Der Zusatz «als Treuhändern des Alpha Trusts» bedeute keine Einschränkung der Rechte auf die CTX Treuhand AG, sondern sei allein darauf zurückzuführen, dass der Trust selbst keine Rechtsperson sei. Es handle sich somit um eine exekutionsrechtliche Notwendigkeit, dass im Spruch die Verwertung der gepfändeten Rechte «gegenüber der CTX als Treuhänderin» zur korrekten Bezeichnung der damaligen Drittschuldnerin ausgesprochen werde. Auch habe dies der Oberste Gerichtshof im konkreten Verfahren zu 08 EX.2016.5802-72 unter Ziff. 7.1.1. ausdrücklich festgehalten. Ungeachtet dessen nehme die Formulierung im Verwertungsbeschluss (ON 109) sogar explizit Bezug auf die alten oder neuen Treuhänder: «von der gegenwärtigen oder neu bestellten Treuhänderin des Alpha Trusts (...)» (08 EX.2016.5802-109, Seite 3 und 4, Spruchpunkte 1.1. c und 1.1. d).

Bezüglich des Ablaufes argumentiere die Zweitbeklagte überspitzt formalistisch. Ihrer Ansicht zur Folge habe die Abberufung der CTX Treuhand AG zeitlich vor der Neubestellung der Kläger stattgefunden, weil die Abberufung im Beschluss des Vitaly Smagin vom 09.03.2020 unter Ziff. 1 geschah und die Neubestellung unter Ziff. 2 erfolgt sei. Mit der Abberufung der CTX Treuhand AG seien die Gesamtrechte vollständig ausgeübt worden laut der Zweitbeklagten.

Die Abberufung der CTX Treuhand AG und die Bestellung der Kläger als neue Treuhänder des Alpha Trusts sei aber gemäss den Klägern natürlich gleichzeitig mit demselben Beschluss am 09.03.2020 erfolgt. Eine Reihenfolge lasse sich aus dem Beschluss nicht herauslesen. Das Gericht müsse auch keine Aufzählung einzelner in Betracht kommender Rechtshandlungen vornehmen und schon gar keine Reihenfolge der auszuübenden Rechtshandlungen anordnen. Die Zweitbeklagte könne damit nicht die Einhaltung einer bestimmten Reihenfolge von Rechtshandlungen verlangen. Das Fürstliche Landgericht habe auch explizit im Verfahren zu 08 EX.2016.5802-109 erklärt, dass dem Verpflichteten das Recht der Bestellung und Abberufung der Treuhänder zustehe, ohne dass irgendeine Voraussetzung vorliegen müsse. Die

Pfändung der Gesamtrechte von Ashot Yegiazaryan als Treugeber, Protektor und Begünstigter des Alpha Trusts sowie deren Überweisung zur Verwertung würden damit auch nach der Abberufung der CTX Treuhand AG aufrecht bleiben und hätten nach der Bestellung der neuen Treuhänder weiterhin Bestand. Dies solange, bis das Exekutionsverfahren beendet bzw. z. B. der betreibende Gläubiger befriedigt werde.

Ändere sich der Treuhänder, sei dies ein Fall der Gesamtrechtsnachfolge des Drittschuldners, bei dem die neuen Treuhänder des Treugut mit allen Belastungen übernehmen wie sie zuvor bestanden hätten. Aus Art. 911 Abs. 4 PGR folge, dass bei Abberufung des alten und Bestellung des neuen Treuhänders diese im Wege der Gesamtrechtsfolge in die Rechte und Pflichten des Treuhandverhältnisses eintrete.

Die Kläger seien damit uno actu und ipso iure in die Rechte und Pflichten der CTX Treuhand AG als Treuhänder des Alpha Trusts eingetreten, ohne dass es einer besonderen Handlung oder eines gerichtlichen Beschlusses bedurft hätte.

Seitens der Bestellung der neuen Treuhänder hätten die liechtensteinischen Gerichte und Behörden diese mehrfach rechtlich beurteilt.

Im Exekutionsverfahren zu 08 EX.2016.5802 sei der Treuhänderwechsel auch sofort und problemlos akzeptiert worden und es sei der Verwertungsbeschluss (ON 109 im dortigen Verfahren) ergangen. Dies sei auch vom Fürstlichen Obergericht bestätigt und in der Begründung des Beschlusses des Fürstlichen Obergerichts (ON 152) der korrekte Treuhänderwechsel auch konkret angesprochen worden.

Die Kläger seien im Handelsregister beim Amt für Justiz als Treuhänder auch eingetragen. Die Erstbeklagte habe versucht sich als Treuhänderin des Alpha Trust im Handelsregister eintragen zu lassen, wobei dies versehentlich auch für einen Moment geschehen sei, das Amt für Justiz

habe aber diese Eintragung sofort von Amtswegen rückgängig gemacht. In der entsprechenden Verfügung sei auch auf die Exekutionsbewilligung und den Verwertungsbeschluss zu 08 EX.2016.5802 hingewiesen und explizit festgehalten worden, dass es Ashot Yegiazaryan untersagt sei, für den Alpha Trust Treuhänder zu bestellen und abzuberufen. Der Antrag zur Eintragung der zusätzlichen Treuhänderin sei rechtskräftig abgewiesen worden.

Im Verfahren zu 07 HG.2020.93-6 habe das Fürstliche Landgericht erwogen, dass es Ashot Yegiazaryan aufgrund der Pfändung seiner (aufrechten) Gesamtrechte an der Aktivlegitimation mangele. Dies sei nach der Verwertung vom 09.03.2020 gewesen. Im Verfahren zu 07 HG.2020.112-9 habe sich der Sohn von Ashot Yegiazaryan, Stefan Yegiazaryan, an das Fürstliche Landgericht als Trustaufsichtsgericht gewandt und habe eine Anordnung geeigneter Massnahmen zur Vermeidung einer Überverwertung beantragt. Das Fürstliche Landgericht habe klare Worte dafür gefunden, dass die Anführung der CTX Treuhand AG im Spruch nicht eine Fixierung bedeute, sondern lediglich die zum damaligen Zeitpunkt korrekte Bezeichnung des gepfändeten Treuhandverhältnisses.

Im rechtskräftigen Urteil zu 05 CG.2020.133-32 sei festgehalten, dass Ashot Yegiazaryan kein Protektor des Alpha Trusts mehr sei und auch sonst seine Gesamtrechte gegenüber des Alpha Trusts verloren habe. Die Gesamtrechte seien rechtskräftig gepfändet und Vitaly Smagin vollstreckbar zur Verwertung überwiesen worden, sodass es Ashot Yegiazaryan an der Sach- und Aktivlegitimation mangele.

Auch in der Rechtssache zu 04 CG.2021.275-30, wo die Kläger als Treuhänder des Alpha Trust die Darlehensrückzahlung von der Tochtergesellschaft des Trusts, der Savannah Advisors AG, begehrt hätten, seien diese aktivlegitimiert gewesen. Im erwähnten Urteil sei rechtskräftig die Feststellung getroffen worden, dass die Kläger die einzigen Treuhänder des Alpha Trusts seien.

Die Idee der Zweitbeklagten bezüglich der Theorie von «exekutiven Teiltreuhänder» sei unrichtig bzw. wäre nicht möglich, weil es eine teilweise Unwirksamkeit nicht geben könne. Entweder seien die Kläger Treuhänder des Alpha Trusts oder eben nicht. Eine Zwischenlösung als «Teiltreuhänder» könne es nicht geben.

Auch der Vorwurf der Zweitbeklagten, die Kläger würden eine «Absolutheit» im Zusammenhang mit dem Alpha Trust begehren, also für immer Treuhänder sein wollen, sei nicht durchdacht. Vitaly Smagin sei von den Gerichten ermächtigt worden, den bisherigen Treuhänder abzuberufen, neue Treuhänder zu bestellen und auch sonst die Protektorenrechte auszuüben. Wenn er das tue, habe das rechtlich die Wirkung eines Protektorenbeschlusses. Was das sei, richte sich nach der Treuurkunde. Der Beschluss bewirke nach Ziff. 14, Punkt 5, der Treuurkunde vom 02.06.2015 den Wechsel des Treuhänders in jeder Beziehung.

Natürlich sei richtig, dass nach Zahlung der Schuld gemäss Exekutionsbeschluss gegen Vitaly Smagin bzw. seine Rechtsnachfolger die Pfändung und Verwertungsbefugnis im Exekutionsverfahren wieder aufgehoben worden wäre. Dies sei ein mögliches Szenario, aber hier nicht relevant. Noch sei nichts bezahlt und alle Exekutionsschritte aufrecht.

Das vorliegende Urteil sei auf Grundlage der gegenwertigen Sach- und Rechtslage zu fällen. Jedes Feststellungsurteil bilde nur die Sach- und Rechtslage zum Zeitpunkt des Schlusses der mündlichen Verhandlung ab. Hätten die Beklagten nicht weiter das Gefühl etwas habe sich geändert, müssten diese eine Klage bzw. Oppositionsklage einbringen.

Die Zweitbeklagte selbst leite ihre eigene Treuhänderstellung allein aus dem «Instrument of Appointment of Additional Trustees of the Alpha Trust» von Ashot Yegiazaryan vom 31.03.2020 und 16.04.2020 ab. Weitere

Ausführungen zur eigenen Treuhänderstellung tätige sie nicht. Wie bereits ausgeführt, habe aber Ashot Yegiazaryan gar kein Bestellungsrecht mehr gehabt. Die Zweitbeklagte lasse auch ausser Acht, dass mit Beschluss des Fürstlichen Landgerichts zu 08 EX.2016.5802-3, Spruchpunkt 2, das Gebot an Ashot Yegiazaryan erlassen worden sei, sich jeder Verfügung über die bezeichneten Gesamtrechte zu enthalten.

Für die Zweitbeklagte wurde mit Beschluss des Fürstlichen Landgerichts vom 12.04.2022 (ON 52) eine Zustellkuratorin in der Person der Mag. iur. Sabine Fröhlich bestellt.

Der Erstbeklagten konnte die Klage gemeinsam mit dem Beschluss des Fürstlichen Landgerichts vom 30.12.2021 (ON 37) betreffend die Aufforderung der Benennung eines Zustellbevollmächtigten nach Art. 9 ZustG im Rechtshilfeweg am 26.07.2022 zugestellt werden (vgl. ON 84).

1.2 Mit hg. am 05.12.2022 eingereichter Klagebeantwortung (ON 98) beantragte die Zweitbeklagte das Klage- sowie die Eventualbegehren unter Kostenfolge abzuweisen. Begründend brachte die Zweitbeklagte zusammengefasst vor, dass es den Klägern an der Aktivlegitimation mangle. Aufgrund des vollstreckbaren Schiedsspruches sei der betreibenden Partei Vitaly Smagin wider die verpflichtete Partei Ashot Yegiazaryan die Exekution zur Hereinbringung der vollstreckbaren Forderung von USD 72'243'000.00 (in der Hauptsache), USD 6'899'701.32 (an kapitalisierten Zinsen) sowie noch ein Betrag an Kosten und Zinsen durch u. a. Pfändung der der verpflichteten Partei als Treugeber, Protektor und Begünstigter des Alpha Trusts gegenüber der CTX Treuhand AG als Treuhänderin des Alpha Trusts zustehenden und im Spruch der Exekutionsbewilligung vom 21.11.2016 zu 08 EX.2016.5802-3 näher bezeichneten Gesamtrechte, darunter insbesondere das Recht zur Bestellung und Abberufung der Treuhänder des Alpha Trusts, bewilligt worden.

Mit Beschluss des Fürstlichen Landgerichts vom 02.03.2020 zu 08 EX.2016.
5802-109 sei die Verwertung der mit Exekutionsbewilligung des Fürstlichen
Landgerichts vom 21.11.2016 zu 08 EX.2016.5802-3 gepfändeten, der
verpflichteten Partei als Treugeber, Protektor und Begünstigter des Alpha
Trusts, gegenüber der CTX Treuhand AG als Treuhänderin des Alpha
Trusts, zustehenden Gesamtrechte, nämlich insbesondere u. a. des
Rechts zur Bestellung und Abberufung der Treuhänder des Alpha Trusts,
bewilligt worden, und zwar durch Ermächtigung der betreibenden Partei,
die im Verwertungsbeschluss des Fürstlichen Landgerichts vom 02.03.2020
zu 08 EX.2016.5802-109 näher bezeichneten Gesamtrechte anstelle des
Verpflichteten geltend zu machen.

Mit der vorliegenden Klage würden die Kläger nun zusammengefasst
begehren, zwischen Ihnen und den Beklagten solle festgestellt werden,
dass sie die einzigen Treuhänder des Alpha Trusts seien. Ihre Rechte als
Treuhänder des Alpha Trusts würden die Kläger daraus ableiten, dass sie
von Vitaly Smagin am 09.03.2020 zu Treuhändern des Alpha Trusts bestellt
worden seien, wobei Vitaly Smagin gemäss Beschluss des Fürstlichen
Landgerichts vom 02.03.2020 zu 08 EX.2016.5802-109 ermächtigt worden
sei, bestimmte Rechte des Protektors des Alpha Trusts auszuüben, was
das Recht gemäss Ziff. 10.05 der Treuurkunde in der Fassung vom
02.06.2015 einschliesse, durch schriftliche Anweisung Treuhänder zu
entlassen und zu ernennen, wie das im Spruch des Gerichtsbeschlusses in
Ziff. 1.1 (a und b) ausdrücklich angeführt sei.

Die Beklagten hingegen würden ihre Treuhänderstellung davon ableiten,
dass sie von Ashot Yegiazaryan mittels «Instrument of Appointment of
Additional Trustees of the Alpha Trust» vom 31.03.2020 und 16.04.2020 zu
Treuhänderinnen des Alpha Trusts bestellt worden seien. Die Kläger seien
der Auffassung, dass diese Bestellung der Beklagten unwirksam sei. Sie
würden aber Mehrfaches verkennen. So sei die Bestellung der Kläger als
Treuhänder des Alpha Trusts gänzlich unwirksam.

Sowohl die Exekutionsbewilligung (08 EX.2016.5802-3), als auch der Verwertungsbeschluss (08 EX.2016.5802-109) würden sich im jeweiligen Spruch auf die Pfändung und Verwertung der gegenüber der CTX Treuhand AG als Treuhänderin des Alpha Trusts zustehenden Gesamtrechte richten. Mit Beschluss vom 09.03.2020 habe Vitaly Smagin die CTX Treuhand AG als Treuhänderin des Alpha Trusts aber bereits wirksam abberufen. Nach der Abberufung der CTX Treuhand AG als Treuhänderin des Alpha Trusts am 09.03.2020 würden keine gegenüber der CTX Treuhand AG als Treuhänderin des Alpha Trusts zustehenden Gesamtrechte mehr bestehen.

Laut Beschluss von Vitaly Smagin vom 09.03.2020 habe die Abberufung der CTX Treuhand AG zeitlich klar vor der (beabsichtigten) Neubestellung der Kläger als Treuhänder des Alpha Trusts stattgefunden. Die in Ziff. 1 des genannten Beschlusses genannte Abberufung der CTX Treuhand AG sei der Neubestellung der Kläger in Ziff. 2 des genannten Beschlusses vorgelagert. Mit der Abberufung der CTX Treuhand AG als Treuhänderin laut Ziff. 1 des Beschlusses von Vitaly Smagin vom 09.03.2020 seien die gegenüber der CTX Treuhand AG als Treuhänderin des Alpha Trusts zustehenden Gesamtrechte (die gepfändet worden seien) abschliessend ausgeübt worden.

Mit dem Ausscheiden der CTX Treuhand AG als Treuhänderin des Alpha Trusts habe es keine weiteren gepfändeten Gesamtrechte mehr gegeben, die dem Vitaly Smagin gegenüber der CTX Treuhand AG als Treuhänderin des Alpha Trusts zustehen würden. Die gepfändeten Gesamtrechte, die Vitaly Smagin gegenüber der CTX Treuhand AG zustehen würden, seien daher mit der Abberufung erschöpft.

Vitaly Smagin habe die in der Exekutionsbewilligung zu 08 EX.2016.5802-3 vorgezeichnete Abfolge, und zwar nämlich «Bestellung und Abberufung der Treuhänder des Alpha Trusts» laut Spruch, nicht eingehalten, weil er eben nicht zunächst die Kläger als Treuhänder bestellt und dann die CTX Treuhand AG als Treuhänderin des Alpha Trusts abberufen habe, sondern

genau umgekehrt. Damit habe aber die Neubestellung der Kläger als Treuhänder des Alpha Trusts gerade ausserhalb der gepfändeten Gesamtrechte stattgefunden und sei daher nicht wirksam, weshalb es den Klägern an der erforderlichen Aktivlegitimation fehle.

Jedenfalls sei die Bestellung der Kläger als Treuhänder des Alpha Trusts zumindest teilweise unwirksam, denn die Kläger würden übersehen, dass es sich beim Pfandrecht um ein blosses Sicherungsrecht handle, das nicht über die gesicherte Forderung hinausgehe. Was Art. 288 SR explizit für die Grundpfandrechte bestimme, gelte nach herrschender Lehre und Rechtsprechung auch für alle Pfandrechte, und zwar habe gemäss Art. 288 Abs. 1 SR ein Gläubiger ein Recht darauf, im Falle der Nichtbefriedigung sich aus dem Erlös des Grundstückes bezahlt zu machen. Gemäss Art. 288 Abs. 2 SR sei eine Abrede, wonach das Grundpfand dem Gläubiger, wenn er nicht befriedigt werde, als Eigentum zufallen solle, ungültig. Der aus dem Pfandrecht Berechtigte habe also lediglich die Befugnis im Falle der Nichtzahlung einer Schuld die gepfändete Sache (oder das gepfändete Recht) zu verwerten oder verwerten zu lassen und sich aus dem Erlös bezahlt zu machen.

Die nunmehrige Feststellung der Kläger gehe aber weit über die von ihnen selbst behauptete Befugnis, die sich aus der Pfändung von Gesamtrechten im Verfahren zu 08 EX.2016.5802 ableite, hinaus, weil das Klagebegehren keinerlei Beschränkung auf die Hereinbringung der ihrer angeblichen Stellung als Treuhänder des Alpha Trusts zugrundeliegenden, hereinzubringenden Forderung enthalte, denn die Kläger würden ihre angebliche Stellung von derjenigen von Vitaly Smagin ableiten. Dieser wiederum leite seine Rechte aus dem Beschluss zu 08 EX.2016.5802 ab, indem ihm zur Hereinbringung seiner in 08 EX.2016.5802-3 genau bezeichneten Forderung ein Pfandrecht an den dort bezeichneten Gesamtrechten von Ashot Yegiazaryan eingeräumt worden sei.

Ein Pfandrecht verleihe aber kein Eigentum und es verhalte sich akzessorisch zur gesicherten Forderung. Mit Erfüllung der gesicherten

Forderung gehe auch das darauf lastende Pfandrecht unter. Die
begehrte Feststellung sei insofern völlig unberechtigt und mangle es den
Klägern daher zumindest teilweise an der Aktivlegitimation, als dass die
begehrte Feststellung in keiner Weise die jedenfalls gebotene
Beschränkung auf die gesicherte Forderung enthalte; dasselbe gelte für
die (Sub-) Eventualbegehren.

Denn würde antragsgemäss festgestellt werden, dass die Kläger (die
einzigen) Treuhänder des Alpha Trusts seien, ginge diese Feststellung weit
über die von den Klägern selbst behauptete Berechtigung hinaus, die ja
nur insofern gültig sein sollte, als dies zur Befriedigung der betriebenen
Forderung gemäss Exekutionsbewilligung zu 08 EX.2016.5802-3 nötig sei.
Wenn die Treuhänderstellung der Kläger überhaupt – was bestritten
bleibe – gerechtfertigt sei, dann jedenfalls nur in dem Ausmass zur
Realisation von der betriebenen Forderung, nicht etwa in der begehrten
Absolutheit und damit bezogen auf die gesamten von den Klägern
behaupteten Vermögenswerte des Alpha Trusts von ca. USD 200 Mio.
Das Klagebegehren sei daher jedenfalls in dem Umfang abzuweisen, als
dass die (angebliche) Treuhänderstellung die Verfügungsmacht über die
Vermögenswerte beinhalte, die über die im Exekutionsverfahren zu 08
EX.2016.5802 gesicherte Forderung in der Hauptsache, der kapitalisierten
Zinsen sowie an Kosten, Zinsen und weiterer Kosten des
Exekutionsverfahrens hinausgehe.

1.3 Am 21.12.2022 erklärte Ashot Yegiazaryan seinen <u>Beitritt als
Nebenintervenienten</u> (ON 107), der mit Beschluss des Fürstlichen
Landgerichts vom 22.12.2022 für zulässig erklärt wurde (ON 108).

Der Nebenintervenient erhob die Einrede der Unzuständigkeit und
brachte dazu vor, dass die Kläger ihre Zuständigkeit auf die Gericht-
standsklausel in Ziff. 2.2 der Treuhandurkunde des Alpha Trusts gründen
würden. Gemäss Klagsvorbringen soll es sich bei den Beklagten aber
gerade nicht um Treuhänderinnen und damit um keine Parteien des
Alpha Trusts handeln. Die Unzuständigkeit werde aufgrund der Nichtigkeit

des Alpha Trusts begründet. Zum Verfahren vor dem Fürstlichen Landgericht zur Aktenzahl 04 CG.2019.5-185 sei behauptet worden, dass Ashot Yegiazaryan niemals Treugeber des Alpha Trusts gewesen sei. Es sei daraufhin die Declaration of Trust untersucht worden und es würde sich ergeben, dass sich dort überhaupt keine Angaben zu einem Treugeber des Alpha Trusts finden würden, sondern sei es bloss eine einseitige Erklärung des Treuhänders. Auf Seite 1 der Declaration sei definiert, dass die CTX Treuhand AG als „the trustees", also als Treuhänderin, aufgetreten sei und nicht als Treugeberin („settlor"). Es würden sich aus der Declaration keine Angaben zum Treugeber des Alpha Trusts ergeben. Im Übrigen hätten die Kläger die Sanktionsverordnung vom 10.03.2022 über die Massnahmen im Zusammenhang mit der Situation in der Ukraine verletzt, zumal gemäss eigenem Vorbringen diese von Vitaly Smagin, einem Russen mit Wohnsitz in Russland, bestellt, dem die Gesamtrechte des Alpha Trusts überwiesen worden seien. Die Kläger seien damit als Treuhänder für Vitaly Smagin tätig, was ein Verstoss gegen die Sanktionsverordnung gegenüber Russland sei (Art. 29 Abs. 2 iVm Abs. 1), weil man als Treuhänder für einen Trust nicht handeln dürfe, wenn Treugeber oder Begünstigte des Trusts russische Staatsangehörige oder in der russischen Föderation ansässige natürliche Personen seien, was beides auf Vitaly Smagin zutreffen würde.

1.4 Die Kläger brachten dem entgegen (ON 113), dass sich die Frage, ob jemand Partei eines Trusts sei, sich nicht nach dem Klagsvorbringen richten würde. Ziff. 2.2 des Wortlautes der Treuhandurkunde lautet: „(...) die Rechte aller Parteien sowie die Auslegung und Wirkung der einzelnen Bestimmungen unterliegen der ausschliesslichen Gerichtsbarkeit des Fürstentum Liechtenstein und werden nur nach dem Recht des Fürstentum Liechtenstein ausgelegt". Die Bestellungsbeschlüsse des Nebenintervenienten für die Beklagten würden gerade auf der Treuhandurkunde basieren. Ob diese Bestellungsbeschlüsse Wirkung entfalten würden, gelte es im vorliegenden Rechtsstreit gerade zu beurteilen. Die Auslegung und Wirkung der Bestimmungen des Treuhandvertrages würden der ausschliesslichen liechtensteinischen

Gerichtsbarkeit unterliegen. Unstrittig sei, dass die vormalige Treuhänderin CTX Treuhand AG keine Treuhänderin (mehr) des Alpha Trusts sei. Es müsse also irgendeinen Rechtsnachfolger geben und tatsächlich seien dies die Kläger. Die Gerichtstandsklausel zu Ziff. 2.2 sei gemäss Wortlaut und Sinn jedenfalls anwendbar und damit das Fürstliche Landgericht für den Rechtsstreit zuständig. Die Beklagten würden sich mehrfach selbst als „Parteien" und „Treuhänderinnen" (des Alpha Trusts) bezeichnen, sodass sowohl der formelle, als auch der materielle Parteibegriff der vorliegenden Gerichtstandsklausel (Ziff. 2.2) erfüllt sei.

Es würde keine Nichtigkeit des Alpha Trusts vorliegen. Der Alpha Trust sei im Handelsregister eingetragen und es sei auch nicht strittig, dass der Nebenintervenient die CTX Treuhand AG mit der Errichtung des Alpha Trusts beauftragt habe. Der Nebenintervenient bleibe wirtschaftlicher Gründer. Die CTX Treuhand AG habe den Trust fiduziarisch für ihn mit Treuhandurkunde errichtet, was zulässig gewesen sei. Damit sei die CTX Treuhand AG (die zivil-) rechtliche Treugeberin, und zwar dazumal einzige Treuhänderin, was zulässig und praxisüblich sei. Die Errichtung des Trusts sei daher rechtswirksam gewesen und leide an keiner Nichtigkeit.

Es sei keine Frage der Gerichtstandsvereinbarung, ob die zugrunde-liegende Treuhandvereinbarung nichtig sei oder nicht. Die Gerichtstands-klausel teile das Schicksal der materiellrechtlichen Hauptvereinbarung und bleibe unabhängig davon bestehen, ob die Hauptvereinbarung bestritten, ihr Bestand verneint oder ihre Auflösung begehrt werde. Die Gerichtstandsklausel könne daher nicht aus materiellrechtlichen Gründen, wie etwa der Nichtigkeit des Trusts, bekämpft werden.

Im Übrigen habe das Fürstliche Landgericht eine positive Vorprüfung der Zuständigkeit vorgenommen, ansonsten hätte es die Klage a limine zurückweisen müssen.

Ausserdem würde eine Verfristung der Einrede der Unzuständigkeit vorliegen, weil sich die Zweitbeklagte bereits in den Rechtsstreit gemäss §

251 ZPO iVm § 53 Abs. 3 JN eingelassen habe. Die Zweitbeklagte habe bereits die Klagebeantwortung eingereicht (vgl. ON 98), es seien auch in der Hauptsache verhandelt, ein Beweisbeschluss gefasst und Vergleichsgespräche geführt worden. Der Nebenintervenient müsse den Rechtsstreit in jeder Lage des Rechtsstreites annehmen, in der sich derselbe zur Zeit seines Eintritts befinden würde. Die Säumnisfolgen der Zweitbeklagten könne der Nebenintervenient daher nicht rückgängig machen.

Die Kläger erheben weiters den Vorwurf des Rechtsmissbrauchs, zumal die Beklagten sagen würden, sie seien Treuhänderinnen und nunmehr aber behaupten, dass das Fürstliche Landgericht nicht zuständig sei.

Die Kläger hätten auch nicht gegen die Sanktionsordnung verstossen, weil sie sämtliche Meldepflichten erfüllt hätten.

1.5    Hierzu brachte der <u>Nebenintervenient</u> ergänzend vor (ON 121), dass die Kläger beim Argument der Rechtsnachfolge übersehen würden, dass die Rechtsnachfolge urkundlich nachgewiesen werden müsse, sofern die Zuständigkeitsvereinbarung nicht zwischen den Streitteilen selbst abgemacht worden sei. Auch wenn dieser urkundliche Nachweis gelingen würde, sei die Klage inhaltlich abzuweisen, weil als Rechtsnachfolger der CTX Treuhand AG in Bezug auf die „Declaration of Trust" die Beklagten gerade Treuhänderinnen des Alpha Trusts sein würden.

Die „Declaration of Trust" sei gerade kein Vertrag. Auch wenn die Gerichtstandsklausel nicht das Schicksal der Hauptvereinbarung teilen und unabhängig davon bestehen bleiben würde, ob die Hauptvereinbarung bestritten, ihr Bestand verneint oder ihre Auflösung begehrt werde, so müsse aber auch die Zuständigkeitsvereinbarung zwingend zwischen den Parteien des Prozesses abgeschlossen werden, was hier gerade nicht so sei. Die Kläger würden selbst vorbringen, dass in die Errichtung nur die CTX Treuhand AG als Treugeberin und Treuhänderin mitgewirkt habe.

Die Zuständigkeit Liechtensteins könne nicht aus dem monegassischen Urteil abgeleitet werden.

1.6 Die Kläger hielten dem entgegen (ON 124), dass die Zweitbeklagte gerade meine, Partei zu sein, auch Partei des Alpha Trusts sein wolle und ihre Rechtsstellung explizit auf die Klauseln der Treuhandurkunde (Beilage B) stützen würde. Sie gestehe auch ein, dass die Bestellungsbeschlüsse auf der Treuhandurkunde basieren würden. Noch eindeutiger könne man es nicht sagen.

Weiters seien nach Ansicht der Kläger auch weitere andere Gerichtsstandtatbestände einschlägig, so der Gerichtsstand des Vermögens nach § 50 JN, zumal der Alpha Trust im Inland über Vermögen in Form von 100%igen Aktienanteilen an ihrer liechtensteinischen Tochtergesellschaft, der Savannah Advisors AG, habe und die Aktien seien in Liechtenstein belegen. Das Feststellungsbegehren der Kläger würde auch die Klärung der Eigentumsverhältnisse an der Savannah Advisors AG beinhalten, zumal die rechtswirksamen Treuhänder über das Treuhandgut verfügen dürften. Diese potentiellen Forderungen der Beklagten, die sich auf den Standpunkt stellen, sie seien die Treuhänderinnen und hätten damit einen Anspruch auf Übertragung der Aktien an der Savannah Advisors AG, würde Vermögen iSd § 50 Abs. 1 erster Fall JN darstellen.

Weiters sei auch § 50 Abs. 1 zweiter Fall JN gegeben, zumal der Alpha Trust in Liechtenstein Alleinaktionärin an der in Liechtenstein domizilierten Savannah Advisors AG sei, deren Aktien sich im Inland befinden würden. Dieses Rechtsverhältnis befinde sich damit jedenfalls im Inland. Weiters sei auch der Gerichtsstand für Klagen gegen Ausländer nach § 52 JN gegeben, weil das Feststellungsbegehren auch vor französischen Gerichten verfolgt werden könnte.

Zur Rechtzeitigkeit der Unzuständigkeitseinrede brachten die Kläger weiters ergänzend vor, dass es auf die Reihenfolge der Protokollierung

von Parteivorträgen gerade nicht ankomme, daran ändere auch der Mündlichkeitsgrundsatz nichts. Aus ON 108 ergebe sich, dass die Klagebeantwortung (ON 98) zeitlich nach Eingang des Antrages auf aktorische Kaution (ON 96) vorgelegen habe und einvernehmlich festgehalten worden sei, dass die Tagsatzung nach Entscheid über die aktorische Kaution direkt fortgesetzt werden würde. Es sei sodann in der Tagsatzung die Klagebeantwortung thematisiert worden, worauf die Kläger replizierten (ON 106). Erst danach sei die Unzuständigkeitseinrede vom Nebenintervenienten erhoben und protokolliert worden (ON 107 und 108). Gegen die Protokollierung hätten weder die Zweitbeklagten-vertreterin, noch der Nebenintervenientenvertreter Einwände erhoben. Richtigerweise sei zur Beurteilung der Rechtzeitigkeit der Unzuständigkeits-einrede nur darauf abzustellen, wann tatsächlich inhaltlich zur Sache vorgetragen worden sei. Ein solcher Sachvortrag könne sowohl schriftlich wie mündlich erstattet werden. In ihrer Klagebeantwortung (ON 98) habe die Zweitbeklagte nicht ausgeführt, dass sie diese vor Einlassung in die Sache erstattet habe, beim Kautionsantrag hingegen schon. Sie habe auch in ihrer Klagebeantwortung keine Unzuständigkeitseinrede erhoben und damit nicht spätestens vor Einlassung der Sache und damit nicht mit der Klagebeantwortung die Einrede erhoben, weshalb die Unzuständig-keitseinrede wegen Verspätung zu verwerfen sei.

Die Beklagten würden auch keine notwendige Streitgenossenschaft bilden, weil sie durchaus auch separat hätten klagen können.

Die Gerichtstandsklausel Ziff. 2.2 der Treuhandurkunde greife deshalb, weil die beklagten Parteien gemäss dem Vorbringen der Zweitbeklagten Parteien des Alpha Trusts seien.

Der Sachverhalt im Zusammenhang mit dem Bestellungsvorgang zwischen den Parteien sei unstrittig; lediglich in Bezug auf die Rechts-folgen seien sich die Parteien uneinig. Auch nach liechtensteinischem Recht sei die Errichtung einer Treuhänderschaft der «Declaration of Trust» zwingenderweise zu bejahen. Völlig unstrittig sei auch, dass der Trust

durch eine Erklärung der CTX Treuhand AG im Auftrag des Neben-
intervenienten errichtet worden sei.

Spätestens mit Zustellung der Klage seien die Beklagten Verfahrens-
beteiligte gewesen.

Anlässlich der Tagsatzung vom 06.03.2023 (ON 126) führt die Zweit-
beklagtenvertreterin über Aufforderung aus, dass, sollten in ihrem
eigenen Vorbringen Widersprüche bestehen, sie ausdrücklich erklären
würde, dass anstatt des eigenen bisher erstatteten Vorbringens dasjenige
des Nebenintervenienten gelten solle, genauso wie das entsprechende
Beweisanbot.

1.7 In diesem Verfahren wurde mit hg. am 05.12.2022 eingereichtem
Schriftsatz (ON 98) die Klagebeantwortung der Zweitbeklagten einge-
bracht. Diese machte keine Unzuständigkeitseinrede geltend. Am
21.12.2022 erklärte Ashot Yegiazaryan seinen Beitritt als Nebeninter-
venient (ON 107). Anlässlich der Tagsatzung vom 22.12.2022 (ON 108)
stellte die Zweitbeklagte den Antrag der Auferlegung einer aktorischen
Kaution wie bereits in ON 96. Sodann wurde der Schriftsatz zum Beitritt der
Nebenintervention dargetan und die Gleichschriften dem Klagsvertreter
sowie der Vertreterin der Zweitbeklagten ausgehändigt. Anschliessend
wurde der Beitritt zum einfachen Nebenintervenienten des Ashot
Yegiazaryan für zulässig erklärt. Der Antrag des einfachen Nebeninter-
venienten betreffend die Auferlegung der aktorischen Kaution wurde in
weiterer Folge zurückgewiesen. Nach dem Thema Streitwertbemäng-
elung und Festlegung des Streitwerts für die Feststellungsklage mit CHF
30'000.00 wurde im Protokoll explizit festgehalten, dass die Klagebeant-
wortung der Zweitbeklagten mit ON 98 zeitlich nach Eingang des
Antrages auf aktorische Kaution mit ON 96 im Akt liegt. Es wurde
einvernehmlich festgehalten, dass die Tagsatzung nach Entscheid über
die aktorische Kaution direkt fortgesetzt werden soll (vgl. Seite 14 der ON
108). Eine Gleichschrift der Klagebeantwortung (ON 98) wurde in weiterer
Folge den Klägern in der Tagsatzung übergeben und die Zweit-

beklagtenvertreterin übergab dem Nebenintervenientenvertreter eine Gleichschrift ihrer Klagebeantwortung. Sodann wurde im Protokoll aufgenommen, dass die Kläger bestreiten und weiter vorbringen wie in ON 106. Nachdem dem Nebenintervenientenvertreter eine Äusserungsfrist zur Klagebeantwortung von vier Wochen eingeräumt wurde, wurde auf die Unzuständigkeitseinrede des Nebenintervenienten (ON 107) eingegangen und sowohl dem Klagsvertreter als auch der Zweitbeklagtenvertreterin eine Äusserungsfrist eingeräumt.

1.8   Die Einvernahmen des Ashot und Stefan Yegiazaryan zum Beweisthema der angeblichen Interventionen seitens des Nebenintervenienten waren deshalb abzuweisen, weil dieses Beweisthema für die hier rechtlich relevante Frage, wer einzige Treuhänder des Alpha Trust sind, nicht relevant ist.

Im Übrigen ist dieser Antrag auch wegen Verspätung zurückzuweisen, zumal das Verfahren seit 1,5 Jahren im Gange ist und damit dieses Beweisanbot grob schuldhaft nicht früher vorgebracht wurde. Dasselbe gilt in Bezug auf den Antrag, die Zweitbeklagte im Rechtshilfeweg zu befragen. Die Zweitbeklagtenvertreterin wurde vom Fürstlichen Landgericht bereits mit Schreiben vom 07.02.2023 (ON 117) auf die Folgen des § 375 Abs. 2 ZPO hingewiesen, woraufhin diese antwortete, dass die Zweitbeklagte nicht auf Kontaktversuche der Beklagtenvertreterin reagieren würde und es daher unwahrscheinlich sei, dass diese zur Tagsatzung anreisen werde. Mehr wurde in diesem Zusammenhang nicht ausgeführt. Die Zweitbeklagtenvertreterin wurde auch anlässlich der Tagsatzung vom 06.03.2022 erneut auf § 375 Abs. 2 ZPO hingewiesen. Dies, zumal die Zweitbeklagtenvertreterin erst am 06.03.2023 beantragte, die Zweitbeklagte im Rechtshilfeweg zu befragen, obwohl bereits ein Monat davor auf § 375 Abs. 2 ZPO hingewiesen wurde. Die Zweitbeklagtenvertreterin führte keine Gründe aus, weshalb eine Beweisaufnahme durch einen ersuchten Richter notwendig ist, insbesondere wurde nichts dazu vorgebracht, weshalb dem persönlichen Erscheinen der Zweitbeklagten unübersteigliche Hindernisse entgegen-

stehen oder dasselbe unverhältnismässige Kosten verursachen würden. Der Antrag auf Einvernahme der Zweitbeklagten - gerade von Seiten der Zweitbeklagtenvertreterin - hätte schon viel früher ohne Weiteres erfolgen können. Es sind keine Gründe ersichtlich, weshalb dieser Antrag nicht bereits früher erfolgte. Weiters wurde auch nicht dargetan bzw. bescheinigt, weshalb die Zweitbeklagte überhaupt im Rechtshilfeweg befragt werden solle und nicht an das hiesige Gericht anreisen kann. Die Rechtsfragen in diesem Verfahren, und zwar in Bezug auf die Zuständigkeit sowie die rechtlich relevante Frage, wer beim Alpha Trust die Treuhänder sind, war von Anfang an auch der Zweitbeklagten sowie dem Nebenintervenienten klar und hätten daher die entsprechenden Anträge zu einem viel früheren Zeitpunkt erfolgen können, insbesondere gleich nach der Tagsatzung im Dezember 2022 und nicht erst anlässlich der Tagsatzung vom 06.03.2023. Im Übrigen kennt das vorliegende Verfahren bereits eine geschätzte Verfahrensdauer von 1,5 Jahren, wobei die Zustellkuratorin bereits am 12.04.2022 bestellt wurde. Am 04.10.2022 wurde der Zustellkuratorin die Klage versandt (vgl. ON 82). Die Zweitbeklagtenvertreterin hatte damit mehr als genügend Zeit, den Antrag der Zweitbeklagten auf deren rechtshilfeweise Einvernahme einzubringen bzw. darzutun, weshalb diese nicht beim Fürstlichen Landgericht anreisen kann.

Im Übrigen wurde von Seiten der Zweitbeklagtenvertreterin die Einvernahme der Beklagten für Tatsachen angeboten, die bereits rein basierend auf unstrittigen Urkunden als erwiesen angenommen werden konnten, zumal diese Tatsachen auch unstrittig sind (vgl. ON 98). Aufgrund geklärter Sach- und Rechtslage in Bezug auf die relevante Rechtsfrage, wer die Treuhänder des Alpha Trusts sind, konnte daher aus all diesen Gründen von der Einvernahme sowohl der zweitbeklagten Partei, unabhängig, ob im Rechtshilfeweg oder vor dem Fürstlichen Landgericht, des Nebenintervenienten und des angebotenen Zeugen Stefan Yegiazaryan Abstand genommen werden.

1.9 Im gegenständlichen Verfahren wurde Beweis aufgenommen durch Einsichtnahme in die von den Parteien gelegten <u>Urkunden</u>, nämlich:

1) Urkunden der klagenden Parteien

| | |
|---|---|
| HR-Auszug des Alpha Trust vom 07.12.2020 | Beilage A |
| Treuhandurkunde vom 27.05.2015 | Beilage B |
| Instruments of Appointments of Additional Trustees of 31.03.2020 and of 16.04.2020, i. K. | Beilage C |
| Beschluss von Vitaly Smagin vom 09.03.2020 | Beilage D |
| Annahmeerklärung von Mag. iur. Rudolf Schächle und Mag. iur. Raphael Näscher vom 09.03.2020 | Beilage E |
| Verfügung des Amts für Justiz vom 27.04.2020 | Beilage F |
| Beschluss der VBK vom 15.12.2020 (VBK 2020/35-17) | Beilage G |
| Beschluss der VBK vom 15.12.2020 (VBK 2020/34-13) | Beilage H |
| E-Mail des Vorsitzenden der Beschwerdekommission (an RA Dr. Tschofen) vom 09.02.2021, i. K. | Beilage I |
| Schreiben des Vorsitzenden vom 18.01.2021 samt Kopien der Zustellversuche an die Erstbeklagte | Beilage J |
| Publikation der Verständigung der Hinterlegung im eAmtsblatt vom 23.01.2021, i. K. | Beilage K |
| Affidavit of Service betreffend Murielle Jouniaux vom 03.03.2021 | Beilage L |
| Regus de signification vom 12.11.2021 | Beilage M |
| Signification d'acte et pieces vom 22.11.2021 betreffend Natalia Dozottseva | Beilage N |
| Recepisse de remise d'un acte vom 23.11.2021 betreffend Natalia Dozottseva | Beilage O |
| Signification d'acte et pieces vom 17.11.2021 betreffend Murielle Jouniaux | Beilage P |
| Exekutionsbewilligung vom 21.11.2016 (ON 3) | Beilage Q |
| Beschluss Fürstliches Landgericht vom 02.03.2020 (ON 109) | Beilage R |
| Rekurs samt Antrag auf hemmende Wirkung vom 23.03.2020 | Beilage S |

| | |
|---|---|
| Beschluss Fürstliches Landgericht vom 21.04.2020 (ON 125) | Beilage T |
| Beschluss Fürstliches Obergericht vom 15.09.2020 (ON 143) | Beilage U |
| StGH Urteil vom 29.10.2019 | Beilage V |
| StGH Urteil vom 29.06.2021 | Beilage W |
| Handelsregisterauszug des Alpha Trust vom 09.11.2022 | Beilage X |
| Beschluss des Fürstlichen Landgerichtes vom 24.02.2016 zu 08 EX.2016.839 (ON 4) | Beilage Y |
| Urteil des StGH vom 26.03.2018 zu StGH 2017/29 | Beilage Z |
| Beschluss des Fürstlichen Landgerichtes vom 21.04.2020 zu 08 EX.2016.5802 (ON 125) | Beilage AA |
| Beschluss des Fürstlichen Obersten Gerichtshofes vom 07.09.2018 zu 08 EX.2016.5802 (ON 72) | Beilage AB |
| Brief Fürstliches Landgericht vom 26.08.2020 zu 13 UR.2016.77, ON 360 | Beilage AC |
| Beschluss des Fürstlichen Landgerichtes vom 27.07.2020 zu 07 HG.2020.93 (ON 6) | Beilage AD |
| Beschluss des Fürstlichen Landgerichtes vom 24.08.2020 zu 07 HGJ2020.112 (ON 9) | Beilage AE |
| Urteil des Fürstlichen Obergerichtes vom 09.11.2021 zu 05 CG.2020.133 (ON 32) | Beilage AF |
| Urteil des Fürstliches Landgerichtes vom 12.09.2022 zu 06 CG.2021.275 (ON 30) | Beilage AG |
| Written Statement vom 02.06.2015 | Beilage AH |
| Handelsregisterauszug des Alpha Trusts vom 19.01.2023 | Beilage AI |
| Handelsregisterauszug der Savannah Advisors AG vom 03.11.2022 | Beilage AJ |
| Aktienzertifikat der Savannah Advisors AG Nr. 3 vom 22.07.2021 | Beilage AK |
| Legal Opinion DMLO vom 03.03.2023 samt DeepL-Übersetzung | Beilage AL |

2) Urkunden der zweitbeklagten Partei

Beschluss des Fürstlichen Landgerichts vom 21.11.2016 zu

08 EX.2016.5802, ON 3                                         Beilage 1

Beschluss des Fürstlichen Landgerichts vom 02.03.2020 zu

08 EX.2016.5802, ON 109                                       Beilage 2

3) Urkunden des Nebenintervenienten

Protokoll über die öffentliche mündliche Verhandlung vor
dem Fürstlichen Landgericht vom 10.11.2022 im Verfahren
zu 04 CG.2019.5, ON 185, in Kopie                             Beilage a

4) sowie durch Befragung des Erstklägers (ON 126).

Hinsichtlich der Beweisergebnisse wird auf den Akteninhalt verwiesen (§
417 Abs. 2 ZPO).

# Entscheidungsgründe:

2.  Aufgrund der aufgenommenen Beweise steht der folgende entscheid-
    ungswesentliche **Sachverhalt** als erwiesen fest:

2.1 Am 27.05.2015 erging eine Treuhanderklärung von Seiten der CTX
    Treuhand AG als „Treuhänderin" zur Errichtung des Alpha Trusts.
    (Beilage B)

    Wirtschaftlicher Gründer war Ashot Yegiazaryan. Die CTX Treuhand AG
    errichtete den Alpha Trust fiduziarisch für Ashot Yegiazaryan durch die
    erwähnte Treuhanderklärung. Der Sachverhalts- und Bestellungsvorgang
    ist denn auch zwischen den Parteien unstrittig.

    Unter dem Titel „Anzuwendendes Recht, Verwaltungssitz, Gerichtliche
    Zuständigkeit" heisst es in Ziff. 2.2 der Treuhanderklärung:

    „Verwaltungssitz dieses Trusts ist im Fürstentum Liechtenstein und die
    Rechte aller Parteien sowie die Auslegung und Wirkung der einzelnen

*Bestimmungen unterliegen der ausschliesslichen Gerichtsbarkeit des Fürstentum Liechtensteins und werden nur nach dem Recht des Fürstentum Liechtensteins ausgelegt."*

Die Ziff. 10.4.1 lautet:

*„Der Protektor oder wenn er verstorben ist (oder es sich dabei um eine Gesellschaft handelt, die aufgelöst wird) oder wenn er nicht in der Lage oder bereit ist zu handeln."*

Die Ziff. 10.5 lautet:

*„Die Person, die zur Ernennung neuer Treuhänder nach Unterpunkt 10.4.1 und 10.4.2 berechtigt ist, kann in derselben Reihenfolge, wie oben beschrieben, eine oder mehrere Personen zu weiteren Treuhändern ernennen bis die maximal zulässige Anzahl erreicht ist."*

Die Ziff. 14.2 lautet:

*„Der erste Protektor ist Ashot Yegiazaryan."*

2.2 Im Exekutionsverfahren zu 08 EX.2016.839 liess Vitaly Smagin im Zuge der Vollstreckung des Schiedsurteiles vom 11.11.2014 vor dem London Court of International Arbitration die Begünstigtenrechte des Ashot Yegiazaryan am Alpha Trust pfänden. Die Exekution wurde mit diesem Beschluss bewilligt und er wurde auch letztinstanzlich vom Staatsgerichtshof zu StGH 2017/27 vom 26.03.2018 bestätigt. (Beilage Y)

Im Zuge der weiteren Vollstreckung des Schiedsurteils zu 08 EX.2016.5802 liess Vitaly Smagin die Gesamtrechte des Ashot Yegiazaryan als Treugeber, Protektor und Begünstigter am Alpha Trust pfänden. Es wurden konkret die Gesamtrechte mit Beschluss des Fürstlichen Landgerichts vom 21.11.2016 zu 08 EX.2016.5802-3 gepfändet. Dieser Beschluss

ist in Rechtskraft erwachsen und wurde letztinstanzlich vom Staatsgerichtshof mit Urteil vom 29.10.2019 zu StGH 2018/111 bestätigt. (Beilagen 1, Q und V)

Die Verwertung der Gesamtrechte wurde mit Beschluss des Fürstlichen Landgerichts vom 02.03.2022 zu 08 EX.2016.5802-109 bewilligt, konkret durch Ermächtigung der Ausübung dieser Rechte durch Vitaly Smagin. Der Beschluss war sofort vollstreckbar. Es wurde zwar aufschiebende Wirkung beantragt, aber die dazu nötige Kaution nie hinterlegt. Die aufschiebende Wirkung wurde nicht vom Beklagten geltend gemacht. Der Verwertungsbeschluss wurde vom Fürstlichen Obergericht mit Beschluss vom 15.09.2020 (08 EX.2016.5802-143), berichtigt mit Beschluss des Fürstlichen Obergerichts vom 15.10.2020 (08 EX.2016.5802-152), vollumfänglich bestätigt sowie auch letztlich vom Staatsgerichtshof zu StGH 2020/099. Dieser Beschluss ist damit in Rechtskraft erwachsen. (Beilagen R bis U, W)

2.3 Am 09.03.2020 wurden die Kläger von Vitaly Smagin zu Treuhändern bestellt und diese nahmen die Bestellung an. (Beilagen D und E)



■ Seite 31 ■

## Beschluss

Gemäss Beschluss des Fürstlichen Landgerichts vom 2. März 2020, Ordnungsnummer 109 im Verfahren 08 EX.2016.5802, wurde Herr Vitaly Ivanovich Smagin ermächtigt, bestimmte Rechte des Protektors des Alpha Trusts, liechtensteinische Registernummer FL-002.510.771-1 (der "Alpha Trust"), auszuüben. Das schliesst das Recht gemäss Punkt 14.05 der Treuurkunde in der Fassung vom 2.6.2015 ein, durch schriftliche Anweisung Treuhänder zu entlassen und zu ernennen, wie das im Spruch des Gerichtsbeschlusses Punkt 1.1 (a und b) ausdrücklich ausgeführt ist.

Auf dieser Basis und in Ausübung der Rechte des Protektors beschliesst Herr Vitaly Ivanovich Smagin hiermit und weist an wie folgt:

1. Die CTX Treuhand AG wird mit sofortiger Wirkung als Treuhänderin des Alpha Trusts abberufen.
2. Die Herren Mag. Rudolf Schächle und lic.iur. Raphael Näscher, beide Pflugstrasse 16, 9490 Vaduz, Liechtenstein, werden gemeinsam mit sofortiger Wirkung zu Treuändern des Alpha Trusts bestellt.

## Resolution

Mr. Vitaly Ivanovic Smagin has been authorized by order of the Princely High Court dated 2 March 2020, file piece number 109 in proceedings 08 EX.2016.5802, to exercise certain rights of the Protector of the Alpha Trust, Liechtenstein Register Number 002.510.771-1 (the "Alpha Trust"). This includes the right according to clause 14.05 of the Trust Deed in the version as of 2 June 2015 to dismiss and appoint trustees by written instruction, which has been explicitly set out in the court's order under point 1.1. (a and b).

On this basis an in order to exercise the rights of the Protector Mr. Vitaly Ivanovich Smagin herewith resolves and instructs:

1. CTX Treuhand AG is hereby dismissed as Trustee of the Alpha Trust with immediate effect.
2. Mag. Rudolf Schächle and lic.iur. Raphael Näscher, both Pflugstrasse 16, 9490 Vaduz, Liechtenstein, are jointly appointed as Trustees of the Alpha Trust with immediate effect.

Datum/date: 09.03.2020.

_(signature)_

(Unterschrift/signature Vitaly Ivanovich Smagin)

Unterschrift bezeugt durch / signature witnessed by:

Konstantine Kouzine, Baker McKenzie
(Name)                                Moscow

_(signature)_

(Unterschrift/signature)

(Beilage D)

Die Pfändung der Gesamtrechte war nach wie vor nicht aufgehoben.

2.4  Mit Instruments of Appointments of Additional Trustees vom 31.03.2020 und 16.04.2020 erklärte Ashot Yegiazaryan basierend auf Ziff. 10.4.1 und 10.5 der Treuhanderklärung die Beklagten zu Treuhänderinnen des Alpha Trusts:

DIESE ERNENNUNGSURKUNDE FÜR ZUSÄTZLICHE TREUHÄNDER wird erstellt am 31. Tag des März Zweitausendundzwanzig von der im ersten Teil des Anhangs hierzu genannten Partei, als Protektor, und von der im zweiten Teil des Anhangs hierzu genannten Partei, als zusätzliche Treuhänderin, einerseits und von einem trust settlement (Treuhänderschaft), erschaffen von der im dritten Teil des Anhangs hierzu genannten Partei, als ursprüngliche Treuhänderin, von welchem kurze Einzelheiten im vierten Teil des Anhangs hierzu dargelegt werden (nachfolgend „Treuhanderklärung" genannt) andererseits:

**IN ERWÄGUNG NACHSTEHENDER GRÜNDE**

(A) Vermöge der in Ziffer 10.4.1 und 10.5. der Treuhanderklärung enthaltenen Befugnisse, ist die Befugnis, eine oder mehrere Person(en) als zusätzliche Treuhänder(innen) bis zur gemäss Ziffer 10.1 der Treuhanderklärung erlaubten Obergrenze zu bestellen, dem Protektor vorbehalten.

(B) Der Protektor wünscht, diese Befugnisse der vorgenannten Bestimmungen auszuüben.

(C) Diese Erklärung stellt einen Zusatz zur Treuhanderklärung dar.

(D) Sofern in dieser Erklärung nichts anderes bestimmt wird oder der Inhalt dieser Erklärung nichts anderes erfordert, soll allen Begriffen, Phrasen und Ausdrücken in dieser Erklärung jene Bedeutung zukommen, welche ihnen in der Treuhanderklärung zugeschrieben wurde.

**DAHER BESCHLIESST NUN MIT DIESER ERKLÄRUNG** der Protektor in Ausübung der Befugnisse, welche dem Protektor durch Ziffer 10.4.1 und 10.5. der Treuhanderklärung verliehen wurden, dass die folgende Person zusätzlich zur ursprünglichen Treuhänderin mit denselben Befugnissen wie die ursprüngliche Treuhänderin und mit Wirkung zum heutigen Datum ernannt wird:

**NATALIA DOZORTSEVA**, geboren am 16. Mai, 1969, französische Aufenthaltserlaubnis N JKTSOF4U1, wohnhaft in 9 rue Ouest, saint-Paul-de-Vence, Frankreich (die „zusätzliche Treuhänderin").

Der oben erwähnte Anhang:

Teil Eins:

Ashot Egiazaryan
910 North Crescent Drive
Beverly Hills
90210 California
Vereinigte Staaten von Amerika

Teil Zwei:

Natalia Dozortseva
9 rue des Remparts Ouest
Saint-Paul-de-Vence
France

Teil Drei:

CTX Treuhand AG
c/o Dr. iur. Thomas Wilhelm
Lova.Center
9490 Vaduz
Fürstentum Liechtenstein

Teil Vier:

Der Trust (die Treuhänderschaft) mit dem Namen "ALPHA TRUST", eingetragen ind liechtensteinische Handelsregister unter der Nummer FL-0002,510,771-1

ZU UNRUKND DESSEN wurde diese Urkunde am ganz oben bezeichneten Datum unterzeichnet:

Der Protektor:
**ASHOT EGIAZARYAN**

*[Unterschrift]*

_____

ERNENNUNG BESTÄTIGT UND ANGENOMMEN:

Der zusätzliche Treuhänder:
**MURIELLE JOUNIAUX**

*[Unterschrift]*

_____

DIESE ERNENNUNGSURKUNDE FÜR ZUSÄTZLICHE TREUHÄNDER wird erstellt am 16. Tag
des Aprils Zweitausendundzwanzig von der im ersten Teil des Anhangs hierzu genannten Partei, als
Protektor, und von der im zweiten Teil des Anhangs hierzu genannten Partei, als zusätzliche
Treuhänderin, einerseits und von einem trust settlement (Treuhänderschaft), erschaffen von der im
dritten Teil des Anhangs hierzu genannten Partei, als ursprüngliche Treuhänderin, von welchem kurze
Einzelheiten im vierten Teil des Anhangs hierzu dargelegt werden (nachfolgend „Treuhanderklärung"
genannt) andererseits:

## IN ERWÄGUNG NACHSTEHENDER GRÜNDE

(A) Vermöge der in Ziffer 10.4.1 und 10.5. der Treuhanderklärung enthaltenen Befugnisse, ist die
Befugnis, eine oder mehrere Person(en) als zusätzliche Treuhänder(innen) bis zur gemäss Ziffer
10.1 der Treuhanderklärung erlaubten Obergrenze zu bestellen, dem Protektor vorbehalten.

(B) Der Protektor wünscht, diese Befugnisse der vorgenannten Bestimmungen auszuüben.

(C) Diese Erklärung stellt einen Zusatz zur Treuhanderklärung dar.

(D) Sofern in dieser Erklärung nichts anderes bestimmt wird oder der Inhalt dieser Erklärung nichts
anderes erfordert, soll allen Begriffen, Phrasen und Ausdrücken in dieser Erklärung jene
Bedeutung zukommen, welche ihnen in der Treuhanderklärung zugeschrieben wurde.

DAHER BESCHLIESST NUN MIT DIESER ERKLÄRUNG der Protektor in Ausübung der
Befugnisse, welche dem Protektor durch Ziffer 10.4.1 und 10.5. der Treuhanderklärung verliehen
wurden, dass die folgende Person zusätzlich zur ursprünglichen Treuhänderin mit denselben
Befugnissen wie die ursprüngliche Treuhänderin und mit Wirkung zum heutigen Datum ernannt wird:

MURIELLE JOUNIAUX, geboren am 04. März 1987, französischer Personalausweis N
070706204753, wohnhaft in 108 avenue St Labert, Nizza, Frankreich (die „zusätzliche Treuhänderin").

| Teil Eins: | Ashot Egiazaryan |
| | 910 North Crescent Drive |
| | Beverly Hills |
| | 90210 California |
| | Vereinigte Staaten von Amerika |

| Teil Zwei: | Natalia Dozortseva |
| | 9 rue des Remparts Ouest |
| | Saint-Paul-de-Vence |
| | France |

| Teil Drei: | CTX Treuhand AG |
| | c/o Dr. iur. Thomas Wilhelm |
| | Lova,Center |
| | 9490 Vaduz |
| | Fürstentum Liechtenstein |

| Teil Vier: | Der Trust (die Treuhänderschaft) mit dem |
| | Namen "ALPHA TRUST", eingetragen ind |
| | liechtensteinische Handelsregister unter der |
| | Nummer FL-0002.510.771-1 |

ZU UNRUKND DESSEN wurde diese Urkunde am ganz oben bezeichneten Datum unterzeichnet:

Der Protektor:
**ASHOT EGIAZARYAN**

*[Unterschrift]*

_____

ERNENNUNG BESTÄTIGT UND ANGENOMMEN:

Der zusätzliche Treuhänder:
**MURIELLE JOUNIAUX**

*[Unterschrift]*

_____

(Beilage C)

2.5 Mit Schreiben vom 09.04.2020 beantragte die Erstbeklagte, vertreten durch die BWB Rechtsanwälte AG, ihre Eintragung als zusätzliche Treuhänderin des Alpha Trust im Liechtensteinischen Handelsregister, dies gestützt auf die Treuhanderklärung und das Instrument of Appointments of Additional Trustees of Alpha Trust. Die Eintragung der Erstbeklagten als Treuhänderin des Alpha Trust im Liechtensteinischen Handelsregister erfolgte am 23.04.2020. Nachdem das Amt Kenntnis der Exekutionsbewilligung des Fürstlichen Landgerichts vom 21.11.2016 zu 08 EX.2016.5802-3 erlangte und damit davon, dass die den Protektor Ashot Yegiazaryan gegenüber der CTX Treuhand AG zustehenden Gesamtrechte, wie insbesondere auch das Recht zur Bestellung und Abberufung von Treuhändern des Alpha Trusts, gepfändet sind und an Ashot Yegiazaryan das Gebot erlassen wurde, sich jeder Verfügung über u. a. das Recht zur Bestellung und Abberufung von Treuhändern des Alpha Trust zu enthalten habe, wurde die Eintragung der Erstbeklagten als Treuhänderin des Alpha Trust vom Amt wieder berichtigt bzw. rückgängig gemacht. Eine hiergegen von der Erstbeklagten erhobene Beschwerde wurde mit Beschluss der VBK vom 15.12.2020 für zurückgenommen erklärt.
(Beilagen F bis H)

2.6 Im beim Fürstlichen Landgericht anhängigen Prozess zwischen Vitaly Smagin und dem Alpha Trust zur Aktenzahl 04 CG.2019.5 (vormals 04 CG.2016.115) wurde von Seiten der Beklagten der Parteibeitritt als streitgenössische Nebenintervenientinnen erklärt. Auch in jenem Prozess bringen diese vor, dass sie als (Mit-) Treuhänderinnen des Alpha Trust mit Beschluss des Ashot Yegiazaryan vom 31.03.2020 bzw. 16.04.2020 bestellt worden seien.
(Beilage a, unstrittig)

2.7 Die Kläger sind ihren Meldepflichten als Treuhänder, auch gegenüber der FIU, nachgekommen.

Die Kläger haben überdies keine Kenntnis von weiteren Treuhändern bzw. Bestellungsakten, mit Ausnahme jener betreffend die Beklagten.

(PV)

2.8 Die Kläger sind im Liechtensteinischen Handelsregister unter der Registernummer FL-0002.510.771 bei der unter dem Namen «Alpha Trust» eingetragenen liechtensteinischen Treuhänderschaft die eingetragenen Treuhänder. Sie halten als Treuhänder des Alpha Trust 100%-Anteile an der Savannah Advisors AG, einer in der Föderation St. Kitts und Nevis domizilierten Gesellschaft, die durch Silvio Vogt und die JGT Treuunternehmen reg., Vaduz, vertreten wird. Die Aktien sind in Liechtenstein belegen.
(Beilagen A und X)

2.9 Die Beklagten berufen sich auf ihre Bestellung als Treuhänderinnen und als Folge davon wurde in Monaco von der Savannah Advisors AG, der 100%igen Tochtergesellschaft der Alpha Trust, eine Art Summarverfahren gegen die CMB Monaco mit dem Begehren auf Herausgabe der Gelder und Übertragung auf ein Bankkonto in Vaduz lautend ebenfalls auf die Savannah Advisors AG eingeleitet. Da die CMB Monaco Widerklage auf Hinterlegung der Gelder erhob, wies das Gericht in Monaco mit Beschluss über eine einstweilige Verfügung die Begehren der Savannah Advisors AG ab und gab der Widerklage auf Hinterlegung statt, womit die Vermögenswerte der Savannah Advisors AG und damit das Trustvermögen des Alpha Trust nunmehr bei der CMB Monaco aufgrund dieser gerichtlichen Entscheidung blockiert sind.

## 3. Zur Beweiswürdigung:

3.1. Nach § 272 Abs. 1 ZPO hat das Gericht unter sorgfältiger Berücksichtigung der Ergebnisse der gesamten Verhandlung und Beweisführung nach freier Überzeugung zu beurteilen, ob eine tatsächliche Angabe für wahr zu halten ist oder nicht. Das Gesetz schreibt dem Richter also die Wertung der Ergebnisse des Beweisverfahrens nicht vor, sondern überlässt sie seiner persönlichen Überzeugung. Vom Richter wird die Überzeugung verlangt, hinsichtlich einer tatsächlichen Angabe sei ein solcher

Wahrscheinlichkeitsgrad erreicht, der es unter Berücksichtigung seiner Lebenserfahrung, des von ihm erworbenen Spezialwissens und des durchschnittlichen Erfahrungs- und Wissensschatzes verständiger Menschen unseres Lebenskreises rechtfertig, als Richter die fragliche Tatsache für wahr zu halten (vgl. Rechberger in Fasching/Konecny III, §272 Rz 4 und 5 mwN). Freie Beweiswürdigung bedeutet aber nicht freies Ermessen, weshalb § 272 Abs. 3 ZPO das Gericht verpflichtet, in seiner Urteilsbegründung auch eine freie Beweiswürdigung vorzunehmen.

Ob eine Tatsache als erwiesen zu gelten hat oder nicht, ist eine Frage der Beweiswürdigung. Das Regelbeweismass der ZPO ist die hohe und nicht die an Sicherheit grenzende Wahrscheinlichkeit (RIS-Justiz RS011070; Rechberger in Fasching/Konecny vor § 266 ZPO RZ 11, 13; 7Ob 210/17h; 8Ob 18/18g, u.v.a.m.). Ob die tatsächlichen Angaben einer Partei für wahr oder falsch zu halten sind, hat der Richter nach bestem Wissen und Gewissen aufgrund seiner Lebenserfahrung und Menschenkenntnis zu beurteilen, wobei die Ergebnisse des gesamten Verfahrens, also alle Beweisaufnahmen sowie das gesamt Vorbringen der Parteien, deren Verhalten während des Verfahrens, also alle Beweisaufnahmen sowie das gesamte Vorbringen der Parteien, deren Verhalten während des Verfahrens sowie der von ihnen vermittelte persönliche Eindruck – soweit dies mögliche ist – in diese Würdigung einfliessen sollen. Es hängt sowohl von den objektiven Umständen des Anlassfalls als auch von der subjektiven Einschätzung des Richters ab, wann er diese „hohe" Wahrscheinlichkeit als gegeben ansieht (vgl. Fasching/Konecny von § 266 ZPO, Rz 10).

Dies vorausgeschickt gilt Folgendes:

Der festgestellte Sachverhalt ergibt sich primär und unmittelbar auf die im Anschluss an die einzelnen Feststellungen in Klammern jeweils angeführten Beweismittel, die - sofern nicht nachstehend eine weitergehende Bescheinigungswürdigung erfolgt oder Negativ- feststellungen zu treffen waren - unwidersprochen blieben und dem

Gericht völlig unbedenklich erscheinen. Sofern Negativfeststellungen getroffen wurden oder widersprüchliche Bescheinigungsergebnisse vorliegen, liegt die folgende Würdigung den Bescheinigungsmitteln zugrunde:

3.2. Die Feststellung, dass die Pfändung der Gesamtrechte auch zum Zeitpunkt der Bestellung der Kläger zu Treuhändern durch Vitaly Smagin nach wie vor nicht aufgehoben war, gründet darauf, dass die entsprechenden erwähnten Gerichtsentscheide, insbesondere die Beschlüsse des Fürstlichen Landgerichts vom 02.03.2020 zu 08 EX.2016.5802-109 und vom 21.11.2016 zu 08 EX.2016.5802-3, nach wie vor rechtskräftig waren. Unstrittigerweise machen die Beklagten auch keine Aufhebung geltend.

Die Tatsache, dass die CTX Treuhand AG den Alpha Trust fiduziarisch für Ashot Yegiazaryan durch die Treuhanderklärung gründete, basiert auf der entsprechenden Treuhanderklärung und ist im Übrigen auch unstrittig sowie auch der gesamte Sachverhalt zum Bestellungsvorgang zwischen den Parteien unstrittig ist.

3.3. Basierend auf der glaubwürdigen Aussage des Erstklägers kamen die Kläger ihren Meldepflichten als Treuhänder, insbesondere auch gegenüber der FIU, nach. Es wurde von der Gegenpartei kein entsprechender Gegenbeweis erbracht. Dasselbe gilt in Bezug auf die Kenntnis der Kläger betreffend weitere Treuhänder bzw. Bestellungsakten, mit Ausnahme derjenigen der Beklagten.

**Rechtliche Beurteilung**

4.1 Zur Unzuständigkeitseinrede:

Der Nebenintervenient und die Zweitbeklagte vermeinen, das Fürstliche Landgericht sei unzuständig, weil die Gerichtsstandsklausel in Ziff. 2.2 der Treuhandurkunde des Alpha Trust hier nicht greife, weil diese nur *Parteien*

(des Alpha Trust) erfassen würden. Die Beklagten seien keine Parteien des Alpha Trust, weil die Kläger ihre Treuhänderstellung bestreiten würden.

Der Wortlaut der relevanten Klausel in der Treuhandurkunde unter Ziff. 2.2 lautet:

*«(...) Die Rechte aller Parteien sowie die Auslegung und Wirkung der einzelnen Bestimmungen unterliegen der ausschliesslichen Gerichtsbarkeit des Fürstentum Liechtensteins und werden nur nach dem Bereich des Fürstentum Liechtensteins ausgelegt.»*

Die Bestellungsbeschlüsse des Nebenintervenienten basieren gerade auf der Treuhandurkunde, zumal in den entsprechenden Instruments of Appointments of Additional Trustees vom 31.03.2020 und 16.04.2020 gerade auf Bestimmungen in der Treuhandurkunde Bezug genommen wird, und zwar auf Ziff. 10.4.1 und 10.5. Es gilt vorliegend gerade die Wirkung dieser Bestellungsbeschlüsse zu beurteilen. Gerade aber die Auslegung und Wirkung der Bestimmungen des Treuhandvertrages unterliegen der liechtensteinischen Gerichtsbarkeit entsprechend Ziff. 2.2 der Treuhandurkunde.

Unstrittig ist, dass die CTX Treuhand AG nicht mehr Treuhänderin ist, weshalb es einen Rechtsnachfolger geben muss. Der Sachverhalt betreffend den Bestellungsvorgang ist zwischen den Parteien unstrittig, genauso wie, dass Ashot Yegiazaryan die CTX Treuhand AG mit der Errichtung des Alpha Trust beauftragt gehabt hatte und der Alpha Trust durch Erklärung der CTX Treuhand AG im Auftrag des Nebenintervenienten errichtet wurde. Klar ist auch, dass der Nebenintervenient wirtschaftlicher Gründer blieb. Bei einer Declaration of Trust (Treuhanderklärung) handelt es sich um eine einseitige Errichtung des Trust Instruments durch die Trustees mit entsprechenden Dokumenten im Innenverhältnis. Wenn die CTX Treuhand AG den Trust fiduziarisch für Ashot Yegiazaryan mit der Treuhandurkunde errichtet hatte, war dies zulässig

und ist an der Errichtung des Trusts kein Mangel ersichtlich bzw. keine Nichtigkeit.

Wie die Kläger richtig vermeinen, ist es auch keine Frage der Gerichtsstandsvereinbarung, ob die zugrundeliegende Treuhandvereinbarung nichtig ist oder nicht, zumal die Gerichtsstandsklausel nicht das Schicksal der materiellrechtlichen Hauptvereinbarung teilt und unabhängig davon bestehen bleibt, ob die Hauptvereinbarung bestritten, ihr Bestand verneint oder die Auflösung begehrt wird. Jedenfalls ist die Errichtung des vorliegenden Alpha Trust durch die Declaration of Trust (Treuhanderklärung) zu bejahen.

Im Übrigen ist darauf hinzuweisen, dass sich die Beklagten selbst als «Parteien» und «Treuhänderinnen» bezeichnen, womit der formelle und materielle Parteibegriff der Ziff. 2.2 erfüllt ist (vgl. bspw. ON 98, Seite 3, vierter Absatz, und Seite 6, zweiter Satz; Antrag Auferlegung aktorische Kaution vom 28.11.2022, Seite 2, erster Absatz). Die Zweitbeklagte vermeint selbst, Partei zu sein und möchte auch Partei des Alpha Trusts sein (vgl. ON 98, Klagebeantwortung, sowie ON 115). Sie stützt ihre Rechtstellung explizit auf die Klauseln der Treuhandurkunde (Beilage B, etwa Ziff. 10.4.1 und 10.5). In ON 115 (Aufgetragene Äusserung vom 31.01.2023) gesteht sie selbst ein, dass die Bestellungsbeschlüsse auf der Treuhandurkunde basieren. Erst, als der Nebenintervenient vorbrachte und bestritt, dass die Beklagten als Parteien von der Treuhandurkunde erfasst seien, führte die Zweitbeklagte in ON 126 aus, dass nicht ihr bisheriges Vorbringen, sondern jenes des Nebenintervenienten analog für sie auch gelten würde.

Nunmehr fallen aber alle Rechte der Parteien unter die Gerichtstandsklausel, auch betreffend ihre Auslegung und Wirkung. Da es gerade um die Frage geht, ob die Bestellungsbeschlüsse des Nebenintervenienten, die gerade auf der Treuhandurkunde basieren, gültig sind, ist entsprechend der Gerichtstandsklausel Ziff. 2.2 der Treuhandurkunde

liechtensteinisches Recht nicht nur anwendbar, sondern ist auch das Liechtensteinische Landgericht zuständig.

4.2 Das Fürstliche Landgericht ist aber nicht nur basierend auf Ziff. 2.2 der Treuhandurkunde zuständig, sondern auch aufgrund der Tatsache, dass vorliegend der Gerichtsstand des Vermögens nach § 50 JN greift. Der Alpha Trust ist in das Handelsregister eingetragen worden Er verfügt im Inland über Vermögen in Form von 100%igen Aktienanteilen an der liechtensteinischen Tochtergesellschaft, der Savannah Advisors AG. Die Aktien sind in Liechtenstein belegen. Mit ihrer Klage begehren die Kläger die Feststellung, dass sie die einzigen Treuhänder des Alpha Trusts sind und dies beinhaltet auch die Klärung der Eigentumsverhältnisse an der Savannah Advisors AG, zumal die rechtswirksamen Treuhänder über dieses Treugut verfügen dürften. Sollten die Beklagten mit ihrer Behauptung durchdringen, sind sie die Treuhänderinnen des Alpha Trusts, könnten über das Treugut verfügen und in jenem Falle würde ihnen ein Anspruch auf Übertragung der Aktien an der Savannah Advisors AG zukommen. Diese potentielle Forderung der Beklagten stellt Vermögen iSd § 50 Abs. 1 erster Fall JN dar.

Doch auch § 50 Abs. 1 zweiter Fall JN ist vorliegend gegeben, zumal der Alpha Trust in Liechtenstein Alleinaktionärin an der in Liechtenstein domizilierten Savannah Advisors AG ist, deren Aktien sich im Inland befinden und sich damit das Rechtsverhältnis jedenfalls im Inland befindet.

4.3 Vitaly Smagin liess die Begünstigtenrechte des Ashot Yegiazaryan im Alpha Trust pfänden, was vom Staatsgerichtshof bestätigt wurde (vgl. Verfahren zu 08 EX.2016.839). Im Zuge der weiteren Vollstreckung des Schiedsurteils liess Vitaly Smagin die Gesamtrechte des Ashot Yegiazaryan als Treugeber, Protektor und Begünstigter am Alpha Trust pfänden (vgl. Verfahren zu 08 EX.2016.5802); auch dies wurde vom Staatsgerichtshof bestätigt. Diese Pfändung der Gesamtrechte wurde mit Beschluss des Fürstlichen Landgerichts vom 02.03.2020 bewilligt und war

sofort vollstreckbar. Damit waren die Gesamtrechte des Ashot Yegiazaryan als Begünstigter, Protektor und Treugeber des Alpha Trusts zum Zeitpunkt, als Ashot Yegiazaryan am 31.03. und 16.04.2020 die Beklagten als Treuhänderinnen für den Alpha Trust bestimmte, bereits längst – basierend auf dem erwähnten EX-Verfahren zu 08 EX.2016.5802 – rechtskräftig gepfändet und wurden diese gepfändeten Rechte mit dem erwähnten Beschluss vom 02.03.2020 zu 08 EX.2016.5802-109 zwecks Verwertung an Vitaly Smagin überwiesen, der sodann die Kläger zu Treuhändern bestellte. Damit ist das Instrument of Appointments of Additional Trustees of the Alpha Trust vom 31.03. und 16.04.2020 (Beilage C) nichtig und unwirksam.

Die Vollstreckung geschieht jeweils zuerst durch die Pfändung und dann durch Verwertung. Die Gesamtrechte wurden mit Beschluss des Fürstlichen Landgerichts vom 21.11.2016 zu 08 EX.2016.5802-3 gepfändet und dieser Beschluss erwuchs in Rechtskraft. Die *Verwertung* der Gesamtrechte wurde mit Beschluss des Fürstlichen Landgerichts vom 02.03.2020 zu 08 EX.2016.5802-109 bewilligt, konkret durch die Ermächtigung der Ausübung dieser Rechte durch Vitaly Smagin. Dieser Beschluss war sofort vollstreckbar. Die aufschiebende Wirkung wurde auch nicht von Seiten der Beklagten geltend gemacht. Am 09.03.2020 übte Vitaly Smagin die ihm überwiesenen Rechte aus, indem er die CTX Treuhand AG mit sofortiger Wirkung als Treuhänderin des Alpha Trusts abberief und die Kläger gemeinsam mit sofortiger Wirkung zu Treuhändern des Alpha Trusts bestellte. Die Kläger haben diese Bestellung zu Treuhändern am gleichen Tag angenommen. Zu jener Zeit war die Pfändung der Gesamtrechte nach wie vor nicht aufgehoben. Die Beklagten haben auch keine Aufhebung geltend gemacht.

Aus all diesen Gründen war der Bestellungsvorgang der Kläger zu den Treuhändern des Alpha Trust zweifellos korrekt und nicht zu beanstanden. Vitaly Smagin wurde vom Fürstlichen Landgericht zur Ausübung der Rechte ermächtigt und hat von diesem Recht mit Beschluss vom 09.03.2020 Gebrauch gemacht.

■ Seite 44 ■

Die Formulierung im Verwertungsbeschluss (08 EX.2016.5802-109) nimmt explizit Bezug auf die alten oder neuen Treuhänder («von der gegenwärtigen oder neu bestellten Treuhänderin des Alpha Trust [...]». Wenn hier von «Treuhänderin» die Rede ist, bedeutet dies keine Einschränkung der Rechte auf die CTX Treuhand AG, sondern ist das auf die Natur des Trusts zurückzuführen, der selbst keine Rechtspersönlichkeit zukommt, sondern eine Rechtsbeziehung zwischen Personen ist.

Wenn die Zweitbeklagte den zeitlichen Ablauf moniert, und zwar indem sie ausführt, dass die Abberufung der CTX Treuhand AG zeitlich vor der Neubestellung der Kläger stattgefunden habe, weil die Abberufung im Beschluss des Vitaly Smagin vom 09.03.2020 unter Ziff. 1 geschah und die Neubestellung unter Ziff. 2 erfolgte, so hat sie sich den Vorwurf des überspitzten Formalismus entgegenzuhalten. Eine Reihenfolge lässt sich freilich nicht aus einem Beschluss herauslesen. Die Verwertung hat entsprechend der Exekutionsordnung lediglich dadurch zu geschehen, dass die betreibende Partei ermächtigt wird, die gepfändeten Rechte im Namen der verpflichteten Partei geltend zu machen und die erforderlichen Rechtshandlungen namens des Verpflichteten vorzunehmen. Das Gericht hat dabei keine Aufzählung einzelner in Betracht kommender Rechtshandlungen vorzunehmen und schon gar keine Reihenfolge der auszuübenden Rechtshandlungen anzuordnen. Im Beschluss zu 08 EX.2016.5802-109 hat das Fürstliche Landgericht explizit erklärt, dass das Recht der Bestellung und Abberufung der Treuhänder zusteht, ohne dass irgendeine Voraussetzung vorliegen müsse. Die Pfändung der Gesamtrechte von Ashot Yegiazaryan als Treugeber, Protektor und Begünstigter des Alpha Trust sowie deren Überweisung zur Verwertung bleiben damit auch nach Abberufung der CTX Treuhand AG aufrecht und haben nach Bestellung der neuen Treuhänder weiterhin Bestand, und zwar solange, bis das Exekutionsverfahren beendet wird. Im Übrigen ist auf Art. 911 Abs. 4 hinzuweisen, woraus folgt, dass bei Abberufung des alten und Bestellung des neuen Treuhänders dieser im Wege der Gesamtrechtsnachfolge in die Rechte und Pflichten des Treuhandverhältnisses eintrifft.

Vorliegend trifft dies auf die Kläger zu. Die Kläger wurden auch bereits vom Amt für Justiz als neue Treuhänder in das Handelsregister eingetragen.

Aus all diesen Gründen sind die Kläger als die einzigen Treuhänder des Alpha Trust anzusehen.

4.4 Nach § 234 Abs. 1 ZPO kann auf Feststellung des Bestehens oder Nichtbestehens eines Rechtsverhältnisses oder Rechts geklagt werden, wenn der Kläger ein rechtliches Interesse daran hat, dass jenes Rechtsverhältnis oder Recht durch eine gerichtliche Entscheidung alsbald festgestellt werde. Die Zulässigkeit einer Feststellungsklage nach § 234 ZPO setzt demnach einerseits die Feststellungsfähigkeit des Rechtsverhältnisses und andererseits ein rechtliches Interesse an der alsbaldigen Feststellung voraus.

Lediglich der Vollständigkeit halber wird darauf hingewiesen, dass die Kläger ein rechtliches Interesse an der Feststellung haben, dass sie die einzigen Treuhänder des Alpha Trusts sind, zumal die Beklagten gerade ihre Stellung als Treuhänder basierend auf den Instruments of Appointments of Additional Trustees vom 31.03. und 16.04.2020 in Zweifel ziehen, was insbesondere auch die im gegenständlichen Verfahren vorgebrachten Äusserungen der Zweitbeklagten zeigen. Weiters ist das immanente Interesse auch hinsichtlich des bisherigen Verfahrensablaufes basierend auf den vorliegenden Urkunden gegeben, wonach sich die Beklagten über eine liechtensteinische Rechtsvertretung basierend auf den erwähnten Instruments of Appointments of Additional Trustees vom 31.03. und 16.04.2020 ins Liechtensteinische Handelsregister als Treuhänder haben eintragen lassen und dieser Eintrag sodann nach Vorliegen der hier relevanten Beschlüsse aus dem Exekutionsverfahren berichtigt zu werden hatten.

Weiters ist bereits auch aufgrund des Verhaltens der Beklagten in Monaco, wo diese sich auf ihre Bestellung als Treuhänderinnen ebenfalls



Fürstliches Landgericht
Vaduz, 13.04.2023

Die Landrichterin

Dr. Jasmin Walch, LL.M.

Die Schriftführerin

Kimberly Kriss

Für die Richtigkeit der Ausfertigung

Kimberly Kriss

# Rechtsmittelbelehrung

Frist vorgemerkt
am: 15.05.23 uu

Gegen dieses Urteil ist binnen der unerstreckbaren Frist von vier Wochen ab Zustellung das Rechtsmittel der Berufung an das Fürstliche Obergericht in Vaduz zulässig. Die Berufung ist schriftlich in zweifacher Ausfertigung beim Fürstlichen Landgericht in Vaduz einzubringen, sie kann aber auch mündlich zu Protokoll erklärt werden. Sie hat die Bezeichnung des Urteils, gegen welches Berufung erhoben wird, eine bestimmte Erklärung, inwieweit das Urteil angefochten wird, die ebenso bestimmte kurze Bezeichnung der Gründe der Anfechtung (Berufungsgründe), das tatsächliche Vorbringen und die Beweismittel, durch welche die Wahrheit der Berufungsgründe erwiesen werden kann, und die Erklärung, ob die Aufhebung oder Abänderung des Urteils und gegebenenfalls welche Abänderung beantragt werde (Berufungsantrag) zu enthalten. Im Rahmen der Berufungsanträge und Berufungsgründe können neue Angriffs- und Verteidigungsmittel, welche in erster Instanz nicht vorgebracht worden sind, insbesondere neue Tatsachen und Beweise, vorgebracht werden. Wenn die in der Klage geforderte Geldsumme oder der Wert des Streitgegenstandes den Betrag von CHF 5'000,-- nicht übersteigt oder der Kläger erklärt, statt des in der Klage geforderten Gegenstandes einen CHF 5'000,-- nicht übersteigenden Geldbetrag annehmen zu wollen (Bagatellsache), kann das erstrichterliche Urteil nur wegen der in § 472 der Zivilprozessordnung aufgezählten Gründe mittels Berufung angefochten werden.

Die im Urteil enthaltene Entscheidung über den Kostenpunkt kann ohne gleichzeitige Anfechtung der in der Hauptsache ergangenen Entscheidung nur mittels Rekurs angefochten werden.

Frist vorgemerkt
am: 01.05.23 uu
(2. 5. 23)

Der Rekurs ist binnen der unerstreckbaren Frist von 14 Tagen ab Zustellung an das Fürstliche Obergericht in Vaduz zulässig. Der Rekurs kann beim Landgericht mündlich zu Protokoll erklärt werden oder ist schriftlich in zwei Exemplaren beim Landgericht einzubringen. Der Rekurs muss die bestimmte Erklärung, inwieweit der Beschluss angefochten wird, die ebenso bestimmte kurze Bezeichnung der Gründe der Anfechtung (Rekursgründe) und die Erklärung, ob die Aufhebung oder Abänderung und gegebenenfalls welche Abänderung des angefochtenen Beschlusses beantragt wird (Rekursantrag) enthalten. Wenn der Beschluss wegen der ihm zugrundeliegenden unrichtigen rechtlichen Beurteilung angefochten wird, ist im Rekurs ohne Weitläufigkeit darzulegen, aus welchen Gründen die rechtliche Beurteilung der Sache unrichtig erscheint. Im Übrigen sind das tatsächliche Vorbringen und die Beweismittel, durch welche die Wahrheit der Rekursgründe erwiesen werden kann, erschöpfend anzugeben.



Mit der Urschrift gleichlautend

Fürstliches Landgericht, Kanzlei
Anja Irma Gassner, Urkundsperson

Vaduz, 11. Mai 2023



**APOSTILLE**
( Convention de La Haye du 5 octobre 1961)

1. Land: Fürstentum Liechtenstein
   Diese öffentliche Urkunde
2. ist unterschrieben von Frau Anja Irma Gassner
3. in ihrer Eigenschaft als Beglaubigungsperson
4. sie ist versehen mit dem Siegel / Stempel der
   Liecht.Landgerichtskanzlei

   Bestätigt   11. Mai 2023

5. in 9490 Vaduz      6. am ...........................
7. durch Regierungskanzlei Vaduz
8. unter Nr. 23.03864

9. Siegel / Stempel      10. Unterschrift

Sabine Breuss
Verwaltungs-Angestellte



MMag. Dr. Sabine Hofer-Picout LL.M. MBL MBA
Allgemein
beeidete u. gerichtlich
zert. Dolmetscherin
f.d. engl. u. frz. Sprache
A-6020 Innsbruck